**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CROWN ASSETS, LLC, | ) | Case No. 20-21451 |
| | ) | |
| Debtor. | ) | Chapter 11 |
| | ) | |
| ———————————————— | ) | |
| | ) | |
| SAHIB ARORA; VINEET SINGH; | ) | Removed Case: |
| KING GROUP MGMT, LLC; | ) | |
| MAHARAJA INVESTMENTS, LLC; and | ) | Fulton County, Superior Court, |
| ZILLIONAIRE ASSETS, LLC, | ) | Case Number 2020CV339119 |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No.: |
| | ) | |
| CHARANJEEV SINGH; KARAN S. AHUJA; | ) | 20-02041-JRS |
| JARNAIL SINGH; JONIKA ARORA; | ) | |
| CROWN ASSETS, LLC; 2551 E PINETREE | ) | |
| BLVD MGMT LLC; 2551 EAST PINETREE | ) | |
| BLVD LLC; 4319 COVINGTON HWY LLC; | ) | |
| 140 W DYKES STREET LLC; 1604 E | ) | |
| OGLETHORPE BLVD LLC; KING ASSETS, | ) | |
| LLC; and 2505 S MAIN STREET, LLC, | ) | |
| | ) | |
| Respondents. | ) | |
| ———————————————— | ) | |

**RESPONDENTS CHARANJEEV SINGH, KARAN S. AHUJA, JARNAIL SINGH,
JONIKA ARORA, CROWN ASSETS, LLC, 2551 E PINETREE BLVD MGMT LLC, 4319
COVINGTON HWY, LLC, 140 W DYKES STREET LLC, 1604 E OGLETHORPE
BLVD, LLC, KING ASSETS, LLC, AND 2505 S MAIN STREET, LLC'S ANSWER AND
AFFIRMATIVE DEFENSES TO PETITIONERS' SAHIB ARORA, VINEET SINGH,
KING GROUP MGMT LLC, MAHARAJA INVESTMENTS, LLC, AND ZILLIONAIRE
ASSETS, LLC'S PETITION FOR RELIEF UNDER THE GEORGIA RACKETEER
INFLUENCED AND CORRUPT ORGANIZATIONS ACT, QUIET TITLE,
INJUNCTION, RESCISSION AND OTHER EQUITABLE RELIEF, DECLARATORY
JUDGMENT AND DAMAGES AND FIRST AMENDED AND RESTATED PETITION**

Respondents Charanjeev Singh ("**Charanjeev**"), Karan S. Ahuja ("**Ahuja**"), Jarnail Singh

("**Jarnail**"), Jonika Arora ("**Jonika**"), Crown Assets, LLC ("**Crown**" or the "**Debtor**"), 2551 E

Pinetree Blvd Mgmt LLC ("**Pinetree Management LLC**"), 4319 Covington Hwy, LLC ("**Covington LLC**"), 140 W Dykes Street LLC ("**Dykes LLC**"), 1604 E Oglethorpe Blvd, LLC ("**Oglethorpe LLC**"), King Assets, LLC ("**King Assets**"), and 2505 S Main Street, LLC ("**Main LLC**") (collectively, the "**Crown Respondents**"), file this their Answer and Affirmative Defenses to the Petitioners Shaib Arora ("**Arora**"), Vineet Singh ("**Vineet**"), King Group Mgmt LLC ("**King Group**"), Maharaja Investments, LLC ("**Maharaja**"), and Zillionaire Assets, LLC ("**Zillionaire**") (collectively, the "**Petitioners**")'s Petition for Relief Under the Georgia Racketeer Influenced and Corrupt Organizations Act, Quiet Title, Injunction, Rescission and Other Equitable Relief, Declaratory Judgment and Damages and First Amended and Restated Petition (collectively, the "**Petition**"), and respond to each numbered paragraph of the Petition as follows.[1]

## INTRODUCTION

1.      The Crown Respondents state that this paragraph contains a legal statement or conclusion to which a response is not required.  If a response is required, this paragraph is denied.

## THE PARTIES, JURISDICTION AND VENUE

### Petitioners

2.      The allegations contained in this paragraph are admitted, except that the use of the prefix "Dr." before Arora's name is denied.

3.      The allegations contained in this paragraph are admitted.

### Respondents

4.      The allegations contained in this paragraph are admitted.

---

[1] This answer is timely pursuant to Fed. R. Bankr. P. 9027(g), as it is made within seven (7) days following the filing of the notice of removal and the Crown Respondents' deadline to file an answer in the State Court prior to removal had not yet expired at the time of filing the notice of removal.

5.      The Crown Respondents admit sentences 1, 2, and 4 of this paragraph.  The Crown Respondents deny sentence 3 of this paragraph.

6.      The allegations contained in this paragraph are admitted.

7.      The Crown Respondents admit sentence 1 of this paragraph.  The Crown Respondents further admit that venue is appropriate in this Court as to 2551 East Pinetree Blvd, LLC ("**Pinetree LLC**").  The remaining allegations contained in this paragraph are denied.

8.      The Crown Respondents admit sentence 1 of this paragraph.  The Crown Respondents further admit that venue is appropriate in this Court as to Covington LLC.  The remaining allegations contained in this paragraph are denied.

9.      The Crown Respondents admit sentence 1 of this paragraph.  The Crown Respondents further admit that venue is appropriate in this Court as to Dykes LLC.  The remaining allegations contained in this paragraph are denied.

10.      The Crown Respondents admit sentence 1 of this paragraph.  The Crown Respondents further admit that venue is appropriate in this Court as to Oglethorpe LLC.  The remaining allegations contained in this paragraph are denied.

11.      The Crown Respondents admit sentence 1 of this paragraph.  The Crown Respondents further admit that venue is appropriate in this Court as to King Assets.  The remaining allegations contained in this paragraph are denied.

12.      The Crown Respondents admit sentence 1 of this paragraph.  The Crown Respondents further admit that venue is appropriate in this Court as to Main LLC.  The remaining allegations contained in this paragraph are denied.

## FACTUAL BACKGROUND

13.      The allegations contained in this paragraph are admitted.

14.    The Crown Respondents admit sentence 1 of this paragraph.    The Crown Respondents deny the statement in sentence 2 of this paragraph that Arora "in 2014 formed King Group."  The Crown Respondents are without sufficient information or knowledge to respond the remaining allegations contained in this paragraph, and therefore same are denied.  By way of further response, the Crown Respondents state that Arora did not return to the United States until the end of 2015.

15.    The allegations contained in this paragraph are denied.  By way of further response, there was no "gifting" of membership interests in King Group, as alleged by Petitioners; rather there was a capital contribution by each family member to King Group, which effectuated the purchase of real property on Davenport Road in Jackson County, Georgia.

16.    The allegations contained in this paragraph are denied.

17.    The allegations contained in this paragraph are denied.

18.    The Crown Respondents admit that Charanjeev came to the United States in 2018, that he obtained a Georgia real estate license, and that he is currently a licensed real estate salesperson with Realty First Atlanta LLC.  The remaining allegations contained in this paragraph are denied.  By way of further response, Charanjeev has been regularly traveling back and forth between India and the United States since 2013 and prior to 2013, since 2001, had visited the United States on a tourist visa on multiple occasions.

19.    The allegations contained in this paragraph are denied as stated.

20.    The Crown Respondents admit that Jarnail came to live in the United States in 2018 and that Jonika came to live in the United States in 2019.  The remaining allegations contained in this paragraph are denied.  By way of further response, Jarnail has been regularly traveling back and forth between India and the United States since 2013.  Since 2016, Jarnail has visited the

United States to buy properties at foreclosure sales, auctions, and other avenues.  Jarnail has been

primarily in the United States since 2018.

21.    The allegations contained in this paragraph are denied.

22.    The allegations contained in this paragraph are denied.

23.    The Crown Respondents are without sufficient information or knowledge to

respond to the allegations contained in this paragraph, and therefore same are denied.  By way of

further response, the Crown Respondents knew that Harsimran was engaged in January 2019.  The

date of the wedding was not decided until August or September 2019.

24.    The allegations contained in this paragraph are denied.

25.    The allegations contained in this paragraph are denied.

26.    The allegations contained in this paragraph are denied.

27.    The allegations contained in this paragraph are denied.

28.    The Crown Respondents deny sentence 1 of this paragraph.   The Crown

Respondents further deny and object to the use of the term "Coerced" throughout this paragraph.

The Crown Respondents admit that Arora and Vineet executed the documents referenced in this

paragraph.  The Crown Respondents further state that the documents referenced in this paragraph

speak for themselves, and that any allegations contained in this paragraph that are not consistent

with the plain language contained in such documents, are hereby denied.

29.    The Crown Respondents admit sentence 1 of this paragraph.   The remaining

allegations contained in this paragraph are denied.  By way of further response, Arora did not

complete the referenced paperwork on August 14, 2020; rather it was completed on August 15,

2020, which would have been the next day, or August 16, 2020, in India.

30.    The allegations contained in this paragraph are denied.

31.    The allegations contained in this paragraph are denied.

32.    The Crown Respondents state that the document referenced in this paragraph speaks for itself, and that any allegations contained in this paragraph that are not consistent with the plan language contained in such document, are hereby denied.  The remaining allegations contained in this paragraph are denied.

33.    The allegations contained in this paragraph are denied.

34.    The allegations contained in this paragraph are denied.

35.    The allegations contained in this paragraph are denied.

36.    The Crown Respondents are without sufficient information or knowledge to respond to the allegations contained in this paragraph, and therefore same are denied.

37.    The allegations contained in this paragraph are denied.

38.    The allegations contained in this paragraph are denied.

39.    The allegations contained in this paragraph are denied.

40.    The allegations contained in this paragraph are denied.

41.    The allegations contained in this paragraph are denied.

42.    The allegations contained in this paragraph are denied.

43.    The Crown Respondents admit that the sales of 5754 Attucks Boulevard and 5341 Snapfinger Drive occurred on or around November 27, 2019 and February 25, 2020, respectively. The remaining allegations contained in this paragraph are denied.

44.    The allegations contained in this paragraph are denied.

45.    The Crown Respondents admit that Arora participated in a 1031 "like-kind" exchange in connection with the sale of 5754 Attucks Boulevard.  The remaining allegations contained in this paragraph are denied.

46.     The Crown Respondents admit that Arora executed the document referenced in this paragraph.  The Crown Respondents further deny and object to the use of the term "Coerced" throughout this paragraph.  The Crown Respondents further state that the document referenced in this paragraph speaks for itself, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such document, are hereby denied.  The remaining allegations contained in this paragraph are hereby denied.

47.     The Crown Respondents admit that Arora executed the document referenced in this paragraph.  The Crown Respondents further state that the document referenced in this paragraph speaks for itself, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such document, are hereby denied.  The remaining allegations contained in this paragraph are hereby denied.

48.     The Crown Respondents state that the document referenced in this paragraph speaks for itself, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such document, are hereby denied.  The remaining allegations contained in this paragraph are hereby denied.

49.     The Crown Respondents admit that King Group purchased property under a 1031 "like-kind" exchange at 3180 Atlanta Highway, Clarke County, Georgia.  The Crown Respondents further admit that Zillionaire is owned 50% by King Group and 50% by Crown.  The Crown Respondents deny and object to the use of the term "Coerced" in this paragraph.  The remaining allegations contained in this paragraph are denied as stated.  The Crown Respondents further state that Zillionaire and Crown purchased the property at 90 Hunters Chase in McDonough, Georgia on or around April 2, 2020 and that Zillionaire and Crown hold title to said property as tenants in common.

50.     The Crown Respondents do not have sufficient information or knowledge to respond to sentences 1 and 2 of this paragraph, and therefore the same are denied.  The Crown Respondents deny and object to the use of the term "Coerced" in this paragraph.  The remaining allegations contained in this paragraph are denied.

51.     The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents further reference their response to paragraph 50 and incorporate by reference same into this response.  The remaining allegations contained in this paragraph are denied.

52.     The allegations contained in this paragraph are denied.

53.     The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents deny and object to the use of the term "fraudulent" throughout this paragraph.  The remaining allegations contained in this paragraph are denied.

54.     The Crown Respondents state that the lawsuit and related pleadings referenced in sentence 1 of this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language in the lawsuit and related pleadings referenced, are hereby denied.  The Crown Respondents do not have sufficient information or knowledge to respond to the allegation that Arora, Vineet, and Maharaja were served with process on August 3, 2020, and therefore same is denied.  The remaining allegations contained in this paragraph are denied.

8

55.     The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents deny and object to the use of the terms "Fraudulent" and "Coerced" throughout this paragraph. The remaining allegations contained in this paragraph are denied.

56.     The allegations contained in this paragraph are denied.

57.     The allegations contained in this paragraph are denied.

58.     The allegations contained in this paragraph are denied.

### COUNT I – CLAIMS UNDER THE
### GEORGIA RICO ACT

59.     The Crown Respondents re-state their responses to the preceding paragraphs of the Petition as if fully set forth verbatim herein.

60.     The allegations contained in this paragraph are denied.

61.     The allegations contained in this paragraph are denied.

62.     The allegations contained in this paragraph are denied.

63.     The allegations contained in this paragraph are denied.

64.     The allegations contained in this paragraph are denied.

### Injunction

65.     The allegations contained in this paragraph are denied.

### Divestment

66.     The allegations contained in this paragraph are denied.

### Treble Damages

67.     The allegations contained in this paragraph are denied.

## COUNT II – QUIET TITLE

68.    The Crown Respondents re-state their responses to the preceding paragraphs of the Petition as if fully set forth verbatim herein.

69.    The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.

70.    The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.

71.    The Crown Respondents do not have sufficient information or knowledge to respond to the allegations contained in this paragraph, and therefore same are denied.

72.    The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "Authentic" in this paragraph.

73.    The Crown Respondents object to and deny the use of the term "Authentic" in this paragraph.  The remaining allegations contained in this paragraph are admitted.

74.    The Crown Respondents object to and deny the use of the term "Authentic" in this paragraph.  The Crown Respondents are without sufficient information or knowledge to respond to the allegations contained in this paragraph, and therefore same are denied.

75.    The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied. The Crown Respondents

object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

76.     The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The remaining allegations contained in this paragraph are denied.

77.     The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "Fraudulent" in this paragraph.

78.     The allegations contained in this paragraph are denied.

79.     The Crown Respondents object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

80.     The Crown Respondents object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

81.     The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "conspirator" in this paragraph.  The remaining allegations contained in this paragraph are denied.

82.     The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents

object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

83.    The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

84.    The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

85.    The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

86.    The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the terms "Fraudulent" and "Authentic" in this paragraph.  The remaining allegations contained in this paragraph are denied.

87.     The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the terms "Fraudulent" and "Authentic" in this paragraph.  The remaining allegations contained in this paragraph are denied.

88.     The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the terms "Fraudulent" and "Coerced" in this paragraph.  The remaining allegations contained in this paragraph are denied.

89.     The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "False" in this paragraph.  The remaining allegations contained in this paragraph are denied.

90.     The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

91.     The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents

object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

92.     The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

93.     The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

94.     The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

95.     The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

96.     The allegations contained in this paragraph are denied.

97.     The allegations contained in this paragraph are denied.

98.     The allegations contained in this paragraph are denied.

99.     The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

100.    The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

101.    The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

102.    The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

103.    The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

104.    The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

105.    The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

106.    The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

107.    The allegations contained in this paragraph are denied.

108.    The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent

with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

109.    The allegations contained in this paragraph are denied.

110.    The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "False" in this paragraph.  The remaining allegations contained in this paragraph are denied.

**COUNT III – INJUNCTIVE RELIEF**

111.    The Crown Respondents re-state their responses to the preceding paragraphs of the Petition as if fully set forth verbatim herein.

112.    The Crown Respondents state that the documents referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such documents, are hereby denied.  The Crown Respondents object to and deny the use of the term "Fraudulent" in this paragraph.  The remaining allegations contained in this paragraph are denied.

113.    The allegations contained in this paragraph are denied.

114.    The allegations contained in this paragraph are denied.

115.    The allegations contained in this paragraph are denied.

116.    The allegations contained in this paragraph are denied.

117.    The allegations contained in this paragraph are denied.

118.    The allegations contained in this paragraph are denied.

119.    The allegations contained in this paragraph are denied.

120.    The allegations contained in this paragraph are denied.

121.    The allegations contained in this paragraph are denied.

122.    The allegations contained in this paragraph are denied.

123.    The allegations contained in this paragraph are denied.

124.    The allegations contained in this paragraph are denied.

125.    The allegations contained in this paragraph are denied.  By way of further response, the Petitioners and their counsel have admitted in the Petition and on the record at a hearing in State Court concerning the Crown Respondents' Emergency Motion to Cancel Lis Pendens that they do have an adequate remedy at law.  A true and correct copy of the unofficial transcript of said hearing in State Court is attached hereto as Exhibit A-1 and is incorporated herein by reference.

126.    The allegations contained in this paragraph are denied.

127.    The allegations contained in this paragraph are denied.

128.    The allegations contained in this paragraph are denied.

129.    The allegations contained in this paragraph are denied.

130.    The allegations contained in this paragraph are denied.

131.    The allegations contained in this paragraph are denied.

132.    The allegations contained in this paragraph are denied.

**COUNT IV – RESCISSION ON THE
GROUNDS OF DURESS**

133.    The Crown Respondents re-state their responses to the preceding paragraphs of the Petition as if fully set forth verbatim herein.

134.    The allegations contained in this paragraph are denied.

135.    The allegations contained in this paragraph are denied.

136.    The allegations contained in this paragraph are denied.

137.    The allegations contained in this paragraph are denied.

138.    The allegations contained in this paragraph are denied.

## COUNT V – RESCISSION ON THE GROUND OF
## FRAUDULENT INDUCEMENT

139.    The Crown Respondents re-state their responses to the preceding paragraphs of the

Petition as if fully set forth verbatim herein.

140.    The allegations contained in this paragraph are denied.

141.    The allegations contained in this paragraph are denied.

142.    The allegations contained in this paragraph are denied.

143.    The allegations contained in this paragraph are denied.

144.    The allegations contained in this paragraph are denied.

145.    The allegations contained in this paragraph are denied.

## COUNT VI – RESCISSION ON GROUND
## OF ILLEGALITY

146.    The Crown Respondents re-state their responses to the preceding paragraphs of the

Petition as if fully set forth verbatim herein.

147.    The allegations contained in this paragraph are denied.

148.    The allegations contained in this paragraph are denied.

149.    The allegations contained in this paragraph are denied.

## COUNT VII – DECLARATORY JUDGMENT

150.    The Crown Respondents re-state their responses to the preceding paragraphs of the

Petition as if fully set forth verbatim herein.

151.    The allegations contained in this paragraph are denied.

152.    The allegations contained in this paragraph are denied.

153.    The allegations contained in this paragraph are denied.

## COUNT VIII – CONVERSION OF PINETREE
## PLAZA INCOME

154.    The Crown Respondents re-state their responses to the preceding paragraphs of the

Petition as if fully set forth verbatim herein.

155.    The allegations contained in this paragraph are denied.

156.    The allegations contained in this paragraph are admitted.

157.    The allegations contained in this paragraph are denied.

158.    The allegations contained in this paragraph are denied.

159.    The allegations contained in this paragraph are denied.

160.    The allegations contained in this paragraph are denied.

## COUNT IX – CONVERSION OF BANK FUNDS

161.    The Crown Respondents re-state their responses to the preceding paragraphs of the

Petition as if fully set forth verbatim herein.

162.    The allegations contained in this paragraph are denied.

163.    The allegations contained in this paragraph are denied.

164.    The allegations contained in this paragraph are denied.

165.    The allegations contained in this paragraph are denied.

166.    The allegations contained in this paragraph are denied.

167.    The allegations contained in this paragraph are denied.

168.    The allegations contained in this paragraph are denied.

## COUNT X – CONVERSION THROUGH IDENTITY
## AND FINANCIAL TRANSACTION CARD FRAUD

169.    The Crown Respondents re-state their responses to the preceding paragraphs of the

Petition as if fully set forth verbatim herein.

170.    The allegations contained in this paragraph are denied.

171.    The allegations contained in this paragraph are denied.

172.    The allegations contained in this paragraph are denied.

173.    The allegations contained in this paragraph are denied.

174.    The allegations contained in this paragraph are denied.

175.    The allegations contained in this paragraph are denied.  By way of further response,

an alleged fraud claim cannot be assigned under Georgia law.

176.    The allegations contained in this paragraph are denied.

177.    The allegations contained in this paragraph are denied.

### COUNT XI – BREACH OF FIDUCIARY DUTY

178.    The Crown Respondents re-state their responses to the preceding paragraphs of the

Petition as if fully set forth verbatim herein.

179.    The allegations contained in this paragraph are denied.

180.    The allegations contained in this paragraph are denied.

181.    The allegations contained in this paragraph are denied.

182.    The allegations contained in this paragraph are denied.

### COUNT XII – FRAUD

183.    The Crown Respondents re-state their responses to the preceding paragraphs of the

Petition as if fully set forth verbatim herein.

184.    The allegations contained in this paragraph are denied.

185.     The allegations contained in this paragraph are denied.

## COUNT XIII – IMPOSITION OF AN EQUITABLE LIEN

186.     The Crown Respondents re-state their responses to the preceding paragraphs of the Petition as if fully set forth verbatim herein.

187.     The allegations contained in this paragraph are denied.

188.     The Crown Respondents admit that Dykes LLC, Oglethorpe LLC, and Main LLC are jointly owned by Ahuja and Shaneel Lalani, but deny that they are jointly owned by Sameer Lalani.  The remaining allegations contained in this paragraph are admitted.

189.     The allegations contained in this paragraph are denied.  By way of further response, the Petitioners and their counsel have admitted in the Petition and on the record at a hearing in State Court concerning the Crown Respondents' Emergency Motion to Cancel Lis Pendens that they do have an adequate remedy at law.  A true and correct copy of the unofficial transcript of said hearing in State Court is attached hereto as <u>Exhibit A-1</u> and is incorporated herein by reference.

190.     The allegations contained in this paragraph are denied.

191.     The allegations contained in this paragraph are denied.

## COUNT XIV – IMPOSITION OF A
## CONSTRUCTIVE TRUST

192.     The Crown Respondents re-state their responses to the preceding paragraphs of the Petition as if fully set forth verbatim herein.

193.     The allegations contained in this paragraph are denied.

194.     The Crown Respondents admit that Crown holds a 50% interest in the referenced properties.  The remaining allegations contained in this paragraph are denied.

195.     The allegations contained in this paragraph are denied.

196.    The allegations contained in this paragraph are denied.

## COUNT XV – DISGORGEMENT

197.    The Crown Respondents re-state their responses to the preceding paragraphs of the Petition as if fully set forth verbatim herein.

198.    The allegations contained in this paragraph are denied.

199.    The allegations contained in this paragraph are denied.

## COUNT XVI – REQUEST FOR EQUITABLE ACCOUNTING

200.    The Crown Respondents re-state their responses to the preceding paragraphs of the Petition as if fully set forth verbatim herein.

201.    The allegations contained in this paragraph are denied.

202.    The allegations contained in this paragraph are denied.

203.    The allegations contained in this paragraph are denied.

204.    The Crown Respondents deny that any "rental income" or "profits" have been generated from the referenced properties.  The remaining allegations contained in this paragraph are admitted.

205.    The Crown Respondents state that the document referenced in this paragraph speak for themselves, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such document, are hereby denied.  The Crown Respondents admit that none of the loan proceeds have been paid to Maharaja, because Maharaja is not entitled to payment of such loan proceeds.  The remaining allegations contained in this paragraph are denied.

206.    The Crown Respondents admit that TC Federal filed a lawsuit and state that the lawsuit and related pleadings speak for themselves, and that any allegations contained in this

paragraph that are not consistent with the plain language contained in such documents, are hereby denied.

207.    The allegations contained in this paragraph are denied.

208.    The Crown Respondents admit that Crown and King Group own the referenced properties as tenants in common.  The Crown Respondents object to and deny the use of the term "Coerced" in this paragraph.  The remaining allegations contained in this paragraph are denied.

209.    The allegations contained in this paragraph are denied.

210.    The allegations contained in this paragraph are denied.

211.    The allegations contained in this paragraph are denied.

212.    The allegations contained in this paragraph are denied.

213.    The allegations contained in this paragraph are denied.

214.    The allegations contained in this paragraph are denied.

215.    The allegations contained in this paragraph are denied.

216.    The allegations contained in this paragraph are denied.

**COUNT XVII – CONSPIRACY**

217.    The Crown Respondents re-state their responses to the preceding paragraphs of the Petition as if fully set forth verbatim herein.

218.    The allegations contained in this paragraph are denied.

219.    The allegations contained in this paragraph are denied.

**COUNT XVIII – PUNITIVE DAMAGES**

220.    The Crown Respondents re-state their responses to the preceding paragraphs of the Petition as if fully set forth verbatim herein.

221.    The allegations contained in this paragraph are denied.

**COUNT XIX – ATTORNEY'S FEES**

222.    The Crown Respondents re-state their responses to the preceding paragraphs of the Petition as if fully set forth verbatim herein.

223.    The allegations contained in this paragraph are denied.

**COUNT XX – BREACH OF FIDUCIARY DUTY**
**(Against Respondent Charanjeev)**

224.    The Crown Respondents re-state their responses to the preceding paragraphs of the Petition as if fully set forth verbatim herein.

225.    The allegations contained in this paragraph are denied.

226.    The allegations contained in this paragraph are denied.

227.    The allegations contained in this paragraph are denied.

**COUNT XXI – BREACH OF FIDUCIARY DUTY**
**(Against Respondents Charanjeev and Ahuja)**

228.    The Crown Respondents re-state their responses to the preceding paragraphs of the Petition as if fully set forth verbatim herein.

229.    The Crown Respondents admit that Arora, Charanjeev, and Ahuja executed the referenced document.  The Crown Respondents state that the document referenced in this paragraph speaks for itself, and that any allegations contained in this paragraph that are not consistent with the plain language contained in such document, are hereby denied.  The Crown Respondents further object to and deny use of the term "Coerced" in this paragraph.  The remaining allegations of this paragraph are denied.

230.    The allegations contained in this paragraph are denied.

231.    The allegations contained in this paragraph are denied.

232.    The allegations contained in this paragraph are denied.

## COUNT XXII – CLAIMS UNDER THE BROKERAGE
## RELATIONSHIPS IN REAL ESTATE
## TRANSACTIONS ACT

233.    The Crown Respondents re-state their responses to the preceding paragraphs of the Petition as if fully set forth verbatim herein.

234.    The allegations contained in this paragraph are admitted.

235.    The Crown Respondents state that this paragraph contained a legal statement or conclusion and that a response is not required.  To the extent a response is required, the allegations contained in this paragraph are denied.

236.    The allegations contained in this paragraph are denied.

237.    The allegations contained in this paragraph are admitted.

238.    The allegations contained in this paragraph are admitted.

239.    The allegations contained in this paragraph are denied.

240.    The allegations contained in this paragraph are denied.

241.    The allegations contained in this paragraph are denied.

## COUNT XXIII – MISAPPROPRIATION OF PROSPECTIVE
## BUSINESS OPPORTUNITIES

226 (sic).      The Crown Respondents re-state their responses to the preceding paragraphs of the Petition as if fully set forth verbatim herein.

242.    The allegations contained in this paragraph are denied as stated.

243.    The allegations contained in this paragraph are denied.

244.    The allegations contained in this paragraph are denied.

245.    The allegations contained in this paragraph are denied.

246.    The allegations contained in this paragraph are denied.

247.    Any and all remaining allegations, statements, and requests for relief, including those contained within any "Wherefore" clauses, contained in the Petition, not specifically admitted or denied, are expressly denied by the Crown Respondents.

## AFFIRMATIVE DEFENSES

1.    The Petition fails to state a claim upon which relief may be granted and therefore should be dismissed with prejudice.

2.    In the alternative, some of the claims in the Petition fail to state a claim upon which relief may be granted and therefore should be dismissed with prejudice.

3.    The Petition should be dismissed pursuant to Fed. R. Civ. P. 12(b)(7), made applicable to this adversary proceeding by Fed. R. Bankr. P. 7012, as Petitioners have failed to join a party or parties under Fed. R. Civ. P. 19.

4.    All or some of the claims contained in the Petition are barred by accord and satisfaction.

5.    All or some of the claims contained in the Petition are barred by the doctrine of estoppel.

6.    All or some of the claims contained in the Petition are barred by the failure of consideration.

7.    All or some of the claims contained in the Petition are barred by the Petitioners' own fraudulent conduct, including but not limited to their forgery of documents, their false police reports made, and/or their defamatory conduct.

8.    All or some of the claims contained in the Petition are barred by the doctrine of laches, as the complained of transactions occurred almost or more than a year ago before the Petitioners filed their action against the Crown Respondents.

9.      All or some of the claims contained in the Petition are barred by license.

10.      All or some of the claims contained in the Petition are barred by payment(s) received by or made to the Petitioners.

11.      All or some of the claims contained in the Petition are barred by release.

12.      All or some of the claims contained in the Petition are barred by the Petitioners' waiver, ratification, or acquiescence of the complained of transactions.

13.      The Crown Respondents are entitled to setoff, recoupment, or indemnification on all or some of the claims contained in the Petition.

14.      All or some of the claims contained in the Petition are barred as the alleged injuries were caused by third parties, other than the Crown Respondents.

15.      All or some of the claims contained in the Petition are barred as intervening causes, such as conduct by third parties, illegal acts, or fraudulent acts, are the proximate cause of the alleged injuries sustained by Petitioners.

16.      All of the equitable relief requested in the Petition is barred as the Petitioners' have an adequate remedy at law.

17.      All of the equitable relief requested in the Petition is barred by the Petitioner's unclean hands, which includes their forgery of documents, their false police reports made, and/or their defamatory conduct.

18.      All or some of the claims asserted by Maharaja, Zillionaire, and/or King Group are barred as the procedures for derivative actions have not been followed.

19.      All or some of the claims asserted by Maharaja, Zillionaire, and/or King Group are barred as approval or authorization to file affirmative claims has not been received from certain member(s) of each company as required by each company's operative governing document(s).

20.     The Crown Respondents expressly reserve the right to assert additional affirmative defenses as additional information and/or evidence in support of such affirmative defenses is uncovered during the discovery phase of this litigation.

WHEREFORE, the Crown Respondents respectfully request that the Court:

(a) Dismiss the Petition with prejudice; or

(b) Enter judgment in favor of the Crown Respondents and against the Petitioners on all claims for relief contained in the Petition;

(c) Deny any other requests made by the Petitioners in the Petition;

(d) Award the Crown Respondents their reasonable attorney's fees and costs for having to respond to and defend against this frivolous Petition; and

(e) Enter any further necessary or appropriate relief.

**RESPONDENTS CHARANJEEV SINGH, KARAN S. AHUJA, JARNAIL SINGH, JONIKA ARORA, CROWN ASSETS, LLC, 2551 E PINETREE BLVD MGMT LLC, 4319 COVINGTON HWY, LLC, 140 W DYKES STREET LLC, 1604 E OGLETHORPE BLVD, LLC, KING ASSETS, LLC, AND 2505 S MAIN STREET, LLC'S COUNTERCLAIMS AGAINST PETITIONERS' SAHIB ARORA, VINEET SINGH, KING GROUP MGMT LLC, MAHARAJA INVESTMENTS, LLC, AND ZILLIONAIRE ASSETS, LLC'S**

Respondents Charanjeev Singh ("**Charanjeev**"), Karan S. Ahuja ("**Ahuja**"), Jarnail Singh ("**Jarnail**"), Jonika Arora ("**Jonika**"), Crown Assets, LLC ("**Crown**"), 2551 E Pinetree Blvd Mgmt LLC ("**Pinetree Management LLC**"), 4319 Covington Hwy, LLC ("**Covington LLC**"), 140 W Dykes Street LLC ("**Dykes LLC**"), 1604 E Oglethorpe Blvd, LLC ("**Oglethorpe LLC**"), King Assets, LLC ("**King Assets**"), and 2505 S Main Street, LLC ("**Main LLC**") (collectively, the "**Crown Respondents**"), pursuant to Federal Rule of Civil Procedure 13(a)(1), made applicable to this adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7013, file this their counterclaims (these "**Counterclaims**") against Petitioners Shaib Arora ("**Arora**"),

Vineet Singh ("**Vineet**"), King Group Mgmt LLC ("**King Group**"), Maharaja Investments, LLC ("**Maharaja**"), and Zillionaire Assets, LLC ("**Zillionaire**") (collectively, the "**Petitioners**"), respectfully showing the Court as follows.

## THE PARTIES

1.     Charanjeev is an individual who resides at 325 Crooked Stick Drive, Milton, Georgia 30004.

2.     Ahuja is an individual who resides at 325 Crooked Stick Drive, Milton, Georgia 30004.

3.     Jarnail is an individual who resides at 325 Crooked Stick Drive, Milton, Georgia 30004.

4.     Jonika is an individual who resides at 325 Crooked Stick Drive, Milton, Georgia 30004.

5.     Crown is a Georgia limited liability company with its principal office and its registered agent office at 7530 St. Marlo Country Club Parkway, Duluth, Georgia 30097.

6.     Pinetree Management LLC is a Georgia limited liability company with its principal office and its registered agent office at 200 Glenridge Point Parkway, Suite 100, Atlanta, Georgia 30342.

7.     Covington LLC is a Georgia limited liability company with its principal office and its registered agent office at 5675 Jimmy Carter Blvd., Ste. 109, Norcross, Georgia 30071.

8.     Dykes LLC is a Georgia limited liability company with its principal office at 5675 Jimmy Carter Blvd., Ste. 109, Norcross, Georgia 30071 and its registered agent office at 410 Nora Drive, Fayetteville, Georgia 30214.

9.      Oglethorpe LLC is a Georgia limited liability company with its principal office at 5675 Jimmy Carter Blvd., Ste. 109, Norcross, Georgia 30071 and its registered agent office at 410 Nora Drive, Fayetteville, Georgia 30214.

10.     King Assets is a Georgia limited liability company with its principal office and its registered agent office at 200 Glenridge Point Parkway, Suite 100, Atlanta, Georgia 30342.

11.     Main LLC is a Georgia limited liability company with its principal office at 5675 Jimmy Carter Blvd., Ste. 109, Norcross, Georgia 30071 and its registered agent office at 410 Nora Drive, Fayetteville, Georgia 30214.

12.     Arora is an individual who resides at 660 Belgrave Lane, Tucker, Georgia 30084.

13.     Vineet is an individual who resides at 660 Belgrave Lane, Tucker, Georgia 30084.

14.     King Group is a Georgia limited liability company with its principal office at 660 Belgrave Lane, Tucker, Georgia 30084 and its registered agent office 1150 Faith Avenue SE, Atlanta, Georgia 30316.

15.     Maharaja is a Georgia limited liability company with its principal office and registered agent office at 660 Belgrave Lane, Tucker, Georgia 30084.

16.     Zillionaire is a Georgia limited liability company with its principal office at 660 Belgrave Lane, Tucker, Georgia 30084 and its registered agent office 1150 Faith Avenue SE, Atlanta, Georgia 30316.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b) because it is an action removed from state court.

18.     Venue lies in this district pursuant to 28 U.S.C. § 1409(a), in that this proceeding is an action removed from state court and the Debtor's bankruptcy case is pending in this district.

19.     This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (K), and (O).

## FACTUAL BACKGROUND

### The Family

20.     These Counterclaims arise from a familial business dispute.

21.     Arora and Vineet are brothers.

22.     Arora and Vineet are the cousins of Charanjeev and Ahuja.

23.     Jarnail and Jonika are the parents of Charanjeev and therefore the uncle and aunt of Arora and Vineet, respectively.

24.     Meharban Arora ("**Meharban**") and Neeta Arora ("**Neeta**") are the parents of Arora, Singh, and Harsimran Arora ("**Harsimran**").

25.     Meharban and Jarnail are brothers and Neeta and Jonika are cousins and sisters-in-law.

26.     The families lived together in the same residence in India for over (30) years.

27.     Arora, Vineet, Charanjeev, and Ahuja all grew up together in India.

28.     Jarnail and Meharban have operated and continue to operate businesss in India called Maharaja Farms ("**Maharaja Farms**") and Maharaja Farms II ("**Maharaja Farms II**") which provide event management services and conduct business in real estate.

### Real Estate Investment in the United States

29.     The family members acquired U.S. Green Cards by late 2013, and in 2014, members of each side of the family organized King Group, while still in India, with the intent to eventually relocate to the United States.

30.     King Group initially consisted of nine (9) family members owning eleven percent (11%) each of the company's membership interest.

31.     Each side of the family made capital contributions to King Group upon its creation, totaling approximately $180,000, which was then used by King Group to purchase real property off Davenport Road in Jackson County, Georgia.

32.     The Jackson County property was purchased through an online auction which was viewed by the family members and therefore members of King Group at 38 Green Avenue, Amritsar, Punjab, Republic of India 143001, the familial residence in India (the "**Indian Familial Residence**").

33.     King Group was and is in the business of purchasing, managing, and selling real property throughout the United States, with a focus on real estate in Georgia.

34.     The company effectively served as an investment vehicle for the family members.

35.     On January 6, 2017, the nine (9) family members decided to transfer their respective membership interests in King Group to two (2) family members – Ahuja and Arora – with them holding forty-nine percent (49%) and fifty-one percent (51%), respectively, of the membership interests in the company.[2]

36.     At this time, Ahuja was completing medical school in India and Arora was in the United States.

---

[2] Arora also now operates various entities, including but not limited to King Holdings, LLC, King Capital Island Partners, LLC, Trillionaire Investments, LLC, and King Capital Fund, LLC, all of which are used for personal expenditures and are the alter egos of Arora and likely other family members, such as Vineet, Meharban, and Harsimran.

37.    Since Arora was located in the United States, he was given a majority membership interest in King Group in order to more easily effectuate real estate and other transactions on behalf of the company.

38.    The transfer of these membership interests was evidenced by an Amended and Restated Operating Agreement (the "**King Group Amended and Restated Operating Agreement**").    A true and correct copy of the King Group Amended and Restated Operating Agreement is attached hereto as <u>Exhibit A</u> and is incorporated herein by reference.

39.    As part of their ordinary course of business dealings for the last several decades, including in both the United States and India, the family members would share e-mail accounts, bank accounts, and credit cards, and pooled their personal and business monies together.

40.    There were also various "side agreements" and payments of debt on behalf of other individuals, as is customary in the Indian Sikh culture and in the ordinary course of the family members' business dealings.

41.    Charanjeev completed his medical degree in January 2018 and relocated to the United States in March 2018, with the intent that he start managing King Group, as the family members were unhappy with Arora's management of King Group.

42.    Prior to Charanjeev's arrival, King Group's expenses had been increasing and income decreasing, and it was discovered that Arora had been using King Group to pay for personal expenses, such as vehicles, gambling, and the like.

43.    Around this time, Charanjeev obtained his real estate license and became a licensed associate broker with Keller Williams Realty.

44.    Despite Petitioners' claims to the contrary, Charanjeev obtained his real estate license at his own expense.

45.     Charanjeev then started managing all of King Group's real estate dealings, while Arora worked in the background to effectuate the transactions.

46.     Charanjeev also managed various properties owned by King Group, overseeing repairs and renovations, and collecting rent from tenants.

47.     Serving as the real estate agent and property manager for King Group, Charanjeev saved King Group at least $600,000 in real estate commissions and management fees that otherwise would have been paid to a third-party real estate agent or property management company, respectively.

48.     Charanjeev also used his knowledge and education obtained as a real estate agent to provide advice, guidance, and access to King Group and Arora, which ultimately benefitted King Group and Arora, significantly.

49.     In late 2018, Arora, after suffering significant personal issues and dilemmas, left the United States to live in India for a period of several months, leaving Charanjeev in charge of the management of King Group.

50.     In May or June 2019, Ahuja discovered that Arora had forged the King Group Amended and Restated Operating Agreement to change the membership interests from forty-nine percent (49%) and fifty-one percent (51%) to eleven percent (11%) and eighty-nine percent (89%) for Ahuja and Arora, respectively (the "**Forged King Group Amended and Restated Operating Agreement**").   A true and correct copy of the Forged King Group Amended and Restated Operating Agreement is attached hereto as Exhibit B and is incorporated herein by reference.

51.     At this point in time – May or June 2019 – Arora was back in the United States and had complete and total control over the assets and the bank accounts of King Group.

52.     Ahuja demanded that Arora fix the King Group operating agreement to state the correct membership interest percentages.

53.     It was then discovered that Arora used the King Group Amended and Restated Operating Agreement in 2017, but in 2018, he started providing the Forged King Group Amended and Restated Operating Agreement to lenders and others entering into transactions with King Group.

54.     It was further discovered that Arora even went as far as to file fraudulent federal tax returns with incorrect membership interests listed.

55.     In July 2019, Arora started making threats and outrageous demands against Ahuja and members of his side of the family.

56.     Some of these threats included a demand that Ahuja's side of the family pay Arora $950,000 to "revert-back" the membership interests in King Group.

57.     Ahuja and his side of the family demanded that the properties, assets, and liabilities be distributed equally amongst each side of the family.

58.     Multiple discussions and meetings were held between the families in July and August 2019, with the goal of complete separation.

**The August 2019 Settlement**

59.     In early August 2019, a resolution was reached between the families.

60.     On August 13, 2019, Arora sent a comprehensive e-mail to his attorney – Joel Haber in Conyers, Georgia – directing him to prepare documents to effectuate the settlement (the "**August Settlement Directive**").   A true and correct copy of August Settlement Directive is attached hereto as Exhibit C and is incorporated herein by reference.

61.     Arora had been working out the details of this settlement for at least several days beforehand, consulting with family members and Mr. Haber on several different occasions prior to sending the August Settlement Directive.

62.     At the direction of Arora, Mr. Haber prepared several operating agreements and deeds to effectuate the agreed upon transfers of membership interests in companies and real property.

63.     On August 14, 2020, Arora signed these documents at Mr. Haber's office, but initially held them back as he desired to consult with a CPA and tax attorney in order to avoid certain tax liabilities.

64.     The documents were then fully executed on the evening of August 15, 2020.

65.     That same morning, Arora had won a bid on a property located at 1002 Camp Jackson Way in Cahokia, Illinois, which he had previously boasted about at Mr. Haber's office in the presence of several of multiple people and Mr. Haber.

66.     One such document included an agreement between King Group, the Debtor, and Zillionaire regarding real property at 2318 SE Old Cornelia Highway, Gainesville, GA ("**2318 Old Cornelia**") and 5754 Attucks Boulevard in Morrow, Georgia ("**5754 Attucks**") (the "**Old Cornelia and Attucks Internal Agreement**").  A true and correct copy of the Old Cornelia and Attucks Internal Agreement is attached hereto as <u>Exhibit D</u> and is incorporated herein by reference.

67.     Another such document included a bill of sale of eleven percent (11%) of Ahuja's membership interest in King Group, signed by Ahuja.

68.     The remaining thirty-eight percent (38%) of Ahuja's membership interest in King Group was to be transferred after the whole familial debt was paid in full by Arora, which included balances owed from the real estate Arora kept in King Group , 1031 exchange proceeds from the

sale of a property at 2995 Roosevelt Highway in Atlanta, Georgia ("**2995 Roosevelt**"), fifty percent (50%) of the equity of the residence located at 660 Belgrave Lane in Tucker, Georgia ("**660 Belgrave**"), payment of Jonika and Jarnail's credit cards (amounting to approximately $198,000), fifty percent (50%) of the value of vehicles owned by Crown Royal Cars LLC ("**Crown Cars**"), fifty percent (50%) of a loan promissory note to Charles and Linda Grier upon maturity, as well as various other expenses that Charanjeev and others fronted in connection with the properties owned or previously owned by King Group.

69.     In addition, on August 17, 2019, Vineet called Charanjeev from India and asked him to use a previously prepared corporate resolution for Maharaja to transfer Maharaja's fifty percent (50%) interest in the real property at 2551 East Pinetree Boulevard in Thomasville, Georgia ("**Pinetree Plaza**") to Crown in order to reduce the amount of money owed by Arora and Vineet's side of the family.

70.     Vineet and Meharban at that time also pleaded with Jarnail to keep their credit card and life insurance payments current, which Jarnail continued paying from his account at Associated Credit Union and continued paying through February 2020, the total amount being in the range of $25,000.

71.     Ultimately, Vineet and Meharban were worried about asking Arora, as Arora had refused to make these payments on their behalf, which would have resulted in a default.

72.     In turn, Vineet and Meharban asked Jarnail to keep these payments current, so they would not lose their share or interest in King Group.

73.     Vineet and Meharban also asked Jarnail to help them get their share in King Group from Arora.

74.     The transfer of Pinetree Plaza occurred on August 19, 2019.

75.    On the same day, Vineet called some of the Respondents on at least two occasions about the status of the transfer of Maharaja's interest in Pinetree Plaza.

76.    On one of these phone calls, Vineet apologized to Jarnail for the way that his brother Arora had acted over the past several months and later followed up with a text message.  A true and correct copy of this text message is attached hereto as Exhibit E and is incorporated herein by reference.

77.    Charanjeev also called Vineet and Meharban and talked to Vineet that evening in order to confirm that the transfer had occurred.

**Events After the August 2019 Settlement**

78.    In mid-August 2019, under threat of eviction, Charanjeev, Ahuja, and Jarnail were forced by Arora and others to leave 660 Belgrave, where the family members had been residing.

79.    Between August 2019 and February 2020 – the time period during which Petitioners allege they were under duress and being extorted – Arora purchased several different properties, some millions of dollars, and continued using Charanjeev as a real estate agent on some of these transactions.

80.    Some of these properties included:

a.    2526 Panola Road in Lithonia, Georgia, which was brokered by Charanjeev;

b.    2125 Sigman Road in Conyers, Georgia, which was brokered by Charanjeev;

c.    1002-1100 Camp Jackson Road in Illinois, where Charanjeev was paid a referral fee;

d.    118 S Grant Street in Fitzgerald, Georgia; and

e.    3180 Atlanta Highway in Athens, Georgia.

The Pinetree Plaza Property

81.     In September 2019, Vineet forwarded several e-mails to Charanjeev concerning Pinetree Plaza.  True and correct copies of these e-mails are attached collectively hereto as Exhibit F and are incorporated herein by reference.

82.     In October 2019, Arora and Vineet approached Shaneel Lalani ("**Shaneel**"), Arora and Vineet's partner on two other properties and a partner on Pinetree Plaza with Debtor, and told him that no funds from a property located at 2485 N Columbia Street in Milledgeville, Georgia ("**2485 N Columbia**") should be used for Pinetree Plaza, because Arora and Vineet had taken over the interest in said property and transferred all of their interest in Pinetree Plaza to Debtor.

83.     Arora and Vineet further told Shaneel that they did not want to use such funds because 2485 N Columbia was cash flow positive and Pinetree Plaza was cash flow negative, and that they were no longer involved in the ownership or management of Pinetree Plaza.

84.     In addition, through January and February 2020, Vineet received e-mails from the U.S. Department of Agriculture requesting an update on ownership of Pinetree Plaza, to which he never responded.

85.     In late February or early March 2020, Arora, Vineet, and Meharban visited Shaneel and asked him whether it would be beneficial or not to obtain their interest back in Pinetree Plaza.

86.     Arora then started a campaign of sending e-mails and other communications to Debtor and other Respondents' lenders, in an attempt to cause a default under their respective loans.  True and correct copies of these e-mails are attached collectively hereto as Exhibit G and are incorporated herein by reference.

5754 Attucks and 5341 Snapfinger

87.     As a result of the August 2019 settlement, Zillionaire owned the property at 5754 Attucks, while King Group and the Debtor each owned a fifty percent (50%) interest in the property at 5341 Snapfinger Park Drive in Decatur, Georgia ("**5341 Snapfinger**").

88.     Charanjeev continued managing 5754 Attucks and 5341 Snapfinger for Zillionaire and King Group and the Debtor, respectively, advancing money for repairs on both properties, including the installation of three HVAC units at 5754 and completion of the buildout for the tenant at 5341 Snapfinger.

89.     On November 20, 2019, Arora signed an Amended Operating Agreement for one of his companies – Zillionaire – which added Crown as a member (the "**Zillionaire Amended Operating Agreement**").   A true and correct copy of the Zillionaire Amended Operating Agreement is attached hereto as Exhibit H and is incorporated herein by reference.

90.     On November 27, 2019, Zillionaire sold 5754 Attucks for $1.85 million.

91.     Charanjeev served as the real estate agent for Zillionaire on the sale of 5754 Attucks and charged only a flat commission of $500, in order to save commission costs, which ordinarily would have been in excess of $100,000 for a transaction of this size.

92.     Arora attended the closing on 5754 Attucks, flying in from India, and indicating that he was excited because they had already lined up their share of proceeds for reinvestment, which they did by purchasing an interest in 3180 Atlanta Highway in Athens, Georgia ("**3180 Atlanta**").

93.     On December 21, 2019, King Group, Crown, and Zillionaire entered into an agreement (the "**Zillionaire Internal Agreement**") in order to effectuate a 1031 "like-kind"

exchange.  A true and correct copy of the Zillionaire Internal Agreement is attached hereto as Exhibit I and is incorporated herein by reference.

94.     The Zillionaire Internal Agreement acknowledged and affirmed that King and Crown each held a fifty percent (50%) membership interest in Zillionaire and that King and Crown were each entitled to $341,408.22 of the proceeds from the sale of 5754 Attucks.

95.     On December 23, 2019, Zillionaire used the proceeds from the sale of 5754 Attucks to purchase a sixty-six and 67/10ths (66.67%) interest in the property at 3180 Atlanta and the signature of Ahuja, on behalf of Crown, was obtained to effectuate the purchase.

96.     On December 28, 2019, Arora sent an e-mail to Mr. Haber indicating that Zillionaire had completed a 1031 "like-kind" exchange in connection with the sale of 5754 Attucks and the purchase of 3180 Atlanta.  A true and correct copy of this e-mail is attached hereto as Exhibit J and is incorporated herein by reference.

97.     On February 25, 2020, King and Crown sold 5341 Snapfinger for $1.155 million.

98.     Arora and Ahuja both signed the warranty deed, prepared by a closing attorney, which conveyed the property.  A true and correct copy of this warranty deed is attached hereto as Exhibit K and is incorporated herein by reference.

99.     The 1031 "like-kind" exchange for King Group had been arranged by Charanjeev at Vineet's insistence.

100.    Charanjeev also served as the real estate agent for King and Crown in connection with the sale of 5341 Snapfinger and charged only a flat commission of $500 in order to save the parties' commission costs, which ordinarily would be in excess of $100,000 for a transaction of this size.

101.    Arora, Vineet, and Meharban all attended the closing on 5341 Snapfinger and spoke to Ahuja and Charanjeev for about an hour after closing in the parking lot of the closing attorney's office.

102.    In February 2020, Arora executed a Certified Resolution and Incumbency Certificate for Zillionaire (the "**Zillionaire Certified Resolution**"), which provided Ahuja with the authority to purchase the property at 90 Hunters Chase in McDonough, Georgia ("**90 Hunters**") for $785,000 and execute all documents in connection with such purchase. A true and correct copy of the Zillionaire Certified Resolution is attached hereto as Exhibit L and is incorporated herein by reference.

103.    On April 2, 2020, Crown and Zillionaire purchased 90 Hunters for $785,000, using the funds Crown received from the sale of 5754 Attucks, and in further connection with the purchase, Crown and Zillionaire obtained a loan from Gelt Financial LLC.

104.    Again, from August 2019 through February 2020 – the time period during which Petitioners allege they were under duress and being extorted – Arora signed various documents on transactions with the Debtor and others, namely purchase and sale contracts, closing documents, company documents, company resolutions, and 1031 "like-kind" exchange documents.

105.    Petitioners, and their family members Meharban, Neeta, and Harsimran[3] reaped the benefits of the transactions that they now allege were procured under duress and through extortion and have used some or all of those proceeds to continue building the business of King Group and their affiliated companies.

---

[3] The Debtor and the other Crown Respondents expressly reserve the right to move the Court for leave to add Meharban, Neeta, Harsimran, and others as parties to this action, as they actively participated in the commission of the torts and conspiracies discussed herein.

### The Attempt at an April 2020 Settlement

106.    Between March 2020 and April 2020, Arora and Vineet's side of the family started asking about re-acquiring Pinetree Plaza.

107.    The Crown Respondents decided to sit down again to settle this and all other matters once and for all, even though they thought they had done so in connection with the August 2019 agreements and subsequent agreements.

108.    On April 4, 2020, Charanjeev, Jarnail, Meharban, Harsimran, Vineet and Reeta Rani ("**Reeta**") met once again about settlement.

109.    While an initial deal was worked out, it fell through once Arora provided false information to police the very next day and started again sending false and defamatory e-mails and other communications to the Debtor and other Respondents' lenders.

110.    In June 2020, Arora and Vineet, through the assistance of their counsel, filed and recorded affidavits against Pinetree Plaza (collectively, the "**False Affidavits**").

111.    The e-mails and the filing of the False Affidavits led the lender on Pinetree Plaza – TC Federal Bank – to file an action to quiet title and for declaratory judgment in Thomas County Superior Court against some of the Petitioners, the Debtor, and other Respondents.

112.    In August 2020, the Petitioners filed their Petition against the Debtor and other Respondents.  The Petitioners' filing of notices of lis pendens against virtually all of the properties owned and operated by the Debtor and other Respondents, as well as the State Court's denial of an Emergency Motion to Cancel Lis Pendens, resulted in the Debtor having to file for bankruptcy protection in this Court.

## COUNTERCLAIMS RELATING TO KING GROUP

### COUNT I – BREACH OF THE KING GROUP
### AMENDED AND RESTATED OPERATING AGREEMENT
### (Arora)

113.    The Crown Respondents re-state their allegations contained in the preceding paragraphs of these Counterclaims as if fully set forth verbatim herein.

114.    The operative agreement governing King Group is the King Group Amended and Restated Operating Agreement.

115.    The King Group Amended and Restated Operating Agreement provides that Ahuja held a forty-nine percent (49%) membership interest in King Group as of January 6, 2017.

116.    The King Group Amended and Restated Operating Agreement further provides that Arora held a fifty-one percent (51%) membership interest in King Group as of January 6, 2017.

117.    Upon information and belief, Vineet has been added as a member of King Group.

118.    In connection with the August 2019 transactions, Ahuja executed a Bill of Sale transferring only eleven percent (11%) of his membership interest in King Group.

119.    Therefore, Ahuja still holds a thirty-eight percent (38%) membership interest in King Group.

120.    Arora breached the terms of the King Group Amended and Restated Operating Agreement through the following acts:

    a.    At times after January 6, 2017, Arora transferred money from the bank accounts of King Group to his personal accounts, without the knowledge or authorization of Ahuja, and not for business purposes related to King Group;

b.  At times after January 6, 2017, Arora transferred money from the bank accounts of King Group to the accounts of his company Crown Cars, without the knowledge or authorization of Ahuja, and not for business purposes related to King Group;

c.  At times after January 6, 2017, Arora transferred money from the bank accounts of King Group to the accounts of his company Trillionaire Investments LLC ("**Trillionaire**"), without the knowledge of authorization of Ahuja, and not for business purposes related to King Group;

d.  At times after January 6, 2017, Arora transferred money from the bank accounts of King Group to the accounts of other companies managed, owned, or operated by Arora, without the knowledge or authorization of Ahuja, and not for business purposes related to King Group;

e.  At times after January 6, 2017, Arora paid personal expenses from the accounts of King Group.  For example, Arora paid an attorney to handle defending him personally in a criminal matter involving a Driving Under the Influence charge in Cobb County, Georgia;

f.  At times after January 6, 2017, Arora has failed to make distributions to other members of King Group, namely Ahuja;

g.  Arora filed federal and state tax returns for King Group, listing the incorrect membership interest percentages of King Group;

h.  Arora altered and forged the King Group Amended and Restated Operating Agreement, altering the membership interests in King Group;

i.  Upon information and belief, Arora added Vineet as a member of King Group, without the knowledge or authorization of Ahuja; and

j.   Arora initiated a lawsuit against Ahuja, without the consent or authorization of Ahuja, a member of King Group.

121.   In addition, some or all of the foregoing acts further constitute prohibited transactions as defined by Section 15.01 of the King Group Amended and Restated Operating Agreement.

122.   As a direct and proximate result of Arora's breach(es) of the King Group Amended and Restated Operating, Ahuja has and continues suffering an injury.

123.   Ahuja is therefore entitled to (i) a judgment against Arora in an amount to be determined at trial, and (ii) an award of attorney's fees and costs pursuant to O.C.G.A. § 13-6-11, as Arora has acted in bad faith, has been stubbornly litigious, and has caused unnecessary trouble and expense.

124.   Alternatively, Ahuja is entitled to an order requiring Arora, the defaulting member of King Group, to proceed according to Section 15.03(a)-(c) of the King Group Amended and Restated Operating Agreement.

### COUNT II – BREACH OF FIDUCIARY DUTIES
### (Arora)

125.   The Crown Respondents re-state their allegations contained in the preceding paragraphs of these Counterclaims as if fully set forth verbatim herein.

126.   Arora is the majority membership interest holder in King Group and serves as the manager of King Group.

127.   As a member and manager of King Group, Arora owes fiduciary duties to King Group and its members, including Ahuja.

128.   This fiduciary duty requires Arora to act in good faith and in the best interests of King Group and its members, namely Ahuja.

129.    The foregoing acts described in paragraph 120 of these Counterclaims, establish that Arora acted in a way which negative impacted another's membership interest in King Group, namely Ahuja.

130.    Some or all of the foregoing acts described in paragraph 120 of these Counterclaims further constitute prohibited transactions as defined by Section 15.01 of the King Group Amended and Restated Operating Agreement.

131.    The actions of Arora actually and proximately caused Ahuja to suffer an injury.

132.    Ahuja is therefore entitled to (i) a judgment against Arora in an amount to be determined at trial, (ii) an uncapped award of punitive damages, as Arora acted with specific intent to harm Ahuja, and (iii) an award of attorney's fees and costs pursuant to O.C.G.A. § 13-6-11, as Arora has acted in bad faith, has been stubbornly litigious, and has caused unnecessary trouble and expense.

## COUNT III – TORTIOUS PROCUREMENT OF
## BREACH OF FIDUCIARY DUTIES
### (Vineet)

133.    The Crown Respondents re-state their allegations contained in the preceding paragraphs of these Counterclaims as if fully set forth verbatim herein.

134.    Vineet, without the consent or permission of Ahuja, participated in some or all of the actions described in paragraph 120 of these Counterclaims.

135.    Upon information and belief, Vineet has received promises and other consideration for his participation in some or all of the actions described in paragraph 120 of these Counterclaims and for participating in this frivolous action against the Crown Respondents.

136.    The foregoing acts, as discussed above, represent a breach of the fiduciary duty owed to Ahuja by Arora.

137.    Vineet has tortiously procured a breach of the fiduciary duty owed to Ahuja by Arora.

138.    As an actual and proximate cause of Vineet's actions, Ahuja has suffered an injury.

139.    Ahuja is therefore entitled to (i) a judgment against Vineet in an amount to be determined at trial, (ii) an uncapped award of punitive damages, as Vineet acted with specific intent to harm Ahuja, and (iii) an award of attorney's fees and costs pursuant to O.C.G.A. § 13-6-11, as Vineet has acted in bad faith, has been stubbornly litigious, and has caused unnecessary trouble and expense.

### COUNT IV – CONVERSION
### (Arora and Vineet)

140.    The Crown Respondents re-state their allegations contained in the preceding paragraphs of these Counterclaims as if fully set forth verbatim herein.

141.    Ahuja held forty-nine percent (49%) of the membership interests in King Group as of January 6, 2017 and thirty-eight percent (38%) of the membership interests in King Group as of approximately August 15, 2019.

142.    As discussed in paragraph 42 of these Counterclaims and at other times after 2018, Arora and Vineet used the funds of King Group for the payment of personal expenses and not business expenses.

143.    At times after 2018, Arora and Vineet also made unauthorized distributions to themselves from the profits of King Group, while not making certain distributions to Ahuja, who remained a membership interest holder in King Group.

144.    Arora and Vineet also participated in the unauthorized transfer of membership interests of King Group to Vineet, who claims to now hold a forty-nine percent (49%) membership

interest in King Group, even though Ahuja continues to hold a thirty-eight percent (38%) membership interest in King Group.

145.    Arora and Vineet have exercised the right of ownership over Ahuja's share of the profits of King Group without authorization and in hostility to his rights.

146.    Arora and Vineet have exercised the right of ownership over Ahuja's membership interest in King Group without authorization and in hostility to his rights.

147.    Ahuja is therefore entitled to (i) a judgment against Vineet in an amount to be determined at trial, (ii) an uncapped award of punitive damages, as Vineet acted with specific intent to harm Ahuja, and (iii) an award of attorney's fees and costs pursuant to O.C.G.A. § 13-6-11, as Vineet has acted in bad faith, has been stubbornly litigious, and has caused unnecessary trouble and expense.

## COUNT V – FRAUD
### (Arora and Vineet)

148.    Arora and Vineet have exercised the right of ownership over Ahuja's membership interest in King Group without authorization and in hostility to his rights.

149.    As discussed in paragraphs 120 and 141-144, Arora and Vineet obtained possession and control of Ahuja's property and funds through fraud, fraudulent inducement, and deception as further alleged in these Counterclaims.

150.    Ahuja is therefore entitled to (i) a judgment against Arora and Vineet in an amount to be determined at trial, (ii) an uncapped award of punitive damages, as Arora and Vineet acted with specific intent to harm Ahuja, and (iii) an award of attorney's fees and costs pursuant to O.C.G.A. § 13-6-11, as Arora and Vineet have acted in bad faith, has been stubbornly litigious, and has caused unnecessary trouble and expense.

## COUNT VI – CONSPIRACY
### (Arora, Vineet, and Other Persons)

151.    The Crown Respondents re-state their allegations contained in the preceding paragraphs of these Counterclaims as if fully set forth verbatim herein.

152.    In committing the various tortious and unlawful acts alleged in paragraphs 113 through 150 of these Counterclaims, Arora, Vineet, and other persons, acted in concert and in furtherance of a common plan or scheme in which they all participated, having the goal of obtaining possession and control of Ahuja's property and funds through unlawful means.

153.    Liability for the unlawful conduct of Arora, Vineet, or other persons in furtherance of the conspiracy should therefore be imputed to all the others.

154.    Ahuja is therefore entitled to (i) a judgment against Arora, Vineet, and other persons in an amount to be determined at trial, (ii) an uncapped award of punitive damages, as Arora, Vineet, and other persons acted with specific intent to harm Ahuja, and (iii) an award of attorney's fees and costs pursuant to O.C.G.A. § 13-6-11, as Arora, Vineet, and other persons acted in bad faith, has been stubbornly litigious, and has caused unnecessary trouble and expense.

## COUNT VII – INDEMNIFICATION
### (King Group)

155.    The Crown Respondents re-state their allegations contained in the preceding paragraphs of these Counterclaims as if fully set forth verbatim herein.

156.    The King Group Amended and Restated Operating Agreement provides at Section 11.02 therein that "[t]he Company shall indemnify and hold harmless the Members, and Manager(s), from and against any and all claims and demands whatsoever arising in connection with the Company to the fullest extent provided by Section 14-11-306 of the Act and applicable law."

157.    Claims and demands have been asserted against Arora, and as a member of King Group, Ahuja is entitled to be indemnified by King Group against such claims and demands, including but not limited to any damages assessed against Ahuja and Ahuja's attorney's fees and costs accrued in defending against such claims and demands.

158.    Ahuja is entitled to a decree that King Group is responsible for and must indemnify Ahuja for such amounts.

159.    Ahuja is further entitled to judgment against King Group for such amounts.

## COUNT VIII – DECLARATORY JUDGMENT

160.    The Crown Respondents re-state their allegations contained in the preceding paragraphs of these Counterclaims as if fully set forth verbatim herein.

161.    Ahuja claims that Arora forged the King Group Amended and Restated Operating Agreement to change the membership interests in King Group.

162.    Ahuja further claims that Arora has added Vineet as a member of King Group, without the knowledge or authorization of Ahuja.

163.    The parties are in a position of uncertainty regarding the operative governing documents of King Group and the membership interest holders of King Group.

164.    There is an actual controversy between the parties.

165.    Ahuja therefore requests that the Court declare (i) that the King Group Amended and Restated Operating Agreement is the operative governing document of King Group, (ii) that the Forged King Group Amended and Restated Operating Agreement is not the operative governing document of King Group and has no force or effect and is null and void, (iii) that Ahuja is the holder of at least thirty-eight percent (38%) of the membership interests of King Group, and (iv) that Vineet does not hold any membership interest in King Group.

## COUNTERCLAIMS RELATING TO ZILLIONAIRE

### COUNT IX – BREACH OF THE ZILLIONAIRE OPERATING AGREEMENT
### (King Group)

166.    The Crown Respondents re-state their allegations contained in the preceding paragraphs of these Counterclaims as if fully set forth verbatim herein.

167.    The operative agreement governing Zillionaire is the Zillionaire Amended Operating Agreement.

168.    The Zillionaire Amended Operating Agreement provides that the Debtor and King Group each hold a fifty percent (50%) membership interest in the company, as of November 20, 2019.

169.    King Group breached the terms of the Zillionaire Amended Operating Agreement through the following acts:

    a.  At times after November 20, 2019, King Group transferred money from the bank accounts of Zillionaire to its other accounts, without the knowledge or authorization of the Debtor, and not for business purposes related to Zillionaire;

    b.  At times after November 20, 2019, King Group transferred money from the bank accounts of Zillionaire to the accounts of other companies managed, owned, or operated by King Group and its affiliates, such as Arora, without the knowledge or authorization of the Debtor, and not for business purposes related to Zillionaire;

    c.  King Group caused an alleged debt owed by Arora's sister, Harsimran, to be purchased or assumed by Zillionaire; and

    d.  King Group initiated a lawsuit against the Debtor and other Respondents, without the consent or authorization of the Debtor, a member of Zillionaire.

170.    In addition, some or all of the foregoing acts further constitute prohibited transactions as defined by Section 15.01 of the Zillionaire Amended Operating Agreement.

171.    As a direct and proximate result of King Group's breach(es) of the Zillionaire Amended Operating Agreement, the Debtor has and continues suffering an injury.

172.    The Debtor is therefore entitled to (i) a judgment against King Group in an amount to be determined at trial, and (ii) an award of attorney's fees and costs pursuant to O.C.G.A. § 13-6-11, as King Group has acted in bad faith, has been stubbornly litigious, and has caused unnecessary trouble and expense.

173.    Alternatively, the Debtor is entitled to an order requiring King Group, the defaulting member of Zillionaire, to proceed according to Section 15.03(a)-(c) of the Zillionaire Amended Operating Agreement.

**COUNT X – TORTIOUS PROCUREMENT OF
BREACH OF FIDUCIARY DUTIES
(Arora and Vineet)**

174.    The Crown Respondents re-state their allegations contained in the preceding paragraphs of these Counterclaims as if fully set forth verbatim herein.

175.    The Debtor is a member in Zillionaire pursuant to the Zillionaire Amended Operating Agreement.

176.    The other member in Zillionaire is King Group pursuant to the Zillionaire Amended Operating Agreement.

177.    Arora signed the Zillionaire Amended Operating Agreement on behalf of King Group as King Group's manager.

178.    As a member and manager of Zillionaire, King Group owes fiduciary duties to Zillionaire and its members, including the Debtor.

179.    This fiduciary duty requires King Group to act in good faith and in the best interests of Zillionaire and its members, namely the Debtor.

180.    Arora and Vineet, without the consent or permission of the Debtor, participated all of the actions described in paragraph 169 of these Counterclaims.

181.    The foregoing acts, as discussed above, represent a breach of the fiduciary duty owed to the Debtor by King Group.

182.    Arora and Vineet have tortiously procured a breach of the fiduciary duty owed to the Debtor by King Group.

183.    As an actual and proximate cause of Arora's actions, the Debtor has suffered an injury.

184.    The Debtor is therefore entitled to (i) a judgment against Arora and Vineet in an amount to be determined at trial, (ii) an uncapped award of punitive damages, as Arora and Vineet acted with specific intent to harm the Debtor, and (iii) an award of attorney's fees and costs pursuant to O.C.G.A. § 13-6-11, as Arora and Vineet have acted in bad faith, have been stubbornly litigious, and have caused unnecessary trouble and expense.

### COUNT XI – CONSPIRACY
### (Arora, Vineet, and Other Persons)

185.    The Crown Respondents re-state their allegations contained in the preceding paragraphs of these Counterclaims as if fully set forth verbatim herein.

186.    In committing the various tortious and unlawful acts alleged in paragraphs 169 through 183 of these Counterclaims, Arora, Vineet, and other persons, acted in concert and in furtherance of a common plan or scheme in which they all participated, having the goal of obtaining possession and control of the Debtor's property and funds through unlawful means and

breaching fiduciary duties owed to the Debtor under the Zillionaire Amended Operating Agreement.

187.    Liability for the unlawful conduct of Arora, Vineet, or other persons in furtherance of the conspiracy should therefore be imputed to all the others.

188.    The Debtor is therefore entitled to (i) a judgment against Arora, Vineet, and other persons in an amount to be determined at trial, (ii) an uncapped award of punitive damages, as Arora, Vineet, and other persons acted with specific intent to harm Ahuja, and (iii) an award of attorney's fees and costs pursuant to O.C.G.A. § 13-6-11, as Arora, Vineet, and other persons acted in bad faith, have been stubbornly litigious, and have caused unnecessary trouble and expense.

## COUNT XII – INDEMNIFICATION BY ZILLIONAIRE
### (Zillionaire)

189.    The Crown Respondents re-state their allegations contained in the preceding paragraphs of these Counterclaims as if fully set forth verbatim herein.

190.    The Zillionaire Amended Operating Agreement provides at Section 11.02 therein that "[t]he Company shall indemnify and hold harmless the Members, and Manager(s), from and against any and all claims and demands whatsoever arising in connection with the Company to the fullest extent provided by Section 14-11-306 of the Act and applicable law."

191.    Claims and demands have been asserted against the Debtor, and as a member of Zillionaire, the Debtor is entitled to be indemnified by Zillionaire against such claims and demands, including but not limited to any damages assessed against the Debtor and the Debtor's attorney's fees and costs accrued in defending against such claims and demands.

192.    The Debtor is entitled to a decree that Zillionaire is responsible for and must indemnify the Debtor for such amounts.

193.    The Debtor is further entitled to judgment against King Group for such amounts.

## COUNT XIII – DECLARATORY JUDGMENT

194.     The Crown Respondents re-state their allegations contained in the preceding paragraphs of these Counterclaims as if fully set forth verbatim herein.

195.     The Debtor claims a fifty percent (50%) membership interest in Zillionaire, pursuant to the Zillionaire Amended Operating Agreement, which is the operative governing document for the company.

196.     The parties are in a position of uncertainty regarding the operative governing documents of Zillionaire and the membership interest holders of Zillionaire.

197.     There is an actual controversy between the parties.

198.     The Debtor therefore requests that the Court declare (i) that the Zillionaire Amended Operating Agreement is the operative governing document of Zillionaire, and (ii) that the Debtor is the holder of fifty percent (50%) of the membership interests in Zillionaire.

## <u>COUNTERCLAIMS RELATING TO 2318 OLD CORNELIA</u>

## COUNT XIV – TORTIOUS DEPRAVATION OF MEMBERSHIP INTEREST
## IN KING PACKAGE, LLC
### (Arora)

199.     The Crown Respondents re-state their allegations contained in the preceding paragraphs of these Counterclaims as if fully set forth verbatim herein.

200.     In or around 2017, Jonika and Charanjeev paid approximately $75,000 to King Group, which was to be used in a liquor store business – King Package, LLC ("**King Package**") – located at 2318 Old Cornelia.

201.     Arora is a member and manager of King Package.

202.    In connection with this payment to King Group, to be used by King Package, Arora promised in exchange to provide Ahuja with a twenty-five percent (25%) membership interest in King Package.

203.    After making the payment, Ahuja and his family members started managing and running the liquor store owned and operated by King Package.

204.    The Debtor also received a distribution in February 2020 from King Package.

205.    In March 2020, however, Arora and other persons locked Ahuja and his family members out of the liquor store business, including but not limited to shutting off access to bank accounts and prohibiting them from entering the premises.

206.    Arora never provided Ahuja with his membership interest in King Package, as had been promised by Arora at or around the time Jonika and Charanjeev made the payment to King Group, to be used by King Package.

207.    Arora made the promise knowing it to be false and obtained payment for his companies at the time – King Group and King Assets – from Jonika and Charanjeev.

208.    By failing to provide Ahuja a twenty five percent (25%) membership interest in King Package and later locking Ahuja and his family members out of the business of King Assets, Arora tortiously depraved Ahuja of his interest in King Group.

209.    Jonika, Charanjeev, and Ahuja are therefore entitled to (i) a judgment against Arora in an amount to be determined at trial, (ii) an uncapped award of punitive damages, as Arora acted with specific intent to harm Jonika, Charanjeev, and Ahuja, and (iii) an award of attorney's fees and costs pursuant to O.C.G.A. § 13-6-11, as Arora acted in bad faith, has been stubbornly litigious, and has caused unnecessary trouble and expense.

## COUNT XV – FRAUD
### (Arora)

210.    The Crown Respondents re-state their allegations contained in the preceding paragraphs of these Counterclaims as if fully set forth verbatim herein.

211.    Through the foregoing acts described in paragraphs 200 through 209 of these Counterclaims Arora obtained possession and control of Jonika and Charanjeev's funds and continues to retain Ahuja's membership interest in King Package, through fraud, fraudulent inducement, and deception as further alleged in these Counterclaims.

212.    Jonika, Charanjeev, and Ahuja are therefore entitled to (i) a judgment against Arora in an amount to be determined at trial, (ii) an uncapped award of punitive damages, as Arora acted with specific intent to harm Jonika, Charanjeev, and Ahuja, and (iii) an award of attorney's fees and costs pursuant to O.C.G.A. § 13-6-11, as Arora acted in bad faith, has been stubbornly litigious, and has caused unnecessary trouble and expense.

## COUNTERCLAIMS RELATING TO THE PROPERTIES JOINTLY OWNED BY THE DEBTOR AND KING GROUP

## COUNT XVI – INJUNCTIVE RELIEF
### (King Group, Arora and Vineet)

213.    The Crown Respondents re-state their allegations contained in the preceding paragraphs of these Counterclaims as if fully set forth verbatim herein.

214.    Zillionaire, which the Debtor has a membership interest in, owns the real property at 90 Hunters.

215.    The Debtor jointly owns the following properties with King Group: 106 Commerce Street in Fayetteville, Georgia ("**106 Commerce**"), 3811 Flat Shoals Parkway in Decatur, Georgia ("**3811 Flat Shoals**"), and 2723 Roosevelt Highway in College Park, Georgia ("**2723 Roosevelt**").

216.    On 90 Hunters, Arora, Vineet and others associated with King Group have met with the tenant in said property and falsely indicated that the property was going to be non-judicially foreclosed.

217.    On 106 Commerce, King Group has failed and refused to permit the Debtor to obtain property and other insurance on said property.

218.    King Group, Arora and Vineet had previously canceled the insurance on 106 Commerce through a reversal of ACH payments made to the insurance company and refused to reimburse the insurance company.

219.    On 3811 Flat Shoals, the Debtor has demanded that King Group allow the placement of insurance on said property, to which King Group, Arora and Vineet have either not responded or refused.

220.    The Debtor is without an adequate remedy at law and requests that the Court employ equity to compel King Group to act.

221.    Specifically, the Debtor requests the following equitable relief: (i) that the Court compel King Group, Arora, and Vineet to either place or permit the Debtor to place insurance on 106 Commerce and 3811 Flat Shoals, and (iii) that the Court enjoin King Group, Arora, and Vineet from further communicating with the tenant at 90 Hunters Chase.

## **COUNTERCLAIMS RELATING TO MISCELLANEOUS CLAIMS**

### **COUNT XVII - INJUNCTIVE RELIEF FOR VIOLATIONS OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT (O.C.G.A. § 10-1-370 ET SEQ.) (Arora and Vineet)**

222.    The Crown Respondents re-state their allegations contained in the preceding paragraphs of these Counterclaims as if fully set forth verbatim herein.

223.    Arora and Vineet have disparage the business of another – the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC – by making false or misleading representation(s) of fact.

224.    Arora and Vineet have engaged in conduct which similarly creates a misunderstanding.

225.    Such actions violate the Georgia Uniform Deceptive Trade Practices Act, namely O.C.G.A. § 10-1-372(a)(8) and (11).

226.    As an actual and proximate cause of Arora and Vineet's statements, the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC have and continue to suffer an injury.

227.    Pursuant to O.C.G.A. § 10-1-373(a), the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC are entitled to temporary, interlocutory, and permanent injunctive relief against Arora and Vineet, and any other person or entity acting on their behalf, prohibiting them from (i) communicating with any third party lenders of the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC, (ii) communicating with any third parties, included but not limited to tenants, vendors, and authorities, except their counsel and other representatives, in any way associated with the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC, and (iii) filing any non-privileged affidavits or other documents in the real estate records of any county concerning any real property owned by the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC.

### COUNT XVIII – TORTIOUS INTERFERENCE WITH BUSINESS
### OR CONTRACTUAL RELATIONS
### (Arora and Vineet)

228.    The Crown Respondents re-state their allegations contained in the preceding paragraphs of these Counterclaims as if fully set forth verbatim herein.

229.    As discussed in the Notice of Removal which initiated this adversary proceeding [Dkt. No. 1 at 3-4], the Debtor and other Respondents hold title to real estate and are obligors or guarantors on various loans secured by such real estate.

230.    Arora and Vineet have committed the following tortious acts against the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC:

    a.    Arora has sent unsolicited e-mail communications to the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC's lenders and other third parties claiming that the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC were engaged in various fraudulent schemes.

    b.    Arora and Vineet have provided false information to police and other authorities, causing police reports to be generated.

    c.    Arora and Vineet have filed and recorded the False Affidavits.

    d.    Arora and Vineet have made unsolicited communications to third party vendors of the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC, including tenants

and brokers associated with the real property discussed in the Notice of Removal [Dkt. No. 1 at 3-4.]

    e.    Arora and Vineet have made unsolicited communications to third parties in an attempt to cause the Debtor to default on purchase and sale contracts and offers concerning the real property at 90 Hunters and 4319 Covington Highway in Decatur, Georgia ("**4319 Covington**").

231.    By the above such acts, Arora and Vineet engaged and continue to engage in tortious interference with the business or contractual relations of the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC.

232.    The intent of such acts by Arora and Vineet was and is to provide leverage to them in an apparent on-going dispute regarding the disposition of the assets of King Group.

233.    The further intent of such acts by Arora and Vineet was and is to destroy the business or contractual relations of the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC.

234.    Arora and Vineet acted improperly and without privilege by communicating directly with third parties, to whom neither Arora nor Vineet have any contractual or business relationship with concerning the real property discussed in the Notice of Removal [Dkt. No. 1 at 3-4.]

235.    Arora and Vineet acted purposefully, with malice, and with the specific intent to injure the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC.

236.    The conduct of Arora and Vineet is the actual and proximate cause of the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC's injuries suffered.

237.    The Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC are therefore entitled to (i) judgment against Arora and Vineet in an amount to be determined at trial, (ii) an uncapped award of punitive damages as Arora and Vineet acted with specific intent to harm, and (iii) an award of attorney's fees pursuant to O.C.G.A. § 13-6-11.

## COUNT XIX – DEFAMATION
### (Arora and Vineet)

238.    The Crown Respondents re-state their allegations contained in the preceding paragraphs of these Counterclaims as if fully set forth verbatim herein.

239.    Arora and Vineet made statements about the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC to third parties.

240.    The statements that Arora and Vineet made about the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC to third parties are false.

241.    Arora and Vineet made the statements with malice in an attempt to destroy the business of the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC.

242.    The statements that Arora and Vineet made about the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King

Assets, and Main LLC to third parties tend to injure the reputation of such Respondents and expose such Respondents to public hatred, contempt, or ridicule.

243.    As an actual and proximate cause of Arora and Vineet's statements, the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC have suffered injuries.

244.    The Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC are therefore entitled to (i) judgment against Arora and Vineet in an amount to be determined at trial, (ii) an uncapped award of punitive damages as Arora and Vineet acted with specific intent to harm, and (iii) an award of attorney's fees pursuant to O.C.G.A. § 13-6-11.

**COUNT XX – DEFAMATION PER SE**
**(Arora and Vineet)**

245.    The Crown Respondents re-state their allegations contained in the preceding paragraphs of these Counterclaims as if fully set forth verbatim herein.

246.    Arora and Vineet made statements about the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC to third parties with an intent to injure such Respondents in reference to their trade and office and attempt to impute such Respondents with crime(s) punishable by law.

247.    The statements that Arora and Vineet made about the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC to third parties are false.

248.    Arora and Vineet made the statements with malice in an attempt to destroy the business of the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC.

249.    The statements that Arora and Vineet made about the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC to third parties constitute defamation per se.

250.    Arora has ignored a cease and desist letter from the Debtor and other Respondents' counsel.  Arora and Vineet have also ignored abusive litigation letters sent to their counsel by counsel for the Debtor and other Respondents.

251.    As an actual and proximate cause of Arora and Vineet's statements, the Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC have suffered injuries.

252.    The Debtor, Charanjeev, Ahuja, Jarnail, Jonika, Pinetree Management, Covington LLC, Dykes LLC, Oglethorpe LLC, King Assets, and Main LLC are therefore entitled to (i) judgment against Arora and Vineet in an amount to be determined at trial, (ii) an uncapped award of punitive damages as Arora and Vineet acted with specific intent to harm, and (iii) an award of attorney's fees pursuant to O.C.G.A. § 13-6-11.

### COUNT XXI – FRAUD REGARDING CREDIT CARD
### BALANCE TRANSFER TRANSACTIONS
#### (Arora and Vineet)

253.    The Crown Respondents re-state their allegations contained in the preceding paragraphs of these Counterclaims as if fully set forth verbatim herein.

254.    In 2018, Jarnail made payments from his credit cards to King Group and other members of the family to pay for debts of the family, which in turn Arora, Vineet, and others promised to be paid back by King Group before the balance started accruing interest on the expiration of the balance transfer offer.

255.    This was the normal course of business between the parties.

256.    In August 2020, however, Arora and Vineet reported the balance payments made to Jarnail's credit card as fraudulent to their credit card company – Bank of America.

257.    Chase Bank and Discover Bank reversed the balance transfers on the credit cards, over a year after they had been completed.

258.    This resulted in balances coming back to Jarnail's credit cards and Jarnail is having to make payments on same with interest, fees, and penalties in order to avoid damage to his credit standing with creditor and credit reporting bureaus.

259.    The amount of the balance transfers reversed by Arora and Vineet totals approximately $39,500.

260.    Arora and Vineet made these promises and statements and acted in such manner, even though they knew they were false and would later attempt to reverse the transactions.

261.    Arora and Vineet's promises, statements, and actions were relied upon by Jarnail in making the payments to King Group and other family members

262.    Arora and Vineet's statements and actions were further relied upon by Bank of America in reversing the payments made to the Chase Bank and Discover Bank credit cards owned and controlled by Jarnail.

263.    Arora and Vineet took the step of reversing the payments almost a year after they had been completed.

264.    As a direct and proximate result of Arora and Vineet's statements and actions, Jarnail has suffered and continues to suffer an injury.

265.    Jarnail is therefore entitled to (i) judgment against Arora and Vineet in an amount to be determined at trial, (ii) an uncapped award of punitive damages as Arora and Vineet acted with specific intent to harm, and (iii) an award of attorney's fees pursuant to O.C.G.A. § 13-6-11.

## COUNT XXII – FRAUD REGARDING CREDIT CARD TRANSACTIONS
### (Arora, Vineet and King Group)

266.    The Crown Respondents re-state their allegations contained in the preceding paragraphs of these Counterclaims as if fully set forth verbatim herein.

267.    In January or February 2019, Jonika made approximately $175,000 in payments to King Group and payments on credit cards controlled by Arora and King Group, which Arora, Vineet, and King Group promised to pay back before the balance started accruing interest upon expiration of the balance transfer offer.

268.    Arora, Vineet, and King Group made the statements, even though they knew they were false.

269.    Arora, Vineet, and King Group's statements were relied upon by Jonika when she made the payments referenced above.

270.    Now, Arora, Vineet, and King Group claim that the August 2019 settlement transactions and other subsequent agreements should be rendered null and void.

271.    Further, Arora, Vineet, and King Group have not made any effort to pay the amounts owed to Jonika.

272.    As a direct and proximate result of Arora, Vineet, and King Group's statements and actions, Jonika has suffered and continues to suffer an injury.

273.    Jonika is therefore entitled to (i) judgment against Arora and Vineet in an amount to be determined at trial, (ii) an uncapped award of punitive damages as Arora and Vineet acted with specific intent to harm, and (iii) an award of attorney's fees pursuant to O.C.G.A. § 13-6-11.

## COUNT XXIII – UNJUST ENRICHMENT
### (Arora, Vineet and King Group)

274.    The Crown Respondents re-state their allegations contained in the preceding paragraphs of these Counterclaims as if fully set forth verbatim herein.

275.    In the alternative, the payments made by Jonika to or on behalf of Arora, Vineet, and King Group as discussed in the above paragraphs 267 through 273, provided a benefit to Arora, Vineet and King Group.

276.    Arora, Vineet, and King Group, have been unjustly enriched by Jonika's payments.

277.    Jonika is therefore entitled to (i) judgment against Arora and Vineet in an amount to be determined at trial, (ii) an uncapped award of punitive damages as Arora and Vineet acted with specific intent to harm, and (iii) an award of attorney's fees pursuant to O.C.G.A. § 13-6-11.

WHEREFORE, the Crown Respondents respectfully request that the Court:

(a)  Enter judgment against Petitioners as requested herein;

(b)  Enter other decrees and orders as requested herein;

(c)  Enter an uncapped award of punitive damages against some or all of the Petitioners as requested herein;

(d)  Enter an award of attorney's fees and costs under O.C.G.A. § 13-6-11 against some or all of the Petitioners as requested herein;

(e)  Enter any further and necessary relief.

Pursuant to Federal Rule of Bankruptcy Procedure 7008, the Crown Respondents consent to the entry of final orders or judgment by the bankruptcy court.

[Signature of Counsel on Following Page]

Respectfully submitted this 28th day of October, 2020.

**ROUNTREE LEITMAN & KLEIN, LLC**

/s/ David S. Klein
William A. Rountree
Georgia Bar No. 616503
wrountree@rlklawfirm.com

David S. Klein
Georgia Bar No. 183389
dklein@rlklawfirm.com

Benjamin R. Keck
Georgia Bar No. 943504
bkeck@rlklawfirm.com

*Proposed Counsel for the Debtor Crown Assets, LLC
and Counsel for the Remaining Crown Respondents*

Century Plaza I
2987 Clairmont Road, Suite 175
Atlanta, Georgia 30329
(404) 584-1238

- and -

**MATT THIRY LAW, LLC**

/s/ Matthew R. Thiry
Matthew R. Thiry
Georgia Bar No. 100131
Matt@MattThiryLaw.com

*Proposed Special Counsel for the Debtor Crown
Assets, LLC and Counsel for the Remaining Crown
Respondents*

P.O. Box. 923054
Peachtree Corners, Georgia 30010
(678) 883-6127

# EXHIBIT A-1

*** UNCERTIFIED DRAFT ***

1          THE COURT:  Good afternoon, gentlemen.  This is the
2    matter of Arora, et al. versus -- is it pronounced
3    Ahuja -- Ahuja?
4          MR. KLEIN:  Yes, Your Honor.
5          THE COURT:  All right.  Before the Court is the
6    defendant's motion to cancel the lis pendens.
7          Who is representing the plaintiff in this matter?
8          MR. DOMINY:  Michael Dominy, Your Honor.
9          THE COURT:  Thank you, Mr. Dominy.
10          And on behalf of -- there's several defendants  but
11    on behalf of the defendants?
12          MR. KLEIN:  Your Honor, David Klein.  I represent
13    all of the defendants except for the 2551' entities and
14    also my cocounsel, Matt Thiery, who entered an appearance
15    this morning, is on the line.  He won't be arguing today.
16          THE COURT:  And who's representing the 2551'
17    entities?  Do you know?
18          MR. KLEIN:  So they have just retained counsel but
19    they haven't -- I don't believe they have been served and
20    they are not a part of this motion.
21          MR. DOMINY:  They have been served, Judge, just
22    recently.
23          THE COURT:  So you concur, Mr. Dominy, that there
24    is -- that they don't have a dog in this fight and we can
25    proceed?

*** UNCERTIFIED DRAFT ***

1          MR. DOMINY:  That's correct.

2          THE COURT:  All right.  Then you may proceed,

3     Mr. Klein.

4          MR. KLEIN:  Thank you, Your Honor.

5          Again, David Klein for the moving respondent in this

6     case.  My cocounsel Matt Thiery is on the line as well.

7     We appreciate the Court's attention to this matter in

8     scheduling this hearing today.

9          As discussed in the affidavits filed with the motion

10    my clients are continuing to suffer harm as a result of

11    the notices of lis pendens that have been filed by the

12    petitioners in this case.  That includes high interest

13    rates, the ability to refinance properties and problems

14    being created with their tenants and lenders as a result

15    of these notices of lis pendens.

16         We contend that the petitioners' strategy here in

17    filing this lawsuit and filing notices of lis pendens is

18    to simply lock down the assets of my clients in order to

19    gain an advantage in this litigation.  Their attempt to

20    file these notices of lis pendens is nothing more than an

21    attempt to effectuate what's essentially a prejudgment

22    attachment which is not permitted considering the

23    circumstances of this case nor is it supported by Georgia

24    law.

25         I would like to provide the Court with a little bit

2

*** UNCERTIFIED DRAFT ***

1    of background in terms of what's alleged in the
2    proceedings.  This lawsuit arises from a familial
3    business dispute.  All the clients here are originally
4    from India.  And the petitioners, Mr. Arora and
5    Mr. Singh -- Vineet Singh are brothers.
6        My clients, Charanjeev Singh and Mr. Ahuja, are
7    cousins of the petitioners.
8        The other respondents, Jarnail and Jonika, are the
9    aunt and uncle of the petitioners in this case.
10       All of the LLCs that are the respondents in this
11   case, except for King Assets, are owned and operated by
12   Mr. Ahuja.  And King Assets is operated by my client
13   Charanjeev Singh.  The moving respondents rely on the
14   management of the real estate and the construction of
15   real estate and the sale of real estate as their -- as
16   their primary source of income.
17       So going back to 2014, the various family members
18   formed an entity called King Group Management -- MGMT,
19   LLC.  So there are multiple members of this company.  And
20   the purpose of this company was to invest in real estate
21   here in the United States, primarily in Georgia.
22       And over the course of several years this seemed to
23   be working okay.  And at times in 2019 there was
24   essentially a falling out amongst the family members.
25   And in August of 2019 there was essentially a settlement

3

**\*\*\* UNCERTIFIED DRAFT \*\*\***

1    reached between each side of the family.  And Mr. Arora,
2    one of the petitioners, as part of that settlement,
3    directed his attorney Joel Haber, who is an attorney in
4    Conyers to draft up a number of documents to effectuate
5    the settlement agreement.
6         Many of these documents are actually in the
7    pleadings.  They're attached to the first amended
8    petition that was filed by the petitioners in this case.
9    They're attached as Exhibits A through N and they consist
10   of operating agreements and warranty deeds and things
11   like that.  That were all prepared by Mr. Haber's office.
12   And Mr. Haber's office is actually indicated as being the
13   preparer of these documents directly on the face of the
14   documents.
15        The documents, again, consisted of the transfer of
16   certain membership interest in companies like King Group
17   and another company called Maharaja, which is another
18   petitioner in this case, and the transfer of assets and
19   liabilities amongst the parties respective limited
20   liability companies.  So essentially this was supposed to
21   be a split of the two sides of the family to be
22   effectuated through all these agreements that were
23   signed.
24        In November of 2019, after the majority of the
25   documents were signed in August of 2019, there were

4

**\*\*\* UNCERTIFIED DRAFT \*\*\***

1    additional membership interest transferred.  The
2    transferrer's name -- namely in a company called
3    Zillionaire Assets, LLC.  That again is another one of
4    the petitioners.  That additional membership interest
5    transfer's reflected on Exhibit A that the petitioners
6    attached to the first amended petition.
7        Of the real property interest that were transferred
8    in connection with August 2019 settlement, the
9    petitioners actually retained interest in these
10   properties.  There were usually 50 percent of the
11   property interest being transferred to my client's
12   company, while the petitioner's company retained interest
13   in those properties.  It's my understanding that those
14   properties have since been sold and the proceeds have
15   been distributed amongst the petitioners and my clients.
16   So that all occurred after the 2019 settlement documents.
17       This lawsuit was filed, Your Honor, by the
18   petitioners on August 7, 2020.  This was almost a year
19   after the August 2019 settlement transaction.  And at the
20   time that the petition was filed my clients' lender on a
21   property down in Thomasville, Georgia, which is owned
22   partially by my clients' company Crown Assets, LLC, that
23   lender had actually already filed a lawsuit due to
24   various affidavits and statements that were being made to
25   the lender by petitioners.  Some of those statements are

*** UNCERTIFIED DRAFT ***

1        reflected in the pleadings in this case.  So there's
2        actually a suit that's pending currently in Thomas County
3        Superior Court.  Some of the respondents have filed
4        answers in that case.
5             In late 2000 -- excuse me -- in late August 2020,
6        the last month, my clients discovered that the
7        petitioners had filed notices of lis pendens in relation
8        to this case against various properties in different
9        counties that my clients owned. It's basically their
10       entire real estate portfolio that these lis pendens have
11       been filed against.  We spell out the effected properties
12       that I refer to them as in the motion.  That is all
13       spelled out and the property addresses are spelled in
14       page 3 of the motion that I filed with the Court.  And
15       all of the notices of lis pendens are attached as Exhibit
16       A to the motion.
17            Importantly, each notice of lis pendens states
18       specifically the grounds that their -- the petitioners
19       are alleging they are permitted to file the notices of
20       lis pendens.  And it's all based upon petitioners' claim
21       in their petition for imposition of an "equitable lien"
22       as they call it.
23            So moving on to the argument, Your Honor, a lis
24       pendens provides notice to third parties of a dispute
25       that request relief to a particular property.  On

*** UNCERTIFIED DRAFT ***

1    notices -- a notice of lis pendens is only appropriate if
2    the real property is actually and directly brought into
3    the litigation by the pleadings in a pending lawsuit and
4    as to which some relief is sought respective to that
5    particular property.
6          So if an alleged interest cannot be enforced in law
7    or in equity, then a notice of lis pendens is not
8    authorized and it should be canceled by the Court.  And
9    my clients and I rely on three primary reasons for moving
10   to cancel these lis pendens and why they should be
11   canceled by the Court.
12         The first reason is that the claims in the
13   petition and the first amended petition that formed the
14   basis for these notices of lis pendens filed against the
15   effected properties do not actually involve real
16   property.  And we rely on the case that we cite to in our
17   brief Meadow Springs, LLC vs. IH Riverdale, LLC, 286
18   Georgia 701, 2010, Supreme Court case, which held a
19   limited liability company interest is personal property.
20   A member has no interest in specific limited liability
21   company property.
22         And so basically, the take away from that case is
23   that if a claim involves personal property interest such
24   as a membership interest in an LLC, then the real
25   property is not really involved.  It's not directly being

7

*** UNCERTIFIED DRAFT ***

1    effected by the litigation.
2         Your Honor, in this case we have a familial dispute.
3    We have a business-familial dispute that arose out of a
4    settlement transaction occurring over a year ago in
5    August of 2019.  There are also concerns, like I said,
6    the transfer of membership interests in a company called
7    Zillionaire Assets that occurred in November of 2019 of
8    last year.
9         So based on the pleadings there are various personal
10    property interests that were transferred in connection
11    with the settlement transactions to essentially
12    effectuate a split of the family.  And while interest in
13    real estate were transferred, those properties have since
14    been sold by the parties and proceeds have gone,
15    admittedly in pleadings, to both my clients and to the
16    petitioners.  So they have received proceeds from the
17    sale of real estate that has occurred after this
18    purported transaction that purportedly occurred under
19    duress in August of 2019.
20         The properties that the petitioners have filed lis
21    pendens against in this case were not part of that
22    original transaction.  Instead they were simply part of
23    my clients' real estate portfolio.  They went out and
24    filed notices of lis pendens essentially against all the
25    properties that my clients own as part of the real estate

**\*\*\* UNCERTIFIED DRAFT \*\*\***

1    portfolio and they derive income from.

2         And since the August 2019 and the related

3    November 2019 transactions in reality involving the

4    transfer of personal property interest, they are not

5    permitted to file lis pendens under the reasoning in the

6    Meadow Springs case.

7         Secondly, petitioners' claims allegedly supporting

8    the placement of these lis pendens against my clients'

9    property are going to fail as a matter of law.  That is

10   directly derived from what is in the pleadings in this

11   case.

12   Every single one of the petitioners' claims in this

13   case hinge on an allegation that my clients used the

14   threat of releasing what they call false and defamatory

15   information about Mr. Arora and Mr. Vineet Singh's

16   sister.  And they, you know, allegedly were going to

17   release this false and defamatory information to the

18   groom-to-be's family members because there was a wedding

19   taking place in India at some point in 2019.  And so

20   their entire argument in this case is that they were

21   under duress and they were being extorted by my clients

22   who were allegedly going to release false and defamatory

23   information to effectively mess up a wedding that was

24   going to occur in India in 2019.  That is the sole basis

25   for their claims in this case.

*** UNCERTIFIED DRAFT ***

1           And Your Honor, it is well established and we cite
2      to the Techwerks case, 274 Georgia App. 673.  It's a 2005
3      George Court of Appeals decision.  That case said when a
4      signer of agreement is sophisticated in business matters
5      and has access and in fact obtains the advice of counsel,
6      the defense -- the contractual defense of duress is not
7      available to void a contract or an agreement.
8           So the petition itself -- the pleadings itself
9      establish that Mr. Arora and Vineet Singh are
10     sophisticated in business matters.  They talk about how
11     they've invested all of this money in real estate over
12     the last several years, that they have bought properties
13     all over the state, all over the country.  These are very
14     sophisticated individuals.
15          Then you go on and look at the petition.  And in
16     particular, the first amended petition that was filed in
17     this case, especially the exhibits that were attached to
18     the first amended petition.
19          THE COURT:  Mr. Klein, I don't want to cut you off,
20     Counsel.  But I do want to remind you that I only set
21     aside 15 minutes per side in connection with oral
22     argument, unless a request is made for additional time.
23     And you did not make such a request.
24          THE STAFF ATTORNEY:  Judge?
25          THE COURT:  Yes.

                                                              10

*** UNCERTIFIED DRAFT ***

1          THE STAFF ATTORNEY:  Judge, it was my error.
2    Additional time was requested --
3          THE COURT:  When was that?
4          THE CASE MANAGER:  -- of 30 minutes.  It was -- it
5    was timely requested.  I just timely didn't provide  it
6    to the Court.  So that is my error.
7          Moving respondent requested 30 minutes and
8    petitioner requested 10 minutes.
9          THE COURT:  All right.  I still think, Mr. Klein, we
10   need to move along.
11         MR. KLEIN:  I just have two more --
12         THE COURT:  So I just ask you wrap up.
13         MR. KLEIN:  Understood, Your Honor.  I just have two
14   more points if I have 10 minutes, maybe five minutes, I
15   should be able to wrap up.
16         Again, we cite to the Techwerks case.  You have --
17   you can't -- you can't sustain a claim for duress if
18   somebody's sophisticated in business matters and then
19   they use that term.  In all the documents they've
20   attached to their first amended petition, it's clear they
21   used an attorney to effectuate this 2019 settlement.  And
22   in response to the petitioner's claim -- in their
23   response brief they claim, without any citation to
24   anything, that the Techwerks case is an opposite because
25   it's not an economic duress situation.  I'm not aware of

**\*\*\* UNCERTIFIED DRAFT \*\*\***

1       any case law distinguishing between duress addressed in
2       Techwerks and the alleged duress and extortion in this
3       case.  So I think the Techwerks case still applies.
4               So because their claims are essentially based on
5       this duress argument, they're going to fail and under the
6       Techwerks standard.  And these notices of lis pendens
7       never should have been filed by the petitioners.
8               And finally, Your Honor, the third point is that the
9       sole basis for the notices of lis pendens that's evident
10      on the face of the lis pendens -- it actually says
11      this -- is that it's a claim for equitable lien.  And
12      again, that's in the petition, the first amended
13      petition, and on the face of notices of lis pendens.
14              And we cite to the Stewart case, which is 254
15      Georgia 81, a 1983 case and just the statute, O.C.G.A.
16      23-1-4.  It's well established that a party can't obtain
17      equitable relief if there's an adequate remedy at law.
18      And the adequate remedy at law here is a monetary
19      judgment and they actually ask for it throughout the
20      petition against my clients.
21              So they're not going to be able to get an equitable
22      lien because equity shouldn't come into play here.  What
23      they should be seeking and what they have sought is a
24      monetary judgment against my clients.
25              Your Honor, there's also been a number -- just very

*** UNCERTIFIED DRAFT ***

1     briefly, there's been a number of motions filed in the
2     last 24 hours.  For instance, petitioners filed like a
3     20-page motion for attorney's fees.  We would obviously
4     ask for the Court to deny that request.  But in any
5     event, it's not ripe for the Court's consideration.  If
6     the Court's not going to decline it today, then we would
7     request time to respond.  Also --
8          THE COURT:  The only thing we are hearing today,
9     Mr. Klein, is your motion.  So if there are other matters
10    that were filed within the last 24 hours, they are not on
11    the calendar.
12         Anything else?
13         MR. KLEIN:  No, Your Honor.  Just, you know, I would
14    ask to reserve just a brief minute or two of rebuttal
15    time if I need to address anything that Mr. Dominy brings
16    up in his oral argument.
17         Thank you, Your Honor.
18         THE COURT:  Mr. Dominy?
19         MR. DOMINY:  Thank you, Judge.
20         The issue before the Court for a decision on this
21    motion is very narrow.  And that issue is does
22    petitioners' claims involve real property?  That's all.
23         Now, we are at the very first stage of the case and
24    all the Court can do in response to decide a motion such
25    as this at this stage is to look at the pleadings and

*** UNCERTIFIED DRAFT ***

1      make a determination of whether the claims,
2      quote/unquote, involve real property as contemplated by
3      the lis pendens statute.  And that's it.
4          As Mr. Klein pointed out, petitioners' claims
5      involving the property, petitioners' claims against the
6      property are based in equitable lien or constructive
7      trust.  And that is a very well recognized cause of
8      action in Georgia law in which you're following the
9      money.  Someone steals money from you or gets money
10     through some unlawful means and buys real estate with it.
11     It is well settled in Georgia law that the plaintiff can
12     follow that money and recover that money from the
13     property, hence imposition of an equitable lien.
14         Our complaint clearly and unambiguously sets forth
15     all the facts showing that petitioners had a good claim
16     for equitable lien.  We have alleged and if -- we have
17     the tightest case you could possibly imagine from an
18     evidentiary point of view for following the money because
19     the source of the stolen money or extorted money was
20     sales proceeds from property.  We know for a fact that
21     the respondents used that money that they got to buy
22     other investment properties under a 1031 exchange, which
23     Your Honor is familiar with.
24         Basically you roll that money over into another
25     investment property.  And it was several hundred thousand

14

*** UNCERTIFIED DRAFT ***

1    dollars.  We have it to the penny.  And we know exactly
2    what properties they invested -- they purchased with that
3    investment money and those are the properties in issue.
4        So Mr. Klein's argument that our claims do not
5    involve real property is nonsensical.  The plain language
6    of the claims, the allegations and the language of the
7    petition show that, yes, they involve real property.  We
8    are seeking the imposition of a lien on these particular
9    properties.  And under the lis pendens statute we have a
10   statutory right, a right provided by law, to file notices
11   of lis pendens.  And those notices of lis pendens are
12   entirely proper.
13       Mr. Klein's argument seems to be along the lines --
14   it's not really intelligible.  The complaint says what it
15   says.  And Mr. Klein comes back around and tries to say,
16   no, it says something else.  Really what this is about is
17   money damages.  Well, right.  We could be satisfied with
18   money damages but that doesn't mean we don't have a right
19   to impose an equitable lien to recover that money.
20   That's the whole point of it.
21       Mr. Klein raises the issue of certain personal
22   property.  And what he's referring to are the limited
23   liability company interests.  Yes, that's part of the
24   case but those are separate parts of the case.
25       Mr. Klein in his argument and in his brief

*** UNCERTIFIED DRAFT ***

1    repeatedly states that, well, in reality the claims are
2    not what they look to be.  That we are from couching our
3    claims in terms of equitable line or we are using the
4    guise of an equitable lien and that is totally
5    groundless.  As I said, we have firm, factual, support
6    for our causes and claims and there is no relief
7    available for canceling the lis pendens under these
8    circumstances.
9         By the way, Mr. Klein has gotten into a lot of
10   issues here and, you know, I didn't want to interrupt of
11   course.  But these issues are irrelevant.  Mr. Klein is
12   trying to get a backdoor determination on the merits.
13        And I've cited the case law in my brief, Judge.
14   You're not looking at the merits on a motion to cancel
15   lis pendens.  We have not done any discovery.  Mr. Klein
16   comes to court arguing that our claims fail as a matter
17   of law.  No.  That has nothing to do with it.  And what
18   the case law says, and I cite it in my brief -- the issue
19   before you, Judge, is very narrow.  And basically, it
20   could be approached like this:  Does the complaint show
21   on its face that petitioners' claims do not involve real
22   property?
23        Well, clearly they do.  And Mr. Klein's alternative
24   construction of the petition is just totally groundless.
25   It makes no sense at all.

**\*\*\* UNCERTIFIED DRAFT \*\*\***

1          The issue of duress is not properly before the
2     Court.  The Court is not here on the merits.  The issue
3     of equitable relief, that's not before the Court.  The
4     only issue before the Court is do -- do these allegations
5     quote/unquote involve real property?
6          And what that means to get a little more detail in
7     this specific context is, if we were to prevail, would
8     that effect -- would that directly effect these
9     properties?  Well, of course, it would.  Because what it
10    would do would be to result in the imposition of a lien.
11    It's hard to think of any clearer case of any property
12    being impacted by a claim.
13         So the respondent, to summarize -- that's all I
14    have.  To summarize, though, the allegations regarding
15    the merits are not properly before the Court.  That's
16    improper.  The respondents' argument that petitioners'
17    claims do not involve real property are just total
18    nonsense.  They're totally groundless.  And the notices
19    of lis pendens being firmly supported and petitioners'
20    having a statutory right to record them, the Court --
21    there are no grounds for canceling them.
22         Judge, I did file a motion to strike these
23    affidavits but on the grounds it was simply irrelevant.
24    And the main purpose of my filing that motion was to
25    basically alert the Court to the approach that the

*** UNCERTIFIED DRAFT ***

1     respondents are taking, which is, they're trying to make
2     out like this is some equitable claim, that they're being
3     harmed by the notices of lis pendens, irreparable harmed,
4     and so they need to be canceled.  Well, that has nothing
5     to do with it.
6          This is not an equitable issue.  We have a statutory
7     right to record the lis pendens and if that is preventing
8     them from undertaking certain transactions, well, that's
9     the whole purpose of a notice of lis pendens.
10         I mean, if parties are entitled and have grounds to
11    come into court complaining that a notice of lis pendens
12    is preventing them from conveying title, well, that
13    completely eviscerates the statute and renders it
14    meaningless.  And their arguments are meaningless.
15         I would simply say, Judge.  The issue is very
16    narrow.  Do our claims involve real property?  Well, of
17    course they do.  Therefore, this motion has to be denied.
18         That's all I have.  Thank you.
19         THE COURT:  Thank you, Mr. Dominy.
20         Last word, Mr. Klein.
21         MR. KLEIN:  Thank you, Your Honor.
22         First, I think that's the first time I've been
23    called unintelligible.  But I respectfully disagree that
24    my arguments are unintelligible.
25         But essentially, the petitioners in this case --

18

**\*\*\* UNCERTIFIED DRAFT \*\*\***

1       their argument is you can claim duress to try to get out
2       of a contractual agreement.  Then you could file lis
3       pendens no matter what.  It doesn't matter what the case
4       law says in terms of the pleadings related to your duress
5       allegations.  Then you can tie up real property for the
6       duration of the lawsuit.  That's just not what the law
7       is.
8               Number two, I'm not looking at the merits of this
9       case.  I didn't file, you know, some ridiculously long
10      affidavit or anything like that.  The only reason the
11      affidavits were filed was to get a basis for emergency
12      hearing before the Court.
13              I specifically cite to the petitioners' own petition
14      in the first amended petition in the motion.  So these
15      are allegations coming directly out of their own petition
16      that we support our motion on.
17              And then, finally, I believe Mr. Dominy's statement
18      we would be satisfied with monetary damages.  That
19      completely defeats their claim for an equitable lien
20      because there is an alternative adequate remedy at law
21      here, Your Honor.
22              What, again, they're trying to do here is get a
23      judgment lien against these properties before they ever
24      have a judgment.  That's their remedy here, Your Honor.
25              Thank you.

**\*\*\* UNCERTIFIED DRAFT \*\*\***

1        THE COURT:  All right.  Thank you, Counsel, for your
2    arguments.
3        I think Mr. Dominy, actually, Mr. Klein, focused in
4    or honed in on the analysis in which the Court is
5    required to engage based on the motion that you filed.
6    You contend that the petitioner is not entitled to a lis
7    pendens because he is not entitled to equitable relief
8    and that he is seeking monetary damages.  I don't know
9    that that is the standard for the Court to consider.
10        Filing a notice of lis pendens is a right that's
11    provided by law as you know.  The issue before the Court
12    on a motion to cancel is simply whether the claims
13    alleged in the underlying pleading involve the property
14    at issue.
15        I find based on the arguments that have been made by
16    counsel that in fact does.  As such, I believe that
17    Mr. Dominy in this instance has properly asserted his
18    legal right and that there is no basis upon which the
19    Court would be authorized to cancel the notice at this
20    time.
21        So for all of those reasons, your motion is denied.
22        MR. DOMINY:  Shall I prepare an order?
23        THE COURT:  That's fine.  If you will submit it
24    electronically in Word to Ms. Sanders.
25        I wanted to move forward with the case management

*** UNCERTIFIED DRAFT ***

1    hearing, counsel.  But since we have another lawyer who
2    was recently retained, at least according to both
3    parties, to represent the remaining defendants the 255'
4    entities -- I will accept your characterization of that,
5    Mr. Klein -- we are not able to proceed today.
6         However, I have instructed my staff attorney to
7    ensure that this case is placed on the next available
8    case management conference calendar so that we can set
9    appropriate deadlines, provide some guidance for counsel
10   and begin moving this case forward.
11        The lawsuit was filed on August 8th.  So it has not
12   been pending very long.  But however, in light of the
13   fact that all of the parties have now been served,
14   there's no reason for us to delay the setting of a case
15   management conference in the Court's opinion.  And I
16   would like to move forward with such a conference in
17   October.
18        Any objection to that, Mr. Dominy?
19        MR. DOMINY:  Absolutely not.
20        THE COURT:  Mr. Klein?
21        MR. KLEIN:  No, Your Honor.
22        I'm happy to reach out to the other attorney and
23   tell him about that.
24        THE COURT:  All right.
25        MR. KLEIN:  His name is Ramsey Knowles.

*** UNCERTIFIED DRAFT ***

1           THE COURT:  Okay.  Hopefully he's entered an
2      appearance and Ms. Sanders is able to provide notice.
3      The date of that calendar, I believe, is October 28th.
4           Is that correct, Ms. Sanders?  I'm presiding as
5      well.
6           THE CASE MANAGER:  Yes, Judge.
7           THE COURT:  I can tell you the date, the specific
8      time for the case management conference would be some
9      time in the afternoon and that information will be
10     provided upon publication of the calendar.
11          Anything else that the Court needs to take up on
12     your behalf, Mr. Klein?
13          MR. KLEIN:  No, Your Honor.  Thank you for your
14     time.
15          THE COURT:  All right.  Mr. Dominy?
16          MR. DOMINY:  That's all we have.  Thank you, Judge.
17          THE COURT:  When shall we expect the prosposed
18     order, sir?
19          MR. DOMINY:  Today.
20          THE COURT:  Thank you, gentlemen.  Have a good
21     afternoon.
22          MR. DOMINY:  Thank you.
23          MR. KLEIN:  You too.  Thank you.
24
25

# EXHIBIT A

# AMENDED AND RESTATED
# OPERATING AGREEMENT
# OF
# KING GROUP MGMT, LLC

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE GEORGIA UNIFORM SECURITIES ACT OF 2008, AS AMENDED, IN RELIANCE UPON THE EXEMPTION FROM REGISTRATION SET FORTH IN SECTION 10-5-11(14) OF SUCH ACT. IN ADDITION, THESE SECURITIES HAVE NOT BEEN REGISTERED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION IN RELIANCE UPON AN EXEMPTION FROM SUCH REGISTRATION SET FORTH IN THE SECURITIES ACT OF 1933 PROVIDED BY SECTION 4(2) THEREOF, NOR HAVE THEY BEEN REGISTERED WITH THE SECURITIES COMMISSION OF CERTAIN STATES IN RELIANCE UPON CERTAIN EXEMPTIONS FROM REGISTRATION. THESE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD OR TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS AGREEMENT AND IN A TRANSACTION WHICH IS EITHER EXEMPT FROM REGISTRATION UNDER SUCH ACTS OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACTS.

THIS AMENDED AND RESTATED OPERATING AGREEMENT OF **KING GROUP MGMT, LLC** (hereinafter referred to as the "Operating Agreement") is made and entered into this 6th day of January, 2017, by and between **SAHIB SINGH ARORA and KARAN SINGH AHUJA,** (hereinafter referred to as the "Members and individually as a "Member") whose respective addresses are set forth in ARTICLE 4 of this Operating Agreement. All of the aforementioned parties and any additional persons who may be admitted as Members as herein provided are sometimes hereinafter collectively referred to as the "Members" or hereinafter sometimes individually referred to as a "Member."

## W I T N E S S E T H:

**WHEREAS, KING GROUP MGMT, LLC,** a limited liability company (hereinafter referred to as the "Company") was formed pursuant to the laws of the State of Georgia, the purpose of which shall be all aspects of purchasing, leasing, managing and selling of real property.

**The Members** hereto desire to amend and reinstate (i) the contributions to the capital of the Company by the Members; (ii) the division of the profits and losses derived from the ownership, maintenance and operation thereof of the Company; (iii) the restrictions on disposition of Membership Interests; (iv) Management of the Company; and (v) address various other matters relating to the rights and obligations of the Members;

**NOW, THEREFORE,** the undersigned in consideration of the premises, the mutual promises contained in this Operating Agreement and for the other good and valuable consideration, the Members agree as follows.

LLC. KINGGROUPMGMT, LLC. AROA.17

## ARTICLE 1
## DEFINITIONS

The following terms used in this Operating Agreement shall have the following meaning (unless otherwise expressly provided herein:

"Additional Capital Contributions." With respect to each Member, all additional Capital Contributions made by such Member pursuant to Section 8.02 of this Agreement.

"Additional Capital Contributions Account." An account maintained for each Member equal to (i) the aggregate Additional Capital Contributions to the Company made by such Member, less (ii) the aggregate distributions to such Member pursuant to Section 9.01.

"Articles of Organization." The Articles of Organization of KING GROUP MGMT, LLC as filed with the Secretary of State of Georgia as the same may be amended from time to time.

"Affiliate." (i) in the case of an individual, any relative of such Person, (ii) any officer, director, trustee, partner, manager, employee or holder of ten percent (10%) or more of any class of voting securities of any equity interest in such Person; (iii) any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person; or (iv) any officer, director, trustee, partner, manager, employee or holder of ten percent (10%) or more of the outstanding voting securities of any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person.

"Arbitrable Dispute." Any of the disputes so designated in Section 17.01 hereof.

"Available Cash" means all cash of the Company on hand as of any given time after the payment of all then due debts and liabilities of the Company and after any prepayments of any debts and liabilities of the Company that the Members deem appropriate to cause the Company to make, less any Reserves deemed necessary by the Members, consistent with the provisions of this Agreement, for (a) the repayment of any debts or liabilities of the Company, (b) the working capital or other requirements of the Company, and (c) any contingent or unforeseen liabilities of the Company.

"Business" means.

a)      All aspects of purchasing, leasing, managing and selling of real property.

b)      All actions necessary to or reasonably connected with the Company's foregoing business which may be legally exercised by limited liability companies under the Georgia Act; and

c)      All activities necessary, customary, convenient, or incident to any of the foregoing.

LLC. KINGGROUPMGMT, LLC. AROA.17

"<u>Capital Account</u>" of a Member means a capital account established, maintained, and adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv). Consistent therewith, each Member's Capital Account will be adjusted from time to time pursuant to Section 8.06 hereof, the purpose of which is to set forth certain operating rules for the allocation of book items of income, gain, loss and deduction for Capital Account purposes. The provisions of Article 8 hereof shall be construed in a manner consistent with Treasury Regulations Section 1.704-1(b)(2)(iv). The Capital Accounts shall not be adjusted for items as they are computed and allocated to the Members for federal income tax purposes. Upon the transfer hereunder of all or part of a Membership Interest, other than a Transfer that terminates the Company as a partnership within the meaning of Code Section 708(b)(1)(B), the Capital Account of the transferor Member that is attributable to the transferred Membership Interest will carry over to the transferee Member. In the event of a Transfer of all or part of a Member's Membership Interest that causes a termination of the Company as a partnership within the meaning of Code Section 708(b)(1)(B), the Members' Capital Accounts will be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(1).

"<u>Capital Contribution</u>." Any contribution to the capital of the Company in cash, promissory notes or the agreed value of property by a Member whenever made.

"<u>Code</u>." The Internal Revenue Code of 1986, as amended from time to time.

"<u>Company</u>." **KING GROUP MGMT, LLC**

"<u>Economic Interest</u>" Refers to a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Operating Agreement and the Georgia Act but shall not include any right to vote on, consent to or otherwise participate in any decision of the Members or Managers.

"<u>Economic Interest Owner</u>." The owner of an Economic Interest who is not a Member.

"<u>Entity</u>." Any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association or any foreign trust or foreign business organization.

"<u>Fiscal Year</u>." The Company's fiscal year, which shall be the calendar year.

"<u>Georgia Act</u>." The Georgia Limited Liability Company Act at O.C.G.A Section 14-11-100, et seq.

"<u>Initial Capital Contribution</u>." The initial contribution to the capital of the Company made by a Member pursuant to Section 8.01 of this Operating Agreement.

"<u>Majority Interest</u>." Membership Interests of Members which, taken together, exceed fifty-one percent *(51%)* of the aggregate of all Membership Interests.

LLC. KINGGROUPMGMT, LLC. AROA.17

"Manager." One or more Members designated pursuant to this Operating Agreement as a Manager from time to time pursuant to Section 5.02 hereof.

"Member." Each of the parties who executes a counterpart of this Operating Agreement as a member and each of the parties who may hereafter become members. To the extent a Manager has purchased a Membership Interest in the Company, the Manager will have all the rights of a Member with respect to such Membership Interest, and the term "Member" as used herein shall include a Manager to the extent such Member has purchased said Membership Interest in the Company.

"Membership Interest." A Member's entire interest in the Company including (i) the right to participate in the management of the business and affairs of the Company, and the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement or the Georgia Act, and (ii) the percentage ownership share of each Member in the capital, assets and properties of the Company. The Membership Interests of the Members as of the date of this agreement are as follows:

| Member's Name | Membership Interest |
|---|---|
| SAHIB SING ARORA | 51% |
| KARAN SINGH AHUJA | 49% |

For purposes of the provisions hereof relating to action taken or approval by Members, including voting, written consents or other approval, only Membership Interests held by Members shall be taken into account.

"Net Cash Flow." All cash received by the Company resulting from management and operation of the lodging facilities including proceeds from mortgages or refinancing, plus any other items of income received in cash by the Company, less all payments of debts and expenses, including capital expenditures and principal and interest payments on mortgages and debts, paid in the operation of the Company, and less any Reserves for working capital and capital expenditures which the Members deem reasonably necessary for the operation of the Company or are so specified in any approved budget.

"Net Profits" or "Net Losses." The Company's taxable income or loss determined in accordance with Code Section 703(a) for each of its Fiscal Years (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss) with the following adjustments: (i) such Net Profits and Net Losses will be computed as if items of tax-exempt income and nondeductible, noncapital expenditures (under Code Section 705(a)(1)(B)) and 705(a)(2)(B) were included in the computation of taxable income or loss; (ii) that any items specially allocated pursuant to Article 10 hereof shall not be taken into account in computing Net Profits or Net Losses; (iii) if any Member contributes property to the Company with an initial book value to the Company different from its adjusted basis for federal income tax purposes to the Company, or if Company

property is revalued in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(f) or as otherwise required by the Regulations, Net Profits and Net Loses will be computed as if the initial adjusted basis for federal income tax purposes to the Company of such contributed or revalued property equaled its initial book value to the Company as of the date of contribution or revaluation; and (iv) credits or debits to Capital Accounts due to a revaluation of Company assets in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(f), or due to a distribution of noncash assets as provided in Section 16.04 hereof, will be take into account as gain or loss from the disposition of such assets for purposes of computing Net Profits and Net Losses.

"Operating Agreement." This Operating Agreement as originally executed and as amended from time to time.

"Person." Any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

"Reserves." With respect to any fiscal period, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts deemed sufficient by the affirmative vote of Members holding at least fifty-one (51%) percent of the Membership Interests for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

"Transferring Member." A Member who sells, assigns, pledges hypothecates or otherwise transfers for consideration or gratuitously all or any portion of his Membership Interest.

"Treasury Regulations" or "Regulations." The Federal Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## ARTICLE 2
## FORMATION OF COMPANY

**2.01    Formation**.  The Company was formed on October 27, 2014 as a Georgia limited liability company by causing Articles of Organization to be delivered to the Secretary of State of Georgia in accordance with the provisions of the Georgia Act. The Company shall be taxed as a partnership for federal income tax purposes.

**2.02    Name**. The name of the Company is KING GROUP MGMT, LLC

**2.03    Principal Place of Business**. The principal place of business of the Company within the State of Georgia is located at 285 Jon Jeff Drive, Lilburn, GA 30047.   The Company may locate its places of business and registered office at any other place or places as the Manager or Managers may from time to time deem advisable.

**2.04    Registered Office and Registered Agent**. The Company's registered office shall be at the office of its registered agent located at 1150 Faith Avenue, Atlanta, GA 303015 and the

name of its registered agent at such address is Gobind Madan CPA.   The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Secretary of State of Georgia pursuant to the Georgia Act and the applicable rules promulgated thereunder.

**2.05    Term**. The term of the Company shall commence at the date the Articles of Organization were filed with Secretary of State of Georgia and shall continue until the Company is dissolved, terminated and its affairs wound up in accordance with the provisions of this Operating Agreement or the Georgia Act.

## ARTICLE 3
## BUSINESS OF COMPANY

**3.01    Permitted Businesses**. The Company shall engage in the Business and may engage in any other Business or activities as approved by the Manager.

## ARTICLE 4
## NAMES AND ADDRESSES OF MEMBERS

The names and addresses of the Members as of the date of this Agreement are as follows:

| NAME | ADDRESS |
|------|---------|
| SAHIB SINGH ARORA | 285 Jon Jeff Drive<br>Lilburn, GA 30047 |
| KARAN SINGH AHUJA | 285 Jon Jeff Drive<br>Lilburn, GA 30047 |

Any party may change its address by giving notice of such address change to the other parties pursuant to the notice provisions set forth in Section 17.14.

## ARTICLE 5
## MANAGEMENT

**5.01 Management of Business**. Subject to approval by the Manager as to Major Decisions as provided below, the business and affairs of the Company shall be managed by its Manager(s). Each Manager shall have full authority, power and discretion to delegate the management or control of the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business. The Members shall determine from time to time by Majority Vote which persons shall be the Manager(s), responsible for administering the day-to-day activities of the Company. Each Manager may carry out the business of the

LLC. KINGGROUPMGMT, LLC. AROA.17

Company directly or delegate or assign by contractual agreement any of their responsibilities. The delegation or assignment by contractual agreement of duties under this Agreement shall not release or reduce the liability and responsibility of the Manager(s) and the Manager(s) shall exercise due care in selecting agents, assignees and designees.

Notwithstanding the foregoing, the Manager(s) shall have the authority to undertake any of the following matters ("Major Decision") without first having obtained the affirmative vote of the Members holding at least fifty-one (51%) percent of the Membership Interests:

(a)     the purchase, lease or sale or other disposition of real or personal property;

(b)     the borrowing or refinancing of any funds for or by the Company (whether secured or unsecured), or the prepayment of any such borrowing;

(c)     the approval of projected annual Company budgets, or expenditures of funds in excess of 110% of the amounts specified in any such approved budgets;

(d)     the approval of amounts distributed to the Members pursuant to Section 9.01 hereof;

(e)     any contracts or agreements between the Company and the Members or any of their respective Affiliates;

(f)     the consummation of any major transactions or series of related transactions, which are not in the ordinary course of the Company's business, including, but not limited to making any expenditure or commitment, other than the lease or rental of space on behalf of the Company in the ordinary course;

(g)     the amendment of the Articles of Organization or this Operating Agreement;

(h)     the merger of the Company with or into any other business entity;

(i)     the filing of any bankruptcy petition or commencement of any insolvency proceeding for the Company.

**5.02    Election of Manager**. The Manager(s) shall be SAHIB SINGH ARORA. He shall serve in such capacity until the first to occur of his death, disability, resignation or removal by a Majority Vote.

**5.03    Tax Matters Member**. The Members hereby appoint SAHIB SINGH ARORA as the Company's "Tax Matters Partner", as that term is defined in Section 623 l(a)(7) of the Code, and further appoint the Tax Matters Partner to receive notice of the beginning of any

LLC. KINGGROUPMGMT, LLC. AROA.17

administrative proceeding at the Company level with respect to any Company item or items, as well as to receive notice of any final administrative adjustment resulting from any such proceeding, in each case within the meaning information to the Internal Revenue Service as may be necessary to enable to Internal Revenue Service to provide the Members with such notices as are required under the Code. The Company's Tax Matters Partner shall also keep each Member informed of any administrative or judicial proceedings relative to any adjustment or proposed adjustment at the Company level of Company items. The Tax Matters Partner shall have the authority to (a) enter into any settlement agreement with the Internal Revenue Service, (b) file a petition as contemplated by Sections 6226(a) or 6228 of the Code, (c) intervene in any action as contemplated by Section 6226(b) of the Code, (d) file any request as contemplated by Section 6227(b) of the Code or (e) enter into an agreement extending the period of limitation as contemplated by Section 6229(1)(B) of the Code.

**5.04** **Managers Have No Exclusive Duty to Company**. The Manager(s) shall not be required to manage the Company as their sole and exclusive function and he (or any Manager) may have other business interests and may engage in other activities in addition to those relating to the Company.   Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager or the income or proceeds derived therefrom. The Manager shall incur no liability to the Company or to any of the Members as a result of any other business or venture.

**5.05** **Bank Accounts**. The Manager(s) may from time to time open bank accounts in the name of the Company, and the Manager(s) shall be the sole signatories on such accounts unless the Members or Manager(s) determine otherwise.

**5.06** **Indemnity of the Manager(s), and Employees** . To the fullest extent permitted under O.C.G.A Section 14-11-306, the Company shall indemnify the Manager(s) and its employees  and make advances for reasonable and necessary expenses to them with respect to such matters to the maximum extent permitted under applicable law.

## ARTICLE 6
### RIGHTS, OBLIGATIONS, REPRESENTATIONS
### AND WARRANTIES OF MEMBERS

**6.01** **Limitation on Liability** Each Member's liability shall be limited as set forth in this Operating Agreement, the Georgia Act and other applicable law.

**6.02** **No Liability for Company Obligations**. No Member will have any personal liability for any debts or losses of the Company beyond such Member's Capital Contributions, except as provided by law.

**6.03** **Priority and Return of Capital**. No Member shall have priority over any other Member, either as to the return of Capital Contributions or as to Net Income or Net Loss or distributions except as set forth herein. This Section shall not apply to any loans (as distinguished from Capital Contributions) which a Member has made to the Company.

LLC. KINGGROUPMGMT, LLC. AROA.17

**6.04** **Restrictions on Competitive Activity.** Except as otherwise provided in this Operating Agreement, or in any Covenant Not to Compete, a Confidentiality Agreement, a Noninterference Agreement or any other agreement between the Members, the Members and their respective Affiliates may conduct any other business or activity whatsoever not related to the Company's business, without any accountability to the Company or any Member.

**6.05** **Validity of Agreement**. Each Member warrants that this Operating Agreement and each and every other agreement, document and instrument provided for herein and to which such Member is or shall be a party, when executed and delivered, will constitute the valid and binding obligation of such Member, enforceable against him in accordance with its terms, except as enforceability may be limited by (a) bankruptcy or similar laws from time to time in effect affecting the enforcement of creditor's rights generally or (b) the availability of equitable remedies generally.

**6.06** **No Violation of Material Instruments**. Each Member represents and warrants that the execution and delivery of this Operating Agreement by such Member does not, and the consummation of the transactions contemplated hereby will not:

    (a)    violate or constitute an occurrence of default (which violation or default either singularly or in the aggregate would be considered material) under any provision of, or conflict with, or result in acceleration of any obligation under, or give rise to a right by any party to terminate its obligations under, any material agreement, instrument, order, judgment, decree or other arrangement to which such Member or any of its Affiliates is a party or by which any of them is bound or its respective assets affected;

    (b)    require any consent, approval, filing or notice under any provision of law, or violate any judgment, ruling, order, writ, injunction, decree, statute, role or regulation applicable to such Member or any of the Member's Affiliates.

## ARTICLE 7
## MEETINGS OF MEMBERS

**7.01** **Yearly Meeting**. The yearly meeting of the Members may be held in the month of December or at such other time as shall be determined by unanimous agreement of the Members.

**7.02** **Special Meetings**. Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by any Manager or by a Member or Members holding at least a thirty-three percent (33%) Membership Interest.

**7.03** **Place of Meetings**. The Members may designate any place, either within or outside the State of Georgia, as the place of meetings for any meeting of the Members. If no

LLC. KINGGROUPMGMT, LLC. AROA.17

designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal executive office of the Company in the State of Georgia.

7.04   **Notice of Meetings**. Written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than ten (10) nor more than fifty (50) days before the date of the meeting, either personally or by mail, by or at the direction of the Member calling the meeting, to each Member entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered two calendar days after being deposited in the United States mail, addressed to the Member at his address as it appears on the books of the Company, with postage thereon prepaid.

7.05   **Meeting of all Members**. If all of the Members shall meet at any time and place, either within or outside of the State of Georgia, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice and at such meeting any lawful action may be taken.

7.06   **Record Date**. For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which Notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

7.07   **Quorum**. Members holding fifty-one (51%) percent of the Membership Interests represented in person or by proxy, shall constitute a quorum at any meeting of Members. In the absence of a quorum at any such meeting, a majority of the Membership Interests so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice. However, if at the adjournment of the meeting a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting. At such adjourned meeting at which quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed. The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Membership Interests whose absence would cause less than a quorum to be present.

7.08   **Manner of Acting**. If a quorum is present, the affirmative vote of Members holding fifty-one (51%) percent of the Membership Interest shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Georgia Act, by the Articles of Organization, or by this Operating Agreement. Unless otherwise provided herein or required under applicable law, Members who have an interest (economic or otherwise) in the outcome of any particular matter upon which the Members vote or consent may vote or consent upon any such matter and their Membership Interest, vote or consent, as the case may be, shall be counted in the determination of whether the requisite matter was approved by the Members.

LLC. KINGGROUPMGMT, LLC. AROA.17

**7.09**   <u>Proxies</u>. At all meetings of members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney in fact. Such proxy shall be filed with the Manager before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

**7.10**   <u>Action by Members Without a Meeting</u>. Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by all the necessary Members entitled to vote and required to approve such action and delivered to the Manager for inclusion in the minutes or for filing with the Company records. Action taken under this Section is effective when the Members required to approve such action have signed the consent, unless the consent specifies a different effective date. The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a written consent.

**7.11**   <u>Waiver of Notice.</u> When any notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

## ARTICLE 8
## CONTRIBUTIONS TO COMPANY AND CAPITAL ACCOUNTS

**8.01**   <u>Member's Capital Contributions</u>. Each Member shall contribute the amount of cash, set forth next to such Member's name on Exhibit "A" hereto as the Member's Initial Capital Contribution.

**8.02**   <u>Additional Capital Contributions</u>.

In the event that the Members determine that Additional Capital Contributions are needed by the Company, the Members shall contribute their share of such Additional Capital Contributions (determined by reference to their Membership Interests in the Company) within fifteen (15) days thereafter (or, if later, such time as is set forth in the notice from the Company). In the event that a Member fails to make such Additional Capital Contributions (the "Defaulting Member"), and the remaining Members (the "Non-Defaulting Members") contribute such Defaulting Members' Additional Capital Contribution (the "Disproportionate Contribution"), then the Defaulting Member's Interest in the Company shall be reduced using the following formula:

$$\frac{A}{be \ \ A + C} \ x \ \ I \ x \ 2 \ =$$   Interest in membership interest of the Company to be forfeited by the breaching Member.

where:   A=   Breaching Member's share of Additional Capital Contributions required by this Section 8.02;

   C=   Total capital previously contributed by Breaching Member; and

I=    Breaching Member's membership interest of the
Company prior to their failure to make the required
Additional Capital Contributions.

It is the intent of the parties hereto that the membership interest of the Company forfeited by the Defaulting Member shall be allocated pro rata among the Non-Defaulting Members who contributed the Defaulting Member's share of the Additional Capital Contribution required by this Section 8.02 in the same proportions as such Additional Capital Contributions are made by the Non-Defaulting Members.

**8.03    Optional Loans**.  In addition to or in lieu of making a capital call pursuant to Section 8.02, in the event that the Members by Majority Vote determines that the Company needs additional capital, the Manager may ask each Member to make a loan to the Company in an amount determined by the Manager.  The Manager shall fix, and notify the Members of a date by which the Members must respond to any such request, and the Members shall, before such date, determine whether to make the requested loans (which may be made directly or through Affiliates) and notify the Manager of such decision, but no Member shall be required to make any such loan.  Any loan made pursuant to this Section 8.03 shall bear simple interest at the rate of two percent (2%) per annum in excess of the "prime rate" of SunTrust Bank, Atlanta, Georgia, or its successor entity, in effect from time to time during the periods such loans are outstanding, and shall be payable pursuant to the provision of Sections 9.01 and Section 16.01 hereof.  The Members by Majority Voite shall have complete discretion regarding whether to request a loan from Members pursuant to this Section 8.03 or requesting that the Members make an Additional Capital Contribution pursuant to Section 8.02.

**8.04    No Interest on Contributions**.  No Member shall be entitled to receive interest on his or her Capital Contribution.

**8.05    Loan Guarantees**.  The Members of the Company agree that they shall all, but not less than all, upon request by the Manager, execute unconditional guarantees of repayment of loans, financings, borrowings, rentals or other obligations of the Company.  In addition, the Members of the Company agree to execute any and all documents necessary or required by any lending institution or any third party to make loans to the Company.  The Manager may require that said guarantees be executed on behalf of the Company.

**8.06    Capital Accounts**

(a)    An individual Capital Account shall be established and maintained for each Member, and shall be credited with the Capital Contribution of such Member, any Additional Capital Contributions and that portion of Net Income allocable to such Member and shall be debited with that portion of any Net Loss allocable to such Member and all distributions made by the Company to such Member.

(b)    No interest shall be payable to any Member on any positive balance in

LLC. KINGGROUPMGMT, LLC. AROA.17

such Member's Capital Account.

    (c)    No Member shall have the right to withdraw from his or her Capital Account or to otherwise receive any Company funds or property, except as provided by this Operating Agreement.

    (d)    No Member shall be required to eliminate in any fashion any deficit balance which may arise in his or her Capital Account at the time the Company is dissolved or at any other time.

**8.07**    **Withdrawal or Reduction of Members' Contributions to Capital**

    (a)    A Member shall not receive out of the Company's property any part of such member's Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid, or their remains property of the Company sufficient to pay them.

    (b)    A Member, irrespective of the nature of such Member's Capital Contributions, has only the right to demand and receive cash in return for such Capital Contribution.

## ARTICLE 9
## DISTRIBUTIONS TO MEMBERS

    **9.01**    **Distributions**. Except as otherwise provided in this Operating Agreement, Net Cash Flow shall be distributed to the Members ratably in proportion to their Membership Interests. Such Net Cash Flow shall be distributed at such times as the Members holding fifty-one(51%) percent of the Membership Interest shall determine from time to time, but in no event less frequently than once per year. Should the Members holding fifty-one (51%) percent of the Membership Interest determine that the Net Cash Flow for a particular quarter will be more appropriately reinvested into the Company, they may in their discretion, reduce the distribution amounts to an amount necessary to cover the income tax assessment caused by the Net Profits of the Company, not yet distributed.

    **9.02**    **Distributions In Cash.** A Member, irrespective of the nature of such Member's Capital Contributions or his share of the Net Cash Flow, has only the right to demand and receive cash for the satisfaction of his share of the Net Cash Flow, should the Net Cash Flow be distributed as determined under Section 9.01.

    **9.03**    **Limitation Upon Distributions**. No distribution shall be made to Members if prohibited by O.C.G.A Section 14-11-407.

    **9.04**    **Distributions After the Fiscal Year End**. The Manager may, to the extent consistent with this Article 9, elect to have distributions made after the end of a Fiscal Year relate back to such Fiscal Year, provided, however, that any such distribution must be made

within thirty (30) days after the end of such Fiscal Year.

**9.05**   **Withholding**.  The Manager may cause the Company to withhold income or other taxes as may be required by, and otherwise comply with and take actions necessary as the result of, the provisions of the code of any state or local tax law requiring withholding.  Any amounts of the Company's Available Cash withheld pursuant to this Operating Agreement shall be deemed to have been paid to the members as distributions of the Company's Available Cash in the amounts so withheld pursuant to this Article 9.

**9.06**   **Tax Distributions**.  Unless prevented by applicable law, the Company shall distribute to each Member, with respect to each fiscal year, either during such fiscal year or within sixty (60) days thereafter, to the extent of Available Cash, an amount equal to (i) the amount of the Company's federal taxable income allocated to such Member for such fiscal year, multiplied by (ii) the highest combined federal and state income tax rate to which any Member is subject with respect to such fiscal year (the "Tax Distribution"). All distributions pursuant to this section shall be distributed ratably in proportion to the relative Membership Interests of the Members and shall be credited as a distribution pursuant to Section 9.01.

**ARTICLE 10**
**ADJUSTMENT OF CAPITAL ACCOUNTS AND PROFITS AND LOSSES**

**10.01**   **General Tax Allocations.**  As of the end of each Fiscal Year, and after giving effect to the special tax allocations set forth in Section 10.2, Net Profits and Net Losses shall be allocated among the Members for Capital Account, as well as for federal income tax purposes, ratably in accordance with their respective Membership Interests.

**10.02**   **Special Allocations**.  At the end of each Fiscal Year and notwithstanding any provision of Section 10.01, the following special allocations shall be made for both Capital Account and for federal income tax purposes unless otherwise provided:

(a)      In accordance with the ordering rules of Treasury Regulation Section 1.704-2(j), items of gross income and realized gain first shall be allocated in an amount and in a manner that complies with the "chargeback" requirement of Treasury Regulation Section 1.704-2(i)(4), the "qualified income offset" requirement of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and the "minimum gain chargeback" requirement of Treasury Regulation Section 1.704-2(f).  Further, any "partner nonrecourse deductions" within the meaning of Treasury Regulation Section 1.704-2(i)(2) attributable to "partner nonrecourse debt" shall be allocated to the Member who bears the "economic risk of loss" for such debt in accordance with Treasury Regulation Section 1.704-2(i).  Any losses in excess of the losses allowable to the Members pursuant to the Treasury Regulations promulgated under Code Section 704(b) shall first be allocated to the extent allowable hereunder to Members who are not precluded from receiving such allocations by the preceding provisions of this subparagraph(a), if any, and shall thereafter be allocated as provided in Section 10.01.

(b)      If a taxing authority ignores the characterization of any amounts paid to a

Member (or an Affiliate thereof) as salaries, management fees, commissions, interest or other compensation for services ("Compensation"), and refuses to treat such payments as either guaranteed payments within the meaning of Code Section 707(c) or payments made to such Member other than in such Member's capacity as a "partner" within the meaning of Code Section 707(a), and such taxing authority ultimately treats such amounts paid to a Member (or an Affiliate) thereto as a distribution to such Member for federal income tax purposes which reduces such Member's Capital Account, then the Compensation shall be treated as an allocation of an item of income or gain of the Company to the recipient Member so that, consistent with the intent of the Members, the Compensation shall not be treated as a distribution which reduces the recipient Member's Capital Account. Accordingly, such Member shall be allocated the first available items of Company income and gain (including in a succeeding year) in an amount equal to the Compensation.

(c)    If the Company owns (x) any property contributed by a Member that had a fair market value different from its adjusted basis for federal income tax purposes on the date of the contribution, or (y) any property that has been revalued pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f), then for federal income tax purposes only and not for Capital Account purposes, any income, gain, loss or deduction with respect to such property shall be allocated among the Members in accordance with Code Section 704(c) and the Treasury Regulations thereunder.

**10.03    Tax Items.**  Except as otherwise provided herein, any allocation to a Member of a portion of the Net Profits or Net Losses for a Fiscal Year (or other relevant period) will be deemed to be an allocation to that Member of the same proportionate part of each item of income, gain, loss, deduction or credit that is earned, realized or available by or to the Company for federal income tax purposes.

**10.04    Partial Year Allocations**.  In the event that a Member is admitted to the Company during the Company's Fiscal Year, or all or a portion of a Member's Membership Interest is transferred during the Company's Fiscal Year, Net Profits and Net Losses shall be allocated to the admitted or transferee Member in any manner permitted by Code Section 706 or the Treasury Regulations thereunder, as the Manager shall determine in his discretion. Allocations made in this Article X shall be made to each holder of a Membership Interest whether or not the holder is a substituted Member.

**10.05    Allocations and Distributions Upon Dissolution**.  When the Company is dissolved and wound-up pursuant to Article 16 hereof, all items of income, gain, loss and deduction not previously allocated shall be allocated to the Members pursuant to this Article 10. It is the intent of the parties hereto that after the allocations described in the previous sentence are made and the final cash distribution referred to in Section 16.04 hereof is made, that such actions will result in the Capital Account balances of the Members equaling zero following the dissolution of the Company. The allocation and distribution provisions of Articles 9 and 10, as well as the provisions of Article 14 hereof, shall be construed in such a way in order to achieve this result. Notwithstanding anything in this Agreement to the contrary, no Member shall be obligated to restore any negative balance in his Capital Account upon the dissolution of the Company, the Transfer of all of any portion of his Membership Interest, or otherwise.

LLC. KINGGROUPMGMT, LLC. AROA.17

## ARTICLE 11
## LIMITATION ON LIABILITY AND INDEMNIFICATION

**11.01** **Limitation on Liability of the Members.**  No Member, Company officer, or Manager shall be liable to the Company for any loss or damage sustained by any of them, except loss or damage resulting from intentional misconduct or a knowing violation of law or a transaction for which such Person received a personal benefit in violation or breach of any provision of this Agreement.

**11.02** **Indemnification.**  The Company shall indemnify and hold harmless the Members, and Manager(s),  from and against any and all claims and demands whatsoever arising in connection with the Company to the fullest extent provided by Section 14-11-306 of the Act and applicable law.

## ARTICLE 12

## COMPENSATION AND REIMBURSEMENTS

**12.01** **Compensation.**  Except as otherwise provided herein or approved by an affirmative vote members holding fifty-one (51%) percent of the Membership Interests in the Company, none of the Members, Manager(s), if any, or their Affiliates shall be entitled to compensation in connection with rendering their services to the Company.

**12.02** **Reimbursement of Members.** The Company shall reimburse the Members and Manager(s) for all reasonable and direct out of pocket expenses and costs incurred in connection with rendering services to the Company; provided, however, that any such expenses must be documented in the manner required by the Internal Revenue Service as necessary to allow the deduct ability of such expenses as business expenses of the Company.

## ARTICLE 13

## ACCOUNTING, BOOKS AND RECORDS

**13.01** **Accounting Method.**  The Company will maintain its books and records on such basis of accounting as the Manager shall determine.

**13.02** **Books and Records.**  The Company shall keep, at Company expense, full, complete and accurate books of account and other records showing the assets, liabilities, costs, expenditures, receipts and such other matters as are required by the Code.  Such books of account will be the property of the Company, will be kept in accordance with generally accepted accounting principles and procedures consistently applied and will be open to the reasonable inspection and examination by the Members and their duly authorized representatives.  Such books of account will be maintained at the principal office of the Company, or at such other place as the Manager determines.

LLC. KINGGROUPMGMT, LLC. AROA.17

**13.03**  __Financial Statements__.  Within sixty (60) days following the end of each quarter of the Company, and within ninety (90) days following the end of each Fiscal Year of the Company, the Manager shall cause to be prepared and delivered to each Member unaudited financial statements of the Company for such quarter and Fiscal Year.

**13.04**  __Tax Returns__.  The Manager shall cause the Company's tax returns and other governmental returns and reports to be prepared and timely filed.  The Manager shall deliver copies of Schedule K-1 of Form 1065 (or a comparable schedule), federal and state tax returns and other necessary tax information for each Fiscal Year to each Member no later than sixty (60) days after the end of each Fiscal Year, or such later date as may be otherwise agreed to by the Members.

## ARTICLE 14

## TRANSFERABILITY AND ADDITIONAL MEMBERS

**14.01**  __General__. Except as otherwise specifically provided herein, no Member shall have the right to:

    (a)    sell, assign, pledge, hypothecate transfer, exchange or otherwise transfer for consideration (collectively, "sell"), or

    (b)    gift, bequeath or otherwise transfer for no consideration (whether or not by operation of law, except in the case of bankruptcy), all or any part of his Membership Interest, except that Members have a right to transfer all or a portion of a Membership Interest to the parents, spouses or lineal descendants of the current owners of such interest or into trust established for the benefit of any of the foregoing, for bona-fide estate planning or tax planning purposes.

**14.02**  __Additional Members__. Without vote or assent of Members holding at least fifty one (51%) percent of the Membership Interests, no Person or Entity may become a Member of this Company either by the issuance by the Company of a Membership Interest, or as a transferee of a Member's Membership Interest or any portion thereof.  No new Members shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Members may by an affirmative vote of fifty-one (51%) percent of the Membership Interests at the time a Member is admitted elect to close the Company books (as though the Company's tax year had ended) or to make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of 706(d) of the Code and Treasury Regulations promulgated thereunder.

**14.03**  __Sale. Assignment or Other Transfer of Member Interests__.

    (a) No Member shall sell, assign or otherwise transfer all or any part of his

LLC. KINGGROUPMGMT, LLC. AROA.17

Membership Interest, without first obtaining the affirmative vote or assent of Members holding fifty-one (51%) percent of the Membership Interests in the Company held by all Members excluding the transferring Member, (the "Remaining Members.") The restrictions contained in this Section shall not apply to restrict in any way transfer by any Member of assets which such Member holds other than such Member's Membership interest in the Company.

      (b) As a condition to any transfer, the transferee shall agree to be bound by all of the terms and provisions of this Operating Agreement to the same extent and in the same capacity as the transferor would have been with respect to the transferred Membership Interest had the transferor continued to own such transferred Membership Interest. However, in the event that (i) a Member who has transferred his Membership Interest to or for the benefit of his spouse shall thereafter become divorced from such spouse and following the divorce, such spouse shall retain a Membership Interest in the Company, (ii) the spouse of a Member is awarded or becomes entitled to some or all of such Member's Membership Interest pursuant to a divorce decree or settlement agreement, or (iii) an owner of a Member has transferred a portion or all of his membership interest in such owner to or for the benefit of his spouse shall thereafter become divorced from such spouse and following the divorce, such spouse shall retain a membership interest in a Member or (iv) the spouse of an owner of a Member is awarded or becomes entitled to some or all of such Member's membership interest in a Member pursuant to a divorce decree or settlement agreement, then, in either such event, an Event of Default, as defined in Section 15.02 herein shall have occurred and the Membership Interest held by such spouse (or the membership interest in the Member that is held by such spouse) shall be subject to the provisions of Section 14.03 herein. In addition, the Transferee Member or spouse shall become a holder of an Economic Interest only, with no voting rights, unless the remaining original Members, excluding the Member who transferred such Membership Interest, determine otherwise by majority vote of such Members.

      (c) In exercising discretion to consent to any sale, assignment or transfer covered by the provisions of subparagraph (a) of this Section 14.03, the Members shall require such vendee, assignee or other transferee or counsel for any such person to demonstrate to the Members (i) the vendee, assignee or other transferee is a financially responsible person who understands the nature of an investment in the Company and (ii) such person intends to take and hold the interest transferred for investment for his own account and not for resale to others. No Member shall consent to a sale, assignment or other transfer of less than all of the Membership Interest to the Member, unless in the opinion of the Members, such Member's Membership Interest is large enough to be divided. In addition no such sale, assignment or other transfer shall be effective to bind the Company until and unless the Remaining Members shall receive an opinion of counsel for the vendor, assignor or other transferor in form and substance satisfactory to counsel for the Company that the sale, assignment or other transfer may lawfully be made under all applicable law, including any and all applicable securities laws, and that such sale, assignment or other transfer, together with all other sales or transfers or interests in the Company sold, assigned or transferred within the preceding twelve (12) months and will not result in a termination of the Company pursuant to Code Section 708.

      (d) The transferee of any Member (if a transfer is permitted pursuant to the terms of this Agreement) shall be subject to and bound by all of the terms and conditions of this

LLC. KINGGROUPMGMT, LLC. AROA.17

Agreement.

### 14.04   Deadlock and Triggering of Put/Call Procedure.

(a) If (i) at any time the Members are unable to reach a resolution as to any Major Decision under this Operating Agreement; and (ii) a Member determines that such matter or decision is not resolvable without resort to the following procedure, such Member may send a notice (a "Declaration of Deadlock") to all Members of the Company declaring the existence of a deadlock (a "Deadlock").

(b) Within three (3) calendar days after delivery of a Declaration of Deadlock (the "Delivery Period"), each Member shall provide to the other Member a written report detailing the facts that such Member deems to be relevant to the creation and resolution of the Deadlock, plus any supporting information and a summary of any discussion relevant to the subject matter of the Deadlock. For a period of thirty (30) calendar days after expiration of the Delivery Period (the "Discussion Period"), the Members shall meet in person and/or communicate telephonically or electronically as frequently as necessary to negotiate in good faith to resolve the Deadlock. If the Members are able to resolve the Deadlock they shall, within the Discussion Period, execute a written acknowledgement (the "Resolution Acknowledgement") setting forth in reasonable details the resolution of the Deadlock. Pending resolution of the Deadlock, all Members, Managers and the Company shall continue to perform their respective obligations under this Operating Agreement without regard to whether the Deadlock has been resolved, unless and until such obligations are terminated or expire in accordance with the provisions hereof or are rendered incapable of performance by reason of the Deadlock. In the event that the Members are unable to resolve the Deadlock within the Discussion Period, either Member may institute the procedures set forth in this section.

(c) Manner of Offer. At any time after the expiration of the Discussion Period, if the Deadlock has not been resolved, any Member may at any time offer to the other Members (individually and collectively, the "Electing Members") both to sell all of the offeror's Membership Interest to the Electing Members and to buy all of the Electing Members' Membership Interests (such offeror is hereinafter referred to as the "Initiating Member"). Such offer must be in writing and must contain the following: (1) a statement of intention to make an offer in accordance with this Section; (2) a statement of the Initiating Member's determination of the Stated Amount (as defined below); (3) a statement that a condition to any purchase pursuant to the offer shall be the absolute and unconditional indemnity by the purchasing Member of the Initiating Member against any loss, claim or damage that the Initiating Member may suffer arising out of any guarantee by the Initiating Member of any debt of the Company for borrowed money; (4) a statement that the purchase price of the Membership Interest subject to the offer shall be payable not less than twenty five percent (25%) cash at Closing with the balance, if any, represented by a promissory note of the purchasing Member secured by the acquired Membership Interest and personally guaranteed by the owner of the purchasing Member and payable in equal monthly installments over thirty six consecutive months with interest at the prime rate plus 2% announced by SunTrust Bank, Atlanta, Georgia or successors ("Applicable Rate"); and (5) a statement that such offer is both an offer to sell all the Membership Interest owned by the Initiating Member and an offer to purchase all the Membership Interest owned by

LLC. KINGGROUPMGMT, LLC. AROA.17

the Electing Members (the "Put-Call Offer") on such terms and conditions. The "Stated Amount" means the fair market value of the subject Membership Interest, as determined by a qualified independent appraiser under the procedure outlined in Section 15.03 (c) below; provided however, that the Stated Amount shall not be less than the aggregate of all indebtedness owed by the Company, including any loans to the Company from Members.

The purchase price ("Put-Call Purchase Price") for any Member's Membership Interest in the Company acquired pursuant to this Section shall be that amount which would be distributed to such Member pursuant to Section 9.01 hereof (after giving effect to all applicable provisions of this Operating Agreement, but after liquidating all Reserves then existing and without establishing any additional Reserves), if (i) all of the assets then held by the Company were sold for cash on the date of the Closing (as defined in this section) for a gross sales price equal to Stated Amount and (ii) the Company's liabilities were paid in full. Any loans by a Member to the Company owing to a Member shall be added to the purchase price payable to such Member.

The Put-Call Offer shall be irrevocable for ninety (90) days, and the Electing Members may, on or before such ninetieth (90th) day, accept in writing either the offer to sell or the offer to buy, and upon acceptance, the Initiating Member and the Electing Members shall be required to sell or to buy, as the case may be. If the Electing Members fail to accept either offer within the ninety (90) day period, the Electing Members shall be deemed to have accepted the offer to sell the Membership Interests of the Electing Members to the Initiating Member.

Any two or more Members may jointly execute a Put-Call Offer and specify in the Put-Call Offer that they are to be treated as one Initiating Member for purposes of this Section. For purposes of the remainder of this Section unless the context indicates otherwise, references to "Member," "Initiating Member" or "Electing Member" include, where appropriate, the plural as well as the singular.

(d) Differing Elections. If the Electing Members consists of more than one Member, three possible response combinations may result: (i) all Electing Members elect to purchase the Membership Interest of the Initiating Member, (ii) all Electing Members elect to sell their Membership Interests to the Initiating Member, or (iii) one or more Electing Members elect to purchase the Initiating Membership Member's Interest and one or more Electing Members elect to sell their Membership Interest to the Initiating Member. In the event of a split of elections as described in (iii), an Electing Member's election to sell his Membership Interest shall be ineffective and the election of an Electing Member to purchase the Membership Interest of the Initiating Member shall be the only effective election, and those Electing Member(s) electing to purchase the Initiating Member's Interest shall purchase all of the Initiating Member's Membership Interest.

If there is more than one Electing Member electing to purchase the Initiating Member's Membership Interest, each such Electing Member in the purchasing group shall be entitled to purchase such portion of the Initiating Member's Membership Interest as all such Electing Members shall agree among themselves. In the event all Electing Members in the purchasing group cannot agree on the portion of the Initiating Member's Membership Interest that each of them shall purchase, then each such Electing Member in the purchasing group shall be entitled to

purchase a portion of the Initiating Member's Membership Interest, such portion to be determined by dividing each Electing Member's Ownership Percentage by the total Ownership Percentages of all Electing Members in the purchasing group.

**14.05 Closing.** The closing of such purchase and sale (the "Closing") shall be held at the offices of the Company and on the date specified by the purchaser by written notice to the seller, which date shall be on or before the thirtieth (30) day after such option to purchase or sell has been exercised. At Closing, the purchaser shall pay the Put-Call Purchase Price by wire transfer of immediately available funds.

(a) It shall be a condition to the Closing that the purchasing Member(s) shall either (i) repay all Company indebtedness for borrowed monies under which the selling Member has personal liability or (ii) cause the selling Member to be released from such personal liability by written instrument duly signed by the holder of such indebtedness. The purchasing Member(s) agrees to indemnify in writing the selling Member and hold the selling Member harmless from and against any damage, loss or liability as a result of the purchasing Member's failure to repay such indebtedness at the closing in accordance with the provisions hereof or to obtain the release of the selling Member. The selling Member, may, in his sole and absolute discretion, and without prejudice to any other legal or equitable remedies he may have, refuse to proceed with the Closing unless simultaneously therewith all such indebtedness is so repaid or such releases delivered. In addition, at any Closing held pursuant to this Section, the purchasing Member shall by a legally enforceable agreement assume the payment of, and indemnify the selling Member against all obligations of the Company accruing after Closing other than those obligations owing out of or related to an act or omission of the selling Member which constitutes gross negligence or willful misconduct.

(b) At the Closing, an assignment and, if requested by the Purchasing Member or, a bill of sale from the selling Member to the purchasing Member of the selling Member's Membership Interest together with such other instruments and documents as may be reasonably necessary or desirable to effectuate the sale and transfer to the purchasing Member shall be delivered upon payment of the purchase price. The purchasing Member shall have the right, within his sole and absolute discretion, to cause his nominee or designee to acquire the selling Member's Membership Interest at the Closing but nothing herein shall relieve the purchasing Member of his other obligations hereunder. Any such designee shall, upon Closing, become a Member only if expressly approved and consented to by the purchasing Member.

## ARTICLE 15

## PROHIBITED TRANSACTIONS AND DEFAULTS

**15.01 Prohibited Transactions.** Neither any Member shall, without the consent of all of the other Members, do any one of the following nor shall any Member permit any of such Member's respective Affiliates to do any of the following:

(a)     Use the name of the Company (or any substantially similar name) or any trademark or trade name adopted by the Company except in the ordinary

course of the Company's business;

(b)     Disclose to any nonmember any of the Company business practices, trade secrets, or any other information not generally known to the business community:

(c)     Do any other act or deed with the intention of harming the business operations of the company;

(d)     Do any act contrary to this Operating Agreement except with the prior written approval of all Members;

(e)     Do any act which would make it impossible to carry on the intended or ordinary business of the Company;

(f)     Confess a judgment against the Company.

(g)     Wrongfully transfer or dispose of Company property, real or personal;

(h)     Admit another Person or Entity as a Member except as provided herein.

The Members shall not use, directly or indirectly, the assets of this Company for any purpose other than carrying on the business of this Company, for the full and exclusive benefit of all its Members.

**15.02  Events of Default.** The following events shall be deemed to be events of default by a Member.

(a)     Any attempted transfer of an interest in the Company by the Member without complying with the provisions of Article 14 of this Operating Agreement.

(b)     The making of an assignment for benefit of creditors or the filing of the Member of a petition under any section or chapter of the National Bankruptcy Act, as amended, or under similar law or statute of the Untied States, or any State thereof, by the Member

(c)     Adjudication of the Member as bankrupt or insolvent in proceedings filed against the Member under any section or chapter of the National Bankruptcy Act, as amended, or under any similar law or statute of the United States or any State thereof, without further possibility of appeal or review.

(d)     The appointment or a receiver for all or substantially all of the assets of a Member and the failure to have such receiver discharged with in thirty (30) days after appointment.

(e)     The attempted transfer, whether voluntary or involuntary, of an interest in the Company to the creditor(s) of a Member in partial or complete satisfactory of any judgment or lien held by such creditor(s) against such Member.

(f)     Failure to make the Member's required Initial Capital Contribution or Additional Capital Contribution in accordance with Section 8.01 or Section 8.02 of this Agreement.

**15.03   Effect of Default.**

(a)     On the occurrence of an event of default by a Member, the Non-defaulting Members shall have the right, at their election, to purchase the Membership Interest of the Defaulting Member at a Purchase Price determined in accordance with Section 15.03(c) or to receive an increase in the Membership Interest pursuant to Paragraph 8.02 of this Agreement. Said election may be made at any time within ninety (90) days from the date of such default, upon giving the Defaulting Member ten (10) days written notice of such election, provided such default is continuing on the date such notice is given.

(b)     If the Non-defaulting Member(s) (the "Purchasing Members") exercises his option to purchase then the Defaulting Member and the Purchasing Members shall meet within thirty (30) days after the date the Purchase Price has been determined, at the time and place designated by the Purchasing Member (the "Closing"). At the Closing, the Defaulting Member shall execute all documents that may be necessary or desirable, in the opinion of counsel for the Purchasing Member to convey the Defaulting Member's entire Membership Interest to the Purchasing Member free and clear of all liens and encumbrance. At the Closing, the Purchasing Member shall pay the Purchase Price in cash. The total cash proceeds from such sale shall be applied as follows.

(1)     First to the costs and expenses incurred in determining the Purchase Price (including but not limited to appraisal costs);

(2)     Next to the payment of all loans, including all interest thereon, from the Purchasing Member to the Defaulting Member; and

(3)     The remaining cash shall be paid to the Defaulting Member.

(c)     Purchase Price for Membership Interest. For purposes of this Section 15.03, the Purchase Price for a Membership Interest shall be equal to the amount agreed upon between the Defaulting Member and the Purchasing Member; or if the Defaulting Member and the Purchasing Member cannot

agree upon such a Purchase Price within thirty (30) days after the date of the event triggering the right to effectuate such purchase, then the Purchase Price shall be the fair market value of the Defaulting Member's Membership Interest. The fair market value of the Defaulting Member's Membership Interest shall be as determined by a qualified independent appraiser mutually agreed upon of the Defaulting Member and the Purchasing Member. If the Defaulting Member and the Purchasing Member cannot agree upon an appraiser within ninety (90) days after the date of the event triggering the purchase, then the Purchase Price shall be the fair market value of the Defaulting Member's Membership interest determined as follows: The Defaulting Member shall appoint one (1) qualified appraiser, the Purchasing Member shall appoint one (1) qualified appraiser, and a third appraiser shall be appointed by the two appraisers so appointed. If the two appraisers appointed by the Defaulting Member and the Purchasing Member are unable to agree upon the selection of a third appraiser, the third appraiser shall be selected in accordance with the rules of the American Arbitration Association.

Each of the three (3) appraisers selected in accordance with the above procedure shall separately and independently determine the fair market value of the Defaulting Member's Membership Interest in the Company. When completed, each such appraisal shall be placed in a sealed envelope and delivered to the attorney for the Company to hold until all three appraisals have been received. No appraisal shall be opened or disclosed until all three have been received. After receiving all three appraisals, the attorney for the Company shall open the appraisals and the fair market value shall be the average of the two appraisals that are closest to each other. If, however, the middle appraisal is equal to the average of the high and low appraisals, then the fair market value shall be equal to the middle appraisal. In either case, such determination shall be final and binding upon the parties. The cost of all appraisals made in accordance with this Section 15.03 and shall be deducted from the purchase price proceeds otherwise payable to the Defaulting Member.

**15.04. <u>Additional Effects on Default</u>.** Pursuit to any of the foregoing remedies shall not preclude pursuit of any of the other remedies provided by law, nor shall pursuit of any remedy herein provided constitute a forfeiture or wavier of any amount due to the remaining Members hereunder or of any damages accruing to them by reason of the violation of any of the terms, provisions and covenants herein contained. No waiver by the remaining Member of any violation or breach shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions, and covenants herein contained, and forbearance by them to enforce one or more of the remedies herein provided on an event of default shall not be deemed or construed to constitute a waiver of such default.

## ARTICLE 16

## <u>DISSOLUTION <u>AND</u> TERMINATION</u>

**16.01 <u>Dissolution</u>.** The Company shall be dissolved only upon the occurrence of any of

LLC. KINGGROUPMGMT, LLC. AROA.17

the events set forth in O.C.G.A. Section 14-11-602(b) .

If the Company is continued after the occurrence of an Event of Dissociation of a Member pursuant to this Section, any successor in interest of the Member as to whom the Event of Dissociation occurred shall become an Economic Interest Owner, but shall not be admitted as a Member, except in accordance with Articles 14 hereof.

**16.02    Withdrawing Member.** Unless otherwise approved by Members holding a Majority Interest, a Member who suffers or incurs an Event of Dissociation, or whose status as a Member is otherwise terminated (a "Withdrawing Member"), regardless of whether such termination was the result of a voluntary act by such Withdrawing Member, shall not be entitled to receive outright the fair value of his Membership Interest, and such Withdrawing Member shall become an Economic Interest Owner.

**16.03    Effect of Dissolution.** Upon dissolution, the Company shall cease to carry on its business, except as permitted by the Georgia Act. Upon dissolution, the Managers shall file a statement of commencement of winding up and publish the notice permitted by the Georgia Act.

**16.04    Winding-Up Liquidation and Distribution of Assets.**

    (a)    Upon dissolution, an accounting shall be made by the Company's accountants of the accounts of the Company and of the Company's assets, liabilities and operations from the date of the last previous accounting until the date of dissolution. The Manager(s), or if none, the Persons or Persons selected by Majority Vote of the Members (the "Liquidators") shall immediately proceed to wind up the affairs of the Company.

    (b)    If the Company is dissolved and its affairs are to be wound up, the Liquidators shall:

        (1)    Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Liquidators may determine to distribute any assets to the Members in kind);

        (2)    Allocate any profit or loss resulting from such sales to the Members and Economic Interest Owners in accordance with Article 9 hereof;

        (3)    Discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are creditors, to the extent otherwise permitted by law, other than liabilities to Members and Economic Interest Owners for distributions, and establish such Reserves as may be reasonably necessary to provide for contingent liabilities of the Company;

        (4)    Distribute the remaining assets to the Members, either in cash or in

kind, as determined by the Managers in accordance with the provisions of Section 9.01, with any assets distributed in kind being valued for this purpose at their fair market value. Any such distributions in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1 (b)(2) (ii)(b)(2) of the Treasury Regulations in accordance with the positive balance (if any) in each Member's Capital Account (as determined after taking into an account all Capital Account adjustments for the Company's Fiscal Year during which the liquidation occurs), with any balance in excess thereof being distributed in proportion to the Members' respective Membership Interests. Any such distribution in respect to Capital Accounts shall, to the extent practicable, be made in accordance with the time requirements set forth in Section 1.704- 1 (b)(2)(ii)(b)(2) of the Treasury Regulations; and

(5)  If any assets of the Company are to be distributed in kind, the net fair market value of such assets shall be determined by independent appraisal or by agreement of the Members. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest Owners shall be adjusted pursuant to the provisions of this Operating Agreement to reflect such deemed sale.

(c)    Notwithstanding anything to the contrary in this Operating Agreement upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocation and other Capital Account adjustments for all taxable years ,including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution to reduce or eliminate the negative balance of such Member's Capital account.

(d)    Upon completion of the winding-up, liquidation and distribution of the assets, the Company shall be deemed terminated.

**16.05  Certificate of Termination.** When all debts, liabilities, and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Members, a Certificate of Termination may be executed and filed with the Secretary of State of Georgia in accordance with O.C.G.A Section 14-11-610.

**16.06  Return of Contribution Nonrecourse to Other Members**. Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of his Capital Contribution. If the

LLC. KINGGROUPMGMT, LLC. AROA.17

assets of the Company remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member.

## ARTICLE 17.

### MISCELLANEOUS PROVISIONS

**17.01  Arbitration.** Any dispute arising in connection with this Operating Agreement shall be an Arbitrable Dispute and shall be finally settled by arbitration under the then applicable Commercial Arbitration rules of the American Arbitration Association, by one or more arbitrators agreed upon by the parties or, in the absence of such an agreement, appointed in accordance with such Rules. The arbitration proceedings shall be held in Atlanta, Georgia. Judgment upon the award rendered may be entered in any court having jurisdiction and application may be made to such court for judicial acceptance of such award and an order of enforcement as the case may be. The parties hereby agree that the rendering of an award by the arbitrator or arbitrators shall be a condition precedent to the initiation of any legal proceedings with respect to any Arbitrable Dispute.  The Members agree and understand that this paragraph in no way shall prevent any Member or Members from pursuing civil or criminal remedies for any breach of legal duty or fraudulent or intentional action by any Member, Members or agents, designees' or assignees thereof.

**17.02  Books of Account and Records.** Proper and complete records and books of account shall be kept or shall be caused to be kept by the Manager in which shall be entered fully and accurately all transactions and other matters relating to the Company's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company. The books and records shall be at all times be maintained at the principal executive office of the Company and shall be open to the reasonable inspection and examination of the Members, or their duly authorized representatives during reasonable business hours.

**17.03  Application of Georgia Law.** This Operating Agreement, and the application or interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of Georgia, and specifically the Georgia Act.

**17.04  No Action for Partition.** No Member has any right to maintain any action for partition with respect to any property of the Company.

**17.05  Construction.** Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

**17.06  Headings.** The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

**17.07  Waivers.** The failure of any party to seek redress for violation of or to insist upon

LLC. KINGGROUPMGMT, LLC. AROA.17

the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

**17.08** **Rights and Remedies Cumulative.** The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all of the remedies. Such rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

**17.09** **Heirs, Successors and Assigns.** Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

**17.10** **Creditors.** None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

**17.11** **Counterparts.** This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

**17.12** **Investment Representations.** Any securities created under this Agreement have not been registered under the Georgia Uniform Securities Act of 2008, as amended, in reliance upon the exemption from registration set forth in Section 10-5-11(14) of such act. In addition, these securities have not been registered with the United States Securities and Exchange Commission in reliance upon an exemption from such registration set forth in the Securities Act of 1933 provided by Section 4(2) thereof, nor have they been registered with the Securities Commission of certain states in reliance upon certain exemptions from registration. These securities have been acquired for investment purposes only and may not be offered for sale, pledged, hypothecated, sold or transferred except in compliance with the terms and conditions of this Agreement and in a transaction which is either exempt from registration under such acts or pursuant to an effective registration statement under such acts.

**17.13** **Certification of Non-Foreign Status.** In order to comply with Code Section 1445 and the applicable Treasury Regulations thereunder, in the event of the disposition by the Company of a United States real property interest as defined in the Code and Treasury Regulations, each member shall provide to the Company, an affidavit stating, under penalties of perjury, (i) the Member's address, (ii) United States taxpayer identification number, and (iii) that the Member is not a foreign person as that term is defined in the Code and Treasury Regulations. Failure by any Member to provide such affidavit by the date of such disposition shall authorize the Manager to withhold ten percent (10%) of each such Member's distributive share of the amount realized by the Company on the disposition.

**17.14** **Notices.** Any and all notices, offers, demands, or elections required or permitted to be made under this Agreement ("Notices") shall be in writing, signed by the party giving such Notice, and shall be deemed given and effective (i) when hand delivered (either in person by the

LLC. KINGGROUPMGMT, LLC. AROA.17

party giving such notice, or by its designated agent, (ii) by a nationally known overnight delivery service courier),  next business day delivery or (iii) on the third (3rd) business day  (when making regular deliveries of mail on all of its regularly appointed week day rounds in Atlanta, Georgia) following the day (as evidenced by proof of mailing) upon which such notice is deposited, postage prepaid, certified mail, return receipt requested, with the Postal Service, and addressed to the other party at such party's respective address as set forth below or at such other address as the other party may hereafter designate by Notice.

      **17.15**  **Amendments**. Any amendment to this Operating Agreement shall be made in writing and signed and consented by the affirmative vote of not less than fifty-one  (51%) percent of the Membership Interests.

      **17.16**  **Invalidity**. The invalidity or unenforceability or any particular provision of this Agreement shall not affect the other provisions hereof, and of this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted. If any particular provision herein is construed to be in conflict with the provisions of the Georgia Act, then the Georgia Act shall control and such invalid or unenforceable provisions shall not affect or invalidate the other provisions hereof, and this Agreement shall be construed in all respects as if such conflicting provision were omitted.

      **17.17**  **Further Assurances**. The Members each agree to cooperate, and to execute and deliver in a timely fashion any and all additional documents necessary to effectuate the purposes of the Company and this Agreement.

      **17.18**  **Time**. Time is of the essence of this Agreement, and to any payments, allocations and distributions specified under this Agreement.

**IN WITNESS WHEREOF**, the parties hereto have executed this Amended and Restated Operating Agreement as of the date first above written.

_____ (SEAL)President
**SAHIB SINGH ARORA**

_____ (SEAL)
**KARAN SINGH AHUJA**

EXHIBIT "A"

| **MEMBER** | **CONTRIBUTION** |
|---|---|
| SAHIB SINGH ARORA | $100.00 in cash |
| KARAN SINGH AHUJA | $100.00 in cash |

LLC. KINGGROUPMGMT, LLC. AROA.17

# EXHIBIT B

# AMENDED AND RESTATED
## OPERATING AGREEMENT
### OF
## KING GROUP MGMT, LLC

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE GEORGIA UNIFORM SECURITIES ACT OF 2008, AS AMENDED, IN RELIANCE UPON THE EXEMPTION FROM REGISTRATION SET FORTH IN SECTION 10-5-11(14) OF SUCH ACT. IN ADDITION, THESE SECURITIES HAVE NOT BEEN REGISTERED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION IN RELIANCE UPON AN EXEMPTION FROM SUCH REGISTRATION SET FORTH IN THE SECURITIES ACT OF 1933 PROVIDED BY SECTION 4(2) THEREOF, NOR HAVE THEY BEEN REGISTERED WITH THE SECURITIES COMMISSION OF CERTAIN STATES IN RELIANCE UPON CERTAIN EXEMPTIONS FROM REGISTRATION. THESE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD OR TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS AGREEMENT AND IN A TRANSACTION WHICH IS EITHER EXEMPT FROM REGISTRATION UNDER SUCH ACTS OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACTS.

THIS AMENDED AND RESTATED OPERATING AGREEMENT OF **KING GROUP MGMT, LLC** (hereinafter referred to as the "Operating Agreement") is made and entered into this 9th day of January, 2017, by and between **SAHIB SINGH ARORA and KARAN SINGH AHUJA**, (hereinafter referred to as the "Members and individually as a "Member") whose respective addresses are set forth in ARTICLE 4 of this Operating Agreement. All of the aforementioned parties and any additional persons who may be admitted as Members as herein provided are sometimes hereinafter collectively referred to as the "Members" or hereinafter sometimes individually referred to as a "Member."

## W I T N E S S E T H:

**WHEREAS**, **KING GROUP MGMT, LLC,** a limited liability company (hereinafter referred to as the "Company") was formed pursuant to the laws of the State of Georgia, the purpose of which shall be all aspects of purchasing, leasing, managing and selling of real property.

**The Members** hereto desire to amend and reinstate (i) the contributions to the capital of the Company by the Members; (ii) the division of the profits and losses derived from the ownership, maintenance and operation thereof of the Company; (iii) the restrictions on disposition of Membership Interests; (iv) Management of the Company; and (iv) address various other matters relating to the rights and obligations of the Members;

**NOW, THEREFORE**, the undersigned in consideration of the premises, the mutual promises contained in this Operating Agreement and for the other good and valuable consideration, the Members agree as follows.

LLC. KINGGROUPMGMT, LLC. AROA.17

# ARTICLE 1
## DEFINITIONS

The following terms used in this Operating Agreement shall have the following meaning (unless otherwise expressly provided herein):

"Additional Capital Contributions." With respect to each Member, all additional Capital Contributions made by such Member pursuant to Section 8.02 of this Agreement.

"Additional Capital Contributions Account." An account maintained for each Member equal to (i) the aggregate Additional Capital Contributions to the Company made by such Member, less (ii) the aggregate distributions to such Member pursuant to Section 9.01.

"Articles of Organization." The Articles of Organization of KING GROUP MGMT, LLC as filed with the Secretary of State of Georgia as the same may be amended from time to time.

"Affiliate." (i) in the case of an individual, any relative of such Person, (ii) any officer, director, trustee, partner, manager, employee or holder of ten percent (10%) or more of any class of voting securities of any equity interest in such Person; (iii) any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person; or (iv) any officer, director, trustee, partner, manager, employee or holder of ten percent (10%) or more of the outstanding voting securities of any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person.

"Arbitrable Dispute." Any of the disputes so designated in Section 17.01 hereof.

"Available Cash" means all cash of the Company on hand as of any given time after the payment of all then due debts and liabilities of the Company and after any prepayments of any debts and liabilities of the Company that the Members deem appropriate to cause the Company to make, less any Reserves deemed necessary by the Members, consistent with the provisions of this Agreement, for (a) the repayment of any debts or liabilities of the Company, (b) the working capital or other requirements of the Company, and (c) any contingent or unforeseen liabilities of the Company.

"Business" means.

a)    All aspects of purchasing, leasing, managing and selling of real property.

(b)    All actions necessary to or reasonably connected with the Company's foregoing business which may be legally exercised by limited liability companies under the Georgia Act; and

(c)    All activities necessary, customary, convenient, or incident to any of the foregoing.

"Capital Account" of a Member means a capital account established, maintained, and adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv). Consistent therewith, each Member's Capital Account will be adjusted from time to time pursuant to Section 8.06 hereof, the purpose of which is to set forth certain operating rules for the allocation of book items of income, gain, loss and deduction for Capital Account purposes. The provisions of Article 8 hereof shall be construed in a manner consistent with Treasury Regulations Section 1.704-1(b)(2)(iv). The Capital Accounts shall not be adjusted for items as they are computed and allocated to the Members for federal income tax purposes. Upon the transfer hereunder of all or part of a Membership Interest, other than a Transfer that terminates the Company as a partnership within the meaning of Code Section 708(b)(1)(B), the Capital Account of the transferor Member that is attributable to the transferred Membership Interest will carry over to the transferee Member. In the event of a Transfer of all or part of a Member's Membership Interest that causes a termination of the Company as a partnership within the meaning of Code Section 708(b)(1)(B), the Members' Capital Accounts will be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(1).

"Capital Contribution." Any contribution to the capital of the Company in cash, promissory notes or the agreed value of property by a Member whenever made.

"Code." The Internal Revenue Code of 1986, as amended from time to time.

"Company." **KING GROUP MGMT, LLC**

"Economic Interest" Refers to a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Operating Agreement and the Georgia Act but shall not include any right to vote on, consent to or otherwise participate in any decision of the Members or Managers.

"Economic Interest Owner." The owner of an Economic Interest who is not a Member.

"Entity." Any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association or any foreign trust or foreign business organization.

"Fiscal Year." The Company's fiscal year, which shall be the calendar year.

"Georgia Act." The Georgia Limited Liability Company Act at O.C.G.A Section 14-11-100, et seq.

"Initial Capital Contribution." The initial contribution to the capital of the Company made by a Member pursuant to Section 8.01 of this Operating Agreement.

"Majority Interest." Membership Interests of Members which, taken together, exceed fifty-one percent *(51%)* of the aggregate of all Membership Interests.

"Manager." One or more Members designated pursuant to this Operating Agreement as a Manager from time to time pursuant to Section 5.02 hereof.

"Member." Each of the parties who executes a counterpart of this Operating Agreement as a member and each of the parties who may hereafter become members. To the extent a Manager has purchased a Membership Interest in the Company, the Manager will have all the rights of a Member with respect to such Membership Interest, and the term "Member" as used herein shall include a Manager to the extent such Member has purchased said Membership Interest in the Company.

"Membership Interest." A Member's entire interest in the Company including (i) the right to participate in the management of the business and affairs of the Company, and the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement or the Georgia Act, and (ii) the percentage ownership share of each Member in the capital, assets and properties of the Company. The Membership Interests of the Members as of the date of this agreement are as follows:

| Member's Name | Membership Interest |
|---|---|
| SAHIB SINGH ARORA | 89% |
| KARAN SINGH AHUJA | 11% |

For purposes of the provisions hereof relating to action taken or approval by Members, including voting, written consents or other approval, only Membership Interests held by Members shall be taken into account.

"Net Cash Flow." All cash received by the Company resulting from management and operation of the lodging facilities including proceeds from mortgages or refinancing, plus any other items of income received in cash by the Company, less all payments of debts and expenses, including capital expenditures and principal and interest payments on mortgages and debts, paid in the operation of the Company, and less any Reserves for working capital and capital expenditures which the Members deem reasonably necessary for the operation of the Company or are so specified in any approved budget.

"Net Profits" or "Net Losses." The Company's taxable income or loss determined in accordance with Code Section 703(a) for each of its Fiscal Years (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss) with the following adjustments: (i) such Net Profits and Net Losses will be computed as if items of tax-exempt income and nondeductible, noncapital expenditures (under Code Section 705(a)(1)(B) and 705(a)(2)(B) were included in the computation of taxable income or loss; (ii) that any items specially allocated pursuant to Article 10 hereof shall not be taken into account in computing Net Profits or Net Losses; (iii) if any Member contributes property to the Company with an initial book value to the Company different from its adjusted basis for federal income tax purposes to the Company, or if Company

LLC. KINGGROUPMGMT, LLC. AROA.17

property is revalued in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(f) or as otherwise required by the Regulations, Net Profits and Net Loses will be computed as if the initial adjusted basis for federal income tax purposes to the Company of such contributed or revalued property equaled its initial book value to the Company as of the date of contribution or revaluation; and (iv) credits or debits to Capital Accounts due to a revaluation of Company assets in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(f), or due to a distribution of noncash assets as provided in Section 16.04 hereof, will be take into account as gain or loss from the disposition of such assets for purposes of computing Net Profits and Net Losses.

"Operating Agreement." This Operating Agreement as originally executed and as amended from time to time.

"Person." Any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

"Reserves." With respect to any fiscal period, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts deemed sufficient by the affirmative vote of Members holding at least fifty-one (51%) percent of the Membership Interests for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

"Transferring Member." A Member who sells, assigns, pledges hypothecates or otherwise transfers for consideration or gratuitously all or any portion of his Membership Interest.

"Treasury Regulations" or "Regulations." The Federal Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## ARTICLE 2
## FORMATION OF COMPANY

**2.01    Formation.**  The Company was formed on October 27, 2014 as a Georgia limited liability company by causing Articles of Organization to be delivered to the Secretary of State of Georgia in accordance with the provisions of the Georgia Act. The Company shall be taxed as a partnership for federal income tax purposes.

**2.02    Name.** The name of the Company is KING GROUP MGMT, LLC

**2.03    Principal Place of Business**. The principal place of business of the Company within the State of Georgia is located at 285 Jon Jeff Drive, Lilburn, GA 30047.   The Company may locate its places of business and registered office at any other place or places as the Manager or Managers may from time to time deem advisable.

**2.04    Registered Office and Registered Agent**. The Company's registered office shall be at the office of its registered agent located at 1150 Faith Avenue, Atlanta, GA 303015 and the

LLC. KINGGROUPMGMT, LLC. AROA.17

name of its registered agent at such address is Gobind Madan CPA.   The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Secretary of State of Georgia pursuant to the Georgia Act and the applicable rules promulgated thereunder.

**2.05    Term**. The term of the Company shall commence at the date the Articles of Organization were filed with Secretary of State of Georgia and shall continue until the Company is dissolved, terminated and its affairs wound up in accordance with the provisions of this Operating Agreement or the Georgia Act.

## ARTICLE 3
## BUSINESS OF COMPANY

**3.01    Permitted Businesses**. The Company shall engage in the Business and may engage in any other Business or activities as approved by the Manager.

## ARTICLE 4
## NAMES AND ADDRESSES OF MEMBERS

The names and addresses of the Members as of the date of this Agreement are as follows:

| NAME | ADDRESS |
|------|---------|
| SAHIB SINGH ARORA | 660 Belgrave Lane Tucker, GA 30084 |
| KARAN SINGH AHUJA | 660 Belgrave Lane Tucker, GA 30084 |

Any party may change its address by giving notice of such address change to the other parties pursuant to the notice provisions set forth in Section 17.14.

## ARTICLE 5
## MANAGEMENT

**5.01 Management of Business**. Subject to approval by the Manager as to Major Decisions as provided below, the business and affairs of the Company shall be managed by its Manager(s). Each Manager shall have full authority, power and discretion to delegate the management or control of the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business. The Members shall determine from time to time by Majority Vote which persons shall be the Manager(s), responsible for administering the day-to-day activities of the Company. Each Manager may carry out the business of the

Company directly or delegate or assign by contractual agreement any of their responsibilities. The delegation or assignment by contractual agreement of duties under this Agreement shall not release or reduce the liability and responsibility of the Manager(s) and the Manager(s) shall exercise due care in selecting agents, assignees and designees.

Notwithstanding the foregoing, the Manager(s) shall have the authority to undertake any of the following matters ("Major Decision") without first having obtained the affirmative vote of the Members holding at least fifty-one (51%) percent of the Membership Interests:

(a)     the purchase, lease or sale or other disposition of real or personal property;

(b)     the borrowing or refinancing of any funds for or by the Company (whether secured or unsecured), or the prepayment of any such borrowing;

(c)     the approval of projected annual Company budgets, or expenditures of funds in excess of 110% of the amounts specified in any such approved budgets;

(d)     the approval of amounts distributed to the Members pursuant to Section 9.01 hereof;

(e)     any contracts or agreements between the Company and the Members or any of their respective Affiliates;

(f)     the consummation of any major transactions or series of related transactions, which are not in the ordinary course of the Company's business, including, but not limited to making any expenditure or commitment, other than the lease or rental of space on behalf of the Company in the ordinary course;

(g)     the amendment of the Articles of Organization or this Operating Agreement;

(h)     the merger of the Company with or into any other business entity;

(i)     the filing of any bankruptcy petition or commencement of any insolvency proceeding for the Company.

**5.02    Election of Manager**. The Manager(s) shall be SAHIB SINGH ARORA. He shall serve in such capacity until the first to occur of his death, disability, resignation or removal by a Majority Vote.

**5.03    Tax Matters Member**. The Members hereby appoint SAHIB SINGH ARORA as the Company's "Tax Matters Partner", as that term is defined in Section 623 l(a)(7) of the Code, and further appoint the Tax Matters Partner to receive notice of the beginning of any

LLC. KINGGROUPMGMT, LLC. AROA.17

administrative proceeding at the Company level with respect to any Company item or items, as well as to receive notice of any final administrative adjustment resulting from any such proceeding, in each case within the meaning information to the Internal Revenue Service as may be necessary to enable to Internal Revenue Service to provide the Members with such notices as are required under the Code. The Company's Tax Matters Partner shall also keep each Member informed of any administrative or judicial proceedings relative to any adjustment or proposed adjustment at the Company level of Company items. The Tax Matters Partner shall have the authority to (a) enter into any settlement agreement with the Internal Revenue Service, (b) file a petition as contemplated by Sections 6226(a) or 6228 of the Code, (c) intervene in any action as contemplated by Section 6226(b) of the Code, (d) file any request as contemplated by Section 6227(b) of the Code or (e) enter into an agreement extending the period of limitation as contemplated by Section 6229(1)(B) of the Code.

     **5.04**    **Managers Have No Exclusive Duty to Company**. The Manager(s) shall not be required to manage the Company as their sole and exclusive function and he (or any Manager) may have other business interests and may engage in other activities in addition to those relating to the Company.   Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager or the income or proceeds derived therefrom. The Manager shall incur no liability to the Company or to any of the Members as a result of any other business or venture.

     **5.05**    **Bank Accounts**. The Manager(s) may from time to time open bank accounts in the name of the Company, and the Manager(s) shall be the sole signatories on such accounts unless the Members or Manager(s) determine otherwise.

     **5.06**    **Indemnity of the Manager(s), and Employees** . To the fullest extent permitted under O.C.G.A Section 14-11-306, the Company shall indemnify the Manager(s) and its employees  and make advances for reasonable and necessary expenses to them with respect to such matters to the maximum extent permitted under applicable law.

### ARTICLE 6
### RIGHTS, OBLIGATIONS, REPRESENTATIONS
### AND WARRANTIES OF MEMBERS

     **6.01**    **Limitation on Liability** Each Member's liability shall be limited as set forth in this Operating Agreement, the Georgia Act and other applicable law.

     **6.02**    **No Liability for Company Obligations**. No Member will have any personal liability for any debts or losses of the Company beyond such Member's Capital Contributions, except as provided by law.

     **6.03**    **Priority and Return of Capital**. No Member shall have priority over any other Member, either as to the return of Capital Contributions or as to Net Income or Net Loss or distributions except as set forth herein. This Section shall not apply to any loans (as distinguished from Capital Contributions) which a Member has made to the Company.

LLC. KINGGROUPMGMT, LLC. AROA.17

**6.04    Restrictions on Competitive Activity.** Except as otherwise provided in this Operating Agreement, or in any Covenant Not to Compete, a Confidentiality Agreement, a Noninterference Agreement or any other agreement between the Members, the Members and their respective Affiliates may conduct any other business or activity whatsoever not related to the Company's business, without any accountability to the Company or any Member.

**6.05    Validity of Agreement**. Each Member warrants that this Operating Agreement and each and every other agreement, document and instrument provided for herein and to which such Member is or shall be a party, when executed and delivered, will constitute the valid and binding obligation of such Member, enforceable against him in accordance with its terms, except as enforceability may be limited by (a) bankruptcy or similar laws from time to time in effect affecting the enforcement of creditor's rights generally or (b) the availability of equitable remedies generally.

**6.06    No Violation of Material Instruments**. Each Member represents and warrants that the execution and delivery of this Operating Agreement by such Member does not, and the consummation of the transactions contemplated hereby will not:

(a)    violate or constitute an occurrence of default (which violation or default either singularly or in the aggregate would be considered material) under any provision of, or conflict with, or result in acceleration of any obligation under, or give rise to a right by any party to terminate its obligations under, any material agreement, instrument, order, judgment, decree or other arrangement to which such Member or any of its Affiliates is a party or by which any of them is bound or its respective assets affected;

(b)    require any consent, approval, filing or notice under any provision of law, or violate any judgment, ruling, order, writ, injunction, decree, statute, role or regulation applicable to such Member or any of the Member's Affiliates.

## ARTICLE 7
## MEETINGS OF MEMBERS

**7.01    Yearly Meeting**. The yearly meeting of the Members may be held in the month of December or at such other time as shall be determined by unanimous agreement of the Members.

**7.02    Special Meetings**. Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by any Manager or by a Member or Members holding at least a thirty-three percent (33%) Membership Interest.

**7.03    Place of Meetings**. The Members may designate any place, either within or outside the State of Georgia, as the place of meetings for any meeting of the Members. If no

LLC. KINGGROUPMGMT, LLC. AROA.17

designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal executive office of the Company in the State of Georgia.

     **7.04**   **Notice of Meetings**. Written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than ten (10) nor more than fifty (50) days before the date of the meeting, either personally or by mail, by or at the direction of the Member calling the meeting, to each Member entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered two calendar days after being deposited in the United States mail, addressed to the Member at his address as it appears on the books of the Company, with postage thereon prepaid.

     **7.05**   **Meeting of all Members**. If all of the Members shall meet at any time and place, either within or outside of the State of Georgia, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice and at such meeting any lawful action may be taken.

     **7.06**   **Record Date**. For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which Notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

     **7.07**   **Quorum**. Members holding fifty-one (51%) percent of the Membership Interests represented in person or by proxy, shall constitute a quorum at any meeting of Members. In the absence of a quorum at any such meeting, a majority of the Membership Interests so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice. However, if at the adjournment of the meeting a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting. At such adjourned meeting at which quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed. The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Membership Interests whose absence would cause less than a quorum to be present.

     **7.08**   **Manner of Acting**. If a quorum is present, the affirmative vote of Members holding fifty-one (51%) percent of the Membership Interest shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Georgia Act, by the Articles of Organization, or by this Operating Agreement. Unless otherwise provided herein or required under applicable law, Members who have an interest (economic or otherwise) in the outcome of any particular matter upon which the Members vote or consent may vote or consent upon any such matter and their Membership Interest, vote or consent, as the case may be, shall be counted in the determination of whether the requisite matter was approved by the Members.

**7.09    Proxies**. At all meetings of members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney in fact. Such proxy shall be filed with the Manager before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

**7.10    Action by Members Without a Meeting**. Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by all the necessary Members entitled to vote and required to approve such action and delivered to the Manager for inclusion in the minutes or for filing with the Company records. Action taken under this Section is effective when the Members required to approve such action have signed the consent, unless the consent specifies a different effective date. The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a written consent.

**7.11    Waiver of Notice.** When any notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

## ARTICLE 8
## CONTRIBUTIONS TO COMPANY AND CAPITAL ACCOUNTS

**8.01    Member's Capital Contributions**. Each Member shall contribute the amount of cash, set forth next to such Member's name on Exhibit "A" hereto as the Member's Initial Capital Contribution.

**8.02    Additional Capital Contributions**.

In the event that the Members determine that Additional Capital Contributions are needed by the Company, the Members shall contribute their share of such Additional Capital Contributions (determined by reference to their Membership Interests in the Company) within fifteen (15) days thereafter (or, if later, such time as is set forth in the notice from the Company). In the event that a Member fails to make such Additional Capital Contributions (the "Defaulting Member"), and the remaining Members (the "Non-Defaulting Members") contribute such Defaulting Members' Additional Capital Contribution (the "Disproportionate Contribution"), then the Defaulting Member's Interest in the Company shall be reduced using the following formula:

$$\frac{A}{be \quad A + C} \quad x \quad I \times 2 \quad = \quad$$ Interest in membership interest of the Company to forfeited by the breaching Member.

where:    A=    Breaching Member's share of Additional Capital Contributions required by this Section 8.02;

C=    Total capital previously contributed by Breaching Member; and

LLC. KINGGROUPMGMT, LLC. AROA.17

I=     Breaching Member's membership interest of the Company prior to their failure to make the required Additional Capital Contributions.

It is the intent of the parties hereto that the membership interest of the Company forfeited by the Defaulting Member shall be allocated pro rata among the Non-Defaulting Members who contributed the Defaulting Member's share of the Additional Capital Contribution required by this Section 8.02 in the same proportions as such Additional Capital Contributions are made by the Non-Defaulting Members.

**8.03    Optional Loans**.  In addition to or in lieu of making a capital call pursuant to Section 8.02, in the event that the Members by Majority Vote determines that the Company needs additional capital, the Manager may ask each Member to make a loan to the Company in an amount determined by the Manager.  The Manager shall fix, and notify the Members of a date by which the Members must respond to any such request, and the Members shall, before such date, determine whether to make the requested loans (which may be made directly or through Affiliates) and notify the Manager of such decision, but no Member shall be required to make any such loan.  Any loan made pursuant to this Section 8.03 shall bear simple interest at the rate of two percent (2%) per annum in excess of the "prime rate" of SunTrust Bank, Atlanta, Georgia, or its successor entity, in effect from time to time during the periods such loans are outstanding, and shall be payable pursuant to the provision of Sections 9.01 and Section 16.01 hereof.  The Members by Majority Voite shall have complete discretion regarding whether to request a loan from Members pursuant to this Section 8.03 or requesting that the Members make an Additional Capital Contribution pursuant to Section 8.02.

**8.04    No Interest on Contributions**.  No Member shall be entitled to receive interest on his or her Capital Contribution.

**8.05    Loan Guarantees**.  The Members of the Company agree that they shall all, but not less than all, upon request by the Manager, execute unconditional guarantees of repayment of loans, financings, borrowings, rentals or other obligations of the Company.  In addition, the Members of the Company agree to execute any and all documents necessary or required by any lending institution or any third party to make loans to the Company.  The Manager may require that said guarantees be executed on behalf of the Company.

**8.06    Capital Accounts**

(a)     An individual Capital Account shall be established and maintained for each Member, and shall be credited with the Capital Contribution of such Member, any Additional Capital Contributions and that portion of Net Income allocable to such Member and shall be debited with that portion of any Net Loss allocable to such Member and all distributions made by the Company to such Member.

(b)     No interest shall be payable to any Member on any positive balance in

such Member's Capital Account.

(c)    No Member shall have the right to withdraw from his or her Capital Account or to otherwise receive any Company funds or property, except as provided by this Operating Agreement.

(d)    No Member shall be required to eliminate in any fashion any deficit balance which may arise in his or her Capital Account at the time the Company is dissolved or at any other time.

**8.07    Withdrawal or Reduction of Members' Contributions to Capital**

(a)    A Member shall not receive out of the Company's property any part of such member's Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid, or their remains property of the Company sufficient to pay them.

(b)    A Member, irrespective of the nature of such Member's Capital Contributions, has only the right to demand and receive cash in return for such Capital Contribution.

## ARTICLE 9
## DISTRIBUTIONS TO MEMBERS

**9.01    Distributions**. Except as otherwise provided in this Operating Agreement, Net Cash Flow shall be distributed to the Members ratably in proportion to their Membership Interests. Such Net Cash Flow shall be distributed at such times as the Members holding fifty-one(51%) percent of the Membership Interest shall determine from time to time, but in no event less frequently than once per year. Should the Members holding fifty-one (51%) percent of the Membership Interest determine that the Net Cash Flow for a particular quarter will be more appropriately reinvested into the Company, they may in their discretion, reduce the distribution amounts to an amount necessary to cover the income tax assessment caused by the Net Profits of the Company, not yet distributed.

**9.02    Distributions In Cash.** A Member, irrespective of the nature of such Member's Capital Contributions or his share of the Net Cash Flow, has only the right to demand and receive cash for the satisfaction of his share of the Net Cash Flow, should the Net Cash Flow be distributed as determined under Section 9.01.

**9.03    Limitation Upon Distributions**. No distribution shall be made to Members if prohibited by O.C.G.A Section 14-11-407.

**9.04    Distributions After the Fiscal Year End.**  The Manager may, to the extent consistent with this Article 9, elect to have distributions made after the end of a Fiscal Year relate back to such Fiscal Year, provided, however, that any such distribution must be made

LLC. KINGGROUPMGMT, LLC. AROA.17

within thirty (30) days after the end of such Fiscal Year.

**9.05    Withholding**.  The Manager may cause the Company to withhold income or other taxes as may be required by, and otherwise comply with and take actions necessary as the result of, the provisions of the code of any state or local tax law requiring withholding.  Any amounts of the Company's Available Cash withheld pursuant to this Operating Agreement shall be deemed to have been paid to the members as distributions of the Company's Available Cash in the amounts so withheld pursuant to this Article 9.

**9.06    Tax Distributions**.  Unless prevented by applicable law, the Company shall distribute to each Member, with respect to each fiscal year, either during such fiscal year or within sixty (60) days thereafter, to the extent of Available Cash, an amount equal to (i) the amount of the Company's federal taxable income allocated to such Member for such fiscal year, multiplied by (ii) the highest combined federal and state income tax rate to which any Member is subject with respect to such fiscal year (the "Tax Distribution"). All distributions pursuant to this section shall be distributed ratably in proportion to the relative Membership Interests of the Members and shall be credited as a distribution pursuant to Section 9.01.


**ARTICLE 10**
**ADJUSTMENT OF CAPITAL ACCOUNTS AND PROFITS AND LOSSES**

**10.01    General Tax Allocations.**  As of the end of each Fiscal Year, and after giving effect to the special tax allocations set forth in Section 10.2, Net Profits and Net Losses shall be allocated among the Members for Capital Account, as well as for federal income tax purposes, ratably in accordance with their respective Membership Interests.

**10.02    Special Allocations**.  At the end of each Fiscal Year and notwithstanding any provision of Section 10.01, the following special allocations shall be made for both Capital Account and for federal income tax purposes unless otherwise provided:

(a)    In accordance with the ordering rules of Treasury Regulation Section 1.704-2(j), items of gross income and realized gain first shall be allocated in an amount and in a manner that complies with the "chargeback" requirement of Treasury Regulation Section 1.704-2(i)(4), the "qualified income offset" requirement of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and the "minimum gain chargeback" requirement of Treasury Regulation Section 1.704-2(f).  Further, any "partner nonrecourse deductions" within the meaning of Treasury Regulation Section 1.704-2(i)(2) attributable to "partner nonrecourse debt" shall be allocated to the Member who bears the "economic risk of loss" for such debt in accordance with Treasury Regulation Section 1.704-2(i).  Any losses in excess of the losses allowable to the Members pursuant to the Treasury Regulations promulgated under Code Section 704(b) shall first be allocated to the extent allowable hereunder to Members who are not precluded from receiving such allocations by the preceding provisions of this subparagraph(a), if any, and shall thereafter be allocated as provided in Section 10.01.

(b)    If a taxing authority ignores the characterization of any amounts paid to a

Member (or an Affiliate thereof) as salaries, management fees, commissions, interest or other compensation for services ("Compensation"), and refuses to treat such payments as either guaranteed payments within the meaning of Code Section 707(c) or payments made to such Member other than in such Member's capacity as a "partner" within the meaning of Code Section 707(a), and such taxing authority ultimately treats such amounts paid to a Member (or an Affiliate) thereto as a distribution to such Member for federal income tax purposes which reduces such Member's Capital Account, then the Compensation shall be treated as an allocation of an item of income or gain of the Company to the recipient Member so that, consistent with the intent of the Members, the Compensation shall not be treated as a distribution which reduces the recipient Member's Capital Account. Accordingly, such Member shall be allocated the first available items of Company income and gain (including in a succeeding year) in an amount equal to the Compensation.

(c)     If the Company owns (x) any property contributed by a Member that had a fair market value different from its adjusted basis for federal income tax purposes on the date of the contribution, or (y) any property that has been revalued pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f), then for federal income tax purposes only and not for Capital Account purposes, any income, gain, loss or deduction with respect to such property shall be allocated among the Members in accordance with Code Section 704(c) and the Treasury Regulations thereunder.

**10.03   Tax Items.**  Except as otherwise provided herein, any allocation to a Member of a portion of the Net Profits or Net Losses for a Fiscal Year (or other relevant period) will be deemed to be an allocation to that Member of the same proportionate part of each item of income, gain, loss, deduction or credit that is earned, realized or available by or to the Company for federal income tax purposes.

**10.04   Partial Year Allocations.**  In the event that a Member is admitted to the Company during the Company's Fiscal Year, or all or a portion of a Member's Membership Interest is transferred during the Company's Fiscal Year, Net Profits and Net Losses shall be allocated to the admitted or transferee Member in any manner permitted by Code Section 706 or the Treasury Regulations thereunder, as the Manager shall determine in his discretion. Allocations made in this Article X shall be made to each holder of a Membership Interest whether or not the holder is a substituted Member.

**10.05   Allocations and Distributions Upon Dissolution.**  When the Company is dissolved and wound-up pursuant to Article 16 hereof, all items of income, gain, loss and deduction not previously allocated shall be allocated to the Members pursuant to this Article 10. It is the intent of the parties hereto that after the allocations described in the previous sentence are made and the final cash distribution referred to in Section 16.04 hereof is made, that such actions will result in the Capital Account balances of the Members equaling zero following the dissolution of the Company. The allocation and distribution provisions of Articles 9 and 10, as well as the provisions of Article 14 hereof, shall be construed in such a way in order to achieve this result. Notwithstanding anything in this Agreement to the contrary, no Member shall be obligated to restore any negative balance in his Capital Account upon the dissolution of the Company, the Transfer of all of any portion of his Membership Interest, or otherwise.

## ARTICLE 11
## LIMITATION ON LIABILITY AND INDEMNIFICATION

**11.01    Limitation on Liability of the Members.**  No Member, Company officer, or Manager shall be liable to the Company for any loss or damage sustained by any of them, except loss or damage resulting from intentional misconduct or a knowing violation of law or a transaction for which such Person received a personal benefit in violation or breach of any provision of this Agreement.

**11.02    Indemnification.**  The Company shall indemnify and hold harmless the Members, and Manager(s),  from and against any and all claims and demands whatsoever arising in connection with the Company to the fullest extent provided by Section 14-11-306 of the Act and applicable law.

## ARTICLE 12

## COMPENSATION AND REIMBURSEMENTS

**12.01    Compensation.**  Except as otherwise provided herein or approved by an affirmative vote members holding fifty-one (51%) percent of the Membership Interests in the Company, none of the Members, Manager(s), if any, or their Affiliates shall be entitled to compensation in connection with rendering their services to the Company.

**12.02    Reimbursement of Members.** The Company shall reimburse the Members and Manager(s) for all reasonable and direct out of pocket expenses and costs incurred in connection with rendering services to the Company; provided, however, that any such expenses must be documented in the manner required by the Internal Revenue Service as necessary to allow the deduct ability of such expenses as business expenses of the Company.

## ARTICLE 13

## ACCOUNTING, BOOKS AND RECORDS

**13.01    Accounting Method.**  The Company will maintain its books and records on such basis of accounting as the Manager shall determine.

**13.02    Books and Records.**  The Company shall keep, at Company expense, full, complete and accurate books of account and other records showing the assets, liabilities, costs, expenditures, receipts and such other matters as are required by the Code.  Such books of account will be the property of the Company, will be kept in accordance with generally accepted accounting principles and procedures consistently applied and will be open to the reasonable inspection and examination by the Members and their duly authorized representatives.  Such books of account will be maintained at the principal office of the Company, or at such other place as the Manager determines.

**13.03   Financial Statements**.  Within sixty (60) days following the end of each quarter of the Company, and within ninety (90) days following the end of each Fiscal Year of the Company, the Manager shall cause to be prepared and delivered to each Member unaudited financial statements of the Company for such quarter and Fiscal Year.

**13.04   Tax Returns**.  The Manager shall cause the Company's tax returns and other governmental returns and reports to be prepared and timely filed.  The Manager shall deliver copies of Schedule K-1 of Form 1065 (or a comparable schedule), federal and state tax returns and other necessary tax information for each Fiscal Year to each Member no later than sixty (60) days after the end of each Fiscal Year, or such later date as may be otherwise agreed to by the Members.

## ARTICLE 14

## TRANSFERABILITY AND ADDITIONAL MEMBERS

**14.01   General**. Except as otherwise specifically provided herein, no Member shall have the right to:

(a)     sell, assign, pledge, hypothecate transfer, exchange or otherwise transfer for consideration (collectively, "sell"), or

(b)     gift, bequeath or otherwise transfer for no consideration (whether or not by operation of law, except in the case of bankruptcy), all or any part of his Membership Interest, except that Members have a right to transfer all or a portion of a Membership Interest to the parents, spouses or lineal descendants of the current owners of such interest or into trust established for the benefit of any of the foregoing, for bona-fide estate planning or tax planning purposes.

**14.02   Additional Members.** Without vote or assent of Members holding at least fifty one (51%) percent of the Membership Interests, no Person or Entity may become a Member of this Company either by the issuance by the Company of a Membership Interest, or as a transferee of a Member's Membership Interest or any portion thereof.  No new Members shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Members may by an affirmative vote of fifty-one (51%) percent of the Membership Interests at the time a Member is admitted elect to close the Company books (as though the Company's tax year had ended) or to make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of 706(d) of the Code and Treasury Regulations promulgated thereunder.

**14.03   Sale. Assignment or Other Transfer of Member Interests**.

(a) No Member shall sell, assign or otherwise transfer all or any part of his

LLC. KINGGROUPMGMT, LLC. AROA.17

Membership Interest, without first obtaining the affirmative vote or assent of Members holding fifty-one (51%) percent of the Membership Interests in the Company held by all Members excluding the transferring Member, (the "Remaining Members.")  The restrictions contained in this Section shall not apply to restrict in any way transfer by any Member of assets which such Member holds other than such Member's Membership interest in the Company.

     (b) As a condition to any transfer, the transferee shall agree to be bound by all of the terms and provisions of this Operating Agreement to the same extent and in the same capacity as the transferor would have been with respect to the transferred Membership Interest had the transferor continued to own such transferred Membership Interest. However, in the event that (i) a Member who has transferred his Membership Interest to or for the benefit of his spouse shall thereafter become divorced from such spouse and following the divorce, such spouse shall retain a Membership Interest in the Company, (ii) the spouse of a Member is awarded or becomes entitled to some or all of such Member's Membership Interest pursuant to a divorce decree or settlement agreement, or (iii) an owner of a Member has transferred a portion or all of his membership interest in such owner to or for the benefit of his spouse shall thereafter become divorced from such spouse and following the divorce, such spouse shall retain a membership interest in a Member or (iv) the spouse of an owner of a Member is awarded or becomes entitled to some or all of such Member's membership interest in a Member pursuant to a divorce decree or settlement agreement, then, in either such event, an Event of Default, as defined in Section 15.02 herein shall have occurred and the Membership Interest held by such spouse (or the membership interest in the Member that is held by such spouse) shall be subject to the provisions of  Section 14.03 herein. In addition, the Transferee Member or spouse shall become a holder of an Economic Interest only, with no voting rights, unless the remaining original Members, excluding the Member who transferred such Membership Interest, determine otherwise by majority vote of such Members.

     (c) In exercising discretion to consent to any sale, assignment or transfer covered by the provisions of subparagraph (a) of this Section 14.03, the Members shall require such vendee, assignee or other transferee or counsel for any such person to demonstrate to the Members (i) the vendee, assignee or other transferee is a financially responsible person who understands the nature of an investment in the Company and (ii) such person intends to take and hold the interest transferred for investment for his own account and not for resale to others. No Member shall consent to a sale, assignment or other transfer of less than all of the Membership Interest to the Member, unless in the opinion of the Members, such Member's Membership Interest is large enough to be divided.  In addition no such sale, assignment or other transfer shall be effective to bind the Company until and unless the Remaining Members shall receive an opinion of counsel for the vendor, assignor or other transferor in form and substance satisfactory to counsel for the Company that the sale, assignment or other transfer may lawfully be made under all applicable law, including any and all applicable securities laws, and that such sale, assignment or other transfer, together with all other sales or transfers or interests in the Company sold, assigned or transferred within the preceding twelve (12) months and will not result in a termination of the Company pursuant to Code Section 708.

     (d) The transferee of any Member (if a transfer is permitted pursuant to the terms of this Agreement) shall be subject to and bound by all of the terms and conditions of this

LLC. KINGGROUPMGMT, LLC. AROA.17

Agreement.

### 14.04    Deadlock and Triggering of Put/Call Procedure.

(a) If (i) at any time the Members are unable to reach a resolution as to any Major Decision under this Operating Agreement; and (ii) a Member determines that such matter or decision is not resolvable without resort to the following procedure, such Member may send a notice (a "Declaration of Deadlock") to all Members of the Company declaring the existence of a deadlock (a "Deadlock").

(b) Within three (3) calendar days after delivery of a Declaration of Deadlock (the "Delivery Period"), each Member shall provide to the other Member a written report detailing the facts that such Member deems to be relevant to the creation and resolution of the Deadlock, plus any supporting information and a summary of any discussion relevant to the subject matter of the Deadlock. For a period of thirty (30) calendar days after expiration of the Delivery Period (the "Discussion Period"), the Members shall meet in person and/or communicate telephonically or electronically as frequently as necessary to negotiate in good faith to resolve the Deadlock. If the Members are able to resolve the Deadlock they shall, within the Discussion Period, execute a written acknowledgement (the "Resolution Acknowledgement") setting forth in reasonable details the resolution of the Deadlock. Pending resolution of the Deadlock, all Members, Managers and the Company shall continue to perform their respective obligations under this Operating Agreement without regard to whether the Deadlock has been resolved, unless and until such obligations are terminated or expire in accordance with the provisions hereof or are rendered incapable of performance by reason of the Deadlock. In the event that the Members are unable to resolve the Deadlock within the Discussion Period, either Member may institute the procedures set forth in this section.

(c) Manner of Offer. At any time after the expiration of the Discussion Period, if the Deadlock has not been resolved, any Member may at any time offer to the other Members (individually and collectively, the "Electing Members") both to sell all of the offeror's Membership Interest to the Electing Members and to buy all of the Electing Members' Membership Interests (such offeror is hereinafter referred to as the "Initiating Member"). Such offer must be in writing and must contain the following: (1) a statement of intention to make an offer in accordance with this Section; (2) a statement of the Initiating Member's determination of the Stated Amount (as defined below); (3) a statement that a condition to any purchase pursuant to the offer shall be the absolute and unconditional indemnity by the purchasing Member of the Initiating Member against any loss, claim or damage that the Initiating Member may suffer arising out of any guarantee by the Initiating Member of any debt of the Company for borrowed money; (4) a statement that the purchase price of the Membership Interest subject to the offer shall be payable not less than twenty five percent (25%) cash at Closing with the balance, if any, represented by a promissory note of the purchasing Member secured by the acquired Membership Interest and personally guaranteed by the owner of the purchasing Member and payable in equal monthly installments over thirty six consecutive months with interest at the prime rate plus 2% announced by SunTrust Bank, Atlanta, Georgia or successors ("Applicable Rate"); and (5) a statement that such offer is both an offer to sell all the Membership Interest owned by the Initiating Member and an offer to purchase all the Membership Interest owned by

LLC. KINGGROUPMGMT, LLC. AROA.17

the Electing Members (the "Put-Call Offer") on such terms and conditions. The "Stated Amount" means the fair market value of the subject Membership Interest, as determined by a qualified independent appraiser under the procedure outlined in Section 15.03 (c) below; provided however, that the Stated Amount shall not be less than the aggregate of all indebtedness owed by the Company, including any loans to the Company from Members.

The purchase price ("Put-Call Purchase Price") for any Member's Membership Interest in the Company acquired pursuant to this Section shall be that amount which would be distributed to such Member pursuant to Section 9.01 hereof (after giving effect to all applicable provisions of this Operating Agreement, but after liquidating all Reserves then existing and without establishing any additional Reserves), if (i) all of the assets then held by the Company were sold for cash on the date of the Closing (as defined in this section) for a gross sales price equal to Stated Amount and (ii) the Company's liabilities were paid in full. Any loans by a Member to the Company owing to a Member shall be added to the purchase price payable to such Member.

The Put-Call Offer shall be irrevocable for ninety (90) days, and the Electing Members may, on or before such ninetieth (90th) day, accept in writing either the offer to sell or the offer to buy, and upon acceptance, the Initiating Member and the Electing Members shall be required to sell or to buy, as the case may be. If the Electing Members fail to accept either offer within the ninety (90) day period, the Electing Members shall be deemed to have accepted the offer to sell the Membership Interests of the Electing Members to the Initiating Member.

Any two or more Members may jointly execute a Put-Call Offer and specify in the Put-Call Offer that they are to be treated as one Initiating Member for purposes of this Section. For purposes of the remainder of this Section unless the context indicates otherwise, references to "Member," "Initiating Member" or "Electing Member" include, where appropriate, the plural as well as the singular.

(d) Differing Elections. If the Electing Members consists of more than one Member, three possible response combinations may result: (i) all Electing Members elect to purchase the Membership Interest of the Initiating Member, (ii) all Electing Members elect to sell their Membership Interests to the Initiating Member, or (iii) one or more Electing Members elect to purchase the Initiating Membership Member's Interest and one or more Electing Members elect to sell their Membership Interest to the Initiating Member. In the event of a split of elections as described in (iii), an Electing Member's election to sell his Membership Interest shall be ineffective and the election of an Electing Member to purchase the Membership Interest of the Initiating Member shall be the only effective election, and those Electing Member(s) electing to purchase the Initiating Member's Interest shall purchase all of the Initiating Member's Membership Interest.

If there is more than one Electing Member electing to purchase the Initiating Member's Membership Interest, each such Electing Member in the purchasing group shall be entitled to purchase such portion of the Initiating Member's Membership Interest as all such Electing Members shall agree among themselves. In the event all Electing Members in the purchasing group cannot agree on the portion of the Initiating Member's Membership Interest that each of them shall purchase, then each such Electing Member in the purchasing group shall be entitled to

purchase a portion of the Initiating Member's Membership Interest, such portion to be determined by dividing each Electing Member's Ownership Percentage by the total Ownership Percentages of all Electing Members in the purchasing group.

**14.05 <u>Closing</u>.** The closing of such purchase and sale (the "Closing") shall be held at the offices of the Company and on the date specified by the purchaser by written notice to the seller, which date shall be on or before the thirtieth (30) day after such option to purchase or sell has been exercised. At Closing, the purchaser shall pay the Put-Call Purchase Price by wire transfer of immediately available funds.

(a) It shall be a condition to the Closing that the purchasing Member(s) shall either (i) repay all Company indebtedness for borrowed monies under which the selling Member has personal liability or (ii) cause the selling Member to be released from such personal liability by written instrument duly signed by the holder of such indebtedness. The purchasing Member(s) agrees to indemnify in writing the selling Member and hold the selling Member harmless from and against any damage, loss or liability as a result of the purchasing Member's failure to repay such indebtedness at the closing in accordance with the provisions hereof or to obtain the release of the selling Member. The selling Member, may, in his sole and absolute discretion, and without prejudice to any other legal or equitable remedies he may have, refuse to proceed with the Closing unless simultaneously therewith all such indebtedness is so repaid or such releases delivered. In addition, at any Closing held pursuant to this Section, the purchasing Member shall by a legally enforceable agreement assume the payment of, and indemnify the selling Member against all obligations of the Company accruing after Closing other than those obligations owing out of or related to an act or omission of the selling Member which constitutes gross negligence or willful misconduct.

(b) At the Closing, an assignment and, if requested by the Purchasing Member or, a bill of sale from the selling Member to the purchasing Member of the selling Member's Membership Interest together with such other instruments and documents as may be reasonably necessary or desirable to effectuate the sale and transfer to the purchasing Member shall be delivered upon payment of the purchase price. The purchasing Member shall have the right, within his sole and absolute discretion, to cause his nominee or designee to acquire the selling Member's Membership Interest at the Closing but nothing herein shall relieve the purchasing Member of his other obligations hereunder. Any such designee shall, upon Closing, become a Member only if expressly approved and consented to by the purchasing Member.

## ARTICLE 15

## <u>PROHIBITED TRANSACTIONS AND DEFAULTS</u>

**15.01  <u>Prohibited Transactions</u>.** Neither any Member shall, without the consent of all of the other Members, do any one of the following nor shall any Member permit any of such Member's respective Affiliates to do any of the following:

(a)    Use the name of the Company (or any substantially similar name) or any trademark or trade name adopted by the Company except in the ordinary

LLC. KINGGROUPMGMT, LLC. AROA.17

course of the Company's business;

(b)    Disclose to any nonmember any of the Company business practices, trade secrets, or any other information not generally known to the business community:

(c)    Do any other act or deed with the intention of harming the business operations of the company;

(d)    Do any act contrary to this Operating Agreement except with the prior written approval of all Members;

(e)    Do any act which would make it impossible to carry on the intended or ordinary business of the Company;

(f)    Confess a judgment against the Company.

(g)    Wrongfully transfer or dispose of Company property, real or personal;

(h)    Admit another Person or Entity as a Member except as provided herein.

The Members shall not use, directly or indirectly, the assets of this Company for any purpose other than carrying on the business of this Company, for the full and exclusive benefit of all its Members.

**15.02  Events of Default.** The following events shall be deemed to be events of default by a Member.

(a)    Any attempted transfer of an interest in the Company by the Member without complying with the provisions of Article 14 of this Operating Agreement.

(b)    The making of an assignment for benefit of creditors or the filing of the Member of a petition under any section or chapter of the National Bankruptcy Act, as amended, or under similar law or statute of the Untied States, or any State thereof, by the Member

(c)    Adjudication of the Member as bankrupt or insolvent in proceedings filed against the Member under any section or chapter of the National Bankruptcy Act, as amended, or under any similar law or statute of the United States or any State thereof, without further possibility of appeal or review.

(d)    The appointment or a receiver for all or substantially all of the assets of a Member and the failure to have such receiver discharged with in thirty (30) days after appointment.

LLC. KINGGROUPMGMT, LLC. AROA.17

(e)     The attempted transfer, whether voluntary or involuntary, of an interest in the Company to the creditor(s) of a Member in partial or complete satisfactory of any judgment or lien held by such creditor(s) against such Member.

(f)     Failure to make the Member's required Initial Capital Contribution or Additional Capital Contribution in accordance with Section 8.01 or Section 8.02 of this Agreement.

**15.03   Effect of Default.**

(a)     On the occurrence of an event of default by a Member, the Non-defaulting Members shall have the right, at their election, to purchase the Membership Interest of the Defaulting Member at a Purchase Price determined in accordance with Section 15.03(c) or to receive an increase in the Membership Interest pursuant to Paragraph 8.02 of this Agreement. Said election may be made at any time within ninety (90) days from the date of such default, upon giving the Defaulting Member ten (10) days written notice of such election, provided such default is continuing on the date such notice is given.

(b)     If the Non-defaulting Member(s) (the "Purchasing Members") exercises his option to purchase then the Defaulting Member and the Purchasing Members shall meet within thirty (30) days after the date the Purchase Price has been determined, at the time and place designated by the Purchasing Member (the "Closing"). At the Closing, the Defaulting Member shall execute all documents that may be necessary or desirable, in the opinion of counsel for the Purchasing Member to convey the Defaulting Member's entire Membership Interest to the Purchasing Member free and clear of all liens and encumbrance. At the Closing, the Purchasing Member shall pay the Purchase Price in cash. The total cash proceeds from such sale shall be applied as follows.

(1)     First to the costs and expenses incurred in determining the Purchase Price (including but not limited to appraisal costs);

(2)     Next to the payment of all loans, including all interest thereon, from the Purchasing Member to the Defaulting Member; and

(3)     The remaining cash shall be paid to the Defaulting Member.

(c)     <u>Purchase Price for Membership Interest</u>. For purposes of this Section 15.03, the Purchase Price for a Membership Interest shall be equal to the amount agreed upon between the Defaulting Member and the Purchasing Member; or if the Defaulting Member and the Purchasing Member cannot

agree upon such a Purchase Price within thirty (30) days after the date of the event triggering the right to effectuate such purchase, then the Purchase Price shall be the fair market value of the Defaulting Member's Membership Interest.  The fair market value of the Defaulting Member's Membership Interest shall be as determined by a qualified independent appraiser mutually agreed upon of the Defaulting Member and the Purchasing Member. If the Defaulting Member and the Purchasing Member cannot agree upon an appraiser within ninety (90) days after the date of the event triggering the purchase, then the Purchase Price shall be the fair market value of the Defaulting Member's Membership interest determined as follows: The Defaulting Member shall appoint one (1) qualified appraiser, the Purchasing Member shall appoint one (1) qualified appraiser, and a third appraiser shall be appointed by the two appraisers so appointed. If the two appraisers appointed by the Defaulting Member and the Purchasing Member are unable to agree upon the selection of a third appraiser, the third appraiser shall be selected in accordance with the rules of the American Arbitration Association.

Each of the three (3) appraisers selected in accordance with the above procedure shall separately and independently determine the fair market value of the Defaulting Member's Membership Interest in the Company. When completed, each such appraisal shall be placed in a sealed envelope and delivered to the attorney for the Company to hold until all three appraisals have been received. No appraisal shall be opened or disclosed until all three have been received. After receiving all three appraisals, the attorney for the Company shall open the appraisals and the fair market value shall be the average of the two appraisals that are closest to each other.  If, however, the middle appraisal is equal to the average of the high and low appraisals, then the fair market value shall be equal to the middle appraisal.  In either case, such determination shall be final and binding upon the parties. The cost of all appraisals made in accordance with this Section 15.03 and shall be deducted from the purchase price proceeds otherwise payable to the Defaulting Member.

**15.04.  <u>Additional Effects on Default</u>.** Pursuit to any of the foregoing remedies shall not preclude pursuit of any of the other remedies provided by law, nor shall pursuit of any remedy herein provided constitute a forfeiture or wavier of any amount due to the remaining Members hereunder or of any damages accruing to them by reason of the violation of any of the terms, provisions and covenants herein contained. No waiver by the remaining Member of any violation or breach shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions, and covenants herein contained, and forbearance by them to enforce one or more of the remedies herein provided on an event of default shall not be deemed or construed to constitute a waiver of such default.

## ARTICLE 16

## <u>DISSOLUTION</u> <u>AND</u> <u>TERMINATION</u>

**16.01  <u>Dissolution</u>.** The Company shall be dissolved only upon the occurrence of any of

LLC. KINGGROUPMGMT, LLC. AROA.17

the events set forth in O.C.G.A. Section 14-11-602(b) .

If the Company is continued after the occurrence of an Event of Dissociation of a Member pursuant to this Section, any successor in interest of the Member as to whom the Event of Dissociation occurred shall become an Economic Interest Owner, but shall not be admitted as a Member, except in accordance with Articles 14 hereof.

**16.02   Withdrawing Member.** Unless otherwise approved by Members holding a Majority Interest, a Member who suffers or incurs an Event of Dissociation, or whose status as a Member is otherwise terminated (a "Withdrawing Member"), regardless of whether such termination was the result of a voluntary act by such Withdrawing Member, shall not be entitled to receive outright the fair value of his Membership Interest, and such Withdrawing Member shall become an Economic Interest Owner.

**16.03   Effect of Dissolution.** Upon dissolution, the Company shall cease to carry on its business, except as permitted by the Georgia Act. Upon dissolution, the Managers shall file a statement of commencement of winding up and publish the notice permitted by the Georgia Act.

**16.04 Winding-Up Liquidation and Distribution of Assets.**

(a)   Upon dissolution, an accounting shall be made by the Company's accountants of the accounts of the Company and of the Company's assets, liabilities and operations from the date of the last previous accounting until the date of dissolution. The Manager(s), or if none, the Persons or Persons selected by Majority Vote of the Members (the "Liquidators") shall immediately proceed to wind up the affairs of the Company.

(b)   If the Company is dissolved and its affairs are to be wound up, the Liquidators shall:

(1)   Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Liquidators may determine to distribute any assets to the Members in kind);

(2)   Allocate any profit or loss resulting from such sales to the Members and Economic Interest Owners in accordance with Article 9 hereof;

(3)   Discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are creditors, to the extent otherwise permitted by law, other than liabilities to Members and Economic Interest Owners for distributions, and establish such Reserves as may be reasonably necessary to provide for contingent liabilities of the Company;

(4)   Distribute the remaining assets to the Members, either in cash or in

LLC. KINGGROUPMGMT, LLC. AROA.17

kind, as determined by the Managers in accordance with the provisions of Section 9.01, with any assets distributed in kind being valued for this purpose at their fair market value. Any such distributions in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1 (b)(2) (ii)(b)(2) of the Treasury Regulations in accordance with the positive balance (if any) in each Member's Capital Account (as determined after taking into an account all Capital Account adjustments for the Company's Fiscal Year during which the liquidation occurs), with any balance in excess thereof being distributed in proportion to the Members' respective Membership Interests. Any such distribution in respect to Capital Accounts shall, to the extent practicable, be made in accordance with the time requirements set forth in Section 1.704- 1 (b)(2)(ii)(b)(2) of the Treasury Regulations; and

(5)  If any assets of the Company are to be distributed in kind, the net fair market value of such assets shall be determined by independent appraisal or by agreement of the Members. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest Owners shall be adjusted pursuant to the provisions of this Operating Agreement to reflect such deemed sale.

(c)    Notwithstanding anything to the contrary in this Operating Agreement upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocation and other Capital Account adjustments for all taxable years ,including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution to reduce or eliminate the negative balance of such Member's Capital account.

(d)    Upon completion of the winding-up, liquidation and distribution of the assets, the Company shall be deemed terminated.

   **16.05   Certificate of Termination.** When all debts, liabilities, and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Members, a Certificate of Termination may be executed and filed with the Secretary of State of Georgia in accordance with O.C.G.A Section 14-11-610.

   **16.06   Return of Contribution Nonrecourse to Other Members**. Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of his Capital Contribution. If the

LLC. KINGGROUPMGMT, LLC. AROA.17

assets of the Company remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member.

## ARTICLE 17.

## MISCELLANEOUS PROVISIONS

**17.01  Arbitration.** Any dispute arising in connection with this Operating Agreement shall be an Arbitrable Dispute and shall be finally settled by arbitration under the then applicable Commercial Arbitration rules of the American Arbitration Association, by one or more arbitrators agreed upon by the parties or, in the absence of such an agreement, appointed in accordance with such Rules. The arbitration proceedings shall be held in Atlanta, Georgia. Judgment upon the award rendered may be entered in any court having jurisdiction and application may be made to such court for judicial acceptance of such award and an order of enforcement as the case may be. The parties hereby agree that the rendering of an award by the arbitrator or arbitrators shall be a condition precedent to the initiation of any legal proceedings with respect to any Arbitrable Dispute.  The Members agree and understand that this paragraph in no way shall prevent any Member or Members from pursuing civil or criminal remedies for any breach of legal duty or fraudulent or intentional action by any Member, Members or agents, designees' or assignees thereof.

**17.02  Books of Account and Records.** Proper and complete records and books of account shall be kept or shall be caused to be kept by the Manager in which shall be entered fully and accurately all transactions and other matters relating to the Company's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company. The books and records shall be at all times be maintained at the principal executive office of the Company and shall be open to the reasonable inspection and examination of the Members, or their duly authorized representatives during reasonable business hours.

**17.03  Application of Georgia Law.** This Operating Agreement, and the application or interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of Georgia, and specifically the Georgia Act.

**17.04  No Action for Partition.** No Member has any right to maintain any action for partition with respect to any property of the Company.

**17.05  Construction.** Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

**17.06  Headings.** The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

**17.07  Waivers.** The failure of any party to seek redress for violation of or to insist upon

LLC. KINGGROUPMGMT, LLC. AROA.17

the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

**17.08    Rights and Remedies Cumulative.** The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all of the remedies. Such rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

**17.09    Heirs, Successors and Assigns.** Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

**17.10    Creditors.** None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

**17.11    Counterparts.** This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

**17.12    Investment Representations.** Any securities created under this Agreement have not been registered under the Georgia Uniform Securities Act of 2008, as amended, in reliance upon the exemption from registration set forth in Section 10-5-11(14) of such act. In addition, these securities have not been registered with the United States Securities and Exchange Commission in reliance upon an exemption from such registration set forth in the Securities Act of 1933 provided by Section 4(2) thereof, nor have they been registered with the Securities Commission of certain states in reliance upon certain exemptions from registration. These securities have been acquired for investment purposes only and may not be offered for sale, pledged, hypothecated, sold or transferred except in compliance with the terms and conditions of this Agreement and in a transaction which is either exempt from registration under such acts or pursuant to an effective registration statement under such acts.

**17.13    Certification of Non-Foreign Status.** In order to comply with Code Section 1445 and the applicable Treasury Regulations thereunder, in the event of the disposition by the Company of a United States real property interest as defined in the Code and Treasury Regulations, each member shall provide to the Company, an affidavit stating, under penalties of perjury, (i) the Member's address, (ii) United States taxpayer identification number, and (iii) that the Member is not a foreign person as that term is defined in the Code and Treasury Regulations. Failure by any Member to provide such affidavit by the date of such disposition shall authorize the Manager to withhold ten percent (10%) of each such Member's distributive share of the amount realized by the Company on the disposition.

**17.14    Notices.** Any and all notices, offers, demands, or elections required or permitted to be made under this Agreement ("Notices") shall be in writing, signed by the party giving such Notice, and shall be deemed given and effective (i) when hand delivered (either in person by the

LLC. KINGGROUPMGMT, LLC. AROA.17

party giving such notice, or by its designated agent, (ii) by a nationally known overnight delivery service courier),  next business day delivery or (iii) on the third (3rd) business day  (when making regular deliveries of mail on all of its regularly appointed week day rounds in Atlanta, Georgia) following the day (as evidenced by proof of mailing) upon which such notice is deposited, postage prepaid, certified mail, return receipt requested, with the Postal Service, and addressed to the other party at such party's respective address as set forth below or at such other address as the other party may hereafter designate by Notice.

**17.15** <u>**Amendments**</u>. Any amendment to this Operating Agreement shall be made in writing and signed and consented by the affirmative vote of not less than fifty-one  (51%) percent of the Membership Interests.

**17.16** <u>**Invalidity**</u>. The invalidity or unenforceability or any particular provision of this Agreement shall not affect the other provisions hereof, and of this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted. If any particular provision herein is construed to be in conflict with the provisions of the Georgia Act, then the Georgia Act shall control and such invalid or unenforceable provisions shall not affect or invalidate the other provisions hereof, and this Agreement shall be construed in all respects as if such conflicting provision were omitted.

**17.17** <u>**Further Assurances**</u>. The Members each agree to cooperate, and to execute and deliver in a timely fashion any and all additional documents necessary to effectuate the purposes of the Company and this Agreement.

**17.18** <u>**Time**</u>. Time is of the essence of this Agreement, and to any payments, allocations and distributions specified under this Agreement.

**IN WITNESS WHEREOF**, the parties hereto have executed this Amended and Restated Operating Agreement as of the date first above written.

_____ (SEAL)President
**SAHIB SINGH ARORA**

_____ (SEAL)
**KARAN SINGH AHUJA**

LLC. KINGGROUPMGMT, LLC. AROA.17

EXHIBIT "A"

| MEMBER | CONTRIBUTION |
|---|---|
| SAHIB SINGH ARORA | $100.00 in cash |
| KARAN SINGH AHUJA | $100.00 in cash |

LLC. KINGGROUPMGMT, LLC. AROA.17

# EXHIBIT C



Charanjeev Singh <charan@kw.com>

---

## Re: Liquidation Agreement King Group MGMT LLC

5 messages

---

**Dr Arora** <sahib3@gmail.com>             Tue, Aug 13, 2019 at 12:03 PM
To: Joel Haber <Joel@joelhaber.com>, Vineet Singh <vineetmaharaja@gmail.com>, Charanjeev Singh <charan@kw.com>

Dear Mr Haber,

Please prepare quit claim deed for following properties and I will come this week for signatures. Charan will provide you LLC name.

Address of Properties -
1. 106 Commerce St, Fayetteville, GA 30214 - quit claim 50% interest
2. 2723 Roosevelt Hwy, Atlanta, GA 30337  - quit claim 50% interest
3. 3811 Flat Shoals Pkwy, Decatur, GA 30034  - quit claim 50% interest
4. 5341 Snapfinger Park Dr, Decatur, GA 30035 - quit claim 50% interest
5. 2551 E Pinetree Blvd, Thomasville, GA 31792  (Update operating agreement with 4 partners under Maharaja Investments LLC having 25% interest each - Sahib Arora, Vineet Singh, Charanjeev Singh,Karan Singh Ahuja )

Sincerely,
Dr. Arora
4046734282

On Fri, Jul 12, 2019 at 2:12 PM Dr Arora <sahib3@gmail.com> wrote:
Dear Mr Haber,

Profits will be distributed 25% to each at closing for each property.

Dr Sahib Arora
Vineet Singh
Charanjeev Singh
Karan Singh Ahuja

In exchange of execution, Sahib Arora will be given $950,000 of Cost of properties under King Group MGMT LLC with profits at closing.

Address of Properties -
1. 106 Commerce St, Fayetteville, GA 30214
2. 2995 Roosevelt Hwy, Atlanta, GA 30337
3. 2723 Roosevelt Hwy, Atlanta, GA 30337
4. 5754 Attucks Blvd, Morrow, GA 30260
5. 3811 Flat Shoals Pkwy, Decatur, GA 30034
6. 5341 Snapfinger Park Dr, Decatur, GA 30035
7. 2318 Old Cornelia Hwy, Gainesville, GA 30507 (56% King Group)
8. 2485 N. Columbia St. Milledgeville, GA 31061 (50% King Group)
9. 2551 E Pinetree Blvd, Thomasville, GA 31792  (50% Maharaja investments LLC).Each member will be receiving 25% of profit under Maharaja Investments LLC.

Sincerely,
Dr. Arora
4046734282

--
Sincerely,
Dr. Arora

---

**Charanjeev Singh** <charan@kw.com>                                    Tue, Aug 13, 2019 at 12:40 PM
To: Dr Arora <sahib3@gmail.com>
Cc: Joel Haber <joel@joelhaber.com>, Vineet Singh <vineetmaharaja@gmail.com>

Dear Mr. Haber,
The LLC name is Crown Assets LLC

Charanjeev Singh
Keller Williams First Atlanta
200 Glenridge Point Pkwy
Cell # 4044821118 Office - +14045315700

Emails sent or received shall neither constitute acceptance of conducting transactions via electronic means nor create a
binding Agreement until and unless a written contract is signed by all parties
[Quoted text hidden]

---

**sahib3@gmail.com** <sahib3@gmail.com>                                  Tue, Aug 13, 2019 at 1:27 PM
To: Charanjeev Singh <charan@kw.com>
Cc: Joel Haber <joel@joelhaber.com>, Vineet Singh <vineetmaharaja@gmail.com>

Also, make a bill of sale from Karan Ahuja to Sahib Arora - conveying 11% remaining partnership to Sahib Arora. I believe
McKinzie did bill of sales for us last time.

Thankfully,
Dr Arora
[Quoted text hidden]

---

**Joel Haber** <joel@joelhaber.com>                                     Tue, Aug 13, 2019 at 2:49 PM
To: "sahib3@gmail.com" <sahib3@gmail.com>, Charanjeev Singh <charan@kw.com>
Cc: Vineet Singh <vineetmaharaja@gmail.com>


Is this for King Group MGMT


Joel M. Haber

Attorney at Law

Law Office of Joel M. Haber

2365 Wall Street

Suite 120

Conyers, GA 30013

Ph: (770) 922-9080

Fax: (770)922-4647


NOTICE:  This e-mail message and all attachments transmitted with it may contain legally
privileged and confidential information intended solely for the use of the addressee.  If you are not
the intended recipient, you are hereby notified that any reading, dissemination, distribution,
copying, or other use of this message or its attachments is strictly prohibited.  If you have received
this message in error, please notify the sender immediately by telephone (770) 922-9080 or by e-
mail (Reply to Sender), and delete this message and all copies and backups thereof.  Thank you.
Law Office of Joel M. Haber.

**\*\*WARNING\*\* - Beware of Fraudulent Wire Instructions:**

**Email hacking and fraud are occurring with greater frequency on real estate transactions. If you are involved in a real estate transaction as a buyer, seller, lender or real estate agent/broker or in any other capacity, you must immediately call the escrow agent or closing attorney to whom you will be sending money to or receiving money from via a wire transfer. Please contact the escrow agent or closing attorney using contact information found from an independent source, such as the sales contract, internet or telephone to verify any wiring/funding instructions received from the escrow agent/closing attorney. I am not responsible for any wires sent by you to an incorrect bank account.**

[Quoted text hidden]

---

**Dr Arora** <sahib3@gmail.com>                                      Tue, Aug 13, 2019 at 4:01 PM
To: Joel Haber <joel@joelhaber.com>
Cc: Charanjeev Singh <charan@kw.com>, Vineet Singh <vineetmaharaja@gmail.com>

Yes, that is correct. 50% interest in properties will transferred to Crown Assets LLC.
Sincerely,
Dr Arora
[Quoted text hidden]
--
Sincerely,
Dr. Arora

# EXHIBIT D

## AGREEMENT

THIS AGREEMENT made and entered into this 14th day of August, 2019 by and between KING GROUP MGMT, LLC, a Georgia limited liability company (hereinafter referred to as "King"), CROWN ASSETS, LLC, a Georgia limited liability company (hereinafter referred to as "Crown") and ZILLIONAIRE ASSETS, LLC, a Georgia limited liability company (hereinafter referred to as "Zillionaire").

## W I T N E S S E T H :

WHEREAS, King is the owner of an undivided fifty-six percent interest in real property and the improvements located at 2318 SE Old Cornelia Highway, Gainesville GA 30507 (the "Gainesville Property"); and the remaining forty-four percent interest of the Gainesville Property is owned by Golden Epoch Investments, LLC ("Golden Epoch"); and

WHEREAS, the Gainesville Property is subject to a loan in favor of Fidelity Bank in the original $616,000.00 (the "Gainesville Loan") and King and Golden Epoch are unconditionally liable for the repayment of the Gainesville Loan; and

WHEREAS, Zillionaire is the owner of the real property and the improvements located at 5754 Attucks Boulevard, Morrow GA 30260 (the "Morrow Property") and the sole member of Zillionaire is King; and

WHEREAS, the Morrow Property is subject to a loan in favor of Silver Hill Funding, LLC in the original $1,040,000.00 (the "Morrow Loan") and King is unconditionally liable for the repayment of the Morrow Loan; and

WHEREAS, Zillionaire desires to convey an undivided fifty percent interest in the Morrow Property to Crown and King desires to convey fifty percent of its interest in the Gainesville Property to Crown so that King and Crown shall each own an undivided twenty-eight (28) percent interest in the Gainesville Property; and

WHEREAS, based on the conveyance by Zillionaire and King, King and Crown will each be unconditionally liable for fifty percent of the indebtedness on the Morrow Property and King and Crown will each be unconditionally liable for twenty-five percent of the indebtedness on the Gainesville Property.

NOW THEREFORE, in consideration of the premises and of good and valuable consideration, the receipt and sufficiency whereof is hereby acknowledged, the parties hereto hereby covenant and agree as follows:

1.    Zillionaire does hereby convey an undivided fifty percent interest in the Morrow Property to Crown and Crown shall be unconditionally liable for one-half of the indebtedness to Silver Hill Funding, LLC.

2.      King does hereby convey twenty-five percent of its interest in the Gainesville Property to Crown so that King and Crown shall each own an undivided 28% interest in the Gainesville Property and King and Crown are each twenty-five percent liable for the indebtedness to Fidelity National Bank.

3.      Successors and Assigns.    This Agreement shall apply to, inure to the benefit of, and be binding upon and enforceable against the parties hereto and their respective heirs, legal representative, successors, and assigns, to the same extent as if specified at length through out this Agreement.

4.      Counterparts.    This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of which counterparts together shall constitute one and the same instrument.

5.      Time of the Essence.    Time is of the essence of this Agreement. Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon a Saturday, Sunday, or any public or legal holiday, the party having such privilege or duty shall have until 5:00 p.m. on the next succeeding business day to exercise such privilege or to discharge such duty.

6.      Governing Law.    This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia.

7.      Judicial Interpretation.    Should any provision of this Agreement require judicial interpretation, it is agreed that the court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against one party by reason of the rule of construction that a document is to be construed more strictly against the party who itself or through its agent prepared the same, it being agreed that the agents of all parties have participated in the preparation hereof.

8.      Authority to Execute Agreement.    All parties signing this Agreement on hereby individually warrant that they are authorized to execute this Agreement on behalf of and to bind King, Crown and Zillionaire, respectively.

IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed and its seal to be affixed thereto as of the day and year first above written.

KA

Re.King Crown and Zillionaire Agreement. 19

ZILLIONAIRE:

Zillionaire Assets, LLC
a Georgia limited liability company

By: _____
Sahib Singh Arora, Manager


KING:

King Group Mgmt, LLC
a Georgia limited liability company

By: _____
Sahib Singh Arora, Manager


CROWN:

Crown Assets, LLC
a Georgia limited liability company

By: _____
Karan Singh Ahuja, Manager

# EXHIBIT E



**11:40**  LTE

**‹ 11**  **Vinii**
last seen today at 3:03 PM

▶ ━━━●━━━━━━━━━━━━
0:17            12:55 PM ✓✓

▶ ●━━━━━━━━━━━━━━━
0:03            12:56 PM

**Aug 19, 2019**

Sorry 😐 chachu ji          12:46 PM

📞 **Missed voice call at 1:09 PM**

📞 **Missed voice call at 1:45 PM**

**Aug 31, 2019**

📞 **Missed voice call at 6:13 PM**

**Sep 4, 2019**

📞 **Missed voice call at 1:47 PM**

Call me          1:47 PM

Call me          1:47 PM

Important          1:47 PM

Hi

+                                                      🙂 📷 🎤

# EXHIBIT F

 Gmail

**Charan Singh <charansingh.online@gmail.com>**

---

## Fwd: RESPONSE REQUIRED: Thomas County USDA Service Center - Change of Ownership
1 message

---

**vineet singh** <vineetmaharaja@gmail.com>                                    Wed, Aug 21, 2019 at 4:54 PM
To: Charan Singh <charansingh.online@gmail.com>

---------- Forwarded message ---------
From: **Perez, Samantha (CTR) - FSA, Washington, DC** <samantha.perez@usda.gov>
Date: Wed, Aug 21, 2019, 4:52 PM
Subject: RESPONSE REQUIRED: Thomas County USDA Service Center - Change of Ownership
To: vineetmaharaja@gmail.com <vineetmaharaja@gmail.com>, shaneel786@gmail.com <shaneel786@gmail.com>
Cc: cgreen@tlgproperty.com <cgreen@tlgproperty.com>


Good afternoon,


Debbie Anderson has contacted my team to work on a change of ownership request for Thomas County USDA Service Center located in Thomasville, GA. I have attached the following documents that require your review and signature:

- Cover letter
- Novation Agreement
- Novation Checklist
- GSA-3518 Form
- Quick guide on how to obtain a SAM registration (if you have not done so already; this is required by the Government in order to receive rental payments)


Please read through the documents carefully and let me know if I need to make any revisions. Please send them back to me at your earliest convenienice. If you have any questions, please let me know. Thank you!


V/r,


Samantha Kowgios (Perez)

Realty Analyst

Lease Operations

Management Services Division

Farm Production and Conservation Business Center

U.S. Department of Agriculture

(202) 690-5435

samantha.perez@usda.gov



**Customer Survey Link:** https://www.surveymonkey.com/r/BS_MS?staffName=samantha.perez@usda.gov

*…It was my pleasure to be of service to you.*

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

---

**5 attachments**

**Thomas County (Thomasville), GA Cover letter.pdf**
131K

**Thomas County (Thomasville), GA Novation Agreement.pdf**
22K

**Novation Checklist.pdf**
155K

**GSA3518A-13.pdf**
741K

**SAM.GOV QUICK INSTRUCTIONS GUIDE.pdf**
956K

# EXHIBIT G



**Karan Singh <karansingh12121@gmail.com>**

---

## FW: Fraudulent Deed transfer - 2551 E Pinetree Blvd Thomasville, GA 31792

**Kevin Vick** <Kevin.Vick@tcfederal.com>             Mon, Apr 27, 2020 at 1:19 PM
To: "karansingh12121@gmail.com" <karansingh12121@gmail.com>, Sameer Lalani <sameer.lalani10@gmail.com>, Shaneel
Lalani <shaneel@billionairesfundinggroup.com>
Cc: Greg Eiford <Greg.Eiford@tcfederal.com>, Noel Ellis <Noel.Ellis@tcfederal.com>

Karan, Sameer, and Shaneel,

On April 21st, we received the email below (and attached information) regarding a possible fraudulent deed transfer on the 2551 E
Pinetree Blvd property in Thomasville.

We are obviously concerned about the nature of the allegations made and would like to ask for an immediate explanation regarding
these allegations.

Thanks,

**Kevin Vick**
*VP, Commercial Banker* | TC Federal Bank

**Kevin.Vick@TCFederal.com**

131 S. Dawson St. | PO Box 1197
Thomasville, GA 31799

**main:** 229.226.3221 **direct:** 229.584.1035

**mobile:** 229-221-6117 **fax:** 229.226.3415

**www.TCFederal.com**

---

**From:** Dr Arora <sahib3@gmail.com>
**Sent:** Tuesday, April 21, 2020 1:31 PM
**To:** Greg Eiford <Greg.Eiford@tcfederal.com>; Kevin Vick <Kevin.Vick@tcfederal.com>; aaron@silvis-ambrose.com;
lawhammond <lawhammond@bellsouth.net>; Toby Knifer <tknifer@thomasville.org>
**Subject:** Fraudulent Deed transfer - 2551 E Pinetree Blvd Thomasville, GA 31792

**\*\*\*This message was NOT sent from a TC Federal Bank email account. Please use caution when clicking on links
or opening attachments.\*\*\***

Dear Mr Eiford,

I want to inform my previous agent Charanjeev Singh executed fraudulent quit claim deed from Maharaja Investments LLC to Crown Assets LLC on **August 19,2019** using a forged resolution (Attached).

Then, Karan Ahuja/Crown Assets again transferred the property on **January 16,2020** to take out new loan from TC Federal Bank (Attached).

Maharaja Investments LLC purchased 50% interest in this property on **07/15/2019 -** Warranty deed and settlement statement attached along with copy of wire transfer to Kensington Vanguard National/Jennifer Maxwell Closing escrow. You may confirm with closing attorney in regards to this purchase.

Original resolution was provided For Purchase of property and this was edited by agent to make it For Sale with fake initials on both pages. In the place where the officer or authorized signatory should sign, the notary signed. The place where Vineet "signed" is actually just the table attesting to his ownership of 100 percent of stock at that time. As such, the document is not even properly signed as a resolution. I have original in my possession (attached). There was no money received from any of the transfers. Also, Forged Resolution for Sale by Charanjeev is dated June 22,2019 and we had not closed on this property until July 15,2019. Quite surprising how Maharaja investments LLC decided to sell a property which it had not purchased until a later date for no money to Crown Assets LLC (which was not formed till August 11,2019).

Currently both Charanjeev Singh And Karan Singh Ahuja reside at 325 Crooked Stick Dr, Milton, GA 30004 (Fulton County) I have filed a complaint with Thomas county sheriff department (Case number 2020-24888) which is under investigation with Lieutenant Toby Knifer, Criminal Investigations Division, City of Thomasville Police.

It's a request to bank not to issue further loan while investigation is pending and take necessary action.

Sincerely,

Dr. Arora

4046734282

---

**7 attachments**

    **Unauthorized Quit Claim Deed to Crown Assets LLC by Charanjeev.pdf**
    1105K

    **Fradulent transfer 2.pdf**
    770K

    **Original Copy Signed Resolution - VINEET SINGH.pdf**
    1070K

    **qPublic.net - Thomas County, GA - Report_ 010 001006.pdf**
    298K

    **Warranty Deed Purchase July 15, 2019.pdf**
    361K

    **Bank of America _ Online Banking _ Accounts _ Account Details _ Account Activity - Closing Wire.pdf**
    34K

    **500872 - Settlement Statement - Final (3).pdf**
    570K



Charanjeev Singh <charan@kw.com>

## FW: GA Claim (Gelt Financial LLC to Crown Assets, LLC / Our Ref: GR-407-A)

**mab@2blaw.com** <mab@2blaw.com>                                      Mon, Jul 6, 2020 at 2:13 PM
To: Charanjeev Singh <charan@kw.com>

Charan, what is going on here?

**MICHAEL A. BROCHSTEIN| Attorney at Law**

404-869-1160 *phone*
404-869-0350 *fax*
www.2blaw.com
mab@2blaw.com

Brochstein & Bantley, P.C.

3495 Piedmont Road, N.E.
Eleven Piedmont Center, Suite 330

Atlanta, Georgia 30305

**CONFIDENTIALITY NOTICE:** This e-mail and any attachments contain information from the law firm of Brochstein & Bantley, P.C., and are intended solely for the use of the named recipient or recipients. This e-mail may contain privileged attorney/client communications or work product. Any dissemination of this e-mail by anyone other than an intended recipient is strictly prohibited. If you are not a named recipient, you are prohibited from any further viewing of the e-mail or any attachments or from making any use of the e-mail or attachments. If you believe you have received this e-mail in error, notify the sender immediately and permanently delete the e-mail, any attachments, and all copies thereof from any drives or storage media and destroy any printouts of the e-mail or attachments. If you are not a client of the firm receipt of this communication may not be construed as the creation of an attorney client relationship.

**From:** Amar Agrawal <aagrawal@egalawfirm.com>
**Sent:** Monday, July 6, 2020 2:05 PM
**To:** GAclaims@oldrepublictitle.com
**Cc:** mab@2blaw.com; jackmiller@geltfinancial.com; Marcy Berger <mberger@geltfinancial.com>; Elizabeth Warrington <ewarrington@egalawfirm.com>
**Subject:** GA Claim (Gelt Financial LLC to Crown Assets, LLC / Our Ref: GR-407-A)
**Importance:** High

Dear Sir/Madam,

Attached please find correspondence from our office along with attachments for a title claim. Kindly please acknowledge your receipt of same.

Thank you.



Amar A. Agrawal, Esquire

**Eisenberg, Gold & Agrawal, P.C.**

1040 Kings Highway North, Suite 200

Cherry Hill, New Jersey 08034

**T:** (856) 330-6200 Ext. 102

**F:** (856) 330-6207

**E**: aagrawal@egalawfirm.com

**W:** www.egalawfirm.com

**L:** www.linkedin.com/in/amaragrawal

Notice: To comply with certain U.S. Treasury regulations, we inform you that, unless expressly stated otherwise, any U.S federal tax advice contained in this e-mail, including attachments, is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Service.

Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient, an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient, or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.

---------- Forwarded message ----------
From: Jack Miller <jackmiller@geltfinancial.biz>
To: Amar Agrawal <aagrawal@egalawfirm.com>, Marcy Berger <mberger@geltfinancial.com>
Cc:
Bcc:
Date: Fri, 29 May 2020 14:58:48 -0400
Subject: Fwd: Loan documents Zillionaire Assets LLC - GELT FINANCIALS
See below.

Jack

**Jack Miller**

5300 West Atlantic Ave, Suite 205 | (561) 221-0900 ext. 238 office
Delray Beach, Fl 33484 | Skype: JackMiller613

Follow us on: cid:image001.png@01D1275F.D6CB9E60 cid:image002.png@01D1275F.D6CB9E60

Gelt Financial Corporation www.Geltfinancial.com

Quote "Success has 1000 Battles" Source unknown

Emails sent or received shall neither constitute an acceptance of conducting transactions via electronic means nor create a binding contract until and unless a written contract is signed by the parties. The information in this message may be proprietary and/or confidential, and protected from disclosure. If the reader of this message is neither the intended recipient nor an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately by replying to this message and deleting it from your computer.  Note that we are not a legal or accounting firm and we do not provide legal or accounting advice.

---------- Forwarded message ---------
From: **Dr Arora** <sahib3@gmail.com>
Date: Fri, May 29, 2020 at 11:46 AM
Subject: Loan documents Zillionaire Assets LLC - GELT FINANCIALS
To: Jack Miller <jackmiller@geltfinancial.biz>, Joel Haber <Joel@joelhaber.com>

Dear Mr Miller,

My entity is listed on security deed for - **90 Hunters Chase, McDonough, GA 30253**. King Group MGMT LLC being a 50% managing member of Zillionaire Assets LLC did not sign any resolution authorizing approval of Loan.

Also, deed to secure debt says Assignment of rents - Zillionaire assets did not sign any lease with any prospective tenant for this property. To my knowledge, this property is vacant.

Attached is Operating Agreement for Zillionaire Assets LLC. You may confirm this operating agreement with Joel Haber. Originally, King Group Mgmt LLC was 100% member of Zillionaire assets LLC and Crown Assets LLC was added 50% member in November 2019. https://link.zixcentral.com/u/c3b6995c/hiugud6h6hGaZXZOPI9hPQ?u=https%3A%2F%2Fwww.joelhaber.com%2F

**Kindly let me know how did my entity become a borrower/guarantor to a loan from GELT Financials LLC without my signatures ?**

Also, I want to inform that my previous partner - Karan Ahuja and past agent Charanjeev Singh - Both are siblings - have pending investigation for fraudulent transfers of deeds using fake resolution and fraudulent loan from bank. I am providing case under investigation with Thomas county Police Department - Case# 2020-24888  - Where 50% of our interest ($700,000) was transferred (stolen) in 2551 E Pinetree Blvd, Thomasville, GA 31792 using fake resolution/quit claim deed and new loan from TC federal bank was taken out. If you look in to quit claim deed - transfer tax is $0 on first transfer. HOW DID MY ENTITY TRANSFER A SHOPPING CENTER FOR FREE ? I believe that loan has been frozen by lender as of now and possibly being called due. This matter has been referred to FBI by Thomasville police department.

Sincerely,
Dr. Arora
4046734282
President, King Group MGMT LLC

Links contained in this email have been replaced by ZixProtect Link Protection. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

**13 attachments**



**image001.png**
40K

📄 **90 Hunters Chase, McDonough, GA, 30253.pdf**
156K

📄 **Amended Zillionaire Assets Operating Nov,2019.pdf**
9130K

📄 **Zillionaire Certificate of Organization.pdf**
87K

📄 **Operating agreement Zillionaire assets LLC June 2019.pdf**
2331K

📄 **Fradulent transfer 2 (1).pdf**
770K

📄 **Unauthorized Quit Claim Deed to Crown Assets LLC by Charanjeev (2).pdf**
1105K

📄 **Fwd: Loan documents Zillionaire Assets LLC - GELT FINANCIALS.eml**
18602K

📄 **Final HUD.pdf**
192K

📄 **Marked up Title.pdf**
291K

📄 **Limited Warranty Deed.pdf**
62K

📄 **Zillionaire Internal Agreement - Dated 12.21.19.pdf**
845K

📄 **Ltr to Old Republc re claim 070620.pdf**
81K

# EXHIBIT H

**AMENDED AND RESTATED**
**OPERATING AGREEMENT**
**OF**
**ZILLIONAIRE ASSETS LLC**

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE GEORGIA UNIFORM SECURITIES ACT OF 2008, AS AMENDED, IN RELIANCE UPON THE EXEMPTION FROM REGISTRATION SET FORTH IN SECTION 10-5-11(14) OF SUCH ACT. IN ADDITION, THESE SECURITIES HAVE NOT BEEN REGISTERED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION IN RELIANCE UPON AN EXEMPTION FROM SUCH REGISTRATION SET FORTH IN THE SECURITIES ACT OF 1933 PROVIDED BY SECTION 4(2) THEREOF, NOR HAVE THEY BEEN REGISTERED WITH THE SECURITIES COMMISSION OF CERTAIN STATES IN RELIANCE UPON CERTAIN EXEMPTIONS FROM REGISTRATION. THESE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD OR TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS AGREEMENT AND IN A TRANSACTION WHICH IS EITHER EXEMPT FROM REGISTRATION UNDER SUCH ACTS OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACTS.

THIS AMENDED AND RESTATED OPERATING AGREEMENT OF **ZILLIONAIRE ASSETS LLC** (hereinafter referred to as the "Operating Agreement") is effective this 20th day of November, 2019, by **KING GROUP MGMT LLC AND CROWN ASSETS, LLC** (hereinafter referred to as the "Members and individually as a "Member") whose respective addresses are set forth in ARTICLE 4 of this Operating Agreement. All of the aforementioned parties and any additional persons who may be admitted as Members as herein provided are sometimes hereinafter collectively referred to as the "Members" or hereinafter sometimes individually referred to as a "Member."

**W I T N E S S E T H:**

**WHEREAS**, **ZILLIONAIRE ASSETS LLC,** a limited liability company (hereinafter referred to as the "Company") was formed pursuant to the laws of the State of Georgia, the purpose of which shall be all aspects of the purchase, ownership, operation and financing of a commercial building located at 5754 Attucks Boulevard, Morrow, GA 30260.

**The Members** hereto desire to amend and restate (i) the contributions to the capital of the Company by the Members; (ii) the division of the profits and losses derived from the ownership, maintenance and operation thereof of the Company; (iii) the restrictions on disposition of Membership Interests; (iv) Management of the Company; and (iv) address various other matters relating to the rights and obligations of the Members;

**NOW, THEREFORE**, the undersigned in consideration of the premises, the mutual promises contained in this Operating Agreement and for the other good and valuable consideration, the Members agree as follows.

ZILLIONAIRE ASSETS LLC.OA.18

# ARTICLE 1

## DEFINITIONS

The following terms used in this Operating Agreement shall have the following meaning (unless otherwise expressly provided herein:

"Additional Capital Contributions." With respect to each Member, all additional Capital Contributions made by such Member pursuant to Section 8.02 of this Agreement.

"Additional Capital Contributions Account." An account maintained for each Member equal to (i) the aggregate Additional Capital Contributions to the Company made by such Member, less (ii) the aggregate distributions to such Member pursuant to Section 9.01.

"Articles of Organization." The Articles of Organization of ZILLIONAIRE ASSETS LLC, as filed with the Secretary of State of Georgia as the same may be amended from time to time.

"Affiliate." (i) in the case of an individual, any relative of such Person, (ii) any officer, director, trustee, partner, manager, employee or holder of ten percent (10%) or more of any class of voting securities of any equity interest in such Person; (iii) any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person; or (iv) any officer, director, trustee, partner, manager, employee or holder of ten percent (10%) or more of the outstanding voting securities of any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such Person.

"Arbitrable Dispute." Any of the disputes so designated in Section 17.01 hereof.

"Available Cash" means all cash of the Company on hand as of any given time after the payment of all then due debts and liabilities of the Company and after any prepayments of any debts and liabilities of the Company that the Members deem appropriate to cause the Company to make, less any Reserves deemed necessary by the Members, consistent with the provisions of this Agreement, for (a) the repayment of any debts or liabilities of the Company, (b) the working capital or other requirements of the Company, and (c) any contingent or unforeseen liabilities of the Company.

"Business" means.

    a)    All aspects of the purchase, ownership, operation and financing of a commercial building located at 5754 Attucks Boulevard, Morrow, GA 30260.

    (b)    All actions necessary to or reasonably connected with the Company's foregoing business which may be legally exercised by limited liability companies under the Georgia Act; and

(c)     All activities necessary, customary, convenient, or incident to any of the foregoing.

"Capital Account" of a Member means a capital account established, maintained, and adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv).  Consistent therewith, each Member's Capital Account will be adjusted from time to time pursuant to Section 8.06 hereof, the purpose of which is to set forth certain operating rules for the allocation of book items of income, gain, loss and deduction for Capital Account purposes.  The provisions of Article 8 hereof shall be construed in a manner consistent with Treasury Regulations Section 1.704-1(b)(2)(iv).  The Capital Accounts shall not be adjusted for items as they are computed and allocated to the Members for federal income tax purposes.  Upon the transfer hereunder of all or part of a Membership Interest, other than a Transfer that terminates the Company as a partnership within the meaning of Code Section 708(b)(1)(B), the Capital Account of the transferor Member that is attributable to the transferred Membership Interest will carry over to the transferee Member.  In the event of a Transfer of all or part of a Member's Membership Interest that causes a termination of the Company as a partnership within the meaning of Code Section 708(b)(1)(B), the Members' Capital Accounts will be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(1).

"Capital Contribution." Any contribution to the capital of the Company in cash, promissory notes or the agreed value of property by a Member whenever made.

"Code." The Internal Revenue Code of 1986, as amended from time to time.

"Company." ZILLIONAIRE ASSETS LLC

"Economic Interest" Refers to a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Operating Agreement and the Georgia Act but shall not include any right to vote on, consent to or otherwise participate in any decision of the Members or Managers.

"Economic Interest Owner." The owner of an Economic Interest who is not a Member.

"Entity." Any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association or any foreign trust or foreign business organization.

"Fiscal Year." The Company's fiscal year, which shall be the calendar year.

"Georgia Act." The Georgia Limited Liability Company Act at O.C.G.A Section 14-11-100, et seq.

"Initial Capital Contribution." The initial contribution to the capital of the Company made by a Member pursuant to Section 8.01 of this Operating Agreement.

"Majority Vote." Membership Interests of Members which, taken together, exceed fifty-one percent *(51%)* of the aggregate of all Membership Interests.

"Manager." One or more Members designated pursuant to this Operating Agreement as a Manager from time to time pursuant to Section 5.02 hereof.

"Member." Each of the parties who executes a counterpart of this Operating Agreement as a member and each of the parties who may hereafter become members. To the extent a Manager has purchased a Membership Interest in the Company, the Manager will have all the rights of a Member with respect to such Membership Interest, and the term "Member" as used herein shall include a Manager to the extent such Member has purchased said Membership Interest in the Company.

"Membership Interest." A Member's entire interest in the Company including (i) the right to participate in the management of the business and affairs of the Company, and the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement or the Georgia Act, and (ii) the percentage ownership share of each Member in the capital, assets and properties of the Company. The Membership Interests of the Members as of the date of this agreement are as follows:

| Member's Name | Membership Interest |
|---|---|
| KING GROUP MGMT LLC | 50% |
| CROWN ASSETS, LLC | 50% |

For purposes of the provisions hereof relating to action taken or approval by Members, including voting, written consents or other approval, only Membership Interests held by Members shall be taken into account.

"Net Cash Flow." All cash received by the Company resulting from management and operation of the lodging facilities including proceeds from mortgages or refinancing, plus any other items of income received in cash by the Company, less all payments of debts and expenses, including capital expenditures and principal and interest payments on mortgages and debts, paid in the operation of the Company, and less any Reserves for working capital and capital expenditures which the Members deem reasonably necessary for the operation of the Company or are so specified in any approved budget.

"Net Profits" or "Net Losses." The Company's taxable income or loss determined in accordance with Code Section 703(a) for each of its Fiscal Years (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or loss) with the following adjustments: (i) such Net Profits and Net Losses will be computed as if items of tax-exempt income and nondeductible, noncapital expenditures (under Code Section 705(a)(1)(B)) and 705(a)(2)(B) were included in the computation of taxable income or loss; (ii) that any items specially allocated pursuant to Article 10 hereof shall not be taken into account in computing Net Profits or Net Losses; (iii) if

any Member contributes property to the Company with an initial book value to the Company different from its adjusted basis for federal income tax purposes to the Company, or if Company property is revalued in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(f) or as otherwise required by the Regulations, Net Profits and Net Loses will be computed as if the initial adjusted basis for federal income tax purposes to the Company of such contributed or revalued property equaled its initial book value to the Company as of the date of contribution or revaluation; and (iv) credits or debits to Capital Accounts due to a revaluation of Company assets in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(f), or due to a distribution of noncash assets as provided in Section 16.04 hereof, will be take into account as gain or loss from the disposition of such assets for purposes of computing Net Profits and Net Losses.

"Operating Agreement." This Operating Agreement as originally executed and as amended from time to time.

"Person." Any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

"Reserves." With respect to any fiscal period, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts deemed sufficient by the affirmative vote of Members holding at least fifty-one (51%) percent of the Membership Interests for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

"Transferring Member." A Member who sells, assigns, pledges hypothecates or otherwise transfers for consideration or gratuitously all or any portion of his Membership Interest.

"Treasury Regulations" or "Regulations." The Federal Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## ARTICLE 2

## FORMATION OF COMPANY

2.01    **Formation**.    The Company was formed on December 18, 2018 as a Georgia limited liability company by causing Articles of Organization to be delivered to the Secretary of State of Georgia in accordance with the provisions of the Georgia Act. The Company shall be taxed as a partnership for federal income tax purposes.

2.02    **Name**. The name of the Company is ZILLIONAIRE ASSETS LLC.

2.03    **Principal Place of Business**. The principal place of business of the Company within the State of Georgia is located at 660 Belgrave Lane, Tucker, GA 30084.   The Company may locate its places of business and registered office at any other place or places as the Manager or Managers may from time to time deem advisable.

**2.04** <u>**Registered Office and Registered Agent**</u>. The Company's registered office shall be at the office of its registered agent at 1150 Faith Ave, SE, Atlanta, GA 30316 and the name of its registered agent at such address is Gobind Madan. The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Secretary of State of Georgia pursuant to the Georgia Act and the applicable rules promulgated thereunder.

**2.05** <u>**Term**</u>. The term of the Company shall commence at the date the Articles of Organization were filed with Secretary of State of Georgia and shall continue until the Company is dissolved, terminated and its affairs wound up in accordance with the provisions of this Operating Agreement or the Georgia Act.

**ARTICLE 3**

<u>**BUSINESS OF COMPANY**</u>

**3.01** <u>**Permitted Businesses**</u>. The Company shall engage in the Business and may engage in any other Business or activities as approved by the Majority Vote of the Members.

**ARTICLE 4**

<u>**NAMES AND ADDRESSES OF MEMBERS**</u>

The names and addresses of the Members as of the date of this Agreement are as follows:

| <u>NAME</u> | <u>ADDRESS</u> |
|---|---|
| KING GROUP MGMT LLC | 660 Belgrave Lane<br>Tucker, GA 30084 |
| CROWN ASSETS, LLC | 1150 Faith Avenue<br>Atlanta GA 30316 |

Any party may change its address by giving notice of such address change to the other parties pursuant to the notice provisions set forth in Section 17.14.

**ARTICLE 5**

<u>**MANAGEMENT**</u>

**5.01** <u>**Management of Business**</u>. Subject to approval by the Members by Majority Vote as to Major Decisions as provided below, the business and affairs of the Company shall be managed by its Manager(s). Each Manager shall have full authority, power and discretion to delegate the management or control of the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or

incident to the management of the Company's business. The Members shall determine from time to time by Majority Vote which persons shall be the Manager(s), responsible for administering the day-to-day activities of the Company. Each Manager may carry out the business of the Company directly or delegate or assign by contractual agreement any of their responsibilities. The delegation or assignment by contractual agreement of duties under this Agreement shall not release or reduce the liability and responsibility of the Manager(s) and the Manager(s) shall exercise due care in selecting agents, assignees and designees.

Notwithstanding the foregoing, the Manager(s) shall not have the authority to undertake any of the following matters ("Major Decision") without first having obtained the affirmative vote of the Members holding at least fifty-one (51%) percent of the Membership Interests:

      (a)    the purchase, lease or sale or other disposition of real or personal property;

      (b)    the borrowing or refinancing of any funds for or by the Company (whether secured or unsecured), or the prepayment of any such borrowing;

      (c)    the approval of projected annual Company budgets, or expenditures of funds in excess of 110% of the amounts specified in any such approved budgets;

      (d)    the approval of amounts distributed to the Members pursuant to Section 9.01 hereof;

      (e)    any contracts or agreements between the Company and the Members or any of their respective Affiliates;

      (f)    the consummation of any major transactions or series of related transactions, which are not in the ordinary course of the Company's business, including, but not limited to making any expenditure or commitment, other than the lease or rental of space on behalf of the Company in the ordinary course;

      (g)    the amendment of the Articles of Organization or this Operating Agreement;

      (h)    the merger of the Company with or into any other business entity;

      (i)    the filing of any bankruptcy petition or commencement of any insolvency proceeding for the Company.

      (j)    Additional capital contributions by Members.

    5.02   **Election of Manager**. The Manager shall be KING GROUP MGMT, LLC.  He shall serve in such capacity until the first to occur of his death, disability, resignation or removal

by a Majority Vote.

     **5.03**    **Tax Matters Member**. The Members hereby appoint SAHIB SINGH ARORA as the Company's "Tax Matters Partner", as that term is defined in Section 623 l(a)(7) of the Code, and further appoint the Tax Matters Partner to receive notice of the beginning of any administrative proceeding at the Company level with respect to any Company item or items, as well as to receive notice of any final administrative adjustment resulting from any such proceeding, in each case within the meaning information to the Internal Revenue Service as may be necessary to enable to Internal Revenue Service to provide the Members with such notices as are required under the Code. The Company's Tax Matters Partner shall also keep each Member informed of any administrative or judicial proceedings relative to any adjustment or proposed adjustment at the Company level of Company items. The Tax Matters Partner shall have the authority to (a) enter into any settlement agreement with the Internal Revenue Service, (b) file a petition as contemplated by Sections 6226(a) or 6228 of the Code, (c) intervene in any action as contemplated by Section 6226(b) of the Code, (d) file any request as contemplated by Section 6227(b) of the Code or (e) enter into an agreement extending the period of limitation as contemplated by Section 6229(1)(B) of the Code.

     **5.04**    **Managers Have No Exclusive Duty to Company**. The Manager(s) shall not be required to manage the Company as their sole and exclusive function and he (or any Manager) may have other business interests and may engage in other activities in addition to those relating to the Company.   Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Manager or the income or proceeds derived therefrom. The Manager shall incur no liability to the Company or to any of the Members as a result of any other business or venture.

     **5.05**    **Bank Accounts**. The Manager(s) may from time to time open bank accounts in the name of the Company, and the Manager(s) shall be the sole signatories on such accounts unless the Members or Manager(s) determine otherwise.

     **5.06**    **Indemnity of the Manager(s), and Employees.** To the fullest extent permitted under O.C.G.A Section 14-11-306, the Company shall indemnify the Manager(s) and its employees and make advances for reasonable and necessary expenses to them with respect to such matters to the maximum extent permitted under applicable law.

## ARTICLE 6
## RIGHTS, OBLIGATIONS, REPRESENTATIONS
## AND WARRANTIES OF MEMBERS

     **6.01**    **Limitation on Liability** Each Member's liability shall be limited as set forth in this Operating Agreement, the Georgia Act and other applicable law.

     **6.02**    **No Liability for Company Obligations**. No Member will have any personal liability for any debts or losses of the Company beyond such Member's Capital Contributions, except as provided by law.

**6.03** <u>**Priority and Return of Capital**</u>. No Member shall have priority over any other Member, either as to the return of Capital Contributions or as to Net Income or Net Loss or distributions except as set forth herein. This Section shall not apply to any loans (as distinguished from Capital Contributions) which a Member has made to the Company.

**6.04** <u>**Restrictions on Competitive Activity.**</u> Except as otherwise provided in this Operating Agreement, or in any Covenant Not to Compete, a Confidentiality Agreement, a Noninterference Agreement or any other agreement between the Members, the Members and their respective Affiliates may conduct any other business or activity whatsoever not related to the Company's business, without any accountability to the Company or any Member.

**6.05** <u>**Validity of Agreement**</u>. Each Member warrants that this Operating Agreement and each and every other agreement, document and instrument provided for herein and to which such Member is or shall be a party, when executed and delivered, will constitute the valid and binding obligation of such Member, enforceable against him in accordance with its terms, except as enforceability may be limited by (a) bankruptcy or similar laws from time to time in effect affecting the enforcement of creditor's rights generally or (b) the availability of equitable remedies generally.

**6.06** <u>**No Violation of Material Instruments**</u>. Each Member represents and warrants that the execution and delivery of this Operating Agreement by such Member does not, and the consummation of the transactions contemplated hereby will not:

    (a)    violate or constitute an occurrence of default (which violation or default either singularly or in the aggregate would be considered material) under any provision of, or conflict with, or result in acceleration of any obligation under, or give rise to a right by any party to terminate its obligations under, any material agreement, instrument, order, judgment, decree or other arrangement to which such Member or any of its Affiliates is a party or by which any of them is bound or its respective assets affected;

    (b)    require any consent, approval, filing or notice under any provision of law, or violate any judgment, ruling, order, writ, injunction, decree, statute, role or regulation applicable to such Member or any of the Member's Affiliates.

**ARTICLE 7**
**MEETINGS OF MEMBERS**

**7.01** <u>**Yearly Meeting**</u>. The yearly meeting of the Members may be held in the month of December or at such other time as shall be determined by unanimous agreement of the Members.

**7.02** <u>**Special Meetings**</u>. Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by any Manager or by a Member

or Members holding at least a thirty-three percent (33%) Membership Interest.

      **7.03**    <u>**Place of Meetings**</u>. The Members may designate any place, either within or outside the State of Georgia, as the place of meetings for any meeting of the Members. If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal executive office of the Company in the State of Georgia.

      **7.04**    <u>**Notice of Meetings**</u>. Written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than ten (10) nor more than fifty (50) days before the date of the meeting, either personally or by mail, by or at the direction of the Member calling the meeting, to each Member entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered two calendar days after being deposited in the United States mail, addressed to the Member at his address as it appears on the books of the Company, with postage thereon prepaid.

      **7.05**    <u>**Meeting of all Members**</u>. If all of the Members shall meet at any time and place, either within or outside of the State of Georgia, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice and at such meeting any lawful action may be taken.

      **7.06**    <u>**Record Date**</u>. For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which Notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

      **7.07**    <u>**Quorum**</u>. Members holding fifty-one (51%) percent of the Membership Interests represented in person or by proxy, shall constitute a quorum at any meeting of Members. In the absence of a quorum at any such meeting, a majority of the Membership Interests so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice. However, if at the adjournment of the meeting a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting. At such adjourned meeting at which quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed. The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Membership Interests whose absence would cause less than a quorum to be present.

      **7.08**    <u>**Manner of Acting**</u>. If a quorum is present, the affirmative vote of Members holding fifty-one (51%) percent of the Membership Interest shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Georgia Act, by the Articles of Organization, or by this Operating Agreement. Unless otherwise provided herein or required under applicable law, Members who have an interest (economic or otherwise)

in the outcome of any particular matter upon which the Members vote or consent may vote or consent upon any such matter and their Membership Interest, vote or consent, as the case may be, shall be counted in the determination of whether the requisite matter was approved by the Members.

**7.09    Proxies**. At all meetings of members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney in fact. Such proxy shall be filed with the Manager before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

**7.10    Action by Members Without a Meeting**. Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by all the necessary Members entitled to vote and required to approve such action and delivered to the Manager for inclusion in the minutes or for filing with the Company records. Action taken under this Section is effective when the Members required to approve such action have signed the consent, unless the consent specifies a different effective date. The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a written consent.

**7.11    Waiver of Notice.** When any notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

**ARTICLE 8**
**CONTRIBUTIONS TO COMPANY AND CAPITAL ACCOUNTS**

**8.01    Member's Capital Contributions**. Each Member shall contribute the amount of cash, set forth next to such Member's name on Exhibit "A" hereto as the Member's Initial Capital Contribution.

**8.02    Additional Capital Contributions**.

In the event that the Members by Majority Vote determine that Additional Capital Contributions are needed by the Company, the Members shall contribute their share of such Additional Capital Contributions (determined by reference to their Membership Interests in the Company) within fifteen (15) days thereafter (or, if later, such time as is set forth in the notice from the Company).   In the event that a Member fails to make such Additional Capital Contributions (the "Defaulting Member"), and the remaining Members (the "Non-Defaulting Members") contribute such Defaulting Members' Additional Capital Contribution (the "Disproportionate Contribution"), then the Defaulting Member's Interest in the Company shall be reduced using the following formula:

$$\frac{A}{be \;\; A \; + \; C} \; x \;\; I \; x \; 2 \;\; = \qquad \text{Interest in membership interest of the Company to forfeited by the breaching Member.}$$

where:     A=     Breaching Member's share of Additional Capital
                  Contributions required by this Section 8.02;

           C=     Total capital previously contributed by Breaching
                  Member; and

           I=     Breaching Member's membership interest of the
                  Company prior to their failure to make the required
                  Additional Capital Contributions.

It is the intent of the parties hereto that the membership interest of the Company forfeited by the Defaulting Member shall be allocated pro rata among the Non-Defaulting Members who contributed the Defaulting Member's share of the Additional Capital Contribution required by this Section 8.02 in the same proportions as such Additional Capital Contributions are made by the Non-Defaulting Members.

**8.03    Optional Loans**.  In addition to or in lieu of making a capital call pursuant to Section 8.02, in the event that the Members by Majority Vote determine that the Company needs additional capital, the Manager may ask each Member to make a loan to the Company in an amount determined by the Manager.  The Manager shall fix, and notify the Members of a date by which the Members must respond to any such request, and the Members shall, before such date, determine whether to make the requested loans (which may be made directly or through Affiliates) and notify the Manager of such decision, but no Member shall be required to make any such loan.  Any loan made pursuant to this Section 8.03 shall bear simple interest at the rate of two percent (2%) per annum in excess of the "prime rate" of SunTrust Bank, Atlanta, Georgia, or its successor entity, in effect from time to time during the periods such loans are outstanding, and shall be payable pursuant to the provision of Sections 9.01 and Section 16.01 hereof.  The Members by Majority Vote shall have complete discretion regarding whether to request a loan from Members pursuant to this Section 8.03 or requesting that the Members make an Additional Capital Contribution pursuant to Section 8.02.

**8.04    No Interest on Contributions**.  No Member shall be entitled to receive interest on his or her Capital Contribution.

**8.05    Loan Guarantees**.  The Members of the Company agree that they shall all, but not less than all, upon request by the Manager, execute unconditional guarantees of repayment of loans, financings, borrowings, rentals or other obligations of the Company.  In addition, the Members of the Company agree to execute any and all documents necessary or required by any lending institution or any third party to make loans to the Company.  The Manager may require that said guarantees be executed on behalf of the Company.

**8.06    Capital Accounts**

(a)     An individual Capital Account shall be established and maintained for each Member, and shall be credited with the Capital Contribution of such Member, any Additional Capital Contributions and that portion of Net Income allocable to such Member and shall be debited with that portion of

any Net Loss allocable to such Member and all distributions made by the Company to such Member.

(b)    No interest shall be payable to any Member on any positive balance in such Member's Capital Account.

(c)    No Member shall have the right to withdraw from his or her Capital Account or to otherwise receive any Company funds or property, except as provided by this Operating Agreement.

(d)    No Member shall be required to eliminate in any fashion any deficit balance which may arise in his or her Capital Account at the time the Company is dissolved or at any other time.

**8.07    Withdrawal or Reduction of Members' Contributions to Capital**

(a)    A Member shall not receive out of the Company's property any part of such member's Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid, or their remains property of the Company sufficient to pay them.

(b)    A Member, irrespective of the nature of such Member's Capital Contributions, has only the right to demand and receive cash in return for such Capital Contribution.

**ARTICLE 9**
**DISTRIBUTIONS TO MEMBERS**

**9.01    Distributions**. Except as otherwise provided in this Operating Agreement, Net Cash Flow shall be distributed to the Members ratably in proportion to their Membership Interests. Such Net Cash Flow shall be distributed at such times as the Members holding fifty-one(51%) percent of the Membership Interest shall determine from time to time, but in no event less frequently than once per year. Should the Members holding fifty-one (51%) percent of the Membership Interest determine that the Net Cash Flow for a particular quarter will be more appropriately reinvested into the Company, they may in their discretion, reduce the distribution amounts to an amount necessary to cover the income tax assessment caused by the Net Profits of the Company, not yet distributed.

**9.02    Distributions In Cash.** A Member, irrespective of the nature of such Member's Capital Contributions or his share of the Net Cash Flow, has only the right to demand and receive cash for the satisfaction of his share of the Net Cash Flow, should the Net Cash Flow be distributed as determined under Section 9.01.

**9.03    Limitation Upon Distributions**. No distribution shall be made to Members if prohibited by O.C.G.A Section 14-11-407.

**9.04    Distributions After the Fiscal Year End**.    The Manager may, to the extent consistent with this Article 9, elect to have distributions made after the end of a Fiscal Year relate back to such Fiscal Year, provided, however, that any such distribution must be made within thirty (30) days after the end of such Fiscal Year.

**9.05    Withholding**.    The Manager may cause the Company to withhold income or other taxes as may be required by, and otherwise comply with and take actions necessary as the result of, the provisions of the code of any state or local tax law requiring withholding.    Any amounts of the Company's Available Cash withheld pursuant to this Operating Agreement shall be deemed to have been paid to the members as distributions of the Company's Available Cash in the amounts so withheld pursuant to this Article 9.

**9.06    Tax Distributions**.    Unless prevented by applicable law, the Company shall distribute to each Member, with respect to each fiscal year, either during such fiscal year or within sixty (60) days thereafter, to the extent of Available Cash, an amount equal to (i) the amount of the Company's federal taxable income allocated to such Member for such fiscal year, multiplied by (ii) the highest combined federal and state income tax rate to which any Member is subject with respect to such fiscal year (the "Tax Distribution"). All distributions pursuant to this section shall be distributed ratably in proportion to the relative Membership Interests of the Members and shall be credited as a distribution pursuant to Section 9.01.

**ARTICLE 10**
**ADJUSTMENT OF CAPITAL ACCOUNTS AND PROFITS AND LOSSES**

**10.01    General Tax Allocations.**    As of the end of each Fiscal Year, and after giving effect to the special tax allocations set forth in Section 10.2, Net Profits and Net Losses shall be allocated among the Members for Capital Account, as well as for federal income tax purposes, ratably in accordance with their respective Membership Interests.

**10.02    Special Allocations**.    At the end of each Fiscal Year and notwithstanding any provision of Section 10.01, the following special allocations shall be made for both Capital Account and for federal income tax purposes unless otherwise provided:

(a)    In accordance with the ordering rules of Treasury Regulation Section 1.704-2(j), items of gross income and realized gain first shall be allocated in an amount and in a manner that complies with the "chargeback" requirement of Treasury Regulation Section 1.704-2(i)(4), the "qualified income offset" requirement of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and the "minimum gain chargeback" requirement of Treasury Regulation Section 1.704-2(f).    Further, any "partner nonrecourse deductions" within the meaning of Treasury Regulation Section 1.704-2(i)(2) attributable to "partner nonrecourse debt" shall be allocated to the Member who bears the "economic risk of loss" for such debt in accordance with Treasury Regulation Section 1.704-2(i).    Any losses in excess of the losses allowable to the Members pursuant to the Treasury Regulations promulgated under Code Section 704(b) shall first be allocated to the extent allowable hereunder to Members who are not precluded from receiving such allocations by the preceding provisions of this subparagraph (a), if any, and shall thereafter

be allocated as provided in Section 10.01.

(b)      If a taxing authority ignores the characterization of any amounts paid to a Member (or an Affiliate thereof) as salaries, management fees, commissions, interest or other compensation for services ("Compensation"), and refuses to treat such payments as either guaranteed payments within the meaning of Code Section 707(c) or payments made to such Member other than in such Member's capacity as a "partner" within the meaning of Code Section 707(a), and such taxing authority ultimately treats such amounts paid to a Member (or an Affiliate) thereto as a distribution to such Member for federal income tax purposes which reduces such Member's Capital Account, then the Compensation shall be treated as an allocation of an item of income or gain of the Company to the recipient Member so that, consistent with the intent of the Members, the Compensation shall not be treated as a distribution which reduces the recipient Member's Capital Account.  Accordingly, such Member shall be allocated the first available items of Company income and gain (including in a succeeding year) in an amount equal to the Compensation.

(c)      If the Company owns (x) any property contributed by a Member that had a fair market value different from its adjusted basis for federal income tax purposes on the date of the contribution, or (y) any property that has been revalued pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f), then for federal income tax purposes only and not for Capital Account purposes, any income, gain, loss or deduction with respect to such property shall be allocated among the Members in accordance with Code Section 704(c) and the Treasury Regulations thereunder.

**10.03   Tax Items.**  Except as otherwise provided herein, any allocation to a Member of a portion of the Net Profits or Net Losses for a Fiscal Year (or other relevant period) will be deemed to be an allocation to that Member of the same proportionate part of each item of income, gain, loss, deduction or credit that is earned, realized or available by or to the Company for federal income tax purposes.

**10.04   Partial Year Allocations**.   In the event that a Member is admitted to the Company during the Company's Fiscal Year, or all or a portion of a Member's Membership Interest is transferred during the Company's Fiscal Year, Net Profits and Net Losses shall be allocated to the admitted or transferee Member in any manner permitted by Code Section 706 or the Treasury Regulations thereunder, as the Manager shall determine in his discretion. Allocations made in this Article X shall be made to each holder of a Membership Interest whether or not the holder is a substituted Member.

**10.05   Allocations and Distributions Upon Dissolution**.   When the Company is dissolved and wound-up pursuant to Article 16 hereof, all items of income, gain, loss and deduction not previously allocated shall be allocated to the Members pursuant to this Article 10. It is the intent of the parties hereto that after the allocations described in the previous sentence are made and the final cash distribution referred to in Section 16.04 hereof is made, that such actions will result in the Capital Account balances of the Members equaling zero following the dissolution of the Company.  The allocation and distribution provisions of Articles 9 and 10, as well as the provisions of Article 14 hereof, shall be construed in such a way in order to achieve

this result.  Notwithstanding anything in this Agreement to the contrary, no Member shall be obligated to restore any negative balance in his Capital Account upon the dissolution of the Company, the Transfer of all of any portion of his Membership Interest, or otherwise.

## ARTICLE 11
## LIMITATION ON LIABILITY AND INDEMNIFICATION

**11.01  Limitation on Liability of the Members.**    No Member, Company officer, or Manager shall be liable to the Company for any loss or damage sustained by any of them, except loss or damage resulting from intentional misconduct or a knowing violation of law or a transaction for which such Person received a personal benefit in violation or breach of any provision of this Agreement.

**11.02  Indemnification**.    The Company shall indemnify and hold harmless the Members, and Manager(s), from and against any and all claims and demands whatsoever arising in connection with the Company to the fullest extent provided by Section 14-11-306 of the Act and applicable law.

## ARTICLE 12

## COMPENSATION AND REIMBURSEMENTS

**12.01  Compensation**.    Except as otherwise provided herein or approved by an affirmative vote members holding fifty-one (51%) percent of the Membership Interests in the Company, none of the Members, Manager(s), if any, or their Affiliates shall be entitled to compensation in connection with rendering their services to the Company.

**12.02  Reimbursement of Members**. The Company shall reimburse the Members and Manager(s) for all reasonable and direct out of pocket expenses and costs incurred in connection with rendering services to the Company; provided, however, that any such expenses must be documented in the manner required by the Internal Revenue Service as necessary to allow the deduct ability of such expenses as business expenses of the Company.

## ARTICLE 13

## ACCOUNTING, BOOKS AND RECORDS

**13.01  Accounting Method**.  The Company will maintain its books and records on such basis of accounting as the Manager shall determine.

**13.02  Books and Records**.    The Company shall keep, at Company expense, full, complete and accurate books of account and other records showing the assets, liabilities, costs, expenditures, receipts and such other matters as are required by the Code.  Such books of account will be the property of the Company, will be kept in accordance with generally accepted accounting principles and procedures consistently applied and will be open to the reasonable inspection and examination by the Members and their duly authorized representatives.  Such

ZILLIONAIRE ASSETS LLC.OA.18

books of account will be maintained at the principal office of the Company, or at such other place as the Manager determines.

**13.03  Financial Statements.**  Within sixty (60) days following the end of each quarter of the Company, and within ninety (90) days following the end of each Fiscal Year of the Company, the Manager shall cause to be prepared and delivered to each Member unaudited financial statements of the Company for such quarter and Fiscal Year.

**13.04  Tax Returns.**  The Manager shall cause the Company's tax returns and other governmental returns and reports to be prepared and timely filed.  The Manager shall deliver copies of Schedule K-1 of Form 1065 (or a comparable schedule), federal and state tax returns and other necessary tax information for each Fiscal Year to each Member no later than sixty (60) days after the end of each Fiscal Year, or such later date as may be otherwise agreed to by the Members.

## ARTICLE 14

## TRANSFERABILITY AND ADDITIONAL MEMBERS

**14.01  General**. Except as otherwise specifically provided herein, no Member shall have the right to:

(a)      sell, assign, pledge, hypothecate transfer, exchange or otherwise transfer for consideration (collectively, "sell"), or

(b)      gift, bequeath or otherwise transfer for no consideration (whether or not by operation of law, except in the case of bankruptcy), all or any part of his Membership Interest, except that Members have a right to transfer all or a portion of a Membership Interest to the parents, spouses or lineal descendants of the current owners of such interest or into trust established for the benefit of any of the foregoing, for bona-fide estate planning or tax planning purposes.

**14.02  Additional Members.** Without vote or assent of Members holding at least fifty one (51%) percent of the Membership Interests, no Person or Entity may become a Member of this Company either by the issuance by the Company of a Membership Interest, or as a transferee of a Member's Membership Interest or any portion thereof.  No new Members shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Members may by an affirmative vote of fifty-one (51%) percent of the Membership Interests at the time a Member is admitted elect to close the Company books (as though the Company's tax year had ended) or to make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of 706(d) of the Code and Treasury Regulations promulgated thereunder.

**14.03  Sale. Assignment or Other Transfer of Member Interests.**

(a) No Member shall sell, assign or otherwise transfer all or any part of his Membership Interest, without first obtaining the affirmative vote or assent of Members holding fifty-one (51%) percent of the Membership Interests in the Company held by all Members excluding the transferring Member, (the "Remaining Members.")  The restrictions contained in this Section shall not apply to restrict in any way transfer by any Member of assets which such Member holds other than such Member's Membership interest in the Company.

(b) As a condition to any transfer, the transferee shall agree to be bound by all of the terms and provisions of this Operating Agreement to the same extent and in the same capacity as the transferor would have been with respect to the transferred Membership Interest had the transferor continued to own such transferred Membership Interest. However, in the event that (i) a Member who has transferred his Membership Interest to or for the benefit of his spouse shall thereafter become divorced from such spouse and following the divorce, such spouse shall retain a Membership Interest in the Company, (ii) the spouse of a Member is awarded or becomes entitled to some or all of such Member's Membership Interest pursuant to a divorce decree or settlement agreement, or (iii) an owner of a Member has transferred a portion or all of his membership interest in such owner to or for the benefit of his spouse shall thereafter become divorced from such spouse and following the divorce, such spouse shall retain a membership interest in a Member or (iv) the spouse of an owner of a Member is awarded or becomes entitled to some or all of such Member's membership interest in a Member pursuant to a divorce decree or settlement agreement, then, in either such event, an Event of Default, as defined in Section 15.02 herein shall have occurred and the Membership Interest held by such spouse (or the membership interest in the Member that is held by such spouse) shall be subject to the provisions of  Section 14.03 herein. In addition, the Transferee Member or spouse shall become a holder of an Economic Interest only, with no voting rights, unless the remaining original Members, excluding the Member who transferred such Membership Interest, determine otherwise by majority vote of such Members.

(c) In exercising discretion to consent to any sale, assignment or transfer covered by the provisions of subparagraph (a) of this Section 14.03, the Members shall require such vendee, assignee or other transferee or counsel for any such person to demonstrate to the Members (i) the vendee, assignee or other transferee is a financially responsible person who understands the nature of an investment in the Company and (ii) such person intends to take and hold the interest transferred for investment for his own account and not for resale to others. No Member shall consent to a sale, assignment or other transfer of less than all of the Membership Interest to the Member, unless in the opinion of the Members, such Member's Membership Interest is large enough to be divided.  In addition no such sale, assignment or other transfer shall be effective to bind the Company until and unless the Remaining Members shall receive an opinion of counsel for the vendor, assignor or other transferor in form and substance satisfactory to counsel for the Company that the sale, assignment or other transfer may lawfully be made under all applicable law, including any and all applicable securities laws, and that such sale, assignment or other transfer, together with all other sales or transfers or interests in the Company sold, assigned or transferred within the preceding twelve (12) months and will not result in a termination of the Company pursuant to Code Section 708.

ZILLIONAIRE ASSETS LLC.OA.18

(d) The transferee of any Member (if a transfer is permitted pursuant to the terms of this Agreement) shall be subject to and bound by all of the terms and conditions of this Agreement.

**14.04   Deadlock and Triggering of Put/Call Procedure.**

(a) If (i) at any time the Members are unable to reach a resolution as to any Major Decision under this Operating Agreement; and (ii) a Member determines that such matter or decision is not resolvable without resort to the following procedure, such Member may send a notice (a "Declaration of Deadlock") to all Members of the Company declaring the existence of a deadlock (a "Deadlock").

(b) Within three (3) calendar days after delivery of a Declaration of Deadlock (the "Delivery Period"), each Member shall provide to the other Member a written report detailing the facts that such Member deems to be relevant to the creation and resolution of the Deadlock, plus any supporting information and a summary of any discussion relevant to the subject matter of the Deadlock. For a period of thirty (30) calendar days after expiration of the Delivery Period (the "Discussion Period"), the Members shall meet in person and/or communicate telephonically or electronically as frequently as necessary to negotiate in good faith to resolve the Deadlock. If the Members are able to resolve the Deadlock they shall, within the Discussion Period, execute a written acknowledgement (the "Resolution Acknowledgement") setting forth in reasonable details the resolution of the Deadlock. Pending resolution of the Deadlock, all Members, Managers and the Company shall continue to perform their respective obligations under this Operating Agreement without regard to whether the Deadlock has been resolved, unless and until such obligations are terminated or expire in accordance with the provisions hereof or are rendered incapable of performance by reason of the Deadlock. In the event that the Members are unable to resolve the Deadlock within the Discussion Period, either Member may institute the procedures set forth in this section.

(c) Manner of Offer. At any time after the expiration of the Discussion Period, if the Deadlock has not been resolved, any Member may at any time offer to the other Members (individually and collectively, the "Electing Members") both to sell all of the offeror's Membership Interest to the Electing Members and to buy all of the Electing Members' Membership Interests (such offeror is hereinafter referred to as the "Initiating Member"). Such offer must be in writing and must contain the following: (1) a statement of intention to make an offer in accordance with this Section; (2) a statement of the Initiating Member's determination of the Stated Amount (as defined below); (3) a statement that a condition to any purchase pursuant to the offer shall be the absolute and unconditional indemnity by the purchasing Member of the Initiating Member against any loss, claim or damage that the Initiating Member may suffer arising out of any guarantee by the Initiating Member of any debt of the Company for borrowed money; (4) a statement that the purchase price of the Membership Interest subject to the offer shall be payable not less than twenty five percent (25%) cash at Closing with the balance, if any, represented by a promissory note of the purchasing Member secured by the acquired Membership Interest and personally guaranteed by the owner of the purchasing Member and payable in equal monthly installments over thirty six consecutive months with interest at the

prime rate plus 2% announced by SunTrust Bank, Atlanta, Georgia or successors ("Applicable Rate"); and (5) a statement that such offer is both an offer to sell all the Membership Interest owned by the Initiating Member and an offer to purchase all the Membership Interest owned by the Electing Members (the "Put-Call Offer") on such terms and conditions. The "Stated Amount" means the fair market value of the subject Membership Interest, as determined by a qualified independent appraiser under the procedure outlined in Section 15.03 (c) below; provided however, that the Stated Amount shall not be less than the aggregate of all indebtedness owed by the Company, including any loans to the Company from Members.

The purchase price ("Put-Call Purchase Price") for any Member's Membership Interest in the Company acquired pursuant to this Section shall be that amount which would be distributed to such Member pursuant to Section 9.01 hereof (after giving effect to all applicable provisions of this Operating Agreement, but after liquidating all Reserves then existing and without establishing any additional Reserves), if (i) all of the assets then held by the Company were sold for cash on the date of the Closing (as defined in this section) for a gross sales price equal to Stated Amount and (ii) the Company's liabilities were paid in full. Any loans by a Member to the Company owing to a Member shall be added to the purchase price payable to such Member.

The Put-Call Offer shall be irrevocable for ninety (90) days, and the Electing Members may, on or before such ninetieth (90th) day, accept in writing either the offer to sell or the offer to buy, and upon acceptance, the Initiating Member and the Electing Members shall be required to sell or to buy, as the case may be. If the Electing Members fail to accept either offer within the ninety (90) day period, the Electing Members shall be deemed to have accepted the offer to sell the Membership Interests of the Electing Members to the Initiating Member.

Any two or more Members may jointly execute a Put-Call Offer and specify in the Put-Call Offer that they are to be treated as one Initiating Member for purposes of this Section. For purposes of the remainder of this Section unless the context indicates otherwise, references to "Member," "Initiating Member" or "Electing Member" include, where appropriate, the plural as well as the singular.

(d) Differing Elections. If the Electing Members consists of more than one Member, three possible response combinations may result: (i) all Electing Members elect to purchase the Membership Interest of the Initiating Member, (ii) all Electing Members elect to sell their Membership Interests to the Initiating Member, or (iii) one or more Electing Members elect to purchase the Initiating Membership Member's Interest and one or more Electing Members elect to sell their Membership Interest to the Initiating Member. In the event of a split of elections as described in (iii), an Electing Member's election to sell his Membership Interest shall be ineffective and the election of an Electing Member to purchase the Membership Interest of the Initiating Member shall be the only effective election, and those Electing Member(s) electing to purchase the Initiating Member's Interest shall purchase all of the Initiating Member's Membership Interest.

If there is more than one Electing Member electing to purchase the Initiating Member's Membership Interest, each such Electing Member in the purchasing group shall be entitled to purchase such portion of the Initiating Member's Membership Interest as all such Electing

Members shall agree among themselves. In the event all Electing Members in the purchasing group cannot agree on the portion of the Initiating Member's Membership Interest that each of them shall purchase, then each such Electing Member in the purchasing group shall be entitled to purchase a portion of the Initiating Member's Membership Interest, such portion to be determined by dividing each Electing Member's Ownership Percentage by the total Ownership Percentages of all Electing Members in the purchasing group.

**14.05 Closing.** The closing of such purchase and sale (the "Closing") shall be held at the offices of the Company and on the date specified by the purchaser by written notice to the seller, which date shall be on or before the thirtieth (30) day after such option to purchase or sell has been exercised. At Closing, the purchaser shall pay the Put-Call Purchase Price by wire transfer of immediately available funds.

(a) It shall be a condition to the Closing that the purchasing Member(s) shall either (i) repay all Company indebtedness for borrowed monies under which the selling Member has personal liability or (ii) cause the selling Member to be released from such personal liability by written instrument duly signed by the holder of such indebtedness. The purchasing Member(s) agrees to indemnify in writing the selling Member and hold the selling Member harmless from and against any damage, loss or liability as a result of the purchasing Member's failure to repay such indebtedness at the closing in accordance with the provisions hereof or to obtain the release of the selling Member. The selling Member, may, in his sole and absolute discretion, and without prejudice to any other legal or equitable remedies he may have, refuse to proceed with the Closing unless simultaneously therewith all such indebtedness is so repaid or such releases delivered. In addition, at any Closing held pursuant to this Section, the purchasing Member shall by a legally enforceable agreement assume the payment of, and indemnify the selling Member against all obligations of the Company accruing after Closing other than those obligations owing out of or related to an act or omission of the selling Member which constitutes gross negligence or willful misconduct.

(b) At the Closing, an assignment and, if requested by the Purchasing Member or, a bill of sale from the selling Member to the purchasing Member of the selling Member's Membership Interest together with such other instruments and documents as may be reasonably necessary or desirable to effectuate the sale and transfer to the purchasing Member shall be delivered upon payment of the purchase price. The purchasing Member shall have the right, within his sole and absolute discretion, to cause his nominee or designee to acquire the selling Member's Membership Interest at the Closing but nothing herein shall relieve the purchasing Member of his other obligations hereunder. Any such designee shall, upon Closing, become a Member only if expressly approved and consented to by the purchasing Member.

**ARTICLE 15**

**PROHIBITED TRANSACTIONS AND DEFAULTS**

**15.01  Prohibited Transactions.** Neither any Member shall, without the consent of all of the other Members, do any one of the following nor shall any Member permit any of such Member's respective Affiliates to do any of the following:

(a)     Use the name of the Company (or any substantially similar name) or any trademark or trade name adopted by the Company except in the ordinary course of the Company's business;

(b)     Disclose to any nonmember any of the Company business practices, trade secrets, or any other information not generally known to the business community:

(c)     Do any other act or deed with the intention of harming the business operations of the company;

(d)     Do any act contrary to this Operating Agreement except with the prior written approval of all Members;

(e)     Do any act which would make it impossible to carry on the intended or ordinary business of the Company;

(f)     Confess a judgment against the Company.

(g)     Wrongfully transfer or dispose of Company property, real or personal;

(h)     Admit another Person or Entity as a Member except as provided herein.

(i)     Pledge by a Member of any of their Membership Interests without the consent of the Manager.

The Members shall not use, directly or indirectly, the assets of this Company for any purpose other than carrying on the business of this Company, for the full and exclusive benefit of all its Members.

**15.02   Events of Default.** The following events shall be deemed to be events of default by a Member.

(a)     Any attempted transfer of an interest in the Company by the Member without complying with the provisions of Article 14 of this Operating Agreement.

(b)     The making of an assignment for benefit of creditors or the filing of the Member of a petition under any section or chapter of the National Bankruptcy Act, as amended, or under similar law or statute of the Untied States, or any State thereof, by the Member

(c)     Adjudication of the Member as bankrupt or insolvent in proceedings filed against the Member under any section or chapter of the National

Bankruptcy Act, as amended, or under any similar law or statute of the United States or any State thereof, without further possibility of appeal or review.

(d)     The appointment or a receiver for all or substantially all of the assets of a Member and the failure to have such receiver discharged with in thirty (30) days after appointment.

(e)     The attempted transfer, whether voluntary or involuntary, of an interest in the Company to the creditor(s) of a Member in partial or complete satisfactory of any judgment or lien held by such creditor(s) against such Member.

(f)     Failure to make the Member's required Initial Capital Contribution or Additional Capital Contribution in accordance with Section 8.01 or Section 8.02 of this Agreement.

**15.03   Effect of Default.**

(a)     On the occurrence of an event of default by a Member, the Non-defaulting Members shall have the right, at their election, to purchase the Membership Interest of the Defaulting Member at a Purchase Price determined in accordance with Section 15.03(c) or to receive an increase in the Membership Interest pursuant to Paragraph 8.02 of this Agreement. Said election may be made at any time within ninety (90) days from the date of such default, upon giving the Defaulting Member ten (10) days written notice of such election, provided such default is continuing on the date such notice is given.

(b)     If the Non-defaulting Member(s) (the "Purchasing Members") exercises his option to purchase then the Defaulting Member and the Purchasing Members shall meet within thirty (30) days after the date the Purchase Price has been determined, at the time and place designated by the Purchasing Member (the "Closing"). At the Closing, the Defaulting Member shall execute all documents that may be necessary or desirable, in the opinion of counsel for the Purchasing Member to convey the Defaulting Member's entire Membership Interest to the Purchasing Member free and clear of all liens and encumbrance. At the Closing, the Purchasing Member shall pay the Purchase Price in cash. The total cash proceeds from such sale shall be applied as follows.

(1)     First to the costs and expenses incurred in determining the Purchase Price (including but not limited to appraisal costs);

(2)     Next to the payment of all loans, including all interest thereon, from the Purchasing Member to the Defaulting Member; and

(3)     The remaining cash shall be paid to the Defaulting Member.

(c)     <u>Purchase Price for Membership Interest</u>. For purposes of this Section 15.03, the Purchase Price for a Membership Interest shall be equal to the amount agreed upon between the Defaulting Member and the Purchasing Member; or if the Defaulting Member and the Purchasing Member cannot agree upon such a Purchase Price within thirty (30) days after the date of the event triggering the right to effectuate such purchase, then the Purchase Price shall be the fair market value of the Defaulting Member's Membership Interest. The fair market value of the Defaulting Member's Membership Interest shall be as determined by a qualified independent appraiser mutually agreed upon of the Defaulting Member and the Purchasing Member. If the Defaulting Member and the Purchasing Member cannot agree upon an appraiser within ninety (90) days after the date of the event triggering the purchase, then the Purchase Price shall be the fair market value of the Defaulting Member's Membership interest determined as follows: The Defaulting Member shall appoint one (1) qualified appraiser, the Purchasing Member shall appoint one (1) qualified appraiser, and a third appraiser shall be appointed by the two appraisers so appointed. If the two appraisers appointed by the Defaulting Member and the Purchasing Member are unable to agree upon the selection of a third appraiser, the third appraiser shall be selected in accordance with the rules of the American Arbitration Association.

Each of the three (3) appraisers selected in accordance with the above procedure shall separately and independently determine the fair market value of the Defaulting Member's Membership Interest in the Company. When completed, each such appraisal shall be placed in a sealed envelope and delivered to the attorney for the Company to hold until all three appraisals have been received. No appraisal shall be opened or disclosed until all three have been received. After receiving all three appraisals, the attorney for the Company shall open the appraisals and the fair market value shall be the average of the two appraisals that are closest to each other. If, however, the middle appraisal is equal to the average of the high and low appraisals, then the fair market value shall be equal to the middle appraisal. In either case, such determination shall be final and binding upon the parties. The cost of all appraisals made in accordance with this Section 15.03 and shall be deducted from the purchase price proceeds otherwise payable to the Defaulting Member.

**15.04.  <u>Additional Effects on Default.</u>** Pursuit to any of the foregoing remedies shall not preclude pursuit of any of the other remedies provided by law, nor shall pursuit of any remedy herein provided constitute a forfeiture or wavier of any amount due to the remaining Members hereunder or of any damages accruing to them by reason of the violation of any of the terms, provisions and covenants herein contained. No waiver by the remaining Member of any violation or breach shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions, and covenants herein contained, and forbearance by them to enforce one or more of the remedies herein provided on an event of default shall not be deemed or

construed to constitute a waiver of such default.

## ARTICLE 16
## DISSOLUTION AND TERMINATION

     **16.01    Dissolution.**    The Company shall be dissolved only upon the occurrence of any of the  events set forth in O.C.G.A. Section 14-11-602(b) .

     If the Company is continued after the occurrence of an Event of Dissociation of a Member pursuant to this Section, any successor in interest of the Member as to whom the Event of Dissociation occurred shall become an Economic Interest Owner, but shall not be admitted as a Member, except in accordance with Articles 14 hereof.

     **16.02    Withdrawing Member.**    Unless otherwise approved by Members holding a Majority Interest, a Member who suffers or incurs an Event of Dissociation, or whose status as a Member is otherwise terminated (a "Withdrawing Member"), regardless of whether such termination was the result of a voluntary act by such Withdrawing Member, shall not be entitled to receive outright the fair value of his Membership Interest, and such Withdrawing Member shall become an Economic Interest Owner.

     **16.03    Effect of Dissolution.**    Upon dissolution, the Company shall cease to carry on its business, except as permitted by the Georgia Act. Upon dissolution, the Managers shall file a statement of commencement of winding up and publish the notice permitted by the Georgia Act.

     **16.04    Winding-Up Liquidation and Distribution of Assets.**

          (a)      Upon dissolution, an accounting shall be made by the Company's accountants of the accounts of the Company and of the Company's assets, liabilities and operations from the date of the last previous accounting until the date of dissolution. The Manager(s), or if none, the Persons or Persons selected by Majority Vote of the Members (the "Liquidators") shall immediately proceed to wind up the affairs of the Company.

          (b)      If the Company is dissolved and its affairs are to be wound up, the Liquidators shall:

               (1)      Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Liquidators may determine to distribute any assets to the Members in kind);

               (2)      Allocate any profit or loss resulting from such sales to the Members and Economic Interest Owners in accordance with Article 9 hereof;

               (3)      Discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are creditors, to the

extent otherwise permitted by law, other than liabilities to Members and Economic Interest Owners for distributions, and establish such Reserves as may be reasonably necessary to provide for contingent liabilities of the Company;

(4)     Distribute the remaining assets to the Members, either in cash or in kind, as determined by the Managers in accordance with the provisions of Section 9.01, with any assets distributed in kind being valued for this purpose at their fair market value. Any such distributions in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1 (b)(2) (ii)(b)(2) of the Treasury Regulations in accordance with the positive balance (if any) in each Member's Capital Account (as determined after taking into an account all Capital Account adjustments for the Company's Fiscal Year during which the liquidation occurs), with any balance in excess thereof being distributed in proportion to the Members' respective Membership Interests. Any such distribution in respect to Capital Accounts shall, to the extent practicable, be made in accordance with the time requirements set forth in Section 1.704- 1 (b)(2)(ii)(b)(2) of the Treasury Regulations; and

(5)     If any assets of the Company are to be distributed in kind, the net fair market value of such assets shall be determined by independent appraisal or by agreement of the Members. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest Owners shall be adjusted pursuant to the provisions of this Operating Agreement to reflect such deemed sale.

(c)     Notwithstanding anything to the contrary in this Operating Agreement upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocation and other Capital Account adjustments for all taxable years ,including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution to reduce or eliminate the negative balance of such Member's Capital account.

(d)     Upon completion of the winding-up, liquidation and distribution of the assets, the Company shall be deemed terminated.

**16.05   Certificate of Termination.** When all debts, liabilities, and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining

property and assets have been distributed to the Members, a Certificate of Termination may be executed and filed with the Secretary of State of Georgia in accordance with O.C.G.A Section 14-11-610.

**16.06  Return of Contribution Nonrecourse to Other Members**. Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of his Capital Contribution. If the assets of the Company remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member.

## ARTICLE 17

## MISCELLANEOUS PROVISIONS

**17.01  Arbitration.** Any dispute arising in connection with this Operating Agreement shall be an Arbitrable Dispute and shall be finally settled by arbitration under the then applicable Commercial Arbitration rules of the American Arbitration Association, by one or more arbitrators agreed upon by the parties or, in the absence of such an agreement, appointed in accordance with such Rules. The arbitration proceedings shall be held in Atlanta, Georgia. Judgment upon the award rendered may be entered in any court having jurisdiction and application may be made to such court for judicial acceptance of such award and an order of enforcement as the case may be. The parties hereby agree that the rendering of an award by the arbitrator or arbitrators shall be a condition precedent to the initiation of any legal proceedings with respect to any Arbitrable Dispute.  The Members agree and understand that this paragraph in no way shall prevent any Member or Members from pursuing civil or criminal remedies for any breach of legal duty or fraudulent or intentional action by any Member, Members or agents, designees' or assignees thereof. The arbitration hearing shall have the following procedures:

(a)  WITHIN THIRTY (30) DAYS AFTER THE SERVICE OF A WRITTEN REQUEST FOR PRODUCTION OF DOCUMENTS, THE RECEIVING PARTY SHALL PROVIDE THE REQUESTING PARTY WITH COPIES OF THE REQUESTED DOCUMENTS THAT ARE RELEVANT TO THE CLAIMS, COUNTERCLAIMS, AND DEFENSES ASSERTED IN THE ARBITRATION, AND THAT ARE NOT PRIVILEGED. ANY OBJECTION TO A REQUEST FOR PRODUCTION OF DOCUMENTS THAT CANNOT BE RESOLVED BETWEEN THE PARTIES TO THE ARBITRATION SHALL BE DETERMINED BY THE ARBITRATOR(S), WHICH DETERMINATION SHALL BE CONCLUSIVE.  THIS PROCEDURE RELATED TO THE PRODUCTION OF DOCUMENTS SHALL BE THE SOLE FORM OF WRITTEN DISCOVERY PERMITTED IN THE ARBITRATION.

(b)  EACH PARTY TO THE ARBITRATION SHALL BE PERMITTED TO TAKE A MAXIMUM OF THREE (3) DEPOSITIONS OF FACT WITNESSES.  TO THE EXTENT THAT A PARTY TO THE ARBITRATION DESIRES TO TAKE MORE THAN THREE (3) FACT WITNESS DEPOSITIONS, THE PARTY SHALL REQUEST PERMISSION FROM THE ARBITRATOR(S) TO TAKE THE ADDITIONAL DEPOSITION(S).   THE

ARBITRATOR(S) SHALL PERMIT ADDITIONAL FACT WITNESS DEPOSITION(S) UPON GOOD CAUSE SHOWN OR THE AGREEMENT OF THE PARTIES. NO FACT WITNESS DEPOSITION SHALL LAST LONGER THAN FOUR (4) HOURS OF DEPOSITION TIME. ALL OBJECTIONS TO QUESTIONS POSED IN THE DEPOSITION(S) SHALL BE RESERVED FOR THE ARBITRATION HEARING EXCEPT FOR OBJECTIONS BASED UPON PRIVILEGE.

(c)    TO THE EXTENT THAT EITHER PARTY TO THE ARBITRATION INTENDS TO RELY UPON THE TESTIMONY OF AN EXPERT WITNESS(ES) DURING THE ARBITRATION HEARING, THE OTHER PARTY SHALL BE ENTITLED TO DEPOSE THE EXPERT WITNESS(ES) FOR A MAXIMUM OF SEVEN (7) HOURS OF DEPOSITION TIME. THE EXPERT WITNESS(ES) SHALL PRODUCE A REPORT OR STATEMENT WHICH SETS OUT THEIR EXPERT OPINION AND THE FACTUAL AND LEGAL BASIS THEREOF AT LEAST FOURTEEN (14) DAYS PRIOR TO THE SCHEDULED DEPOSITION, AND AT LEAST THIRTY (30) DAYS PRIOR TO THE DATE OF ARBITRATION HEARING. ALL OBJECTIONS TO QUESTIONS POSED IN THE DEPOSITION(S) SHALL BE RESERVED FOR THE ARBITRATION HEARING.

(d)    THE ARBITRATION AWARD SHALL BE MADE WITHIN ONE HUNDRED TWENTY (120) DAYS AFTER THE APPOINTMENT OF THE ARBITRATOR(S), AND THE ARBITRATOR(S) SHALL AGREE TO COMPLY WITH THIS SCHEDULE BEFORE ACCEPTING APPOINTMENT.

(e)    THE PARTIES SHALL BEAR AN EQUAL SHARE OF THE ARBITRATORS AND ADMINISTRATIVE FEES.

(f)    NOTWITHSTANDING ANY LEGAL AUTHORITY TO THE CONTRARY, "MANIFEST DISREGARD OF THE LAW" ON THE PART OF THE ARBITRATOR(S) IN RENDERING AN AWARD SHALL CONSTITUTE A VALID GROUND TO VACATE.

**17.02  Books of Account and Records.** Proper and complete records and books of account shall be kept or shall be caused to be kept by the Manager in which shall be entered fully and accurately all transactions and other matters relating to the Company's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company. The books and records shall be at all times be maintained at the principal executive office of the Company and shall be open to the reasonable inspection and examination of the Members, or their duly authorized representatives during reasonable business hours.

**17.03  Application of Georgia Law.** This Operating Agreement, and the application or interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of Georgia, and specifically the Georgia Act.

**17.04  No Action for Partition.** No Member has any right to maintain any action for partition with respect to any property of the Company.

**17.05    Construction.** Whenever the singular number is used in this Operating

Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

**17.06  Headings.** The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

**17.07  Waivers.** The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

**17.08  Rights and Remedies Cumulative.** The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all of the remedies. Such rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

**17.09  Heirs, Successors and Assigns.** Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

**17.10  Creditors.** None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

**17.11  Counterparts.** This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

**17.12  Investment Representations**. Any securities created under this Agreement have not been registered under the Georgia Uniform Securities Act of 2008, as amended, in reliance upon the exemption from registration set forth in Section 10-5-11(14) of such act. In addition, these securities have not been registered with the United States Securities and Exchange Commission in reliance upon an exemption from such registration set forth in the Securities Act of 1933 provided by Section 4(2) thereof, nor have they been registered with the Securities Commission of certain states in reliance upon certain exemptions from registration. These securities have been acquired for investment purposes only and may not be offered for sale, pledged, hypothecated, sold or transferred except in compliance with the terms and conditions of this Agreement and in a transaction which is either exempt from registration under such acts or pursuant to an effective registration statement under such acts.

**17.13  Certification of Non-Foreign Status**. In order to comply with Code Section 1445 and the applicable Treasury Regulations thereunder, in the event of the disposition by the Company of a United States real property interest as defined in the Code and Treasury Regulations, each member shall provide to the Company, an affidavit stating, under penalties of perjury, (i) the Member's address, (ii) United States taxpayer identification number, and (iii) that

the Member is not a foreign person as that term is defined in the Code and Treasury Regulations. Failure by any Member to provide such affidavit by the date of such disposition shall authorize the Manager to withhold ten percent (10%) of each such Member's distributive share of the amount realized by the Company on the disposition.

17.14  **Notices**. Any and all notices, offers, demands, or elections required or permitted to be made under this Agreement ("Notices") shall be in writing, signed by the party giving such Notice, and shall be deemed given and effective (i) when hand delivered either in person by the party giving such notice, or by its designated agent, or (ii) the next business day after delivery to a nationally known overnight delivery service courier or (iii) on the third (3rd) business day (when making regular deliveries of mail on all of its regularly appointed week day rounds in Atlanta, Georgia) following the day (as evidenced by proof of mailing) upon which such notice is deposited, postage prepaid, certified mail, return receipt requested, with the Postal Service, and addressed to the other party at such party's respective address as set forth below or at such other address as the other party may hereafter designate by Notice.

17.15  **Amendments**. Any amendment to this Operating Agreement shall be made in writing and signed and consented by the affirmative vote of not less than fifty-one (51%) percent of the Membership Interests.

17.16  **Invalidity**. The invalidity or unenforceability or any particular provision of this Agreement shall not affect the other provisions hereof, and of this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted. If any particular provision herein is construed to be in conflict with the provisions of the Georgia Act, then the Georgia Act shall control and such invalid or unenforceable provisions shall not affect or invalidate the other provisions hereof, and this Agreement shall be construed in all respects as if such conflicting provision were omitted.

17.17  **Further Assurances**. The Members each agree to cooperate, and to execute and deliver in a timely fashion any and all additional documents necessary to effectuate the purposes of the Company and this Agreement.

17.18  **Time**. Time is of the essence of this Agreement, and to any payments, allocations and distributions specified under this Agreement.

SIGNATURE PAGE ATTACHED

ZILLIONAIRE ASSETS LLC.OA.18

**IN WITNESS WHEREOF**, the parties hereto have executed this Amended and Restated Operating Agreement as of the date first above written.

KING GROUP MGMT LLC
a Georgia limtied liability company

By: _____
**Sahib Singh Arora, Manager**


CROWN ASSETS, LLC
a Georgia limited liability company


By: _____
Karan Singh Ahuja, Manager

EXHIBIT "A"

| MEMBER | CONTRIBUTION |
| --- | --- |
| KING GROUP MGMT LLC | $100.00 |
| CROWN ASSETS, LLC | $100.00 |

# EXHIBIT I

## AGREEMENT

THIS AGREEMENT made and entered into this __21__ day of December, 2019 by and between KING GROUP MGMT, LLC, a Georgia limited liability company (hereinafter referred to as "King"), CROWN ASSETS, LLC, a Georgia limited liability company (hereinafter referred to as "Crown") and ZILLIONAIRE ASSETS, LLC, a Georgia limited liability company (hereinafter referred to as "Zillionaire").

### W I T N E S S E T H :

WHEREAS, King and Crown are each owners of an undivided fifty (50%) percent membership interest in Zillionaire; and

WHEREAS, on or about November 27, 2019, Zillionaire sold property located at 5754 Attucks Boulevard, Morrow GA 30260 (the "Morrow Property") and 3635 Exchange LLC as 1031 Intermediary for Zillionaire received $682,816.45 which represents the proceeds from the Sale (the "Proceeds"); and

WHEREAS, King and Crown each are entitled to $341,408.22 of the Proceeds and they desire to purchase replacement properties from their share of the Proceeds; and

WHEREAS, although the replacement properties will be titled in and recorded in the name of Zillionaire, to comply with the provisions of Section 1031, King, at some time in the future, will convey the title to their replacement property into the name of King (the "King Replacement Property") and Crown, at some time in the future, will convey the title to their replacement property into the name of Crown (the "Crown Replacement Property"); and

WHEREAS, the Parties set forth their respective obligations with respect to the purchase by King and Crown of their replacement properties and the conveyance of their respective replacement properties from Zillionaire to Crown or from Zillionaire to King.

NOW THEREFORE, in consideration of the premises and of good and valuable consideration, the receipt and sufficiency whereof is hereby acknowledged, the parties hereto hereby covenant and agree as follows:

1.      King and Crown shall execute all documents necessary or proper for King and Crown to acquire title to their respective replacement properties including the execution of a limited liability resolution wherein all members of Zillionaire consent to the purchase of the respective replacement property (or properties). In the event that King obtains a loan secured by the King Replacement Property, or Crown obtains a loan secured by the Crown Replacement Property and title to the replacement property is still titled in the name of Zillionaire, Crown and King shall execute a Zillionaire limited liability resolution approving the obtaining of the Loan. Notwithstanding the aforementioned, Crown is not obligated to assume any financial obligation of a loan secured by the King Replacement Property and King hereby agrees to indemnify and

Re.King Crown and Zillionaire Agreement. 19

hold harmless Crown as to any claim, action or cause of action arising from said loan. Notwithstanding the aforementioned, King is not obligated to assume any financial obligation of a loan secured by the Crown Replacement Property and Crown hereby agrees to indemnify and hold harmless King as to any claim, action or cause of action arising from said loan.

3.    Successors and Assigns.  This Agreement shall apply to, inure to the benefit of, and be binding upon and enforceable against the parties hereto and their respective heirs, legal representative, successors, and assigns, to the same extent as if specified at length through out this Agreement.

4.    Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of which counterparts together shall constitute one and the same instrument.

5.    Time of the Essence.  Time is of the essence of this Agreement.  Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon a Saturday, Sunday, or any public or legal holiday, the party having such privilege or duty shall have until 5:00 p.m. on the next succeeding business day to exercise such privilege or to discharge such duty.

6.    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia.

7.    Judicial Interpretation.  Should any provision of this Agreement require judicial interpretation, it is agreed that the court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against one party by reason of the rule of construction that a document is to be construed more strictly against the party who itself or through its agent prepared the same, it being agreed that the agents of all parties have participated in the preparation hereof.

8.    Authority to Execute Agreement.  All parties signing this Agreement on hereby individually warrant that they are authorized to execute this Agreement on behalf of and to bind King, Crown and Zillionaire, respectively.

9.    Survival.  The terms and conditions of this Agreement shall survive any closing and shall not merge into any warranty deed.

IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed as of the day and year first above written.

KA        SA

Re:King Crown and Zillionaire Agreement. 19

ZILLIONAIRE:

Zillionaire Assets, LLC
a Georgia limited liability company
By: King Group Mgmt, LLC
Its manager

By: _____
Sahib Singh Arora, Manager

KING:

King Group Mgmt, LLC
a Georgia limited liability company

By: _____
Sahib Singh Arora, Manager

CROWN:

Crown Assets, LLC
a Georgia limited liability company

By: _____
Karan Singh Ahuja, Manager

Re.King Crown and Zillionaire Agreement. 19

# EXHIBIT J

**From:** **Karan Singh** karansingh12121@gmail.com  📎
**Subject:** Fwd: Zillionaire Internal Agreement.pdf
**Date:** August 6, 2020 at 2:29 PM
**To:** David Klein dklein@rlklawfirm.com

KS

---------- Forwarded message ---------
From: **Dr Arora** <sahib3@gmail.com>
Date: Sat, Dec 28, 2019, 3:37 AM
Subject: Zillionaire Internal Agreement.pdf
To: Joel Haber <joel@joelhaber.com>, Charanjeev <charan@kw.com>, Vineet Singh <vineetmaharaja@gmail.com>,
Karan Singh <karansingh12121@gmail.com>

Dear Mr Haber,

I want to inform that King Group MGMT LLC as a 50% member of Zillionaire assets LLC has completed 1031 exchange
for $341,408.22 (50%) of its entitled proceeds towards 3180 Atlanta Hwy, Athens Ga 30606 as per internal agreement.
This property belongs to King Group MgMt LLC and Crown assets LLC/ Karan Ahuja has 0% interest in this property.
Crown assets LLC may purchase any property for its 50% ($341,408.22)proceeds remaining in escrow with 1031
intermediary or receive a 1099 if they decide to withdraw.

Thank you for your assistance.
Sincerely,
Dr Arora



Zillionaire
Interna...ent.pdf

# EXHIBIT K

2020048426    DEED BOOK **28184** Pg **135**

Real Estate Transfer Tax $1,155.00

Filed and Recorded:
3/19/2020 1:36:36 PM
Debra DeBerry
Clerk of Superior Court
DeKalb County, Georgia

Return Recorded Document to:
Hartmanlaw, LLC
145 Towne Lake Parkway
Suite 200
Woodstock, GA 30188

# LIMITED

# WARRANTY DEED

Parcel Number: 16-041 -03-013

STATE OF GEORGIA
COUNTY OF CHEROKEE

FILE #: W-20-118

THIS INDENTURE made this **25th day of February, 2020**, between **King Group Mgmt, LLC a Georgia Limited Liabilty Company and Crown Assets** of the County of **DeKalb,** and State of Georgia, as party or parties of the first part, hereinunder called Grantor, and **McLendon Capital, LLC a Georgia Limited Liability Company** as party or parties of the second part, hereinafter called Grantee (the words "Grantor" and "Grantee" to include their respective heirs, successors and assigns where the context requires or permits).

WITNESSETH that: Grantor, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable considerations in hand paid, at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, has granted, bargained, sold, aliened, conveyed and confirmed, and by these presents does grant, bargain, sell, alien, convey and confirm unto the said Grantee.

All that tract or parcel of land lying and being in Land Lot 41 of the 16th District, DeKalb County, Georgia, and being more particulary described as follows:

Beginning at the iron pin found on the Southwesterly right of way of Snapfinger Park Drive (a 60-foot right of way) 313.21 feet Northwesterly, as measured along the Southwesterly right of way line of Snapfinger Park Drive, from the corner formed by the intersection of the Southwesterly right of way line of Snapfinger Drive with the Westerly right of way line of Panola Road, thence leaving the Southwesterly right of way line of Snapfinger Park Drive and running South 12 degrees 36 minutes 40 seconds West a distance of 211.13 feet to an iron pin found on the Northeasterly line of property now or formerly owned by United Central Bank (Deed Book 23966 Page 77, DeKalb County, Georgia records); running thence North 77 degrees 23 minutes 20 seconds West along the Northeasterly line of said United Central Bank property, 252.00 feet to an iron pin set on the Southeasterly line of property now or formerly owned by State Farm Mutual Automobile Insurance Company (Deed Book 5491 Page 339, aforesaid records); running thence North 12 degrees 36 minutes 40 seconds East along the Southeasterly line of said State Farm Mutual Automobile Insurance Company property, 213.60 feet to an iron pin set on the Southwesterly right of way line of Snapfinger Park Drive; running Southeasterly along the Southwesterly right of way line of Snapfinger Park Drive, and following the curvature thereof, the following courses and distances; along the arc of a curve to the right (said arc having a radius of 542.96 feet and being subtended by a chord bearing South 79 degrees 58 minutes 39 seconds East a distance of 96.83 feet), and an arc distance of 96.96 feet to a point; and South 74 degrees 51 minutes 43 seconds East, 155.42 feet to the iron pin found which marks the point of beginning, being a tract or parcel of land containing 1.247 acres and

DEED BOOK 28184 Pg 136
Debra DeBerry
Clerk of Superior Court
DeKalb County, Georgia

having a building thereon located at and known as No. 5341 Snapfinger Park Drive, according to the present system of numbering buildings in unincorporated Dekalb County, Georgia; and being more particularly shown on and described in accordance with a plat of survey prepared for Bridge Pointe Christian Daycare Academy Incorporation, Branch Banking and Trust Company and First American Title Insurance Company, dated April 8, 2014 and revised April 10, 2014.

This Deed is given subject to all easements and restrictions of record.

TO HAVE AND TO HOLD the said tract or parcel of land, together with all and singular the rights, members and appurtenances thereof, to the same being, belonging or in anywise appertaining, to the only proper use, benefit and behoof of the said Grantee, forever in FEE SIMPLE.

AND THE SAID Grantor will warrant and forever defend the right and title to the above described property unto the said Grantee against the claims of all persons by, through and under the above-named grantor.

IN WITNESS WHEREOF, Grantor has hereunto set grantor's hand and seal this day and year first above written.

Signed, sealed and delivered in presence of:

WITNESS

Notary Public

**GRANTOR:**

**King Group Mgmt, LLC, a Georgia Limited Liability Company**

By: _____ (SEAL)
Sahib Singh Arora, Member

**Crown Assets LLC, a Georgia Limited Liability Company**

By: _____ (SEAL)
Karan S. Ahuja, Member

# EXHIBIT L

## CERTIFIED RESOLUTION AND INCUMBENCY CERTIFICATE
## ZILLIONAIRE ASSETS, LLC

I, SAHIB SINGH ARORA does hereby certify that: (i) I am the Sole Member of KING GROUP MGMT, LLC, a Georgia limited liability company, which is the Manager of ZILLIONAIRE ASSETS, LLC, a Georgia limited liability company (the "Company"); and (ii) the following is a true and correct copy of a Resolution duly adopted at a special meeting of the Members of the Company (the "Members") held on February 21, 2020 in the members offices; and (iii) such Resolution has not been repealed, altered or amended and remains in full force and effect as of the date hereof:

WHEREAS, Members of the Company were present at a meeting for the purpose of the approval of the purchase by the Company of real property with improvements located thereon and located at 90 Hunters Chase, McDonough GA 30253 (the "Property") from Ameris Bank for the purchase price of $785,000.00 (the "Purchase"); and

IT IS HEREBY RESOLVED, that the Members of the Company hereby approve the Purchase of said Property; and

IT IS FURTHER RESOLVED, that KARAN AHUJA, ("Authorized Person") is hereby authorized and directed to execute and deliver, on behalf of the Company, such agreements, instruments or documents which he, in his sole and absolute discretion, deem necessary or desirable to facilitate or carry out the Purchase of the Property and that the Company and the Members of the Company shall be bound by all such acts; and

IT IS FURTHER RESOLVED, that the Company hereby ratifies and affirms all of the actions heretofore taken by the Authorized Person and/or the Company in connection with the Purchase of the Property; and

The undersigned Member further certifies:

1.      that these resolutions and the conduct of the Meeting were in full compliance with and in due observance of the Operating Agreement;

2.      that the Company is a Georgia limited liability company and is in good standing with the Secretary of State's office in the State of Georgia;

3.      that the following are all of the Members and Managers of the Company and that the signatures set forth opposite the Member's or Manager's name is that Members and

RE.Southern Sisters.PurchaserResolution.20

Managers true and correct signature and their signature constitutes their consent to these resolutions:

| Name | Title | Signature |
|------|-------|-----------|
| King Group Mgmt, LLC | Manager/ Member<br><br>50% Membership Interest | King Group Mgmt, LLC<br>a Georgia limited liability company<br><br>By: _____<br>Sahib Singh Arora, Manager |
| Crown Assets, LLC | Member<br>50% Membership Interest | Crown Assets, LLC<br>a Georgia limited liability company<br><br>By: _____<br>Karan Singh Ahuja, Manager |

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Company, effective this _____ day of January, 2020.

**ZILLIONAIRE ASSETS, LLC**
a Georgia limited liability company
By: King Group Mgmt, LLC
Its manager

By: _____
Sahib Singh Arora, Manager

RE.Southern Sisters.PurchaserResolution.20

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CROWN ASSETS, LLC, | ) | Case No. 20-21451 |
| | ) | |
|     Debtor. | ) | Chapter 11 |
| | ) | |
| _____ | ) | |
| | ) | |
| SAHIB ARORA; VINEET SINGH; | ) | Removed Case: |
| KING GROUP MGMT, LLC; | ) | |
| MAHARAJA INVESTMENTS, LLC; and | ) | Fulton County, Superior Court, |
| ZILLIONAIRE ASSETS, LLC, | ) | Case Number 2020CV339119 |
| | ) | |
|     Petitioners, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No.: |
| | ) | |
| CHARANJEEV SINGH; KARAN S. AHUJA; | ) | 20-02041-JRS |
| JARNAIL SINGH; JONIKA ARORA; | ) | |
| CROWN ASSETS, LLC; 2551 E PINETREE | ) | |
| BLVD MGMT LLC; 2551 EAST PINETREE | ) | |
| BLVD LLC; 4319 COVINGTON HWY LLC; | ) | |
| 140 W DYKES STREET LLC; 1604 E | ) | |
| OGLETHORPE BLVD LLC; KING ASSETS, | ) | |
| LLC; and 2505 S MAIN STREET, LLC, | ) | |
| | ) | |
|     Respondents. | ) | |
| _____ | ) | |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies under penalty of perjury that he served the foregoing pleading

on all counsel or parties of record in this adversary proceeding by filing a copy of same with the

Court's CM/ECF system, which will automatically provide a copy of same to such counsel or

parties.  The undersigned further certifies under penalty of perjury that he served the foregoing

pleading, pursuant to Fed. R. Bankr. P. 7004 and Fed. R. Civ. P. 5(b)(F), made applicable to this

adversary proceeding pursuant to Fed. R. Bankr. P. 7005 on the following by causing a copy of

same to be deposited in the U.S. Mail, postage prepaid, addressed as follows:

Sahib Arora
660 Belgrave Lane
Tucker, Georgia 30084

Vineet Singh
660 Belgrave Lane
Tucker, Georgia 30084

King Group Mgmt LLC
Attn: Gobind Madan, CPA, Registered Agent
1150 Faith Avenue SE
Atlanta, Georgia 30316

Zillionaire Assets LLC
Attn: Gobind Madan, CPA, Registered Agent
1150 Faith Avenue SE
Atlanta, Georgia 30316

Maharaja Investments LLC
Attn: Sahib Arora, Registered Agent
660 Belgrave Lane
Tucker, Georgia 30084

And by causing a copy of same to be deposited in the U.S. Mail, postage prepaid, addressed as

follows and by Electronic Mail, addressed as follows:

Michael A. Dominy
The Dominy Law Firm, LLC
729 Piedmont Ave NE
Atlanta, GA 30308
michael@dominylaw.net
*Counsel for the Petitioners*

Ramsey A. Knowles
Jared K. Hodges
Knowles Gallant LLC
6400 Powers Ferry Road – Suite 350
Atlanta, Ga 30339
rknowles@knowlesgallant.com
jhodges@knowlesgallant.com
*Counsel for 2551 East Pinetree Blvd LLC*

This 28th day of October, 2020.

/s/ David S. Klein
David S. Klein
Georgia Bar No. 183389
dklein@rlklawfirm.com