**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CROWN ASSETS, LLC, | ) | Case No. 20-21451 |
| | ) | |
| Debtor. | ) | Chapter 11 |
| _____ | ) | |
| | ) | |
| SAHIB ARORA; VINEET SINGH; | ) | Removed Case: |
| KING GROUP MGMT, LLC; | ) | |
| MAHARAJA INVESTMENTS, LLC; and | ) | Fulton County, Superior Court, |
| ZILLIONAIRE ASSETS, LLC, | ) | Case Number 2020CV339119 |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No.: |
| | ) | |
| CHARANJEEV SINGH; KARAN S. AHUJA; | ) | 20-02041-JRS |
| JARNAIL SINGH; JONIKA ARORA; | ) | |
| CROWN ASSETS, LLC; 2551 E PINETREE | ) | |
| BLVD MGMT LLC; 2551 EAST PINETREE | ) | |
| BLVD LLC; 4319 COVINGTON HWY LLC; | ) | |
| 140 W DYKES STREET LLC; 1604 E | ) | |
| OGLETHORPE BLVD LLC; KING ASSETS, | ) | |
| LLC; and 2505 S MAIN STREET, LLC, | ) | |
| | ) | |
| Respondents. | ) | |
| _____ | ) | |

**RESPONDENTS CHARANJEEV SINGH, KARAN S. AHUJA, JARNAIL SINGH,
JONIKA ARORA, CROWN ASSETS, LLC, 2551 E PINETREE BLVD MGMT LLC, 4319
COVINGTON HWY, LLC, 140 W DYKES STREET LLC, 1604 E OGLETHORPE
BLVD, LLC, KING ASSETS, LLC, AND 2505 S MAIN STREET, LLC'S
MOTION FOR SANCTION RELATING TO PERJURY WITH
<u>MEMORANDUM OF LAW IN SUPPORT</u>**

Respondents Charanjeev Singh, Karan S. Ahuja, Jarnail Singh, Jonika Arora, Crown

Assets, LLC,  2551 E Pinetree Blvd Mgmt LLC, 4319 Covington Hwy, LLC, 140 W Dykes Street

LLC, 1604 E Oglethorpe Blvd, LLC, King Assets, LLC, and 2505 S Main Street, LLC (the

"**Crown Parties**") file this Motion for Sanctions Relating to Perjury and Memorandum of Law in Support, and respectfully show the Court as follows:

## INTRODUCTION

The Crown Parties do not take lightly the seriousness of the matters presented in this Motion. Knowing that the facts and law support the Crown Parties' defenses and counterclaims in this case, the Crown Parties have nevertheless been subjected to the abusive litigation initiated and continued by the Petitioners. The Petitioners' story has never "added up," and as shown herein, the Petitioners have engaged in a pattern of perjurious statements in an effort to hold the Crown Parties and their respective livelihoods hostage. The Petitioners have used their perjury to bring the claims presented in this Court, as well causing the dispute this Court remanded back to Thomas County Superior Court, and furthermore, have used their perjury to interfere with the Debtor's properties through the improper recording of lis pendens.

As shown herein, the Petitioners' conduct is outrageous. There are five separate topics on which it is indisputable the Petitioners have made conflicting sworn statements. Those issues involve: (a) Maharaja Investments, LLC's source of the funds for the purchase of the Thomasville property, (b) the membership of Maharaja Investments, LLC, (c) the membership of King Group MGMT, LLC, (d) the membership of Zillionaire Assets, LLC, (e) the nature and timing of the alleged threats, and (f) a real estate transfer made by the Petitioners to a witness represented by Petitioner's counsel during the pendency of this case.

The Crown Parties believe that the only appropriate remedy to the Petitioners' extreme abuse of the legal system is to dismiss the Petitioners' claims with prejudice and to order that the associated lis pendens be cancelled.

<u>**ARGUMENT AND CITATION TO AUTHORITY**</u>

**I.    The Legal Authority Supporting Imposition of Sanctions.**

It is well-established that the Court has inherent authority to fashion sanctions, including

dismissal, for abuse of the judicial process.  The District Court addressed the same by stating:

> Beyond the purview of the sanctions provisions located within the federal
> rules and statutes, " '[c]ourts have the inherent power to police those
> appearing before them.' " <u>Hernandez v. Acosta Tractors Inc.</u>, 898 F.3d
> 1301, 1306 (11th Cir. 2018) (quoting <u>Purchasing Power, LLC v. Bluestem
> Brands, Inc.</u>, 851 F.3d 1218, 1223 (11th Cir. 2017)). This inherent power
> includes the authority to fashion sanctions for conduct that is an abuse of
> the judicial process. <u>Id.</u> This power stems not from a rule or statute, but
> rather from " 'the control necessarily vested in courts to manage their own
> affairs so as to achieve the orderly and expeditious disposition of cases.'
> " <u>Purchasing Power, LLC</u>, 851 F.3d at 1223 (citing <u>Chambers v. NASCO,
> Inc.</u>, 501 U.S. 32, 43 (1991)). "Because of their very potency, inherent
> powers must be exercised with restraint and discretion" and in compliance
> with the mandates of due process. <u>Chambers</u>, 501 U.S. at 44, 50.
>
> "The key to unlocking [this] inherent power is a finding of bad
> faith." <u>Sciarretta v. Lincoln Nat. Life Ins. Co.</u>, 778 F.3d 1205, 1212 (11th
> Cir. 2015) (citing <u>Barnes v. Dalton</u>, 158 F.3d 1212, 1214 (11th Cir. 1998)).
> More specifically, this inherent authority may be utilized "to sanction a
> party who has acted in bad faith, vexatiously, wantonly, or for oppressive
> reasons." <u>Marx v. Gen. Revenue Corp.</u>, 568 U.S. 371, 383 (2013). "Bad
> faith exists when the court finds that a fraud has been practiced upon it, or
> 'that the very temple of justice has been defiled ...' " <u>Allapattah Svcs., Inc.
> v. Exxon Corp.</u>, 372 F. Supp. 2d 1344, 1373 (S.D. Fla. 2005)
> (quoting <u>Chambers</u>, 501 U.S. at 46).
>
> Particularly, this Circuit has held that a court imposing sanctions pursuant
> to its inherent power must make a finding that the party to be sanctioned
> acted   in *subjective* bad   faith. <u>Hernandez</u>,   898   F.3d   at   1306
> (quoting <u>Purchasing Power, LLC</u>, 851 F.3d at 1224); <u>Deshon v. Circle K
> Stores, Inc.</u>, No. 17-CV-80482, 2018 WL 566840, at *1 (S.D. Fla. Jan. 26,
> 2018) (discussing that Eleventh Circuit has held that the standard for courts'
> inherent authority is a subjective bad-faith standard); <u>Kalch v. Raytheon
> Tech. Svcs. Co., LLC</u>, No. 6:16-CV-1529-Orl-40KRS, 2017 WL 3088049,
> at *1 (M.D. Fla. July 20, 2017) (the key to unlocking the court's inherent
> authority is bad faith, requiring direct evidence that the party "accused of
> the misconduct acted with the subjective intent to abuse the judicial
> process") (citing <u>Purchasing Power, LLC</u>, 851 F.3d at 1223-24). However,
> a district court must not merely conclude that an individual has acted in bad

faith; instead, unless the evidence is uncontroverted, it must make findings regarding the individual's conduct upon which the sanctions are premised. Byrne v. Nezhat, 261 F.3d 1075, 1123 (11th Cir. 2001) abrogated on other grounds, Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639 (2008); Rothenberg v. Sec. Mgmt Co., 736 F.2d 1470, 1472 (11th Cir. 1984).

Notably, this Circuit has mandated that the inherent authority to impose sanctions must be exercised with "restraint and discretion," and is "not a remedy for protracted litigation," but rather "it is for rectifying disobedience...." Purchasing Power, LLC, 851 F.3d at 1225 (citing Chambers, 501 U.S. at 44). Accordingly, "[c]ourts considering whether to impose sanctions under their inherent power should look for disobedience and be guided by the purpose of vindicating judicial authority." Id.

In fashioning an appropriate sanction for conduct that abuses the judicial process, courts have discretion to dismiss a lawsuit, recognized as "a particularly severe sanction," as well as to "assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Chambers, 501 U.S. at 45-46 (internal citations omitted). However, dismissal with prejudice, though the most severe sanction, can be appropriate when (1) a party's misconduct was willful or in bad faith; and (2) lesser sanctions will not suffice to remedy the party's misconduct. Neal v. IMC Holdings, Inc., No. 1:06-CV-3138-WSD/AJB, 2008 WL 11334050, at *4 (N.D. Ga. Oct. 20, 2008) R&R adopted, 2009 WL 10669622 (N.D. Ga. Mar. 31, 2009) (citing Betty K Agencies, Ltd., v. M/V MONADA, 432 F.3d 1333, 1338 (11th Cir. 2005)). Furthermore, "... dismissal with prejudice is thought to be more appropriate in a case where a party, as distinct from counsel, is culpable." Betty K Agencies, Ltd., 432 F.3d at 1338.

Crider v. Amerigas Propane, Inc., No. 116CV04331ELRLTW, 2018 WL 7019354, at *5–6 (N.D. Ga. Dec. 7, 2018), report and recommendation adopted, No. 1:16-CV-04331-ELR, 2019 WL 1178424 (N.D. Ga. Jan. 17, 2019); See also, Lambert v. Worldwide Mktg. Techs. Corp., 708 F. App'x 559, 562 (11th Cir. 2017); Forsberg v. Pefanis, No. 1:07-CV-3116-JOF-RGV, 2009 WL 10668304, at *3 (N.D. Ga. Feb. 23, 2009); Combs v. Rockwell Int'l Corp., 927 F.2d 486, 488 (9th Cir. 1991); Carter v. Gen. Car & Truck Leasing Sys., Inc., 218 F.R.D. 180, 182–83 (N.D. Iowa 2001); Knapp v. Convergys Corp., 209 F.R.D. 439, 442–43 (E.D. Mo. 2002).

II.     **Petitioners' Pattern of Perjury.**

a.  **The Money Used to Purchase the Thomasville Property.**

In their verified complaint filed with the Court, the Petitioners have misrepresented that the $700,000 used by Maharaja Investments, LLC came from the personal savings of Sahib Arora and Vineet Singh: "The $700,000 that Maharaja paid to purchase the 50% interest in Pinetree Plaza, free and clear, came out of Dr. Arora's and Vineet's pockets and was the product of years of hard work and prudent action."  [Doc. 28, ¶ 121; See also, Doc. 28, ¶ 40 ("The $700,000 was the product of years of hard work and represented practically all of Dr. Arora's and Vineet's Savings."); Doc. 1, Ex. A, p. 27, ¶ 40; Doc. 1, Ex. A, p. 55, ¶ 121].  Petitioner Sahib Arora acknowledged that he signed a verification of the complaint.  (*Deposition of Sahib Arora*, March 3, 2021, 76:6-9)[1]

Notwithstanding the statements in the verified complaints as to the $700,000 coming out of the pockets of Dr. Arora and Vineet Singh, Dr. Arora's deposition testimony clearly establishes that the statements in the complaints were outright misrepresentations.

> Q:  Where did Maharaja Investments, LLC obtain $700,000.00 in cash to purchase an interest in the Pinetree Plaza Shopping Center?
> A:  Money was wired from King Group MGMT and money came into King Group from Zillionaire Assets Refinance.

(*Sahib Depo*, 72:9-14).  Dr. Arora went on to also confirm that the money was not the personal savings of Vineet Singh.  (*Sahib Depo*, 75: 5-7).

In sworn statements, all made by Petitioner Sahib Arora, there are irreconcilable statements regarding the source of the $700,000.  In the pleadings, it is the personal savings of Sahib Arora and Vineet Singh, and is overdramatized, but when questioned in deposition, Sahib Arora testified

---

[1] The *Deposition of Sahib Arora*, March 3, 2021, is attached hereto as **Exhibit A**, and is hereby incorporated by reference.  It will be hereinafter cited as "Sahib Depo."

that the money came from King Group MGMT, LLC, and that the money originated from the refinancing of a piece of real estate.

### b. Maharaja Investments, LLC Membership Circus

Unfortunately, the source of the $700,000 is not the only misrepresentation relating to Maharaja Investments, LLC. In addition, there are conflicting sworn statements regarding the membership of Maharaja Investments, LLC.

In their verified complaint filed with the Court, the Petitioners claim that they signed the Amended and Restated Operating Agreement of Maharaja Investments, LLC, dated August 14, 2019 ("Amended Maharaja Agreement"), under duress, and that the document is therefore invalid. [Doc. 28, ¶ 153; Doc 1., Ex. A, p. 65, ¶ 153]. The original complaint in this action was filed with the Fulton County Superior Court on August 7, 2020. [Doc. 1, p. 10].

Throughout this litigation, including in their verified pleadings, the Petitioners have maintained that the Amended Maharaja Agreement is the result of duress and is invalid. However, notwithstanding their claims that the document is invalid, as shown below, Sahib Arora and Vineet Arora filed affidavits in the real estate records of Thomas County, expressly relying on the Amended Maharaja Agreement as the basis for their statements. In this case, the Petitioners take the position that the Amended Maharaja Agreement is invalid; however, they have signed affidavits claiming authority from the Amended Maharaja Agreement.

> Q: And did you sign an affidavit pertaining to title that was filed in
> the Thomasville case?
> A: Yes.
> Q: Excuse me, the Thomasville real estate records, correct?
> A: Yes.

(*Sahib Depo*, 78:5-10).

> Q:  In your affidavit, you said you said you were the managing member of Maharaja Investments, LLC?
> A:  Uh-huh.
> Q:  What document were you relying on when you stated that?
> A:  I was relying on the August 14th Maharaja Operating Agreement.
> Q:  And that document is one of the documents you are contending was coerced, correct?
> A:  Yes.

(*Sahib Depo*, 78:21 – 79:7).

Petitioner's counsel in this matter also drafted the referenced affidavit filed in Thomas County.  (*Affidavit Pertaining to Title*, Sahib Arora, June 3, 2020)[2].   In the aforementioned affidavit, Sahib Arora claimed to be the Managing Member of Maharaja Investment, LLC, in reliance on the Amended Maharaja Agreement.  (*Exhibit B*, ¶ 2).  Sahib Arora further swore that "[a]s of August 19, 2019, being the date of the Quitclaim Deed, I possessed sole legal authority to act on behalf of Maharaja as its authorized agent in conveyancing real property."  (*Exhibit B*, ¶ 7).

Unfortunately, that is not where the misrepresentations by Petitioners regarding the membership of Maharaja Investment, LLC concludes.

> Q:  Exhibit 5.  So we have Exhibit 5 here which is a communication from your counsel in which he attaches a copy of the Operating Agreement for Maharaja showing Vineet as the 100 percent member as of this email being on August 11, 2020, correct?
> A:  Uh-huh.
> Q:  And is this an accurate statement regarding the membership of Maharaja at that time?
> MR. DOMINY: You are asking if what I said is accurate?
> MR. THIRY: Yes.
> MR. DOMINY: Of course it is.
> THE WITNESS: What is your question?
> BY MR. THIRY:
> Q:  So on the date that Mr. Dominy sent this email which is August 11th of 2020, was Vineet 100 percent owner of Maharaja?
> A:  Yeah.  Vineet is 100 percent owner because we are not counting that August 14th agreement signed in the US.

---

[2] A true and correct copy of the referenced affidavit is attached hereto as **Exhibit B**, and is hereby incorporated by reference.

> Q: Setting aside the August 14th agreement, you're saying –
> A: Vineet is 100 percent owner, yes, that is correct. That is a fact.

(*Sahib Depo*, 146:19 - 147:19). Notwithstanding the filing of the affidavit, dated June 2, 2020, with Thomas County, Petitioners are claiming that as of August 11, 2020, Vineet Singh is the sole member of Maharaja Investments, LLC. However, it does not stop there, as the interrogatory responses provided by Maharaja Investments, LLC, verified by Sahib Arora the day before his deposition, state otherwise. Per Maharaja Investment, LLC's interrogatory responses, the membership history of Maharaja Investments, LLC is as follows:

- June 9, 2019 (formation) through August 14, 2019: Vineet Singh, sole member;

- August 14, 2019 through April 30, 2020 (which Petitioners claim is invalid): Vineet Singh (25%), Sahib Arora (25%), Karan Ahuja (25%), and Charanjeev Singh (25%);

- April 30, 2020 through present: Vineet Singh (50%) and Sahib Arora (50%).

(*Petitioner Maharaja Investments, LLC's Supplemental Responses to Crown Assets LLC's First Set of Interrogatories*, March 2, 2021, p.2, No. 5). A true and correct copy of the aforementioned is attached hereto as **Exhibit C**, and is hereby incorporated by reference. The Petitioners are not waiting on the Court to resolve the validity of the Amended Maharaja Agreement, and have, instead, unilaterally elected to strip Karan Ahuja and Charanjeev Singh of their respective membership interests provided by the Amended Maharaja Agreement. However, that is an issue for another day. The interrogatory responses directly conflict with the deposition testimony (both provided by Sahib Arora under oath within one day of each other).

The membership history, as provided by Maharaja Investments, LLC through its interrogatory responses verified by Sahib Arora, the deposition testimony of Sahib Arora, the position taken in the sworn pleading in this case in comparison to the position taken in the affidavit filed in Thomas county cannot be reconciled.

When convenient to Petitioners' story, the Amended Maharaja Agreement is invalid. When convenient to Petitioners' story, the Amended Maharaja Agreement is valid. When convenient, Vineet Singh is the sole member of Maharaja Investments, LLC. When convenient, Vineet Singh is not the sole member of Maharaja Investments, LLC. As with all of the Petitioners' allegations, the facts morph as needed. However, in switching back and forth out of convenience, Petitioner Sahib Arora has signed sworn statements under oath that cannot be reconciled.

### c. King Group MGMT, LLC Membership Circus

The membership history of King Group MGMT, LLC, according to the conflicting statements of Sahib Arora, is more than contradictory. However, the Petitioners' actual response, as shown herein, as to the membership history of King Group MGMT, LLC is that the membership is whatever Sahib Arora wants it to be at any given time. Moreover, after the close of a tax year, Sahib Arora contends he has the authority to reach back into the previous year and change the membership for purposes of reporting the membership to the Internal Revenue Service in the company's tax returns, as opposed to being required to close the books as of the end of the tax year.

Below, the myriad of irreconcilable sworn statements are addressed in more detail. However, before getting into those details, the list below provides a quick summary of the different conflicting King Group MGMT, LLC membership statements made by Sahib Arora:

1. 2019 – Sahib Arora signed real estate transaction documents as the sole member.

2. February 20, 2020 – Sahib Arora signed deed as the sole member. (*Sahib Depo*, 119:3-11);

3. The interrogatory responses with Sahib Arora as the sole original member, followed by interests to several family members, followed by Sahib Arora and Karan Ahuja as the only

two partners, and followed finally by Sahib Arora returning to being the sole member. *(Petitioner King Group MGMT LLC's Responses to Crown Assets LLC's First Set of Interrogatories*, January 25, 2021, p.3, No. 5.   A true and correct copy of the aforementioned is attached hereto as **Exhibit D**, and is hereby incorporated by reference.).

4.  Sahib Arora was the sole member of King Group in February of 2020, and added Vineet Singh as a member later.  (*Sahib Depo* 186:12-16).

5.  The 2019 King Group MGMT, LLC tax return indicates that Sahib Arora was 49% member for the entirety of 2019 and Vineet Singh was 49% member for the entirety of 2019.  A true and correct copy of the Form K-1s included within that tax return, redacted to remove personal information, are attached hereto as **Exhibit E**, and are hereby incorporated by reference.

Sahib Arora acknowledged that he signed real estate transaction documents in both 2019 and 2020 as the sole member of King Group MGMT, LLC:

> Q: Before you go on to the tax return.  Did you sign any documents on behalf of King Group as the sole member of King Group in 2019?
> A: In closings?
> Q: Yes.
> A: Yes, I did.
> Q: Did you sign any documents as the sole member of King Group in 2020?
> A: In February, closing of Snapfinger, yes.  Snapfinger property I signed as sole member and Ahuja signed as sole member for Crown.
> Q: And that is sole member of King Group, correct?
> A: I signed as sole member of King Group MGMY, LLC for the record.

(*Sahib Depo* 178:8 – 181:24).  His claim to being the sole member of King Group in 2019 and 2020 is consistent with King Group's interrogatory responses, which stated that per the Interrogatory responses, verified by Sahib Arora, all of the members of King Group since its inception on or around October 27, 2014 were as follows:

When King Group was formed on October 27, 2014, Dr. Sahib Arora was the sole Organizer and its sole Member and Manager. In July 2016, Dr. Arora instructed King Group's accountant to file the tax returns for 2015 reflecting the following Members and ownership percentages: 1. Sahib Arora – 12%; 2. Meharban Arora – 11%; 3. Neeta Arora – 11%; 4. Harsimran Arora – 11%; 5. Vineet Singh – 11%; 6. Jarnail Singh – 11%; 7. Charanjeev Singh – 11%; 8. Jonika Arora 11%; 9. Karan Singh Ahuja – 11%. The tax returns for 2016 reflected the same Members and ownership percentages. In 2018, all parties agreed that in the 2017 and subsequent years, profits would be distributed to Sahib Arora as 89% Membership owner and Karan Ahuja as 11% Membership owner. Although Ahuja transferred his 11% interest to Sahib Arora in connection with the August 14, 2019 coerced transactions, Dr. Arora has made a continuing tender of the interest back to Ahuja. Sahib Arora has continuously served as Manager of King Group since it was formed.

(*Exhibit D*, p.3, ¶ 5). However, this interrogatory response fails to mention Vineet Singh being added back as a member of King Group.

Q: So in February 2020 when you signed as the sole member of King Group, you were not the sole member of King Group, correct?
A: I was the sole member of King Group at that time, but I added Vineet later.

(*Sahib Depo* 186:12-16). Per Sahib Arora's testimony, which again conflicts with his prior acts as the sole member of King Group in 2019 and 2020, and further conflicts with the history of membership recited in the interrogatory response verified by Sahib Arora, the current members of King Group are Sahib Arora with 51% and Vineet Singh with 49%:

Q: Who are the current members of King Group?
A: As of 2021?
Q: As of today.
A: I am 51 percent and I added Vineet Singh as 49 percent.
Q: When did that happen?
A: That happened last year.
Q: So in 2021?
A: Yeah. 2019, 2020 I would say.
MR. DOMINY: Are you sure about that answer?
THE WITNESS: After Ahuja is out.

(*Sahib Depo* 176:12-176:24).  As shown above, his own lawyer improperly interjected a question into the deposition to confirm the answer.

Also in conflict with the interrogatory responses and the signing documents as the sole member in both 2019 and 2020 is the 2019 tax return for King Group, which was provided by the Petitioners during discovery.  As shown on the 2019 tax returns, for the full year of 2019, Sahib Arora was the 51% member and Vineet Singh was the 49% member.  (*Exhibit E*).  When confronted with his irreconcilable statements, Sahib Arora attempted to avoid the issue by proclaiming counsel's brain was insufficient to understand:

> Q: So let's talk about what the document is, because K-1 on it has a big bold statement that says partners' share of income deductions and credits.
> A: I told you I added Vineet as member 49 percent.  He is just going again round and round.
> Q: No. I am trying to understand –
> A: You can't understand.  I tried to explain you three, four times. You can't understand.
> Q: Why can't I understand it?
> A: You don't have the brain to understand.

(*Sahib Depo*, 183:23 – 184:8.).

The percentages shown on the tax returns, confirmed by Sahib Arora, are in direct conflict with the interrogatory responses in two ways.  First, there is no mention in the interrogatory response of Vineet Singh being a member in 2019.  Second, the interrogatory response indicates that Karan Ahuja was an 11% member of King Group through August 14, 2019.  As such, Karan Ahuja should have been included within the Form K-1s of the company, but was not. (*See Exhibit E*, pp. 8-18).  When pressed on the issue of Karan Ahuja not receiving a K-1 from King Group, even though Sahib Arora stated Karan Ahuja's interest was transferred to him in August of 2019, Sahib Arora attempted to explain it by playing a shell game with the membership interest of King Group and the membership interest in Zillionaire Assets, LLC:

> MR. DOMINY: He needs to know why Ahuja is not 11 percent on there.
> THE WITNESS: Ahuja gave – Ahuja got 11 percent from Zillionaire Assets, LLC.

(*Sahib Depo*, p 185:25-186-4).  However, Sahib Arora's unilateral effort to move membership interests from one entity to another does not answer why Karan Ahuja, who Sahib Arora acknowledges was a member in King Group until August of 2019, did not receive a K-1 for 2019.  This cannot be reconciled with slight of hand and an "I can do what I want" response.

Moreover, in conflict with Sahib Arora's testimony that he added Vineet Singh as a member in 2020 retroactively to January 1, 2019, there is an operating agreement for King Group MGMT, LLC, which Petitioners did not produce in discovery and was obtained from a law firm involved in a real estate transaction.  A true and correct copy of that operating agreement is attached hereto as **Exhibit F**, and is hereby incorporated by reference.  This operating agreement purports to be executed on September 19, 2019, and sets forth that the members of King Group MGMT, LLC are Sahib Arora (51%) and Vineet Singh (49%).  This is yet another example of the irreconcilable changing facts regarding the membership of King Group MGMT, LLC.

Vineet Singh would not affirmatively testify as to when he regained a membership interest in King Group MGMT, LLC:

> Q: Were you a member of King Group in 2019?
> A: Yes. My brother would have included me and I was.
> Q: When were you added as a member in 2019 to King Group?
> A: Look, it's my brother entity this King Group.  We could include me at anytime and kick me out at anytime.  I don't remember when he put me in.

(Deposition of Vineet Singh, March 5, 2021, 95:9-16)[3].

> Q: Are you currently a member of King Group?

---

[3] The Deposition of Vineet Singh, March 5, 2021, is attached hereto as **Exhibit G**, and is hereby incorporated by reference.  This deposition will hereinafter be cited as "Vineet Depo."

A: It is my brother's entity.  If you say you are a member, then I am.
If it says you are not, then I am not.

Q: Okay. That wasn't my question.  I said: Right now are you a
member of King Group?

A: The tax return is to be amended. We have two --- maybe the King
Group will go into my brother's name.  We haven't decided on
anything yet.

Q: I am going to ask the question again.  As of right now are you a
member of King Group?

MR. DOMINY: Objection to form.

MR. KLEIN: What is the form objection, Michael?  What is the
form objection? Are you going to withdraw that?  How was that –
where is the form objection?  Is he a member right now or not? I'm
asking him these simple questions and I'm getting this 89/11 stuff
back every time.  Do we need to take a break so you can talk to him?

MR. DOMINY: Hang on.

MR. KLEIN: I mean, I've been very nice to him –

MR. DOMINY: I know you have.

MR. KLEIN: -- these past three days.

MR. DOMINY: I know you have. Hang on. Hang on.

MR. KLEIN (Resuming)

Q: Are you a member of King Group as of right now at this moment?

A: I do not know.

(*Vineet Depo* 95:25-97:7).

Q: Okay. Do you remember signing this deed that's been placed in
front of you as a member of King Group on August 17, 2019?

A: I told you it's my brother's membership.  If he makes me a
member, then I sign as a member.

Q: Okay. Do when did he make you a member before I signed this
deed?  What was the date?

A: I don't remember.

Q: What operating agreement was sent to the attorney at Sherman &
Phalen for this closing?

A: It would be a valid document.  We do not indulge in any illegal
activity, the way they shows the agreement for Pinetree Shopping
Center.

(*Vineet Depo* 98:5-17).  As shown by the sworn testimony of both Sahib Arora and Vineet Singh,

the membership interests in King Group are a shell game, changing at the whim of Sahib Arora,

who changes his mind in one year and causes tax reporting for previous years to retroactively be

changed to reflect his desires (i.e. not contemporaneously occurring in the tax year to match the

reporting to the Internal Revenue Service). If it were so easy to adjust the membership interests

retroactively, it makes no sense why transactional lawyers feel so compressed at the end of a year

to complete certain deals for tax purposes. In Sahib Arora's world, he controls everything, so he

will do what he wants when he wants. He changes the facts, even if doing so causes the record to

be replete with irreconcilable sworn statements. If the current facts are not convenient or do not

meet his wishes, Sahib Arora has the power to go back in time and change the facts as he desires.

> Q: So you don't go back in time after a year closes and change who
> the members of the company are per your testimony today?
> A: It's my entity, I can do how I want to distribute.
> Q: Okay.
> A: Yeah.
> Q: That's great.
> A: As long as everything, all the taxes are being paid, everything is
> all member are happy, it can be done. It is my entity, I can do 10
> percent, I can do 50 percent, I can do 100 percent interest. It is my
> entity. Yeah. Can we move on to the next question now?

(*Sahib Depo* 188:24-189:12). As shown above, there are multiple irreconcilable sworn statements

regarding the membership history of King Group MGMT, LLC.

There is also a conflict of facts in the pleadings regarding the nature of the 11% interests

provided to several of the respondents. In Petitioners' complaint, Petitioners claim that Sahib

Arora gifted the 11% interests. [Doc 1, p. 9, ¶ 15]. However, in Petitioners' *Answer and

Affirmative Defenses to Counterclaim*, Petitioners acknowledge that at the time the 11%

memberships were provided, certain family members invested a sum total of approximately

$180,000 in King Group. [Doc. 27, p. 7, ¶ 31]. Sahib Arora also acknowledged this contribution

during his deposition. (*Sahib Depo*, 164:13-16).

> Q: Did the facts from 2014 change between August 7 or '20 when
> you filed your Complaint and 11/28/2020 when you filed your reply
> to the counterclaim?
> A: Did something change?

> Q: Yeah. Did something change about the facts in 2020 that changed
> it from an investment –
> A: Facts of the case are the same.  Your clients are fraudsters, they
> defrauded, like it's mentioned in the Complaint.  Whatever those
> equities are mentioned, they did.   That is what they did.  Yeah.
> Q: So what does – so what does talking about my clients being
> fraudsters have to do with the difference between a gift or
> investment in your two documents?
> MR. DOMINY: Object to the form.
> THE WITNESS: You are going round and round on your questions.
> Repeat your question.
> BY MR. THIRY:
> Q: I asked you, what changed from August 7 of 2020 when you filed
> your Complaint to 11/28 of 2020 –
> A: I don't know what changed.  Nothing changed to my knowledge.
> Yeah.

(*Sahib Depo*, 168-6 - 169:6).  Sahib Arora calls the transfer of the 11% interests in King Group

MGMT, LLC "gifts," even though he acknowledges that the membership interests were provided

with an exchange of an investment.  Again, the conflicting statements of Sahib Arora cannot be

reconciled.

### a.   Zillionaire Assets, LLC Membership Circus

Like has been shown with Maharaja Investments, LLC and King Group MGMT, LLC, the

membership history of Zillionaire Assets, LLC is also a circus.  According to the 2019 Zillionaire

Assets, LLC tax return provided by Petitioners, the 2019 membership of Zillionaire Assets, LLC

consisted of King Group MGMT, LLC (89%) and Karan Ahuja (11%).  *Exhibit H*, pp. 8-11.  A

true and correct copy of the aforementioned tax return, redacted, is attached hereto as **Exhibit H**,

and is hereby incorporated by reference.   Sahib Arora confirmed the accuracy of this during his

deposition.  *Sahib Depo*, 158:19-159:5.

The tax return and Sahib Arora's deposition testimony directly conflict with the

interrogatory response provided by Zillionaire Assets, LLC, for which Sahib Arora signed the

verification.  A true and correct copy of the interrogatory responses are attached hereto as **Exhibit**

**I**, and are hereby incorporated by reference:

> Identify all members (and their respective membership interests), officers, and registered agents of Zillionaire since its inception on or around December 18, 2018.
> ANSWER: King Group MGMT LLC ("King Group").  A 50% Membership Interest was transferred to the Debtor, Crown Assets, LLC, according to the Amended and Restated Operating Agreement of Zillionaire Assets, LLC dated November 20, 2019, which Petitioners seek to rescind.

(*Exhibit H*, p. 3).  The interrogatory response mentions nothing of Karan Ahuja ever owning an

interest in Zillionaire Assets, LLC, which is in direct conflict with the tax return and Sahib Arora's

testimony.  In an effort to explain away his perjury, Sahib Arora crafted a response to why Ahuja

was listed as an 11% owner:

> Q: Can you explain to me how your Interrogatory responses do not match your 2019 tax return?
> A: I can explain you the return, the tax return.
> Q: Okay. Start there.
> A: Okay. So Zillionaire Assets had one member, King Group MGMT, LLC.  Under King Group I am 89 percent and he is 11 percent and –
> MR. DOMINY: Who is 11 percent?
> THE WITNESS: Karan Ahuja.  Indirectly Ahuja is 11 percent in Zillionaire Assets.  So 11 percent ownership to him.  And since he did a bill of sale for 11 percent back to me which is King Group and 89 percent goes to K-1 to King Group.  So that is the explanation for it to your question.
> Q: So if I am understanding what you are saying correctly, that the schedule K-1s that are attached to this reflect the ownership of King Group as opposed to the ownership of Zillionaire Assets?
> A: Is reflect what it reflects.  You can go round and round on the question.  It reflects what it's reflecting.

*Sahib Depo*, 159:16-17.  What it is not reflecting is an accurate representation of the membership

of Zillionaire Assets, LLC.  In addition, contrary to the attempted side-step by Sahib Arora, the K-

1s do not reflect the ownership of King Group MGMT, LLC either, as King Group MGMT, LLC,

and not the members thereof, received a 2019 K-1 from Zillionaire Assets, LLC.  However, this

answer conflicts with Sahib Arora's previous testimony and the 2019 tax return of King Group

MGMT, LLC, wherein Karan Ahuja is not listed as an owner (i.e. there is no K-1, even a partial-

year K-1 for Karan Ahuja in 2019).  Again, the Petitioners' versions of their own facts cannot be

reconciled.

### b.  Misrepresentations Regarding Threats

#### i.  Direct v. Indirect Threats

Sahib Arora's deposition testimony conflicted on multiple occasions as to whether he

received any direct threats from the Respondents.  For clarification as to what a "direct" versus

"indirect" threat is, Sahib Arora was provided the following explanation:

> Q: Okay. Let me give you an example.  If I threaten Michael then
> tell him – if I give him a threat and then he tells you about the threat,
> you don't have direct knowledge, you have secondary knowledge,
> Michael has direct knowledge.  He is the person that receives the
> threat.

(*Sahib Depo*, 26:7-13).

> Q: You received direct threats.  When did you receive direct threats?
> A: 2019.
> Q: And from whom did you receive a threat in 2019?
> A: Charanjeev, Jarnail, Karan Ahuja, those three.
> Q: Those three.  And what threats were conveyed to you by
> Charanjeev in 2019?
> A: In 2019.  There are many threats.  First they wanted to be 50
> percent partner in my entity and in MGMT, King Group
> Management, MGMT.  And they will go to any length to get 50%.
> Q: And when you say they will go to any length to get 50 percent –
> A: Including shooting me.
> Q: Including shooting you?
> A: Yeah.
> Q: So are you saying that Charanjeev in 2019 threatened to shoot
> you?
> A: Indirectly.
> Q: Well, how did he indirectly threaten to shoot you?
> A: Through actions and through words.

> Q: Explain to me the threat itself. What was said to you?
> Q: Explain to me the threat itself.  What was said to you?
> A: They were in an argument in July, and so Ahuja came to US in June of 2019, and then when he is here Jarnail and Charanjeev are already here in my house.  They are planning to extort the 50 percent in King Group MGMT, LLC, and the plan was actually when I looked at records, it started in January of 2019, that they wanted 50 percent in everything I had built in my company.  And so in June when Ahuja came here, that is when things started getting aggressive in the house and July they started like making more demands.  I am here with them and we are together living in my house harassing me.  So that is – that is how it started, July.  August 14th they made sure that I give them 50 percent in my entity, and so Charanjeev asked me to give the list of properties, I want 50 percent. Like this is the list in the King Group and other entities. And his father is making threats to my father calling night, like every night throughout the phone, harassing him, I need 50 percent right now, right now, like that was his command.  And so, so August 14th, Charanjeev created a list and then reached out to Joel Haber and Ron.
> MR. DOMINY: I will have to – I am going to object to the responsiveness of this answer. Do you understand the question?  He is asking you what the threats are –
> MR. THIRY: Just so I understand, you are objecting to your own client's responsiveness while he is answering my question?
> MR. DOMINY: According to our stipulation, that is exactly right.

(*Sahib Depo*, 32:16 – 35:1).  Before being interrupted by his own attorney, Sahib Arora provided a long answer, but did not once identify a single direct threat he received, and yet he claimed he received direct threats from Jarnail Singh, Karan Ahuja, and Charanjeev Singh.  After his attorney interjected again, Sahib Arora then conceded that the alleged threats he was aware of were not direct threats, but were, instead, indirect. (*Sahib Depo*, 38:6-24).

However, in the verified complaint, Petitioners stated otherwise: "Defendants represented to Dr. Arora and Vineet that if they agreed to the Coerced Transactions of August 14, 2019, Defendants would not take any action to harm their sister as they had threatened."  [Doc. 28, ¶ 140; See also, Doc. 1, Ex. A, p. 62, ¶ 140].

Q:  Earlier we went through the threats and to whom they were made, and at the end of your testimony on that topic, you testified that none of the Defendants communicated any of the alleged threats directly to you.  And now you're saying in your Complaint that they represented to you these things.  Which is it?

MR. DOMINY: Object to the form.

…

Q:  You can be concerned about them, I am asking about the direct threats.  When we talked about them, so the direct threats, you said just a moment ago now, that you did receive direct threats from my clients regarding not taking actions or actions to harm your sister.

A:  Uh-huh.

Q:  Now, did they directly threaten you regarding your sister?

A:  Did they directly threaten me regarding my sister.  Jarnail did.

Q:  Jarnail directly threatened you?

A:  Repeat your question again, because it's – like your questions are – it's a little bit – can we put it in multiple context, but repeat your question.  Yeah.

Q:  I want to stay in the context of direct threats.  So somebody directly represented to you or directly threatened to you about your sister's wedding or harm to your sister.

A:  Directly. Did they – did one of your – you're saying one of your clients directly.  Jonika threat was conveyed indirectly through Vineet.  Jarnail was also being conveyed to me through Meharban. Charanjeev and Karan, their threats were conveyed indirectly through their father through Meharban and then they were inform and then they tell me what is going on.

Q:  So just to confirm.  Your testimony is that you did not receive direct threats from my clients regarding Harsinran or her wedding, correct?

A: Direct threats.  I am not answering that question because I'm still thinking, because a threat has to come into my mind what date or what month and then I can say yes or no to that question.  But at this point I am unable to recall.

Q:  You are unable to recall whether one of my clients made a direct threat regarding Harsinran?

A: Yes.

Q: But you signed a verification to the Complaint that says that they did make a representation to you regarding those transactions and your sister, right?

MR. DOMINY: Object to form.  It says to him and to  me, right?

MR. THIRY: That is fine.

THE WITNESS: Complaint has me, Vineet, and Meharban.

BY MR. THIRY:

Q:  So let's touch on that for a second.  It says, Defendants represented to Doctor Arora and Vineet.  You are Doctor Arora, correct?

A: Yes.

Q:  So they representing to you something, correct?

A: (Indicating yes.)

Q:  What did they represent to you regarding the threats that were allegedly relating to your sister Harsinran?

MR. DOMINY: Object to form.

THE WITNESS: Defendants.  Who are the Defendants in your case? Who are the Defendants?

BY MR. THIRY:

Q: You sued them.  You tell me.

A: So they are Defendants, right?  Which Defendant are you directing to?

Q: I am asking you.  Any.

A: Any?

Q: Yes.

A:  I have answered your question before also.  Jarnail indirectly threatening and direct threats.  Charanjeev also through Jarnail. Jonika direct threats to Vineet and indirectly conveyed to me.  Yeah.

Q: So I am going to object to the responsiveness of your question, or your response to my question.  The question was whether or not there were direct, and you said three or four time now about the indirect that you received through Vineet or Meharban.  I am asking you whether or not it was represented to you –

A:  I don't recall.

Q:  You don't recall?

A:  I don't recall.

Q:  But you signed a verification for the Complaint saying that you did?

MR. DOMINY: Objection to form.

BY MR. THIRY:

Q: That is fine.  Go ahead.

A: I signed what I signed.  It's in front of you.  Yeah.

(*Sahib Depo*, 128:5 - 133:24).

When being questioned as to the nature of the alleged threats, Sahib Arora asked for an example of the threats:

Q: Okay. So of the threats that were not indirect, what direct threats did Charanjeev make to you in 2019?

A: Can you give me an example? Like –

Q: I wasn't a party of your conversation.

A: Can you give an example?
MR. DOMINY: No, he can't give you an example of threats that
were made to you. So again, please answer his question if you can.
If you don't remember, tell him you don't remember. If there were
indirect threats, tell him they were indirect. If they were direct, tell
him what they were.
THE WITNESS: To retain the title of the shopping center. Like he
stole the shopping center and then he is like I am going to fight it, I
am going to not – like that was a conversation in November of 2019,
so …
BY MR. THIRY:
Q: Other than the threat in November of 2019 regarding the
shopping center, did Charanjeev make any other direct threats to
you?
A: I don't remember.

*Sahib Depo*, 41:4 - 42:4. The Petitioners have filed salacious claims in this case alleging extortion

and duress as a part of a racketeering scheme, and yet when pressed about the alleged threats set

forth as the basis, Sahib Arora asked for an example, and had limited memory.

There are three conflicting responses regarding direct threats: 1. Sahib Arora received

direct threats, as stated in the complaint, 2. Sahib Arora only received the alleged threats indirectly,

and 3. Sahib Arora does not recall whether he received any direct threats. His inconsistent sworn

testimony is not a surprise, given the characterization of the situation by his sister, Harsimran, in

text communications with Jonika Arora:

[9/11/19, 4:18:27 AM] J: I heard ur function called off… so was
feeling bad n worried abt it
[9/11/19, 4:18:38 AM] Harsimran: So what ?
[9/11/19, 4:18:44 AM] Harsimran: Don't worry about anything
[9/11/19, 4:18:58 AM] Harsimran: It's good .. I wanted that way
[9/11/19, 4:19:04 AM] Harsimran: No functions
[9/11/19, 4:19:16 AM] Harsimran: I have no family around
[9/11/19, 4:19:28 AM] Harsimran: So no functions
[9/11/19, 4:20:46 AM] J: But I heard it was called of coz we ripped
off all the cash / seized the accounts n moreover I was cmg from
America to ruin the function so everyone was scared of me n out of
fear they called off the function
[9/11/19, 4:21:56 AM] Harsimran: Noooo
[9/11/19, 4:24:04 AM] Harsimran: **That's all lie**

[9/11/19, 4:24:07 AM] Harsimran: It was such a waste of money ..
[9/11/19, 4:24:10 AM] J: That's what ur parents n telling to
everyone…n everyone is telling us…which is so shocking
[9/11/19, 4:24:18 AM] Harsimran: Let them
[9/11/19, 4:24:23 AM] Harsimran: Do you care ?
[9/11/19, 4:24:26 AM] Harsimran: Still ?

A true and correct copy of the text chain is attached hereto as **Exhibit K**, and is hereby incorporated

by reference.  Exhibit K, pp. 7-8 (emphasis added).  (*Deposition of Harsimran Arora*, March 8,

2021, EX. 25, pp. 7-8 (emphasis added)) [4].  We do not need to rely on Harsimran to reach the

conclusion that it is all a lie.  Sahib Arora's own sworn testimony establishes the same.

Sahib Arora testified in deposition that he did not receive direct threats, until confronted

with his verified pleading.  Then, he elected to change his position yet again by claiming he cannot

recall (even though he testified moments before and verified the previous pleadings).   He

inconsistent sworn statements cannot be reconciled.

### ii.  The Timing of the Alleged "Hundred People" Threat

According to Vineet Singh, Jarnail traveled to India for one day, made a "threat" to Vineet,

and then returned to the United States.  *Vineet Depo*, 30:7-23.  According to Vineet's deposition

testimony, that took place in September of 2019.  *Vineet Depo*, 30:11.

In an affidavit filed by Vineet Singh, he stated:

> After Jarnail had come and gone, Jonika started coming back around the
> family home again, making the same threats against Harsimran to me and
> Meharban and adding a new one – that she would send a gang of "one
> hundred people" to wreak the home of Anhad's family and threaten them
> with physical harm – if we took any action against them for their fraudulent
> conveyance of the Pinetree Plaza property to Ahuja's company Crown LLC.

---

[4] A true and correct copy of the deposition transcript is attached hereto as **Exhibit J**, and is hereby
incorporated by reference.   This deposition will hereinafter be cited as "Harsimran Depo."

*Affidavit of Vineet Singh*, August 23, 2020, ¶ 37.  A true and correct copy of the aforementioned affidavit is attached hereto as **Exhibit L**, and is hereby incorporated by reference.  Per Petitioner's complaint, the complained of conveyance of the Pinetree Plaza property to Crown Assets, LLC took place on August 19, 2019.  [Doc. 28, ¶ 32].  As such, combining the affidavit and the timing, as established by the deposition testimony, this "new" alleged threat regarding one hundred thugs would have taken place in September.

However, that is contrary to the timing set forth in Vineet Singh's own deposition testimony, in which he **specifically** recalls the date being August 14, 2019:

> Q: And do you recall the specific month and year when the hundreds-of-thugs threat was made by Jonika to you directly?
> Mr. Dominy: Object to the form.
> The Witness: I do remember she gave this on August 14.  She also did the same before August 14, but August 14 is when she left home.
> BY MR. KLEIN: (Resuming)
> Q: Did she make that threat to you directly after August 14th?
> A: It did not happen after August 14 …

*Vineet Depo*, 25:2-13.  The Petitioners have fabricated the alleged threats and are now attempting to change the timing of the alleged threats they fabricated to match the timeline they would prefer. The statements in the affidavit, verified complaint, and deposition testimony cannot be reconciled.

### c.  The Related Real Estate Transfer

During his deposition, Sahib Arora was asked about whether any real estate transactions have taken place since the filing of the complaint in this action whereby real estate was transferred to either a family member or to an entity controlled by a family member.  Unsurprisingly, he was not truthful and did not disclose the real estate transaction to a company solely owned by his sister, Harsimran Arora, only 63 days prior to his deposition (the deed is dated December 30, 2020, and

was recorded on January 27, 2021). This is the same sister that is the alleged target of the alleged

threats, is represented by Petitioner's counsel[5], and is a witness for Petitioners.

> Q: Since this case was filed, has any company in which you own an interest, transferred any real estate to any company to which any of your family members own an interest?
> A: Usually I don't do any transfer. Once I buy property, it's held under my entity. If I sell it, it's a fair market. I don't do family, family transfer, all that. That is – it's just not – I have had a very bad experience of extortion with family members, so I have to be very careful.
> Q: So let me ask the question again now. Since this case was filed, has any company in which you own an interest, transferred any real estate to any companies in which any of your family members own an interest?
> A: I don't recall any transfer.

(*Sahib Depo*, 140:24 – 141:15).

In her deposition, Harsimran Arora testified that "2526 Panola Road is my brother's place."

(*Harsimran Depo*, 11:4). However, that too is an outright misrepresentation. 2526 Panola Road

was transferred by King Group MGMT, LLC to Rising Star Constructions, LLC, via quitclaim

deed dated December 30, 2020. A true and correct copy of the aforementioned deed is attached

hereto as **Exhibit M**, and is hereby incorporated by reference. As is shown on the face of the deed,

Sahib Arora signed on behalf of King Group MGMT, LLC. (*Exhibit G*, p. 1). The face of the

deed indicates that the transaction was for "one dollar ($1.00)," although the PT61 filed with the

transaction indicates $50,000 was exchanged. A true and correct copy of the PT61 is attached

hereto as **Exhibit N**, and is hereby incorporated by reference. As is shown by the Limited

Warranty Deed attached hereto as **Exhibit O**, which is hereby incorporated by reference. King

Group MGMT, LLC acquired this real estate on September 6, 2019. At that time, King Group

---

[5] Harsimran Arora, a non-party witness, is represented by Petitioners' counsel. (*Harsimaran Depo*, 14:10-15).

MGMT, LLC paid $174,900 for the subject property.  A true and correct copy of the PT61 is attached hereto as **Exhibit P**, and is hereby incorporated by reference.

Harsimran Arora, sister of Sahib Arora, is the sole member of Rising Star Constructions, LLC.  (*Harsimran Depo*, 38:22-39:4).  During the litigation, in which she is a witness, Harsimran Arora's company received a piece of real estate for far less than fair market value.   That in and of itself is substantial, but not grounds for sanctions.  However, what is cause for sanctions is that Sahib Arora was not honest about the real estate transaction ever taking place, and Harsimran Arora attempted to cover for him by falsely stating the property belonged to her brother.

## CONCLUSION

The record is replete with irreconcilable conflicting sworn statements by Petitioners.  In addition, as is addressed in the separate motion, Petitioners have failed to preserve and actively destroyed evidence.  For the reasons set forth herein, the Crown Parties respectfully request that this Court grant this Motion and impose the requested sanctions.  The Petitioners have shown that the truth of the matter is of no consequence to them, and that they will change the facts when convenient.  Their behavior is an outright abuse of the legal system and has forced the Respondents to litigate in an ever-changing morass of untrue allegations.   The Crown Parties respectfully request that the Court exercise its inherent powers and dismiss the Petitioners' claims with prejudice and order that the associated lis pendens be cancelled.

[Signature of counsel on following page]

Respectfully submitted, this 3rd day of May, 2021.

**ROUNTREE LEITMAN & KLEIN, LLC**

/s/ David S. Klein
William A. Rountree, GA Bar No. 616503
David S. Klein, GA Bar No. 183389
Benjamin R. Keck, GA Bar No. 943504
Century Plaza I
2987 Clairmont Road, Suite 350
Atlanta, Georgia 30329
(404) 584-1238
wrountree@rklawfirm.com
dklein@rklawfirm.com
bkeck@rklawfirm.com

*Counsel for the Crown Parties*

- *AND* -

**MATT THIRY LAW, LLC**

/s/ Matthew R. Thiry
Matthew R. Thiry, GA Bar No. 100131
P.O. Box. 923054,
Peachtree Corners, Georgia 30010
(678) 883-6127
Matt@MattThiryLaw.com

*Special Counsel for the Crown Parties*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CROWN ASSETS, LLC, | ) | Case No. 20-21451 |
| | ) | |
| Debtor. | ) | Chapter 11 |
| _____ | ) | |
| | ) | |
| SAHIB ARORA; VINEET SINGH; | ) | Removed Case: |
| KING GROUP MGMT, LLC; | ) | |
| MAHARAJA INVESTMENTS, LLC; and | ) | Fulton County, Superior Court, |
| ZILLIONAIRE ASSETS, LLC, | ) | Case Number 2020CV339119 |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No.: |
| | ) | |
| CHARANJEEV SINGH; KARAN S. AHUJA; | ) | 20-02041-JRS |
| JARNAIL SINGH; JONIKA ARORA; | ) | |
| CROWN ASSETS, LLC; 2551 E PINETREE | ) | |
| BLVD MGMT LLC; 2551 EAST PINETREE | ) | |
| BLVD LLC; 4319 COVINGTON HWY LLC; | ) | |
| 140 W DYKES STREET LLC; 1604 E | ) | |
| OGLETHORPE BLVD LLC; KING ASSETS, | ) | |
| LLC; and 2505 S MAIN STREET, LLC, | ) | |
| | ) | |
| Respondents. | ) | |
| _____ | ) | |

## CERTIFICATE OF SERVICE

The undersigned certifies under penalty of perjury that he served the foregoing on all counsel or parties of record in this adversary proceeding by filing a copy of same with the Court's CM/ECF system, which will automatically provide a copy of same to such counsel or parties, and by Electronic Mail service, addressed as follows.

Michael A. Dominy
The Dominy Law Firm, LLC
729 Piedmont Avenue, NE
Atlanta, Georgia 30308
michael@dominylaw.net

Ramsey A. Knowles
Knowles Gallant LLC
Suite 350
3400 Powers Ferry Road
Atlanta, Georgia 30339
rknowles@knowlesgallant.com

This 3rd day of May, 2021.

/s/ David S. Klein
David S. Klein
Georgia Bar No. 183389
dklein@rlklawfirm.com