IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| IN RE: ) | CHAPTER 11 |
| ) | |
| CROWN ASSETS, LLC, ) | |
| ) | CASE NO. 20-21451-jrs |
| Debtor. ) | |
| _____ ) | |
| ) | Removed Case: |
| SAHIB ARORA, VINEET SINGH, ) | |
| KING GROUP MGMT, LLC, MAHARAJA ) | Fulton County Superior Court |
| INVESTMENTS, LLC, and ) | Case Number 2020CV339119 |
| ZILLIONAIRE ASSETS, LLC, ) | |
| ) | |
| Petitioners, ) | ADVERSARY PROCEEDING |
| v. ) | NO. 20-02041-jrs |
| ) | |
| CHARANJEEV SINGH, KARAN S. ) | |
| KARAN, JARNAIL SINGH, JONIKA ) | |
| ARORA, CROWN ASSETS, LLC, 2551 E. ) | |
| PINETREE BLVD MGMT, LLC, 2551 ) | |
| EAST PINETREE BLVD, LLC, 4319 ) | |
| COVINGTON HWY, LLC, 140 W. DYKES ) | |
| STREET, LLC, 1604 E. OGLETHORPE ) | |
| BLVD, LLC, KING ASSETS, LLC, AND ) | |
| 2505 S. MAIN STREET, LLC, ) | |
| ) | |
| Respondents. ) | |
| _____ | |

**PETITIONERS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

This matter came on for trial from September 20, 2021 through September

27, 2021 on Petitioners' First Amended and Restated Petition for Relief Under the

Georgia Racketeer Influenced and Corrupt Organizations Act, Quiet Title,

Injunction, Rescission and Other Equitable Relief, Declaratory Judgment and Damages (the "Complaint") and Respondents' Counterclaims.

The Arora Family consists of Sahib Arora ("Sahib"), Vineet Singh ("Vini"), Harsimran Arora ("Harsimran"), Meharban Arora ("Meharban"), Neeta Arora ("Neeta"). Sahib, Vini, King Group MGMT, LLC ("King Group"), Maharaja Investments, LLC ("Maharaja"), and Zillionaire Assets, LLC ("Zillionaire") are the Petitioners in this case (collectively, "Petitioners").

The Singh Family consists of Charanjeev Singh ("Charanjeev"), Karan Karan ("Karan"), Jarnail Singh ("Jarnail"), and Jonika Arora ("Jonika"). Charanjeev, Karan, Jarnail, Jonika, Crown Assets, LLC ("Crown"), 2551 E. Pinetree Blvd Mgmt, LLC ("Pinetree Mgmt"), 2551 East Pinetree Blvd, LLC ("Pinetree LLC"), 4319 Covington Hwy, LLC ("Covington LLC"), 140 W. Dykes Street, LLC ("W. Dykes LLC"), 1604 E. Oglethorpe Blvd, LLC ("Oglethorpe LLC"), King Assets, LLC ("King Assets"), and 2505 S. Main Street, LLC ("Main Street LLC") are the Respondents in this case (collectively, "Respondents").[1]

Pinetree Plaza is real property and improvements located at 2551 E. Pinetree Blvd, Thomasville, Georgia ("Pinetree Plaza"). 2551 East Pinetree Blvd, LLC currently owns Pinetree Plaza and the members of this entity are Karan (50%), Shaneel and Sameer Lalani (50%) ("Pinetree LLC").

---

[1] For ease of reading, Petitioners will cite to the trial transcripts as "Witness, vol. #, Page #."

After considering the documentary evidence admitted at trial and the testimony of the witnesses, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### The Family History

Meharban and Jarnail are brothers who began doing business together in India approximately 40 years ago. Sahib, Vini, Harsimran, Charanjeev, and Karan are cousins. Sahib, Vini, Harsimran are Meharban and Neeta's children. Charanjeev and Karan are Jarnail and Jonika's children.

Over the course of those 40 years, these two families resided together in a home in Amritsar, India. Sahib, vol. II, 10; Jarnail, vol. IV, 55. The home has 24 hour seven days a week security with a gate surrounding the property. Meharban, vol. II, 28; Jonika, vol. V, 10-1; Jarnail, vol. IV, 55. Both families raised each other's children. Jonika, vol. V, 10.

Meharban and Jarnail jointly own and operate a hospitality venue in India known as Meharban Farms. They also jointly own a hotel, a farm and 8-10 small businesses. Meharban, vol. II, 12; Jarnail, vol. IV, 57. Their business relationship in India is fifty-fifty partnership. *Id.*; Jarnail, vol. IV, 55. All income from their businesses is deposited into a joint bank account that covers the expenses of the

two families in India. It is a "family pot of money."  Karan, vol. VI, 7-8;

Charanjeev, vol. V, 66; Jarnail, vol. IV, 57.

The education, including medical school education, of all six children was

funded from the joint account. Charanjeev, vol. V, 66.

Prior to 2019, Jarnail and Meharban had "really good relations." Meharban,

vol. II, 12. Their business relationship was good. Jarnail, vol. IV, 56. Jarnail had a

very good relationship with all the children prior to 2019. Jarnail, vol. IV, 60.

The common aunts, Reeta Rani and Neena Tuckar, Meharban and Jarnail's

sisters, reside in the Atlanta, Georgia area.

**King Group 2014 through March 2018**

In 2014, the two families started a real estate business in the United States in

the Atlanta, Georgia area known as King Group MGMT, LLC ("King Group").

The business of King Group is to buy commercial and residential property at a

discount and either lease it or liquidate it. Sahib, vol.. II, 49.

Gobind Madan, a CPA, filed the articles of organization in 2014. Sahib, *id.*

at 49. He also has prepared King Group's tax returns and the individual family

members' tax returns. Sahib, *id.* at 51; Karan, vol. VI, 19.

When it was formed in 2014, the families intended King Group to have nine

members.  These nine members were Sahib, Vini, Meharban, Neeta, Charanjeev,

Karan, Jarnail, Jonika, and Harsimran. Each member held an 11% interest in King

Group, except Sahib who held a 12% interest. From its inception, Sahib has been the manager of King Group and the majority member. Sahib, vol. II, 49, 50.

As the manager of King Group from 2014 – to the present, Sahib has made the business decisions for and actively been involved in the purchase and sale of real estate for King Group. *Id.* Sahib was the "front face" of King Group. Jarnail, vol. III, 108; Charanjeev, vol.. V, 79. From 2015-2018, he was "doing the deals, dealing with people, making relations to expand the business." Charanjeev, *id.* at 82-83. Before Charanjeev's arrival, Sahib alone managed the real property acquisitions and sales, handled the closings, managed the leases and the tenants.

During this same time period in India, Charanjeev and Karan managed the businesses located there. Charanjeev, *id.* In 2017, they resided in India and pursued their medical degrees. *Id.* at 81.

**King Group from March 2018 to June 2019**

In March 2018, Charanjeev came to America, because he did not have any interest in pursuing medicine. When he arrived, he began to take an active role in the business. Charanjeev, *id.* at 92. Charanjeev went to the auctions every Tuesday of the month with Sahib to learn the auction process. Sahib, vol. II, 53. After he obtained his real estate license in May 2018, he became King Group's in-house real estate agent. Charanjeev, vol. V, 94;  Sahib, vol. II, 54.

Charanjeev also helped find tenants for properties and installed his first tenant in January 2019. Sahib, vol. II, 56. He collected rents and deposited them into the King Group account until June 2019. In June 2019, he began retaining for himself the rents he collected from 5754 Attucks Blvd and 5341 Snapfinger. Sahib, vol. II, 115, 116.

The monthly lease payment for 5754 Attucks Blvd was $19,000. From August 2019 through November 2019, Charanjeev paid $5000 each month to King Group. He retained the remaining $14,000. For four months he collected and retained $56,000 in rent payments to which he was not entitled. Sahib, vol. II, 114-115.

The monthly lease payment for 5341 Snapfinger was $11,000. From July 2019 through February 2020, Charanjeev collected the rent but did not remit it to King Group. For eight months he collected and retained $88,000 in rent payments to which he was not entitled. He also retained the $24,000 security deposit for this tenant. Sahib, vol. II, 116.

He also performed minor maintenance on the King Group properties and used the King Group debit card ending in 2144 for that purpose from October 2018 through August 2019. Sahib, vol. II, 56.  Charanjeev also used the debit card for personal expenses and withdrawals. RExh. 123.

Charanjeev was not an authorized signer on the King Group bank account, but had full access to the King Group bank account. Sahib, vol. II, 57. Charanjeev had online access and managed the balance transfers and pay them back. *Id.*

King Group and Sahib, as the manager of King Group, relied on Charanjeev's representation of King Group as its real estate agent. Sahib, vol. II, 54.

**King Group's Source of Funds**

The source of funds for King Group's first purchase of real property in 2014 was funds from the Arora Family and the Singh Family that equaled approximately $175,000.

From 2016 through the present, the source of funds has been Sahib's personal cash contributions and his credit card cash advances that King Group has paid. RExh. 123. In 2017, Sahib provided to King Group credit card cash advances in the amount of $230,239. PExh. G.

From 2016 through January 2019, Jarnail, Karan, Charanjeev, Vineet, and Meharban have provided funding through credit card cash advances that King Group paid in full. RExh. 123. Jonika began lending her credit card cash advances to King Group in late 2018 and 2019. Sahib, vol. II, 51.

The cash advances involve a card holder accepting the interest free loan from the card with a certain by which the advance must be paid in full. Before the

no interest advance period expires, King Group pays the credit card balance in full either from rental income or liquidation of real estate or by transferring balances from another family member's card which then is paid in full. *Id.* at 51; Charanjeev, vol. V, 83.

From 2017 through August 2019, Charanjeev managed the credit card cash advances and balance transfers for King Group. In 2017, Charanjeev reviewed the credit card statements twice monthly. Charanjeev, vol. III, 82.

### King Group's Tax Returns

The King Group 2015 and 2016 federal tax return Schedule K-1s state that Sahib owned a 12% interest and Meharban, Nita, Harsimran, Jarnail, Jonika, Charanjeev, and Karan each owned an 11% interest in King Group. RExh. 6; RExh. 7.

The King Group 2017 federal tax return Schedule K-1s state that Sahib owned an 89% interest at the end of the year and Karan owned an 11% interest at the end of the year. RExh. 8. The beginning of the year numbers on the K-1s reflect the 2015 and 2016 membership interests.

The King Group 2018 federal tax return Schedule K-1s state that Sahib owned an 89% interest and Charanjeev owned an 11% interest in King Group. PExh. 47.

The King Group 2019 federal tax return Schedule K-1s state that Sahib owned an 89% interest at the beginning and 51% at end of the year with Vini owning 0% at the beginning of the year and 49% at the end of the year. RExh. 9. Karan was an 11% member from January 1 through August 14 that was not reflected on the 2019 tax returns.

**King Group Operating Agreements**

King Group's first operating agreement was signed in August 2017, but dated January 6, 2017 (the "January 6 Operating Agreement"). Sahib, vol. II, 72; PExh. 43.

In August 2017, the two families discussed consolidating the membership interests of King Group into a representative of the Arora Family and the Singh Family – Sahib with 51% and Karan with 49%. Sahib, vol. II, 72-73. The families chose Sahib and Karan for two primary reasons. Both were American citizens and Sahib lived in Atlanta. Karan, vol. VI, 11; Charanjeev, vol. V, 81, 83. And, Sahib was the face of King Group, actively involved in the business from its formation in 2014, and was the only family member residing in Atlanta permanently. Charanjeev, vol. V, 83.

During this discussion, Sahib raised concerns about the membership split given that he alone was managing King Group and contributing more capital and cash advances into the business than any other family member. The family

addressed Sahib's concerns by agreeing that going forward other family members would put more effort into King Group's business. Sahib, vol. II, 73.

The increased participation by other family members in King Group after the August 2017 discussions did not occur. Sahib, vol. II, 75.  It came to be that Charanjeev and Karan were building a hotel in Amritsar and planned to stay in India. Sahib, vol. II, 75-76.

In March 2018 when the tax returns were being prepared, Sahib, Jarnail and Charanjeev discussed Sahib's continued role as the only family member managing and operating the business in Atlanta. Based on these discussions, the two families agreed to change the membership interests so that Sahib held an 89% interest and Karan held an 11% interest. Sahib, vol. II, 74.

Sahib created a new Amended and Restated Operating Agreement dated January 9, 2017 (the "January 9 Operating Agreement"). PExh. 44. The January 9 Operating Agreement membership interests were 89% and 11%. This change in membership was decided and Jarnail acknowledged this change to Gobind Madan. Sahib, vol. II, 74.

Since Karan was in India, Sahib used the signature page from the January 6 Operating Agreement as the signature page for the January 9 Operating Agreement. Sahib, vol. II, 75.

Under the provisions of both operating agreements, Section 5.01, Sahib was

the manager of King Group. Sahib, vol. II, 76.  This section provided that the manager "shall have full authority, power and discretion . . . to perform any and all other acts or activities customary or incident to the management of the company's business." PExh. 43, 44. "Notwithstanding the foregoing, the manager shall have the authority to undertake any of the following matters, major decisions, without first having obtained the affirmative vote of the members holding at least 51 percent of the membership interest. The purchase of legal sale or other disposition of real or personal property, . . . the approval of amounts distributed to members pursuant to Section 9.010." *Id.*

### Charanjeev and Karan Ratify the 89/11 Membership Change

In August 2017, all family members consented to the change of membership of 49% and 51%. Sahib, vol. II, 79.  In March 2018, Jarnail, Karan, and Charanjeev consented to the change of membership of 89% to 11%. *Id.*

Beginning in June 2019 with Karan's arrival in Atlanta, the Singh Family challenged the change in membership interests. They asserted that either they were unaware of the reduction in Karan's interest or they were aware but believed it to be a temporary change. Karan, vol. VI, 11.

The documentary evidence presented at trial establishes that Karan and Charanjeev knew of the change in membership interest in 2018 and 2019, but they did not dispute or contest Sahib's 89% interest until Karan arrived in June 2019.

In his role as King Group's in-house real estate agent, Charanjeev's responsibilities included handling the closings, emailing corporate documents, emailing the operating agreement, providing the buyer/seller information and the commission agreement. Sahib, vol. II, 80. Documents he provided for King Group's 2018 and 2019 real estate closings prominently state that Sahib is the 89% member of King Group.

1. Acknowledgment and receipt to a settlement statement dated March 28, 2019 for 355 Spyglass Bluff Alpharetta, Georgia. 82-83. Charanjeev signed the settlement statement on behalf of King Group. PExh. F.

2. Email from Charanjeev to Sahib dated May 10, 2019 pertaining to the closing for the sale of 3554 Habersham at Northlake. 83; PExh. K. The closing attorney asked for King Group's operating agreement which Sahib forwarded to Charanjeev to send. Sahib, vol. II, 85, 86. The operating agreement presented is the January 9, 2017 Operating Agreement stating that Sahib is the 89% member.

3. King Group Resolution for the purchase of 3554 Habersham. Sahib signed as the manager and 89% member of King Group. Sahib, vol. II, 86. Used the January 9 operating agreement. Sahib, vol. II, 86; PExh. O

4. 5754 Attucks Boulevard email from closing attorney and asking for the operating agreement. Sahib, vol. II, 86-87.  Charanjeev on the email and operating agreement with 89/11. Sahib, vol. II, 87; PExh. L

5. King Group resolution dated June 26, 2019 for the refinance of 5754 Attucks Boulevard under Zillionaire. Sahib and Karan signed showing that the membership interests are 89% and 11%. Sahib, vol. II, 87; PExh 65.

6. King Group resolution dated March 25, 2019 for the purchase of Spyglass Bluff giving Charanjeev the authority to act on behalf of King Group. Sahib signed as the 89% member of King Group. PExh. T.

**King Group's Acquisitions and Sales from 2014 through July 2019**

*2014*

King Group's first acquisition was 38.5 acres for $175,000.  Each family member contributed money toward the purchase. Sahib, vol.. II, 59.

*2015*

King Group did not buy or sell any property in 2015. *Id.* at 62.

*2016*

King Group purchased four properties and sold one in 2016. *Id.* at 63-64.

1.    1911, 1931 Roosevelt Highway purchased for $80,081

2.    Jimmy Carter Boulevard land purchased for $80,000 and sold for $200,000. The net sales proceeds paid off the balance transfers for

Jarnail, Charanjeev, and Sahib. *Id.* at 63. In 2015, Sahib contributed $150,000 in cash advances. *Id*. Jarnail contributed $50,000 in cash advances. *Id.* at 64.

*2017*

King Group purchased three properties and sold two in 2017.

1.      650 Belgrave Lane purchased for $217,000 and sold for $277,000. *Id.* at 66.

*2.*     2318 Old Cornelia Highway 56% interest purchased for $285,000. *Id.*

3.      1050 Donald Lee Hollowell Parkway purchased for $95,000 and sold for $277,000. *Id.* These net proceeds went toward the acquisition of 2318 Old Cornelia Highway in a 1031 exchange. *Id.* at 67.

4.      38.5 acres sold for $220,000.

*2018*

In 2018 King Group purchased eight and sold four properties. *Id.* at 68.

Charanjeev was involved with three of these properties.

1.      1009 Pathview Court was purchased for $348,000 and sold for $528,000.

2.      6205 Arnall Court was purchased for $649,000 and sold for $795,000.

3.      4661 Snapfinger Road was purchased for $38,651 and sold for $60,000.

4.      355 Spyglass Bluff was purchased for $268,000.

5.      3554-3556 Habersham at Northlake was purchased for $241,000.

6.  106 Commerce Street purchased for $295,000 in a 1031 exchange from the 4531 Campbellton Road sale.

7.  4531 Campbellton Road purchased for $155,000. *Id.* at 69

8.  1931 1911 Roosevelt Highway was sold for $900,000. Charanjeev was King Group's agent and received a $50,000 commission on the sale. *Id.* at 69.

9.  5754 Attucks Blvd was purchased for $450,000 in a 1031 exchange from the 1931 1911 Roosevelt Highway sale.

*2019*

King Group purchased four and sold three properties from January to August 14, 2019.

1.  355 Spyglass Bluff sold for $375,000.

2.  3811 Flat Shoals Parkway purchased for $145,000.

3.  5341 Snapfinger Park Drive purchased for $315,000. It sold in February 1010 for $1,155,000. King Group and Crown Assets each received $541,000. PExh. 50. Originally, King Group planned to treat this sale as a 1031 but elected not to do so.  Vini, vol. VI, 94, 104.

4.  2723 Roosevelt Highway purchased for $160,000.

5.  2995 Roosevelt Highway sold for $265,694.

6.  2485 N. Columbia Street, Milledgeville purchased for $3,275,000 with the down payment from originating with the refinance loan proceeds of 660 Belgrave Lane.

7.  3554-3556 Habersham at Northlake sold for $511,000 with the proceeds being used in a 1031 exchange for the Milledgeville property.

15

### Milledgeville Shopping Center

King Group purchased a 50% interest in Milledgeville Shopping Center as part of a 1031 exchange from 3554 Habersham at Northlake. The 660 Belgrave Lane refinancing funds were used to purchase 3554 Habersham at Northlake. The closing was July 3, 2019. Billionaire Funding Group, LLC was the other 50% purchaser. Sahib, vol. II, 88. King Group was the borrower on the $3,000,000 loan for the purchase of the property. *Id.* at 98.

### King Group Distributions and Payment of Family Members' Expenses

The January 6 and January 9 Operating Agreements provided that the Manager, without obtaining the affirmative vote of at least 51% of the membership interests, shall have the authority to approve amounts distributed to the Members. PExh. 43, 44.

King Group did not make annual cash distributions to its two members, Sahib and Karan. King Group made direct cash payments to Jarnail in the amount of $80,500 from 2016 through July 2019. King Group made direct cash payments to Sahib in the amount of $98,815 from 2016 through July 2019. Sahib, however, unlike any of the other family members, made cash investments into King Group of $179,200 from his personal funds that were not repaid and that were not cash advances from credit cards. In 2017, he also paid credit card cash advances to King Group in the amount of $230,239. PExh. G.

King Group also paid the federal and state income tax payments for Sahib, Vini, Meharban, Jarnail, Charanjeev, and Karan. Sahib, vol. II, 77. King Group paid the insurance for Meharban and Jarnail for the years 2016-March 2019 and paid for their medical expenses throughout that time period. Jarnail, vol. IV, 41; RExh. 123.

Beginning October 2018, Charanjeev had use of a King Group debit card ending in 2214 in order to buy materials and supplies related to King Group properties. Charanjeev also made cash withdrawals for his personal use in the amount of $12,300 from October 2018 through May 2019.

King Group also paid each credit card's balance for any transfer to King Group.

### King Group's 2017-2019 Loans to King Package, Inc.

The shareholders of King Package, Inc. are Sahib and Harinder Bajaj. Charanjeev, vol. V, 89. The real property and the building are owned by King Group and another entity. King Group owns a 56% interest in the real property. King Package operates a liquor store on the premises and pays the loan payment for King Group as rent for the premises.

As part of the August 14 Agreement, Zillionaire, King Group, and Crown Assets entered into an Agreement that provided for Crown Assets to have 50% of King Group's interest in 2318 Old Cornelia Highway, the real property (the

"Zillionaire Internal Agreement"). PExh. 1. As a result, Crown Assets and King Group are each 28% owners of the real property. The Zillionaire Internal Agreement does not mention or include the liquor store business. Karan, vol. VI, 68; PExh. 1.

A review of the King Group bank statements for November 2017, May 2018, and November 2018 indicate that King Group made payments to King Package in the amount of $197,771.00. RExh. 123. The January 2018 bank statement shows a deposit of $200,000 from the refinance of King Package. Based upon uncontroverted testimony, the parties agree that King Package did refinance the business with Fidelity Bank and those funds were deposited into the King Group bank account to repay the payments made to King Package by King Group. RExh. 123.

### Charanjeev's Commissions

After obtaining his real estate license in May 2018, Charanjeev became the in house agent for King Group. Sahib, vol. II, 50. As a new agent, he did not have any listings. *Id.* at 53. King Group helped him grow as an agent. *Id.* As King Group's agent, he would forward documents such as the operating agreement and other closing documents to the closing attorney and lender. *Id.* Sahib added Charanjeev as the agent on the property so he could earn a commission. *Id.* at 54.

Charanjeev offered a $500 flat commission to build his record in the real estate community so that he could obtain real estate listings from other sources. *Id.* at 55. He also wanted to prevent King Group from paying "a lot of money to the broker." Charanjeev, vol. V, 232. His broker advised him to "just put a $500 commission" in the contracts. *Id.*

Charanjeev's first listing for King Group was in late November 2018, 1931 and 1911 Roosevelt Highway. Sahib, vol. II, 50.  He made a $44,000 commission on this sale that he retained. *Id.* at 55.

He did receive these full commissions which he did not remit to King Group. Charanjeev, vol. V, 232-233.

| | |
|---|---|
| Pinetree Plaza | $7000 |
| 3811 Flat Shoals | $3,625 |
| 5754 Attucks Blvd | $18,000 |
| 2723 Roosevelt Hwy | $4,800 |
| Arnall Court | $23,000 |
| Roosevelt Hwy | $45,000 |

Charnjeev testified he "guessed" he saved King Group "north of $500,000" in commissions from May 2018 through 2019 but did not provide any documents or details to substantiate his guestimate. Charanjeev, vol. V, 183.

When King Group used other agents, those agents would reimburse 50% of the commission to King Group. Sahib, vol. II, 55.

**660 Belgrave Lane**

The testimony regarding ownership of 660 Belgrave Lane is undisputed. Neeta Tuckar owned 660 Belgrave Lane since 1997. She conveyed the property to Sahib, Vini, Harsimran, Meharban, and Neeta in October 2016 for $65,000. While King Group paid the $65,000, Sahib contributed, through personal funds that were not repaid by King Group, the amount of $179,200 as reflected in bank statements. RExh. 123. Sahib repaid King Group for the $65,000 purchase price of 660 Belgrave Lane.

Subsequently, Vini, Harsimran, Meharban, and Neeta conveyed the home to Sahib. On May 1, 2018, Sahib refinanced the home and deposited the net proceeds of $313,813.36 into the King Group bank account. PExh. J; RExh 123. Sahib personally has paid the mortgage payments for this refinance loan from 2018 through the present. While other family members resided at 660 Belgrave, none paid rent or paid any expenses. Sahib, vol. II, 52.

King Group used $240,000 of the 660 Belgrave refinancing proceeds to purchase 3554 Habersham in 201?. When King Group sold 3554 Habersham the proceeds were used in a 1031 exchange for the Milledgeville Shopping Center that

was purchased on July 3, 2020.  Shaneel Lalani was the 50% tenant in common

with King Group for the Milledgeville Shopping Center. Vini, vol. VI, 103.

### The Threats

After Harsimran's engagement on January 17, 2019, Jarnail began calling

Meharban and Vini leaving "very bad messages." Meharban, vol. II, 12-13.

Harsimran, vol. I, 144. Jarnail told Meharban to break the engagement because the

fiancé's family is poor. Meharban, vol. II, 13. She received a threatening message

from Jarnail in January 2019. He was screaming. "your father is dead. Pick up the

phone. I'll destroy everything." Harsimran, vol. I, 245.

Vini deleted Jarnail's WhatsApp voice mails and messages in 2019 prior to

any litigation. Meharban deleted all the messages related to threats so that no one

hear them. Meharban, vol. II, 41. When he deleted the WhatsApp messages he did

not realize he would "end up in court." *Id.* at 42.

In late June 2019, when Meharban and Vini returned to India, Jonika began

asking Meharban to give 50% of King Group to Charanjeev and Karan based on

their familial relationship. Vini, vol.. I, 28. Vini conveyed this demand to Sahib. *Id.*

at 29. Sahib refused to give them 50% at that time based on his role in the

company since 2014. *Id.* at 28-29. When Sahib refused, Jarnail began calling

Meharban every single night and harass him to force Sahib to give 50% of King

Group to Charanjeev and Karan. *Id.* at 29.

In June and July, Jarnail began saying that he would approach a minister in India whose daughter Charanjeev was dating about the matter. Meharban, *id.* at 14. Meharban believed the minister was very powerful with influence who could harm Meharban.  Jarnail threatened to have "a drug case put on" him. *Id.*

Jarnail told Meharban that if Sahib did not transfer 50% of King Group to Charanjeev and Karan, he would shoot Sahib, he would wreck Sahib. Meharban, vol. II, 30-31.  Jarnail also broke the fan and door in the home.

Jarnail threatened Vini directly by leaving dirty messages on his phone. *Id.* at 30. Jarnail called to say, "has your father died, is he deceased" and "either give the 50 percent of the property or I will make the liv- -- your father's life miserable and I'll make sure that he is thoroughly and fully defamed in the society." *Id.* at 30-31.

Jarnail threatened to defame Harsimran's character. *Id.* at 31. "I'll make sure that your sister is also defamed. I would say that she is a loose [character], she's not a very good [character], that she has too many boyfriends and I'll make sure that everybody's life is ruined." *Id.*

In July 2019, Sahib learned from Meharban and Vini that Jarnail, Jonika, Charanjeev, and Karan were making demands for 50% of King Group and threatening the family. Sahib, vol. II, 91 The demands were made indirectly to

Sahib. 91. One demand for 50% of King Group was made directly to Sahib the first week of July 2019. *Id.* at 91. Sahib pushed back. *Id.*

Charanjeev, Karan, Jarnail, and Jonika did not communicate any death threats or threats to ruin Harsimran's wedding directly to Sahib., vol. III, 8.

When Meharban conveyed the death threat to Sahib, he "asked Meharban to convey they should start looking for a house for themselves." *Id.* at 9.

Vini had one saved voice message from Jarnail on his phone from August 1, 2019. It exemplifies all the messages he left for Vini and Meharban between June and August 2019. Vini, vol. I, 42; PExh. 73.

In an angry raised voice Jarnail threatens "total destruction." "You do not know what the price is for a daughter's marriage." He used many profanities such as "motherf***er, sister f***er, you have to turn over the property to my son's name." *Id.* at 49.

In his testimony, Jarnail explained that the intent of his voicemail to Meharban was to say "when you're going to hurt me, then I will hurt you." Jarnail, vol. IV, 86.

Importantly, when his counsel asked him: "Have you ever told him that you were going to break up his daughter Harsimran's wedding?" Jarnail did not answer the question. His response was that he helped Harsimran with medical school. Jarnail, vol. IV, 58.

Jarnail threatened to defame Harsimran and the family in society. Vini, vol I, 139-140. He said "your sister is not of a good character, that I'm going to spread this loud and clear in the society and all of you will be defamed. *Id.* at 140.

Jonika became threatening through August 2019. *Id.* She threatened to tell others that Harsimran does not have good character. *Id.* Meharban and Vini could not force Jonika out of the family house because she would have "spoiled the marriage right away, right then." *Id.* at 124. Vini was not fearful for his life but fearful that Jonika would break Harsimran's marriage *Id*. at 125.

On August 14, 2019, in India at the family home, Jonika was angry when Meharbon told her that Sahib owned the majority of King Group. *Id.* at 50. Jonika left the house at 3:00 AM telling Meharbon and Vini "face to face" that she was "going to gather a hundred people  -- hundred of our relatives and would go to Harsimran's fiancée's house and would break up the marriage. . .." *Id.* at 51, 122, 125; , vol. II, 14.  Vini and Meharban believed these threats because Jonika left the house right away. *Id.*

Harsimran was present in the home during this incident.  She heard loud voices and Jonika. Jonika took the car and went away from the house.  Harsimran asked Vini what happened. He told her that Jonika said she would take 100 people to her in-law's house and create a scene if they don't transfer the property in Karan and Charanjeev's names. Harsimran, vol. I 192.

Vini had a WhatsApp message chain with Jarnail. *Id.* at 131; RExh. 74.  On August 15, 2019 at 7:16:48, Jarnail messaged Vini saying, "your father commit me. He stops Sahib."  Vini responds, "no, he did not."  Vini found Jarnail to be very angry over the thought that Meharban would prevent Sahib from transferring 50% of the King Group properties to Charanjeev and Karan. *Id.* at 133. Vini assured Jarnail that Meharban did not stop Sahib from conveying the properties. *Id.* In that same chain at 7:26:29, Vini tells Jarnail that Sahib was going to the CPA on August 15, 2019.

Meharban called Jarnail and explained Jonika's actions and begged Jarnail to forgive him and let Harsimran get married.  Meharban, vol.. II, 14.  He also called Sahib and pressured him to do what was being asked of him. *Id.*

**Harsimran's Wedding Plans**

Harsimran's marriage was arranged.  She did not know her future husband before meeting him in December 2018.  The meeting was scheduled by a third party based on the families' reputations.  Once engaged, it is very disrespectful to break the arrangement.  The man can break the marriage if negative comments are made about the woman's character. Harsimran, vol. I, 189-190. Negatively commenting on a future bride's character in India is harmful to the marriage. Vini, Vol. I, 123.

Harsimran became engaged on January 17, 2019 at a ceremony in India. Meharban, vol. II, 12. Sahib returned to India for the ceremony. Karan also attended the ceremony. Karan, vol. VI, 79. All the family was there except for Charanjeev and Jarnail. *Id.*

The original wedding date was November 10, 2021. *Id.* The wedding was planned as a grand affair with 700-800 people attending over two days on November 9 and 10. Merhaban was afraid that Jarnail would disrupt Harsimran's marriage. Meharban, vol. II, 20. He went to the future in-law's home and asked them to move up the wedding date. The wedding date was changed to October 25, 2019 and Jarnail and Jonika were not told about the change. *Id.* at 20.

He was concerned the in-laws would reject the marriage offer after the Singh Family stole Meharban's half of the joint business account as part of the effort to ruin Harsimran's marriage. *Id.* at 18, 44-45. Jarnail and Jonika withdrew 3 core rupees from the joint bank account in India, which equals approximately $399,000. PExh. 27. Meharban had intended to use the money taken from the bank account to pay for Harsimran's wedding. *Id.* Meharban's mother-in-law paid for Harsimran's wedding. *Id.* at 21.

He visited Harsimran's future in-laws at the end of September or beginning of October to explain the financial situation. *Id.* at 46.

Immediately after August 14, Vini made efforts to do business with
Charanjeev, Karan, and Jarnail by contributing 25% to a new business with them.
Vini, vol. VI, 96. When Jarnail went to India in September he knew "they would
never do business together." *Id.*  At that point, with Pinetree Plaza taken and the
bank accounts cleaned out, Vini told her fiancé in September about the family
issues because he realized he could not solve the situation. Harsimran, vol. I, 194.

The wedding was moved to a smaller location. Harsimran, vol. II, 195. Only
15 people from her side of the family and 100 from her fiancé's side of the family
attended. Harsimran, vol. II, 194.

Harsimran felt terrible because she had wanted all of her family to be present
at the wedding. Harsimran, vol. II, 195. She did not inform Jonika of the change,
because the family thought Jonika and Jarnail would try to ruin the wedding.
Jarnail was continuously threatening Meharban regarding transferring 50% of the
King Group properties.

### Harsimran's Communications with the Singh Family After Her Wedding

Charanjeev texted Harsimran saying he was upset about not getting to be
part of the wedding. Harsimran, vol. II, 240.  Harsimran believed Charanjeev was
pretending in the text. If he or Jonika wanted to be part of her wedding they would
not have left India during the wedding preparation time. Karan told her he would

be back for the wedding preparation but he never returned to India. She believes

that "they had no intentions to attend the wedding." *Id.* at 241.

She confronted Jarnail at their family home in India about why he froze the

joint bank accounts during her wedding. Her lavish wedding could not occur

because suddenly the bank accounts were frozen. He did not answer Harsimran. *Id.*

at 197.

Harsimran met with Jarnail on January 24, 2020 at Maharaja Farms.

Harsimran, vol. II, 196-97. She explained to him how the fight between the

families was affecting her mental health. Jarnail promised he would return Pinetree

Plaza when he went back to the United States.  She subsequently learned that

Karan had taken a large loan on Pinetree Plaza on January 17, 2021. Jarnail never

had any intentions of returning the property to her family. *Id.* at 199.

Harsimran came to the United States on January 28, 2020. She went to visit

Jonika at her St. Marlo home. They had a good meeting. Charanjeev and Karan

promised they would return the Pinetree Plaza when Jarnail returned from India.

*Id.* at 198. Harsimran did not know during that meeting that the property was

encumbered.

She and Meharban met with them again in February 2020 and it was

pleasant. Harsimran, *id.* at 198-99; Meharban, vol. II, 35-36. Again, Charanjeev

and Karan promised to return Pinetree Plaza. Harsimran, *id.;* Meharban, *id*.

Meharban "believed 100%" that they would transfer Pinetree Plaza back to them.

Meharban, *id.* at 36-37.  Soon after that meeting, Jonika stopped taking her calls

given her continued demands for the return of Pinetree Plaza. Harsimran, *id.* at

198-99.

### The August 14 Agreement

Vini and Meharban conveyed the threats to Sahib and pleaded with him to

convey 50% of King Group to Charanjeev and Karan.  Sahib refused and pushed

back at first. As Meharban became more upset with the threats and believed Jarnail

and Jonika would follow through and harm Harsimran, Sahib relented. But again,

he made an effort to receive value for his interest in King Group.

Sahib emailed Joel Haber on July 12, 2019 providing the terms for the

execution of a document between Charanjeev, Karan, Sahib, and Vini stating that

each would receive 25% of the profits at the closings of eight King Group

properties and 25% of the profits from the sale of Pinetree Plaza owned by

Maharaja. Haber, vol. III, 133; PExh. 62. Sahib also included the term that he

would receive $950,000 of the cost of the eight properties along with his 25% of

the profits. PExh. 62.

This version of the business separation was not accepted by the Singh

Family. Jonika and Jarnail's threats to disrupt Harsimran's wedding and to malign

her character heightened and continued.  Meharban and Vini exerted more pressure on Sahib to convey 50% of the King Group properties to the Singh Family.

On August 13, 2019, Sahib contacted Mr. Haber by email again. This email asked Mr. Haber to prepare four quitclaim deeds and to update the Maharaja operating agreement to include all four men. *Id.* at 135; PExh 62.

On August 14, 2019, Sahib, Charanjeev, and Karan met at Joel Haber's office to consummate the separation. During the meeting, Charnjeev sent photos of all the documents to Vini who was in India. Charanjeev, vol. V, 147; RExh. 70 at 3:17 PM.  Vini through messages asks Charanjeev about the transfer structured. *Id* at 146; RExh. 70 at 6:54 PM.

Sahib did not seek legal advice from Mr. Haber regarding the August 14 meeting and transactions. Sahib, vol. II, 95. He never explained the business deal to Mr. Haber. Sahib, vol. II 95. Mr. Haber testified that he "could not really give advice to a client on business unless [he] actually knows the whole deal." Haber, *id.* at 135. Mr. Haber had a ministerial role preparing documents for what Charanjeev, Karan, and Sahib told him they wanted. *Id.* at 161. He was not in the meeting with the three men. *Id.* at 167.

Before drafting the Bill of Sale conveying Karan's 11% interest in King Group to Sahib, Mr. Haber confirmed with Karan that his interest was 11%.  He testified that he was sitting beside Karan during this exchange. Mr. Haber asked

Sahib if his King Group interest was 89% and he replied yes. He asked Karan, "Do you own 11%?" Mr. Haber recalls Karan shaking his head which affirmatively said yes.

He then prepared the Bill of Sale, gave it to Karan stating that the document conveyed his undivided 11% interest in King Group to Sahib, which was Karan's total interest. Karan signed the Bill of Sale without verbal comment. *Id.* at 139; PExh. 49. If Karan had retained an interest in King Group, Mr. Haber would have drafted an amended and restated operating agreement for King Group. *Id.* at 140.

Mr. Haber may have called tax attorney Al Caproni to verify there were no tax issues with the transactions, but he does not recall with certainty if he did. *Id.* at 165. If there had been a tax issue, he would have discussed it with Charanjeev, Karan, and Sahib. *Id.* at 166.

Four quitclaim deeds were signed by Sahib conveying to Crown Assets 50% of each of the four King Group properties: 106 Commerce Street; 2723 Roosevelt Highway; 3811 Flat Shoals Parkway; 5341 Snapfinger Park Drive. RExh. 15, 16, 17, 18 (the "August 14 Deeds"). On August 14, 2019, these were the only unencumbered properties owned by King Group.

King Group also owned three other properties that were encumbered with loans: 2485 N. Columbia Street (the Milledgeville Shopping Center) $3,000,000;

2318 Old Cornelia Highway $616,000; and 5754 Attucks Blvd $1,040,000. PExh.

1; Vini, vol.VI, 92; Sahib, vol. II, 98.

At the meeting, Charanjeev and Karan wanted to ensure they would receive

50% of the profits from any future sale of 2318 Old Cornelia Highway and 5754

Attucks Blvd, which resulted in the execution of the Zillionaire Internal

Agreement. PExh. 1. Under this agreement, Zillionaire conveyed an undivided

50% interest in Attucks Blvd. and King Group conveyed 25% of its interest in Old

Cornelia Highway which was an undivided 28% interest in that real property to

Crown Assets.  In return, Crown Assets was liable for 50% of the debt on Attucks

Blvd. and 25% of the debt on Old Cornelia Highway. Crown Assets did not pay its

percentage of either loan. Sahib, vol. II, 97.

On August 14, 2019, all the documents were executed, but Vini needed to

return his signature page for the Maharaja Amended and Restated Operating

Agreement. So, Mr. Haber held the documents in escrow until he received Vini's

signature page which he received the next day by email.  He then recorded the

deeds on August 16 and released the Zillionaire Internal Agreement and the

Maharaja Amended and Restated Operating Agreement. Haber, vol. at 169.

After Sahib executed the deeds and the agreement, Charanjeev made a

demand for $900,000. Sahib, vol.. II, 101.

The August 14 documents are referred to as the "August 14 Agreement."

**August 15 Meeting**

Only Charanjeev and Sahib were present at this meeting in Mr. Haber's office. Charanjeev stated that the $900,000 included balances owed on Jonika, Vini and Meharban's credit cards, expenses he paid for King Group, and equity in 660 Belgrave. They agreed that Sahib would pay Vini and Meharban's balances and Charanjeev would pay Jonika's balance. Sahib questioned the reimbursement for expenses since Charanjeev used a King Group debit card for any expenses. He also questioned Charanjeev's demand for equity from 660 Belgrave. Charanjeev stated he would provide Sahib with bank statements to substantiate his reimbursements after the meeting, but he did not. Sahib, vol.. II, 101-102.

**Maharaja's Purchase of Pinetree Plaza**

Maharaja was created to own Pinetree Plaza. It was formed on June 9, 2019 and Vini was the sole member. He was the only authorized signer on the bank account. Maharaja's first operating agreement was executed on June 9, 2019.

Vini procured the purchase agreement for King Group for 2551 Pinetree Shopping Center. King Group assigned it to Maharaja Investments, LLC and 2551 Pinetree LLC that was owned by Shaneel Lalani. Vini, vol. I, 88; PExh. 11. Charanjeev was the real estate agent for Maharaja for the purchase of Pinetree Plaza. Sahib, vol. II, 106. He received a commission as agent for Maharaja when the sale closed. *Id.*

It was decided that a new entity would be formed to own the shopping center. Vini, vol. I, 89.

King Group provided the funds to Maharaja Investments to purchase Pinetree Plaza. *Id.* King Group obtained the funds from the refinance of 5754 Attucks Boulevard on June 26, 2019. King Group received $950,000 from the refinancing of 5754 Attucks Boulevard. *Id.* King Group wired $625,168.01 for the purchase and Shaneel Lalani sent $110,000 on behalf of King Group since he owed King Group funds from another property. PExh. 26;

The Pinetree Plaza purchase price was approximately $1,435,000. Pinetree LLC and Maharaja each paid 50% of the purchase price in cash. Vini, vol. I, 20. Charanjeev sent an email about the purchase of Pinetree Plaza and that's when Sahib wired the funds. Vini, vol. I, 90.

Maharaja treated the purchase money as a loan from King Group. RExh. 24.

The closing was scheduled for July and Vini was leaving for India on June 23, 2019.  He signed a Certified Resolution and Incumbency Certificate of Maharaja Investments, LLC dated June 22, 2019 giving Charanjeev authority to purchase Pinetree Plaza (the "Maharaja Purchase Resolution"). PExh. 25. This resolution was the only one he signed for Maharaja.

The closing was held remotely on July 15, 2019. The Amended Estimated Closing Statement has Vini's signature for Maharaja. PExh. 28. Vini did not attend

the closing and did not sign the closing statement as he was in India. Vini, vol. I,

89. Charanjeev was the authorized agent for Maharaja to consummate the purchase

of Pinetree Plaza. PExh. 25. He testified that he cannot remember if he attended the

closing or if he signed the closing statement. Charanjeev, vol. V, 196-197.

Maharaja and Pinetree LLC each purchased 50% of Pinetree Plaza and

owned the property as tenants in common. PExh. 13.

### Charanjeev's Transfer of Maharaja's Interest in Pinetree Plaza

For some time after August 14, 2019 the threats and demands ceased.

Meharban, vol.. II, 17.  Petitioners soon learned why that was the case.

Karan testified that Vini called him on April 16 to say that the next closing

would be a 1031 exchange without cash available to pay the remaining debt so he

and Charanjeev should transfer Pinetree Plaza to Crown Assets. Karan, vol.. VI,

28-29. Karan during his testimony "just remembered" that he asked Vini about the

Maharaja August 14 Operating Agreement who said he did not execute it. Karan,

*id.* at 29. He also testified that Mr. Haber emailed him the operating agreement

again on August 19 and it did not have Vini's signature. *Id.* at 30. The Singh

Family did not produce this email at trial.

On or about August 16, Charanjeev and Karan discussed whether to take

Pinetree Plaza or the Milledgeville Shopping Center. Interestingly, neither of them

claim to have spoken with Vini about the Milledgeville Shopping Center during

this time period. Charanjeev decided he would transfer Pinetree Plaza to Crown Assets. Karan, *id.* at 30.  Pinetree Plaza was a free and clear asset. Milledgeville was encumbered with a $3,000,000 loan. Sahib, vol. II, 98.

Based upon these purported conversations with Vini without corroboration or any writing, Karan and Charanjeev decided to transfer Pinetree Plaza to Crown Assets. Karan, *id.* at 30;  The Singh Family did not trust Sahib. They believed him to be a loose cannon and unstable and erratic. Karan, vol. VI, 70. Yet, Charanjeev and Karan chose to take Pinetree Plaza from Maharaja as payment for an unliquidated debt they believed the Arora Family still owed them after receiving a 50% interest in seven properties and a 50% interest in Pinetree Plaza. Charanjeev, vol V, 221-223.

Charanjeev and Karan believe that under the August 14 Operating Agreement or the Original Operating Agreement Vini's verbal consent for them to take Pinetree Plaza was sufficient as either requires 51% to transfer. Karan, vol. VI, 82. Vini never consent or authorization for Charanjeev or Karan or anyone to transfer Maharaja's 50% interest in Pinetree Plaza to Crown Assets. Vini, vol. VI, 91.

Charanjeev did not feel the need to get anything in writing from Vini. Charanjeev, vol. V, 223.

On August 19, 2019, Charanjeev executed a Quitclaim Deed conveying Maharaja's 50% interest in Pinetree Plaza to Crown Assets. PExh. 15.

On August 19, 2019, Charanjeev visited Michael Brochstein's office and asked him to prepare the Quitclaim Deed. Brochstein, vol.. III, 179. Mr. Brochstein asked for evidence of Charanjeev's authority to make the transfer. Charanjeev produced a copy of a Certified Resolution and Incumbency Certificate of Maharaja Investments, LLC dated June 22, 2019 that stated Charanjeev had the authority to sell Pinetree Plaza signed by Vini (the "Maharaja Sale Resolution"). *Id.* at 179-180. Mr. Brochstein is certain it was a copy and not an original. He corrected the declaration he drafted for Respondents in this case which stated that Charanjeev gave him an original resolution. *Id.* at 188; PExh 98.

Charanjeev told Mr. Brochstein that there was no consideration conveyed to Maharaja from Crown Assets. *Id.* at 182. If consideration had been paid, transfer tax would have been due and owing. Even if the transfer is a corporation to corporation transfer, the transfer tax must be paid if financial consideration is present. *Id.* at 194.

Charanjeev insisted at trial that he gave Mr. Brochstein an original Maharaja Sale Resolution. Charanjeev also testified that Vini never gave him a Maharaja Purchase Resolution. During the trial, Petitioners produced the original of the

Maharaja Purchase Resolution. Respondents have been unable to produce the original Sale Resolution and Mr. Brochstein has not seen the original.

The Arora Family believe that the Sale Resolution was created by Charanjeev or Karan from the Purchase Resolution to validate Charanjeev's transfer of Pinetree Plaza to Crown Assets.

Neither Charanjeev nor Karan told Meharban, Vini, or Sahib that they transfer occurred. They learned of the unauthorized conveyance on September 13 when Jarnail flew to India for the sole purpose of telling them face to face that Pinetree Plaza was not theirs.

On September 13, Jarnail went to India and arrived at the family home at 3:00 AM. Meharban, vol.. II, 17;  Jonika, vol. V, 56; Harsimran, vol.. II, 191. Jonika, Harsimran, Meharban, and Vini were in the family home when Jarnail arrived in the middle of the night on September 13, 2019. Jonika, vol. V, 56; Harsimran, vol. II at 191.  Meharban was sleeping and Jarnail woke him up.  The security guards had opened the door for Jarnail. Meharban, vol.. II, 17.  On demand, Meharban went to the living room.

Jarnail told him he had "snatched" the Thomasville property from Meharban. Meharban, vol.. II, 17.  He came to India to fight about it. *Id.* at 14.

Vini told Harsimran that Jarnail came to tell them that he had transferred the shopping center to his name and now they can do nothing about it. And he

threatened that he would ruin the wedding if they try to do anything about it. Harsimran, *id.* at 192.

Jarnail stayed for only one day. Harsimran, vol.. II, 192. Jarnail's passport stamps show his arrival in India on September 13, 2019 and his arrival in Atlanta on September 14, 2019. PExhibit D.

Vini contacted Sahib as soon as Jarnail told them about the transfer.  Vini and Meharban returned to the United States on or about September 18, 2019 to determine what happened with Pinetree Plaza. Sahib immediately emailed Charanjeev demanding a return of Maharaja's interest. PExh. 28; Sahib, vol. II, 105-106.

Sahib also emailed Charanjeev's broker to inform him of the transfer given Charanjeev's agency relationship with Maharaja. Sahib, vol. II, 106.

Karan emailed Sahib on September 20, 2019 with the terms to sell back Maharaja's interest to Vini or an entity he chooses for $385,000. PExh. 19; Sahib, vol II, 107.

Sahib wanted to pursue litigation against Charanjeev and Karan and met with an attorney. A demand letter was prepared, but it was not sent because Harsimran's wedding had not occurred. Sahib, vol. II, 110-111.

The Arora family was unaware, but in November 2019, Charanjeev began the refinancing of Pinetree Plaza with TC Federal Bank. Karan, vol.. VI, 41-42.

This $1.5 million loan closed in January 2020 with Pinetree Plaza as the collateral for the loan. Contemporaneously with that loan, Crown Assets conveyed its 50% interest in Pinetree Plaza to Pinetree LLC and Karan became a 50% member of Pinetree LLC.  Karan, *id.* at 62.

From the TC Federal loan, Karan and Shaneel Lalani each personally received $300,000. Karan, *id.,* 44-45. According to Karan, they could their share of the loan for any purpose. *Id.* at 73.

### Maharaja Operating Agreement

Vini signed and initialed Maharaja's first operating agreement on June 19, 2019. PExh. 24 (the "Maharaja Original Operating Agreement").Under this Original Operating Agreement, Vini is the sole member of Maharaja and owns 100% of the interest in Maharaja. Vini, Vol. I, 113.

The pertinent provisions of this operating agreement are as follows:

Article 3.1 of the Original Operating Agreement states that unanimous approval of the existing members is required to admit additional members.

Article 4.2 requires that "the unanimous approval of the members must be obtained prior to … "[t]he sale, exchange or other disposition of substantially all of the Company's assets occurring as part of single or multiple transactions or plan." This section further provides: "The signatures of all Members is required to sign contracts and obligations on behalf of the Company." PExh 24.

Charanjeev emailed the Maharaja Original Operating Agreement to Shilpa Ray for the assignment from King Group to Maharaja and Billionaire Funding Group, LLC. PExh. 29.

A second version of the Maharaja Original Operating Agreement surfaced which shows the addition of Karan as a 50% member of Maharaja with Vini as a 50% member (the "Maharaja 50/50 Operating Agreement"). PExh. Q. In this agreement, Karan signed his name below Vini's on page 9 and changed page 10 to indicate the split in membership interests. Vini, Vol. I, 114; PExh Q. Vini's initials that appear on pages 9 and 10 are not Vini's. Vini, Vol. I, 114. Otherwise, the Maharaja 50/50 Operating Agreement is identical to the Original Operating Agreement.

Vini testified that he had no knowledge of this 50/50 Operating Agreement. He also testified that he did not approve the admission of Karan as a member of Maharaja.

On August 14, 2019, at the request of the parties, Joel Haber drafted a Maharaja Investments, LLC Amended and Restated Operating Agreement which split the membership interests equally between Karan, Charanjeev, Arora, and Vini (the "Maharaja August 14 Operating Agreement"). Under the terms of this Operating Agreement, the approval of 51% of the members is required to sell property owned by Maharaja.  This approval must be given at a meeting of the

members, but a meeting may be waived if 51% of the members give their approval

in writing to sell the property.

At the August 14 Meeting, all but Vini executed this Operating Agreement.

Vini was in India and did not return the signed agreement during the meeting.  He

signed the agreement on August 14 or August 15 and returned it by email to Sahib.

PExh. P. Joel Haber testified that he received Vini's signature page on or around

August 15-16.

### The Theft of the Joint Funds and Gold in India

In mid to late September, Jonika withdrew all the funds from the joint bank

accounts in India.  Meharban, vol. II, 18; PExh. 27.  Approximately 3 core rupees

were taken that was Meharban's share of the joint account. PExh. 27. After doing

so, Jarnail asked Meharban, "How are you going to marry your daughter?" *Id*.

Jonika also took the gold from the safety deposit box in the bank in India with a

total weight of about 10 kilograms. *Id.*

Meharban did not give Jarnail permission to take all of the money from the

joint account in India. *Id.* at 44.

### The Arora Family's Efforts for Return of Pinetree Plaza to Maharaja

Meharban spoke with Charanjeev and Karan on the phone about returning

Pinetree Plaza.  They said they would return it when Meharban returned to

America. Meharban, vol.. II, 21.

In January 2020, Meharban met with Neena Tuckar and Charanjeev and Karan asking them to return Pinetree Plaza. They told him again that when Jarnail came to America in March they would return the shopping center. He had full confidence the shopping center would be returned. *Id.*

After a pleasant meeting in February 2020 at the Singh Family's St. Marlo house with Harsimran, Meharban, Ms. Tuckar, Jarnail, Charanjeev, and Karan, Meharban believed Pinetree Plaza would be transferred back to them. *Id.* at 36-37.

**Communication with Jonika And Charanjeev After the Threats.**

On August 21 and 23, 2019, Vini communicated by WhatsApp with Jonika about Harsimran's wedding dress. Vini, vol. I, 126-127; RExh. 66. At this point in time, it was too far along to find another dressmaker since the wedding dresses take four to six months to make. *Id.*

After Vini found out about Charanjeev's transfer of Maharaja's interest in Pinetree Plaza, he continued to communicate with Charanjeev through May 2020. *Id.* at 141. Vini did so because he believed Charanjeev and Karan would return Pinetree Plaza when Jarnail returned from India in March 2020. *Id.* at 141-142.

In September, Vini messaged Charanjeev asking for Vini and Meharban's accounts passwords and user names and Harsimran and Nita's passwords and usernames on their credit karma accounts. *Id.* at 151, 152; RExh. 70 at 9/19/19 at 9:38 PM and 9/23/19 6:26 PM. Vini asked for this information so he could change

the usernames and passwords on all of the Arora family bank and credit card
accounts. *Id.* at 152.

Harsimran's communications with Jonika and Charanjeev were not
confrontational. Harsimran, vol. II, 219. She ignored their texts that were not true.
*Id*. at 216, 226. She texted Jonika after the wedding to let her know she was
married and could no longer be threatened. *Id.* at 223. In the text chain Harsimran
believed Jonika was trying to manipulate the conversation. *Id.* at 224. She believed
that Charanjeev's text claiming he missed being at the wedding was not genuine.
Before the wedding he was being greedy and stealing property, which distracted
her wedding plans. *Id*. at 229.

### Crown Assets Breach of the Zillionaire Internal Agreement

On August 28, 2019 at 3:44 AM, Vini asked Charanjeev to deposit money
into the King Group bank account to cover Crown Assets' half of the Attucks Blvd
mortgage payment. *Id.* at 148-149; RExh. 70. Per the Zillionaire Internal
Agreement, Crown Assets was obligated to pay half the mortgage payment from
August 14 onward, which Crown Assets did not pay. *Id.* at 149. During this time,
Charanjeev was collecting the monthly rent from the Attucks Blvd tenant but was
not remitting the full rent payment to King Group. *Id.* at 149.

### Zillionaire Amended and Restated Operating Agreement

Prior to November 20, 2019, Zillionaire had one member – King Group. On November 20, Charanjeev demanded that Sahib added Crown Assets as a 50% member for three reasons. Attucks Blvd was under contract and Charanjeev threatened to interfere with the closing. Charanjeev was collecting the rent and not remitting to King Group which left King Group without a revenue source to pay the mortgage. RExh. 123. Charanjeev promised that Pinetree Plaza would be returned to Maharaja when Jarnail returned from India in March. Sahib, vol. III, 20.

### Charanjeev's Unauthorized Use of Harsimran's Credit Cards

Prior to the August 14, 2019 Agreement, Charanjeev had access to the Arora Family's credit cards and personal bank accounts. He would ensure minimum payments were made on credit cards and transfer balances as necessary. Whenever one of the family members from either family went back to India, they would leave their American credit cards, identification, and phones at the 660 Belgrave house.

Charanjeev had possession of her credit cards to set up automatic payments while she was in India. When he moved out of 660 Belgrave he took all of her credit cards and her identities with him. He was in America and she was in India. She never authorized him to steal money from her cards. Harsimran, vol. I, 246.

When Harsimran returned to India, she left her American credit cards and identification at 660 Belgrave Lane. Harsimran had given Charanjeev permission to set up automatic payments for her cards. She had not given him permission to use the funds in her Wells Fargo bank account. When he moved out of 660 Belgrave on August 19, 2017, Charanjeev took her credit cards and identification cards with him. Harsimran, Vol.. II, 204.

After the August 14 Agreement, the families had separated and were no longer doing business together in the United States. Meharban and Jarnail continued to operate together the joint businesses in India. Charanjeev was no longer authorized to use the Arora Family's credit cards or bank accounts.

After August 14, 2019, Charanjeev used without Harsimran's permission or authorization for his personal expenses Harsimran's two Capital One cards, Citi Diamond Preferred card, Discover card, and Fifth Third card.  She did not make any of the charges on these statements nor did she authorize Charanjeev to use them to make purchases. Harsimran, Vol., II, 203-205; PExh. 35, 40-42. Each of these charges and balance transfers occurred after the August 14, 2019 Agreement without her permission.

These unauthorized charges and balance transfers totaled: $35,106. PExh 35 Capital One Statement; PExh 36 – Capital One Statement; PExh 37 – Citi Diamond Preferred Statement; PExh 40 – Discover Card Statement; PExh 41 –

Fifth Third Statement.  Charanjeev also paid his bills from her Wells Fargo

checking account without her permission or authorization. Harsimran, Vol. 11,

206; PExh 42 – Wells Fargo Checking Statement.

During this same time period, Charanjeev called these credit card companies

purporting to be Harsimran to ask for credit limit increases. Each of his requests

was rejected and had a detrimental effect on her cards. *Id.* at 207. She learned of

his attempts when she received letters from each company. *Id;* PExh 39 – credit

line increase rejection letters

She did not witness Charnajeev make the charges or make the calls, but he

was in possession of all her cards and she traced the individual charges back to

him. She also called Discover to ask about the letter. She was told that a man

called to speak on her behalf. *Id.*

Harsimran contacted Charanjeev asking him to pay the credit cards as the

transactions were his and she did not give him permission to make them. He

promised to pay them, but he did not. *Id.* at 208.

Prior to Charanjeev's unauthorized use her "cards were free and clear." *Id.* at

231 Her cards had never been used for King Group business expenses or any

related entity. *Id.* at 232.

### Karan's Theft of Bayview Check

The Zillionaire Amended and Restated Operating Agreement names Sahib as the manager of Zillionaire.  Karan is not a member of Zillionaire.  Only Sahib has access to Zillionaire's bank account and authority to endorse checks on behalf of Zillionaire. PExh. 9.

In November 2019, Zillionaire as the borrower expected to receive a check from Bayview Loan Servicing, LLC in the amount of $25,169.53. Sahib informed Bayview that the check had not been received. Bayview in response informed Sahib that the check sent to 660 Belgrave Lane dated November 12, 2019 had been cashed. It sent a copy of the endorsed and cashed check to Zillionaire. This copy shows that Karan endorsed the check to Crown Assets – "Pay to the order of Crown Assets LLC" with his signature below.  PExh. 96.

Karan admitted signing the check. He thinks it was sent to his St. Marlo house, but doesn't recall how it got there, but acknowledges it was addressed to 660 Belgrave Lane. Karan, vol. VI, 76-77.

### Forgery and Theft of Maharaja and Vini Checks

Charanjeev had access to Vini's credit cards, but Vini had never given Charanjeev access to his bank account. Vini, vol. I, 71, Nor had he given Charanjeev or any member of the Singh Family authority to sign any checks drawn on Vini's bank account. On August 12, 2019, check number 1010 from Vini's

personal bank account was made payable to Karan Karan in the amount of $5300. The signature is not Vini's. PExh. 26.

Vini was and is the only authorized signer on the Maharaja bank account. Vini, vol.. I, 70. On July 30, 2019, a check made payable to King Property Advisors, LLC in the amount of $15,000 was drawn on Maharaja's bank account. The signature on the check is not Vini's. PExh. 31. King Property Advisors is solely owned by Charanjeev. Vini did not write the check or sign the check or authorize anyone to sign the check. Vini, vol.. I, 71.

### Tender of Karan's 11% King Group Interest

On July 16, 2020, Sahib tendered to Karan the 11% interest he transferred to Sahib on August 14, 2019. P.Exh. 87. Karan did not accept this tender.

### Gelt Financial Guaranty

Under the Zillionaire Amended and Restated Operating Agreement, Crown Assets and King Group would share equally the profits from the sale of Attucks Blvd. PExh. 9. Sahib and Karan intended to treat that sale as a 1031 exchange with each using their proceeds to buy a property under the name of their respective entity only. RExh. 33. Zillionaire would not be an owner of the properties purchased by Crown Assets and King Group. RExh. 33.

Crown Assets, King Group, and Zillionaire entered into an Agreement dated December 21, 2019 (the "Zillionaire 1031 Agreement") in which the parties set out

the terms for the use of the Attucks Blvd sales proceeds in separate 1031 exchanges. RExh. 33. The Agreement provides that neither Crown Assets nor King Group is obligated to assume any financial obligation of loan secured by their respective 1031 replacement properties. *Id.*

They each signed for the other a Zillionaire resolution authorizing the other to execute all documents necessary to effectuate a loan for their respective 1031 exchange properties. PExh. 2, 4.  The Crown Assets' property was 90 Hunter's Chase. PExh. 4. The King Group property was 3180 Atlanta Hwy. PExh. 3.

Karan on behalf of Crown Assets obtained a loan from Gelt Financial. Gelt Financial required a guaranty from Zillionaire and a confession of judgment from Zillionaire before it would fund the loan. PExh.7. Karan executed the guaranty on behalf of Zillionaire without consulting Sahib based upon the 90 Hunter's Chase Resolution.

When Sahib learned of the guaranty, he mailed a letter to Jack Miller at Gelt Financial inquiring about the guaranty. PExh. 5. In this letter he questioned how Zillionaire could be a guarantor when he as the manager and 50% owner had not given his consent.

Sahib was not aware that the 90 Hunter's Chase Resolution gave Karan the authority sign a guaranty and a confession of judgment on behalf of Zillionaire. He

believed that the Zillionaire Amended and Restate Operating Agreement controlled in this instance given the obligations to which Karan committed Zillionaire.

### Charlie Gonzalez

Charlie Gonzalez testified that he decided to not do business with King Group for business reasons, not because of the internal dispute between the Arora Family and Singh Family. Gonzalez, vol. V, 51.

### Attempts at Resolution

On April 4, 2020, Charanjeev, Jarnail, Vini, Meharban, Reeta Rani, and Harsimran held a meeting to discuss the return of Pinetree Plaza to Maharaja. Charanjeev testified that "we figured out amount, you know, signed it off." PExh. 60. The amount stated on the note from the April 4 meeting that was signed by Charanjeev and Vini is $224,931 in exchange for the return of a 25% interest in Pinetree Plaza. Karan was not present at the meeting and had not signed the note. PExh. 60. Charanjeev, vol. V, 173. Charanjeev wrote the amount he believed he was owed as reimbursement from King Group, but did not provide receipts or credit card statements. Harsimran asked him to provide the documents or to share the information electronically at the meeting.  He did not do either. Harsimran, vol. I, 200-201.

Vini reached out to Charanjeev the following day asking for the documents. Charanjeev said he would send the documents after Vini sent the money to Mr. Brochstein to hold in escrow.

On April 6, 2020, Charanjeev emailed Mr. Brochstein asking him to draft an agreement between Karan and Vini regarding the transfer of an interest in Pinetree Plaza to Vini. Brochstein, vol. III, 183; PExh. M. Vini was to pay Karan $224,931 after deducting $170,000 Vini would have received from the TC Federal refinance loan had he owned 25% of Pinetree Plaza at that time. *Id.* Mr. Brochstein did not finalize this agreement.

Charanjeev said he would provide the Pinetree LLC bank statements and get the documents drafted once the money was in escrow. "Because I didn't trust them to pay." Charanjeev, vol. V, 173. The person promising to pay was Vini.

Charanjeev's statement of mistrust without proof of payment is in stark contrast to his and Karan's insistence that they did not need any proof of Vini's purported approval for them to take Maharaja's 50% interest in Pinetree Plaza. When they were taking a free and clear $700,000 asset, Vini's verbal approval was enough. When they were selling half of that now encumbered interest back to Vini, Vini's verbal agreement to pay was not.

## CONCLUSIONS OF LAW

Petitioners seek recission of the August 14 Deeds, the Zillionaire Internal

Agreement, the Bill of Sale, the Maharaja August 14 Operating Agreement, and

the Zillionaire Amended and Restated Operating Agreement.[2]

Under Georgia law, equity can be used to provide relief when no adequate remedy

at law exists. To exclude equitable relief, the remedy at law "must be complete and

the substantial equivalent of the equitable relief. It is not enough that there is a

remedy at law. It must be plain and adequate, or in other words, as practical and as

efficient to the ends of justice and its prompt administration as the remedy in

equity." *Davis v. Logan,* 206 Ga. 524, 526 (1950).

The Court may award Petitioners money damages for their claims, but

money damages are not the substantial equivalent of the equitable relief they seek,

which is the return of Maharaja interests in Pinetree Plaza and the rescission of the

August 14 Deeds, rescission of the Zillionaire Internal Agreement, and return of

the sales proceeds from Attucks Boulevard and Snapfinger.

The Court finds that based on the nature of Petitioners' claims allows for the

Court to award equitable relief and monetary relief.

---

[2] Given that this document is Petitioners' Proposed Findings of Fact and Conclusions of Law, Petitioners will seek damages in the alternative under their various claims. If Petitioners prevail on their claims for recission, the remaining claims, except for attorney's fees and RICO claims, will be moot.

### A.    Recission Based Upon Duress Claim

Georgia law states that the free assent of the parties is essential to a valid contract and duress by threats or other acts by which the free will of the party is restrained and his consent induced renders the contract voidable at the election of the injured party. O.C.G.A. § 13-5-6.  The Georgia Supreme Court has noted that the codification of duress applies to economic duress. *Tidwell v. Critz,* 248 Ga. 201, 203 (1981).  Economic duress involves taking undue or unjust advantage of a person's economic necessity or distress to coerce him into making a contract. *Compris Technologies, Inc. v. Techwerks*, 274 Ga. App. 673, 682 (2005).

The Court finds that Petitioners have not alleged economic duress.  Based on the evidence presented at trial, they have asserted legal duress which requires coercion.

"Duress which will avoid a contract must consist of threats of bodily or other harm, or other means amounting to coercion, or tending to coerce the will of another, and actually inducing him to do an act contrary to his free will." *Tidwell v. Critz,* 248 Ga. 201, 203 (1981).

In *Cooperative Resource Center, Inc. v. Southeast Rural Community Assistance Project, Inc.,* 256 Ga. App. 719 (2002), CRC was one of the most experienced entities in its field and consulted with legal counsel before signing a guaranty and executed the guaranty its counsel negotiated and advised it to sign.

The court found that the defense of duress was not available to CRC. The court noted, however, if the defense were available, the record did not show that the defendant's conduct induced CRC to "act contrary to its free will, or to coerce CRC into pursuing a different course from that which its own judgment at that time dictated as the best for its own interests." *Id.* at 721.

Unlike in *Cooperative Resource Center*, the Arora Family did not initiate the family separation. Karan's arrival to Atlanta in June 2019 seems to be the catalyst for the events that occur thereafter. Jarnail was leaving "nasty" voicemails beginning in January 2017 after Harsimran's engagement, but the threatening demands for 50% of King Group and escalation in Jarnail's communications did not commence until after Karan arrived.

While the testimony of the parties is contradictory, one fact permeates the story. Sahib believes he developed King Group and was central to its success from 2014 through the present. Without his free will being restrained and his consent to the August 14 agreement induced, he never would have relinquished 50% of any King Group properties to Charanjeev and Karan. Meharban and Vini conveyed Jarnail and Jonika's threats to ruin Harsimran to him. Meharban and Vini made clear to Sahib that Harsimran would be ruined if he did not enter into an agreement with Charanjeev and Karan to give them 50% of the King Group properties.

Sahib was not pursuing a separation and resisted doing so until the threats became more intense and frequent. Jarnail and Jonika made it clear that they would not take no for an answer. And as Jarnail threatened on August 1, 2017, "You do not know what the price is for a daughter's marriage."

Examining the severity and implications of these threats in the context of the Indian culture, the Court finds that they did rise to the level of coercion and actually induced Sahib and Vini to act contrary to their free will.

Respondents contend that Mr. Haber's involvement negates the duress claim. A case from Pennsylvania is illustrative on this point. In *Litten v. Jonathan Logan, Inc*., 286 A.2d 913 (Pa. Super. Ct. 1971), the plaintiffs "contend[ed] they were compelled under the duress and coercion of the defendant to enter into the written contract because defendant had maneuvered plaintiffs into an untenable economic crisis from which they could extricate themselves only by signing the agreement prepared by defendant." *Id.* at 277.

The plaintiffs had legal counsel; however, "Plaintiff's attorney, who happened to be a brother of defendant's attorney, advised them they had no alternative but to sign." *Id.* at 280.  The court affirmed a jury verdict in plaintiffs' favor, stating:  "No amount of lawyer's advice or plaintiffs' business experience could have assisted plaintiffs." *Id.* at 281.

While Sahib is sophisticated in business matters, the Court finds Mr. Haber's testimony credible that Sahib did not seek his legal advice regarding the August 14 separation nor did Mr. Haber give any legal advice. Similar to *Litten,* any advice Mr. Haber may have given would not have altered the terms of the August 14 Agreement.

Mr. Haber wanted to give Sahib advice and wanted to draft an overall settlement agreement, but Sahib declined his legal services.  Mr. Haber was a scrivener for the transaction and did not provide legal advice of any kind regarding the terms or the effect of the documents.

The Court does not find compelling the testimony regarding Mr. Haber's call to a tax attorney about any tax implications as a result of the Zillionaire agreement. Mr. Haber's recollection on this point was not clear.

Petitioners have presented sufficient evidence to establish duress and neither Sahib nor any other Petitioner obtained the advice of legal counsel in reaching an agreement with Charanjeev and Karan.

In fact, the evidence presented shows that Sahib and Vini believed the separation between the families to be complete as of August 14 except for the resolution of cash advances and Charanjeev's expenses on August 15.  Sahib and Charanjeev came to terms on those items on August 15 with the understanding that

Charanjeev would be paid at the next available King Group closing when Charanjeev presented his receipts.

Petitioners began pursuing these claims only after they learned on September 14, 2019 that Charanjeev had fraudulently conveyed Maharaja's interest in Pinetree Plaza to Crown Assets on August 19, 2019. This conveyance was not part of the August 14-15 agreement, but Charanjeev and Karan's wrongful act to take more than what was bargained for on August 14 and August 15 brought their plan of fraud and extortion to light.

### B.    Recission Based on Fraudulent Inducement Claim

O.C.G.A. § 13-4-60 provides that a "contract may be rescinded at the instance of the party defrauded; but, in order to rescind, the defrauded party must promptly, upon discovery of the fraud, restore or offer to restore to the other party whatever he has received by virtue of the contract if it is of value." The question of what is a reasonable or prompt time within which to rescind a contract depends on the facts of the particular case and is a question for the trier of fact. *Newton v. Burks,* 139 Ga. App. 617, 618 (1976).

The Georgia Supreme Court has stated that a delay of more than six months of giving notice to rescind results in a waiver of the rescission claim. *Walker v. Johnson*, 278 Ga. 806 (2006). A time gap as small as three months has not been found to be an unreasonable delay in giving notice of rescission.

Additionally, on March 14, 2020, the Georgia Supreme Court issued its

*Amended Order Declaring Statewide Judicial Emergency* pursuant to O.C.G.A. §

38-3-62 which suspended, tolled, extended and granted relief from any deadlines

or other time schedules or filing requirements imposed by statutes, rules,

regulations or court orders in civil and criminal matters. This order was extended

under July 15, 2020.

Petitioners learned of the Crown Parties' fraud on September 14, 2019 when

Jarnail arrived in India for the purpose of telling Meharban and Vini that Pinetree

Plaza now belonged to his family. Sahib immediately emailed Charanjeev

demanding the return of Pinetree Plaza to Maharaja. Vini and Meharban returned

to America on September 18 to pursue the return of the shopping center.

Sahib, Vini, and Meharban testified to their efforts for the return of Pinetree

Plaza to Maharaja from September 2019 through early April 2020. During this

period, family meetings were held to discuss the return of the property. The Singh

Family continued to tell the Arora Family that when Jarnail returned from India in

March the property would be returned to Maharaja.

In April 2020, they learned that Crown Assets had transferred its interest in

Pinetree Plaza to Pinetree LLC. Pinetree LLC then used the shopping center as

collateral for a $1.500,000 loan.

On July 16, 2020, Michael Dominy sent the rescission letter to the Singh Family rescinding the transactions that occurred as part of the August 14 Agreement and tendering to Karan his 11% interest in King Group.

The Court finds that given the circumstances Petitioners promptly offered to restore to Karan his 11% interest in King Group and rescind the August 14 transactions.

To justify rescission of an agreement for fraud in the inducement, Petitioners must prove that Charanjeev and Karan made a knowingly false representation; that they did so with the intent of inducing Petitioners to act in reliance on the misrepresentation; and that Petitioners justifiably relied on the misrepresentation to their detriment. *Shuford v. Aames Plumbing and Heating, Inc.,* 327 Ga. App. 844 (2014).

When the Arora Family learned that the Singh Family had taken Pinetree Plaza, they made efforts for the return of the property. During September and October the Arora Family was reluctant to take any action since Harsimran was not yet married. The threats had ceased after the August 14 transactions and the Arora Family did not want them to start again.

After the wedding at the end of October, the Arora Family renewed their efforts for the return of Pinetree Plaza. The evidence shows that Charanjeev and Karan promised to return Pinetree Plaza if Sahib amended the Zillionaire

operating agreement to add Crown Assets as 50% member of Zillionaire.

Zillionaire had a closing scheduled for 5754 Attucks Boulevard in late November,

and the Singh Family wanted 50% of those sales proceeds.

On November 20, 2019, Sahib added Crown Assets as a 50% member to

Zillionaire on the belief that the Singh Family would return Pinetree Plaza to

Maharaja. Charanjeev knew that Sahib would not agree to add Crown Assets

without this promise. Harsimran was married which was a reason to believe

Charanjeev's promise.

The Court finds that Charanjeev knew when he made the promise that he did

not intend to return Pinetree Plaza to Maharaja, but Sahib was justified in believing

Charanjeev's promise. Charanjeev fraudulently induced Sahib to add Crown

Assets as a member to Zillionaire and Crown Assets received $876,000 from the

closing of Attucks Boulevard which it otherwise would not have received.

The Court finds that rescission is the appropriate remedy in this instance.

The Court orders that the Zillionaire Amended and Restated Operating Agreement

is void.

### C.    Recission Based on Illegality of Consideration Claim

The effect of illegal consideration is codified in O.C.G.A. § 13-3-45 which states:

"If the consideration is good in part and void in part, the promise will or will not be

sustained, depending upon whether it is entire or severable. If the consideration is

illegal in whole or in part, the whole promise fails." "An illegal consideration consists of any act or forbearance , or a promise to act or forbear, which is contrary to law or public policy." *Barger v. Garden Way, Inc.,* 231 Ga. App. 723, 724-25 (1998). If all or part of the consideration of a contract is illegal the contract is void. *Hanley v. Savannah Bank & Trust Co.,* 208 Ga. 585 (1952).

The evidence presented at trial shows that Sahib agreed to execute the documents that were part of the August 14 Agreement to prevent the Singh Family from consummating their threats to break up Harsimran's wedding and to defame her character. King Group and Maharaja gave valuable property interests and the Singh Family gave a promise to not defame or harm Harsimran's marriage. The Singh Family received 50% ownership of five King Group properties, 50% of the member interest in Maharaja, a 50% interest in Attucks Boulevard, and a 28% interest in 5318 Old Cornelia Highway in exchange for their promise to not carry out their threats.

The consideration that passed between the parties for these transactions was based on extortion to defame and harm Harsimran's reputation, character, and marriage. O.C.G.A. 16-8-16(a)(3) makes threats to defame and harm someone an illegal act.

The Court finds that the consideration given by the Singh Family was illegal, making the August 14 transactions void and unenforceable.

### D. Petitioners' Claims Under Georgia's Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-1, et seq ("RICO").

The Georgia Supreme Court has decreed that the applicable standard of proof in state civil RICO actions is preponderance of the evidence. *Williams Gen. Corp. v. Stone,* 279 Ga. 428 (2005)(overruling cases; in accord with preponderance of the evidence standard in federal civil RICO claims). Preponderance of the evidence means that the plaintiff must produce evidence when considered in light of all the facts leads the trier of fact to believe that what the plaintiff claims is more likely true than not. *Blossom v. CSX Transp.,* 13 F3d. 1477 (11th Cir. 1994).

To have standing to bring a civil claim under RICO, Petitioners must prove by a preponderance of the evidence that one or more of Respondents violated the RICO statute, Petitioners suffered an injury, and Respondents' RICO violation and the injury are causally connected. *Quasebarth v. Green Tree Servicing, LLC,* 90 F. Supp. 3d 1373, 1382 (M.D. Ga. 2015).

It is unlawful for any person to acquire an interest in or control of money or real property or personal property through a pattern of racketeering activity or proceeds derived from that activity. O.C.G.A. 16-14-4(a); *Williams v. Unum Life Ins. Co. of America,* 2007 WL 2479561 (N.D. Ga. Aug. 27, 2007). Under RICO, Petitioners need not prove that an enterprise exists, but only establish the

racketeering activity. *Williams v. Mohawk Indust., Inc.,* 465 F.3d 1277, 1293 (11th Cir. 2006).

For the Court to consider Petitioners' RICO claims, Petitioners first must establish a pattern of racketeering activity. O.C.G.A. 16-14-3(4). Petitioners must show that one or more of Respondents engaged in "at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents, . . ., and that the last of such acts occurred within four years." O.C.G.A. § 16-14-3(4).

Petitioners have established by a preponderance of the evidence that one or more Respondents committed eight predicate acts under RICO during the period of January 2019 through March 2020 to unlawfully obtain: 50% ownership of six King Group properties; 50% of the profit from the sale of two King Group properties; 100% of Maharaja's interest in Pinetree Plaza; 50% of the equity in 660 Belgrave Lane; and 50% of King Package, LLC.

**Predicate Acts**

1.  Under O.C.G.A. 16-8-16(a)(3), a "person commits the offense of theft by

extortion when he unlawfully obtains property of or from another person by

threatening to: disseminate any information tending to subject any person to

hatred, contempt, or ridicule or to impair his credit or business repute."

The Singh Family wanted 50% of the King Group properties and 50% of

Maharaja's interest in Pinetree Plaza. They resorted to extortion to satisfy their

desire when Sahib refused to comply. Sahib succumbed to their demands on

August 14 when the threats to harm Harsimran's marriage and reputation escalated

to a level he could not ignore.

Jarnail and Jonika committed theft by extortion when they threatened to

disseminate information that would subject Harsimran to "hatred, contempt, or

ridicule" in order to unlawfully obtain property from King Group, Zillionaire,

Maharaja, Sahib, and Vini.  Jarnail and Jonika made threats to break Harsimran's

marriage by publishing statements to her fiancé, his family, and her community in

Amritsar that would impugn and malign her character as a woman and as a bride.

These statements that she was a loose woman of poor character who had many

boyfriends would subject her to hatred, contempt or ridicule by her fiancé and his

family and break her engagement.

In July 2019, Sahib refused to convey the property. On August 1, 2019,

Jarnail left a voice message on Vini's phone that specifically threatened to interfere

with Harsimran's marriage if Sahib did not convey 50% of King Group to

Charanjeev and Karan. Jarnail explained at trial that his message meant "when you're going to hurt me, then I will hurt you." He threatened "total destruction" to Harsmiran's marriage and future life, because he had not been given the properties.

On August 14 in India, Jonika threatened to send others to Harsimran's fiancé's home in India to disrupt their marriage if Sahib did not transfer 50% of the King Group properties to her sons. Jarnail also made threats to Vini using foul language that he would break up Harsimran's marriage if the interest was not conveyed. He threatened to defame her character.

The Court notes that such threats in America may seem harmless, but the Court must view the threats through the lens of Indian culture. Harsimran's marriage was arranged through an intermediary. The initial arrangement came about based on her and her family's reputation and character. The negative and damning statements Jarnail and Jonika threatened to make about Harsimran's character would have destroyed her marriage.

The Court acknowledges that Jarnail and Jonika deny making any threats about Harsimran's character or to break up her marriage. Of note, when asked directly by his counsel at trial if he had threatened to interfere with Harsimran's wedding, Jarnail deflected the question and did not answer.

Given the demeanor of the witnesses, the testimony presented, and Jarnail's voice message, however, the Court finds that Petitioners' claim of threats is more likely true than not and Petitioners have proven theft by extortion.

King Group's injury from the loss of 50% of five properties, 50% of 2318 Old Cornelia Highway, and 50% of the sales proceeds from the sale of 5754 Attucks Blvd and Snapfinger flowed directly from Jonika and Jarnail's threats to break Harsimran's marriage and defame her character.  Without the need to protect their sister from harm, Sahib would not have made these conveyances or entered into the Zillionaire Internal Agreement.

Vini, on behalf of Maharaja, would not have agreed to split his Maharaja membership interests with Charanjeev and Karan but for the Singh Family's threats to break Harsimran's marriage and defame her character. Maharaja's injury, and Vini's injury, is the loss of any ownership interest in Pinetree Plaza that flowed directly from the acts of the Singh Family from January 2019 through October 2019.

2.  Under O.C.G.A. § 16-8-3(a), a "person commits the offense of theft by deception when he obtains property by any deceitful means or artful practice with the intention of depriving the owner of the property." A person "deceives if he intentionally: (4) Sells or otherwise transfers or encumbers property intentionally failing to disclose a substantial and valid known lien, adverse claim, or other legal

impediment to the enjoyment of the property, whether such impediment is or is not

a matter of official record; . . . ." O.C.G.A. § 16-8-3(b)(4).

Charanjeev, Karan, and Crown Assets committed theft by deception when

they intentionally transferred Maharaja's 50% interest in Pinetree Plaza without

verbal or written authorization or consent from Vini. The Court does not find

credible Charanjeev and Karan's testimony that Vini gave them verbal consent to

transfer the free and clear $700,000 asset one or two days after the parties had

reached an agreement on the division of the Maharaja membership interests. They

each were adamant in their testimony that they did not get Vini's consent in

writing.

The Court finds curious that for all other pertinent communications to

Respondents position in this case, they have produced text message chains and

voice messages in support of their positions. For this particular transfer, however,

Charanjeev and Karan do not have a WhatsApp message or a voice message in

which Vini specifically gives his authority to transfer Maharaj's interest in Pinetree

Plaza to Crown Assets.

Further, by their own testimony, Charanjeev and Karan discussed final terms

of the business separation only with Sahib in Joel Haber's office on August 14 and

again on August 15. They did not discuss the final separation terms with Vini or

Meharban. The finalized agreement terms were resolved with Sahib at Joel Haber's

office. Their testimony that they could only communicate with Vini regarding the Maharaja transfer does not ring true.

At that point in time in August, the parties believed themselves to be bound by the August 14 Maharaja Operating Agreement. The plain terms of that operating agreement negate any verbal consent to transfer Pinetree Plaza to Crown Assets or any party. The Operating Agreement requires 51% approval of the members to sell property and this approval must be given at a meeting of the members, which can be waived if 51% of the members give their approval in writing to sell the property.

Respondents did not produce any evidence of a meeting of the Maharaja members to give approval of the sale. And, Charanjeev and Karan vehemently deny the existence of any written approval from Vini to sell Pinetree Plaza.

Petitioners have shown by a preponderance of the evidence that Charanjeev's deceitful conveyance of Maharaja's 50% ownership in Pinetree Plaza to Crown Assets constitutes theft by deception as it intentionally deprived the rightful owner, Maharaja, of its property.

After this transfer to Crown Assets, Charanjeev then intentionally deceived TC Federal Bank when he transferred Pinetree Plaza to Pinetree LLC so that Pinetree LLC could obtain the refinance loan for Pinetree Plaza. Pinetree LLC also intentionally deceived TC Federal Bank when it applied for the loan without

disclosing that Maharaja had a claim to 50% of Pinetree Plaza that created a "legal impediment to the enjoyment of the property." Pinetree LLC pledged Pinetree Plaza as collateral for the refinance loan of Pinetree Plaza.

The undisputed testimony established that Shaneel Lalani, the principal of Pinetree LLC, knew about Sahib, Vini, and Maharaja's claims to Pinetree Plaza but did not want to get involved. Karan signed an affidavit for the loan which stated he knew of no issues. As the agent for Crown Assets, Charanjeev transferred the property to Pinetree LLC for the purpose of obtaining the loan without disclosing the claims.

Charanjeev and Karan had known since as early as September 16, 2019 that Vini and Sahib contested the transfer from Maharaja to Crown Assets. The record is clear that if Vini and Sahib had known about the second transfer and the loan, they would have intervened prior to the consummation of the transaction.

Maharaja's loss of a $700,000 asset and Vini's loss of a 50% interest in Maharaja flowed directly from Charanjeev, Karan, Crown Assets, and Pinetree LLC's theft of these property interests in Pinetree Plaza. The Court finds that Petitioners have shown by a preponderance of the evidence that Charanjeev, Karan, Crown Assets, and Pinetree LLC committed theft by deception.

3.      O.C.G.A. § 16-8-4(a) – Pinetree LLC committed theft by conversion when it lawfully obtained the rents from Pinetree Plaza but failed to hold those

rents in escrow while knowing Maharaja had a legal claim to a portion of those rents. Pinetree LLC, through its principal Shaneel Lalani, knew in October 2019 that Maharaja was seeking the return of its 50% interest in Pinetree Plaza.

Pinetree LLC and Maharaja were tenants in common. "A tenant in common shall be liable to account to his cotenant if he receives any rent or other profit from the joint property or deprives his cotenant of the use of his fair proportion of the joint property." O.C.G.A. § 44-6-121(b)(1), (3). Each tenant in common is entitled to his share of the use, rent and profits from the jointly owned property. *Dozier v. Wallace*, 169 Ga. App. 126 (1983). When one tenant in common receives more than his share, his is liable to account for the surplus. *Smith v. Smith*, 141 Ga. 629 (1914).

When Pinetree LLC failed to set aside Maharaja's share of the rents from Pinetree Plaza, it committed theft by conversion. Shaneel Lalani and Karan knew that Maharaja asserted a legal claim to its portion of the rents based upon Vini and Sahib's efforts to have Maharaja's interest transferred back to it.

The Court finds that Maharaja has proven by a preponderance of the evidence that Pinetree LLC committed theft by conversion. Maharaja is entitled to its portion of those rents from August 19, 2019 through the date of this order.

Charanajeev also committed theft by conversion when he did not remit the rents to King Group that he collected from the tenants at Attucks Blvd and

Snapfinger.  He collected the rents for King Group and retained what did not

belong to him in the amount of $122,000. The Court finds that King Group has

proven by a preponderance of the evidence that Charanjeev committed theft by

conversion.

    4.    O.C.G.A. § 16-9-1(b) is the predicate act of forgery in the first degree.

Charanjeev, Karan, and Crown Assets committed forgery in the first degree when

with intent to defraud when they knowingly made and possessed a writing in such

a manner that the writing as made or altered purports to have been made by

authority of one who did not give such authority and delivers such writing.

    This writing is the Maharaja Sale Resolution that Charanjeev delivered to

Mr. Brochstein as proof of his authority to sell Maharaja's 50% interest in Pinetree

Plaza to Crown Assets. Petitioners did not present conclusive proof at trial that

Charanjeev or Karan had doctored or forged the Maharaja Sale Resolution.

Conclusive proof, however, is not required for the Court to find forgery in the first

degree. The Court need only determine if it is more likely than not that the

Maharaja Sale Resolution was not an authentic document executed by Vini.

    Based on the preponderance of the evidence, the Court finds that the

Maharaja Sale Resolution did not give Charanjeev the authority to convey Pinetree

Plaza to Crown Assets. Vini executed one resolution on June 22, 2019 before

leaving for India. At trial, Petitioners produced the original of this resolution with

72

the ink signatures which states it was for the purchase of Pinetree Plaza (the

"Maharaja Purchase Resolution").

The need for a resolution was to facilitate the closing of the purchase of

Pinetree Plaza. Vini was the sole member of Maharaja on June 22, 2019 and was

departing for India the next day. The closing was scheduled for July. Charanjeev as

Maharaja's agent was given authority to proceed with the purchase of Pinetree

Plaza through the Maharaja Purchase Resolution. There was no practical need for a

resolution to sell the property before it was purchased.

Mr. Brochstein testified that Charanjeev did not present an original

resolution to him to show his authority for the transaction. He corrected a

statement in a declaration given to Respondents earlier in this case that Charanjeev

had given him an original resolution. Mr. Brochstein is certain Charanjeev

presented a copy and not an original to him. The Court finds Mr. Brochstein's

testimony credible on this issue.

Based on the foregoing, the Court finds by a preponderance of the evidence

that Charanjeev committed forgery in the first degree under O.C.G.A. § 16-9-1(b).

5.      O.C.G.A. 16-9-1(d)(1) – Charanjeev committed forgery in the third

degree when with the intent to defraud he knowingly wrote checks in the amounts

in such manner that the checks as made purport to have been made by authority of

one who did not give such authority.

A check in the amount of $10,000 was written on Maharaja's bank account
to King Property Advisors, which is Charanjeev's company. Only Vini had
authority to write checks on the account. Vini testified that the signature on the
check is not his.

The Court finds Vini's testimony credible and finds that Charanjeev committed
forgery in the third degree.

6.    O.C.G.A. 16-9-33 states that a person commits the offense of financial
transaction card fraud when they obtain money, goods, services, or anything else of
value by presenting the card without the authorization or permission of the
cardholder. Harsimran's testimony shows by a preponderance of the evidence that
she did not give Charanjeev authorization to use her credit cards after August 14
for any purpose. The documentary evidence shows that Charanjeev did use the
cards to purchase goods for his personal use.  The Court finds that Charanjeev
committed the offense of financial transaction card fraud.

7.    O.C.G.A. 16-9-121 states that a person commits the offense of
identity fraud when they willfully and fraudulently without authorization or
consent use or possess with intent to fraudulently use identifying information
concerning a person. Harsimran's testimony and documentary evidence show that
more likely than not Charanjeev called to obtain credit line increases for

Harsimran's credit cards without her request, consent, or knowledge. The Court

finds that Charanjeev committed the offense of identity fraud.

### Damages Under RICO

Based upon the evidence presented at trial, the Court finds that Petitioners

met their burden of proof for each of the predicated acts asserted under RICO.

Petitioners' injuries flowed directly from Respondents' racketeering activity.

Under RICO § 16-4-6(a), the Court has a choice of remedies other than

money damages to award a plaintiff. The Court can order a defendant "to divest

himself or herself of any interest in any enterprise, real property, or personal

property." Section 16-4-6(c) provides that when a person is injured "by reason of

any violation of Code Section 16-14-4 [they] shall have a cause of action for three

times the actual damages sustained and, where appropriate, punitive damages.

Such person shall also recover attorney's fees in the trial and appellate courts and

costs of investigation and litigation reasonably incurred." O.C.G.A. § 16-14-6(c).

Based upon the injury inflicted upon Maharaja and Vini, the Court will order

Pinetree LLC to divest itself of 50% of its interest in Pinetree Plaza by executing

an appropriate deed conveying  that interest to Maharaja. This remedy does not

allow for a judgment of three times the actual damages sustained.

Based upon the injury inflicted upon King Group, the Court will order

Crown Assets to divest itself of the 50% interest conveyed to it in the four King

Group properties. This remedy does not allow for a judgment of three times the actual damages sustained.

Based upon the injury inflicted upon King Group, the Court will enter a money judgment against Crown Assets and Karan, jointly and severally, for 38% of the profits received by Crown Assets from the sales of 5754 Attucks Boulevard and Snapfinger in the total amount of $437,760. The Court will triple this damage award for a total of $1,313,280.

Based upon the injury inflicted upon Vini, the Court will enter a money judgment against Karan for $5,300. The Court will treble this damage award for a total of $15,900.

Based upon the injury inflicted upon Maharaja, the Court will enter a money judgment against Charanjeev for $10,000. The Court will treble this damage award for a total of $30,000.

Based upon the injury inflicted upon King Group, the Court will enter a money judgment against Charanjeev for $122,000. The Court will not treble this damage award.

Based upon the injury inflicted upon Maharaja and Vini, the Court will enter a money judgment against Pinetree LLC for $330,000 which is half the amount of TC Federal Bank loan proceeds distributed to two 50% owners of Pinetree LLC. The Court will not treble this damage award.

For the remaining predicate acts, the Court awards the amount of $1 as general damages. The Court will not treble this damage award.

O.C.G.A. § 16-14-6(c) states that Petitioners "shall also recover attorney's fees in the trial and appellate courts and costs of investigation and litigation reasonably incurred." This Code section requires the Court to award reasonable attorney's fees if Petitioners prevail on their RICO claims. Counsel for the parties agreed they would not object to the other's attorney's fees. Petitioners' attorney's fees total $ in this case. As required by the statute, the Court awards to Petitioners a judgment in the amount of $ as reasonable attorney's fees.

### E.    Declaratory Judgment Action

The Court has the power in the case of actual controversy to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). "Any such declaration shall have the force and effect of a final judgment or decree. . . . " *Id.*

Petitioners ask the Court to determine which King Group operating agreement and which Maharaja operating agreement control the conduct of the business and affairs of each company. The Court finds that as a matter of Georgia limited liability company law a limited liability company's operating agreement controls the business and affairs of the entity. O.C.G.A. § 14-11-101, et seq.

**King Group**

Prior to August 2017, King Group did not have a written operating agreement in place. King Group had nine members and Sahib held the majority interest of 12%. He acted as the manager of King Group from its formation and after the execution of the operating agreement in August 2017.

Petitioners assert that the January 9  Operating Agreement is valid and binding while Respondents assert that the valid agreement is the January 6 Operating Agreement  The provisions of the two operating agreements are identical except for the membership interest held by the two members, Sahib Arora and Karan Ahuja. Each operating agreement states that Sahib is the manager of King Group.

Sahib and Karan physically executed the January 6, 2017 operating agreement in August 2017 when the families discussed consolidating the membership interests of King Group with a representative from each side of the family. The operating agreement provided that Sahib held a 51% ownership interest and Karan held a 49% ownership interest.

The parties agree that Sahib was the "face" of King Group from its formation. Sahib was the only family member from either side of the family who resided full time in Atlanta until March 2018 when Charanjeev arrived. Sahib was the only family member who was buying and selling properties and managing the

rental properties on behalf of King Group prior to Charanjeev's arrival. Charanjeev manage the credit card cash advances and balance transfers in 2017. Charanjeev was in India finishing medical school until March 2018 and Karan arrived in June 2019 after completing medical school. When Vini was in Atlanta he assisted Sahib with the business of King Group.

Sahib also was the only member of either family who made cash contributions to King Group.  Sahib and other family members provided cash loans through credit card cash advances, but King Group repaid these cash advances.  In 2017, Sahib loaned $ to King Group through cash advances, which exceeded the amount any other family member loaned to King Group.

Karan testified that he was operating the family business in India until his arrival in Atlanta in 2019.  In fact, he stated he was overwhelmed with this work and his medical school studies. The evidence establishes that while he was the family representative in King Group, he was not involved in the King Group business until his arrival in June 2019.

Sahib testified that in August 2017, Jarnail, Charanjeev, and Karan promised they would take an active role in King Group and become involved in buying and selling properties and managing the rental properties. No one from the Singh Family became more involved from August 2017 through March 2018. Respondents did not contradict Sahib's testimony.

In March 2018, Jarnail, Charanjeev and Sahib discussed Sahib's role as manager of King Group as the tax returns were being prepared. The parties agreed to restructure the membership interests so that Sahib would hold an 89% interest in King Group and Karan would hold an 11% interest. Sahib changed the membership interests and postdated the operating agreement to January 9, 2017. Sahib attached the August 2017 signature page to the postdated March 2018 operating agreement.

The Court finds that the testimony regarding the parties' discussions of the King Group membership interests establishes that Sahib was an 89% member and Karan was an 11% member as of March 2018. The parties elected to backdate the operating agreement to January 9, 2017 which the Court will recognize as valid. Thus, the controlling King Group operating agreement is the January 9 Operating Agreement.

**Maharaja**

The Court also must determine which Maharaja operating agreement controlled the corporation's business from its formation up to August 14, 2019 and from August 14, 2019 to the present.

[If the Court does not rescind the August 14, 2019 Maharaja Operating Agreement under Petitioners' RICO Claim then the Court finds that this operating agreement is binding and controlling.]

At its formation, Vini was the sole member of Maharaja.  Maharaja had an operating agreement dated June 9, 2019 that was the controlling document until August 14, 2019.

On August 14, Vini agreed to split equally his 100% ownership of Maharaja with Charanjeev, Karan, and Sahib so that each would own a 25% membership interest in Maharaja. Its sole asset was a 50% interest in Pinetree Plaza worth at least $735,000 on August 14, 2019.

At the August 14 meeting, all but Vini executed the operating agreement in Joel Haber's office. Vini was in India at the time. Joel Haber testified that he presented the operating agreement to the parties and directed their attention to the provision that requires a 51% vote for major decisions. Charanjeev electronically sent the operating agreement to Vini. Vini signed the operating agreement signature page and emailed it to Joel Haber on or about August 15. Joel Haber testified that he received Vini's signature between August 15 and August 16. The Court finds Vini and Joel Haber's testimony credible on this point.

Respondents challenge the validity of the August 14 operating agreement claiming that Vini either did not sign the operating agreement or did not return the signature page in a timely manner.  Respondents' position ignores Georgia limited liability company law.

A limited liability company is not required to execute its operating agreement and is bound by its operating agreement whether or not the limited liability company executes the operating agreement. O.C.G.A. § 14-11-101(18).

An Eleventh Circuit case addresses this issue applying Georgia law. *Wright v. Scales 925 Atlanta, LLC,* 761 Fed. App'x. 884 (11th Cir. 2019). In *Wright,* two limited liability companies were validly formed with operating agreements that were never signed by the members. *Id.* at 866. Scales Management, LLC had 4 members and Scales 925 Atlanta, LLC had one member – Scales Management. A contract dispute ensued with employees who contracted with Scales 925 through its manager. The employees argued that the manager who was to be a member was not because he did not sign the operating agreements. *Id.* at 888.

The Court held that the operating agreement for Scales 925 did not require the manager to sign to become a member. The operating agreement expressly designated members. *Id.* at 888-89. The Court also affirmed that operating agreements are binding under Georgia law even though they are unsigned, citing to O.C.G.A. § 14-11-101(18).

Thus, based on Georgia law, the August 14 Maharaja Operating Agreement became valid and controlling on August 14, 2019 when the parties agreed to be bound by it regardless of when or if all the parties executed it.

**F.    Charanjeev's Unauthorized Conveyance Maharaja's Interest**

Petitioners ask the Court to find that Charanjeev did not have the authority to transfer Maharaja's 50% ownership interest in Pinetree Plaza to Crown Assets.

As discussed, supra, the Georgia limited liability company act states that a limited liability company's operating agreement controls when it speaks to an issue. The August 14 Maharaja Operating Agreement provides in Article 5.01(a) that at least 51% of the membership interests must affirmatively vote for Maharaja to "purchase, lease or sale or other disposition of real or personal property." The operating agreement also named Sahib as the manager. The agreement further details how Maharaja's members can take action without a meeting in Article 7.10.

"Action required to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by all the necessary Members entitled to vote and required to approve such action. . . ."

The Court finds that Charanjeev did not have express or implied corporate authority to transfer Maharaja's 50% interest in Pinetree Plaza to Crown Assets. Charanjeev testified that he relied on a Maharaja Corporate Resolution dated June 22, 2019 signed by Vini as the sole member of Maharaja to transfer Pinetree Plaza to Crown Assets. He also testified he also relied on Vini's verbal approval to transfer to Crown Assets in a phone call on August 15, 2019. This reliance was misplaced for several reasons discussed below.

First, the plain language of the operating agreement requires a 51%

affirmative vote of the members at a meeting or by written consent if no meeting to

sell or dispose of Maharaja's real property. Respondents did not produce any

documentary or testimonial evidence that 51% of Maharaja's membership interest

approved the transfer of Pinetree Plaza to Crown Assets.  Respondents did not

produce the required written consents signed by 51% of the membership interests.

Charanjeev was insistent that he did not need anything in writing from Vini.

Charanjeev's testimony was that Vini told him to transfer the property, but Vini

holds only a 25% interest.  Charanjeev was clear that he did not contact Sahib, a

25% member and the manager of Maharaja, about the transfer. Neither he nor

Karan produced a written consent signed by them.  As a result, this transfer was

not authorized by Maharaja.

Second, Petitioners' testimony is that the corporate resolution relied upon by

Charanjeev for authority to transfer Pinetree Plaza is a copy of the original

purchase resolution signed by Vini on June 22, 2019 giving Charanjeev the

authority to purchase Pinetree Plaza that Charanjeev doctored to authorize the sale

of Pinetree Plaza.  The Court finds it curious that Charanjeev did not produce an

original resolution to Michael Brochstein for the transfer of Pinetree Plaza.  Also

curious is Charanjeev's testimony that Vini executed a resolution for the sale of the

property four weeks before the closing of the purchase of the property.

Third, the Court need not reach the issue of whether the resolution is fraudulent because the resolution did not give corporate authority to Charanjeev to transfer Pinetree Plaza to Crown Assets. This resolution states it gives Charanjeev authority to sell the property and to execute a purchase and sale agreement for the property.  What the resolution did not do is give authority to convey the property in a manner outside of a sale.  Charanjeev by his own testimony did not sell the property to Crown Assets.  He transferred Pinetree Plaza without consideration to Crown Assets as indicated on the PT61 and as testified to by Michael Brochstein. This resolution, whether genuine or fraudulent, did not authorize Charanjeev to transfer Pinetree Plaza to Crown Assets.

Fourth, Respondents testified that they believed Sahib had gone rogue and was acting irrationally. They no longer wanted to do business with him. They did not trust him.  For these reasons, they wanted the transactions on documented on August 14.

Sahib executed five deeds.  The parties executed the Zillionaire, King Group, and Crown Assets agreement.  The parties executed the Maharaja operating agreement.  Karan executed the Bill of Sale.

On August 15, Charanjeev and Sahib meet again to discuss any remaining issues and they made notes detailing some numbers.  At that time, Charanjeev and Sahib agreed that when the number was finalized Respondents would be paid from

King Group's next real estate closing. All parties believed the issues were resolved and the separation was finalized save Charanjeev producing receipts for expenses he claimed he paid on behalf of King Group.

It strains credulity to believe Charanjeev's testimony that on August 16 Vini called him to say Charanjeev and Karan could have Sahib and Vini's 50% interest in Maharaja.  Respondents presented voice mails and text messages to substantiate various communications between Respondents and Petitioners. Yet, in this instance involving the transfer of a $700,000 asset, Respondents did not produce any voice mails or text messages regarding Vini's alleged statement to Charanjeev to take his and Sahib's $350,000 interest in Maharaja.

The Court finds that the evidence weighs against Respondents' position that Vini authorized Charanjeev to transfer Sahib and Vini's 50% interest to Karan and Charanjeev.

Based upon the evidence presented at trial, the Court finds that Charanjeev did not have authority to take Sahib and Vini's 50% interest in Maharaja and did not have authority to transfer Maharaja's 50% interest in Pinetree Plaza to Crown Assets.

Without authority to execute the Quitclaim Deed, it is null and void.

### G.    Fraudulent Misrepresentation

Georgia law states that "[wi]illfull misrepresentation of a material fact, made to induce another to act, upon which such person acts to his injury, will give him a right of action." O.C.G.A. 51-6-2. "Fraud, accompanied by damage to the party defrauded, always gives a right of action to the injured party." O.C.G.A. 51-6-1. "Fraud may be consummated by signs or tricks, or through agents employed to deceive, or by any other unfair way used to cheat another." O.C.G.A. 23-2-56.

Slight circumstances may be sufficient to prove the existence of fraud. "Fraud is not committed by willful misrepresentation alone but in this regard is subtle and can be accomplished in an infinite number of ways including signs and tricks and even, in some instances, by silence." *Infinity Ins. Co. v. Martin*, 240 Ga. App. 609, 611 (1999). In fact, "recourse to circumstantial evidence is usually required." *Federal Ins. Co. v. Westside Supply Co.,* 264 Ga. App. 240, 243 (2003). O.C.G.A. 13-5-5 states that "fraud renders contracts voidable at the election of the injured party."

Petitioners have met their burden and established the elements of fraud committed by Respondents Karan, Charanjeev and Crown Assets.
At the August 14 meeting, the parties agreed to a division of King Group properties, including the membership interest of Maharaja and two properties held by Zillionaire.  This division was consummated by the execution of four deeds, an amended and restated Maharaja operating agreement, and the Zillionaire

agreement. Charanjeev and Sahib on August 15 discussed potential remaining obligations owed by both sides of the family. It appears from the testimony that Charanjeev and Sahib agreed that King Group would make a payment of some amount to be finalized from the next closing of a King Group property sale.

Yet, as the testimony shows, on August 19, 2019, Charanjeev executed a quitclaim deed conveying Maharaja's 50% interest in Pinetree Plaza to Crown Assets. There is no evidence in the record that Charanjeev discussed such a transfer with Sahib.  Charanjeev testified that Vini called him on August 15, 2019 and told him to take Pinetree Plaza.  Vini denies making this statement. In order to effectuate the transfer, Charanjeev provided a copy of a resolution to Michael Brochstein purportedly authorizing Charanjeev to sell Maharaja's interest in Pinetree Plaza.

As discussed supra, the Court finds that this resolution did not give Charanjeev that authority. Also, Charanjeev should have had the original resolution since Vini left for India immediately after executing the resolution. The Court finds that all the evidence taken together proves that Charanjeev and Karan made willful misrepresentations of material facts that the parties would go their separate ways with the any agreed upon payments due Charanjeev and Karan to be paid at the next closing.

Given the timing of the transfer to Crown Assets, Charanjeev and Karan misrepresented to Sahib that the separation was complete and that they would wait for final payment of a number to be determined. While it may be coincidental, on August 19 when Charanjeev transferred the Maharaja interest for no consideration, the Singh Family moved out of 660 Belgrave Lane. Neither Charanjeev nor Karan shared either of these events with Sahib or Vini. In this move, Charanjeev took Harsimran's credit cards and identification documents with him.

The evidence shows that Charanjeev and Karan did not have any intention to finalize the separation on August 14 and 15 and planned to take Pinetree Plaza for themselves. Their representations to the contrary on August 14 and 15 induced Vini to split his 100% membership interest in Maharaja which resulted in a $700,000 loss to Vini and Maharaja.

### H.   Brokerage Relationships In Real Estate Transactions Act

The Court finds that the Brokerage Relationships in Real Estate Transactions Act, O.C.G.A. 10-6A-1, et seq., is not applicable based upon the evidence presented at trial in this case.  Petitioners have no claim under this statute because Charanjeev is not a broker but a real estate agent which is not covered by the Act.

### I.   Breach Of Fiduciary Duty Against Charanjeev Claim

A fiduciary or confidential relationship arises when "one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another

or where, from a similar relationship of mutual confidence, the law requires the

utmost good faith, such as the relationship between the partners, principal and

agent, etc." O.C.G.A. § 23-2-58. Such a relationship may be created by law,

contract, or the facts of a particular case. *Bienert v. Dickerson*, 276 Ga. App. 621,

624  (2005).

When a fiduciary relationship exists, the agent may not make a profit for

himself out of the relationship to the injury of the principal. *White v. Shamrock*

*Bldg. Systems*, 294 Ga. App. 340, 346 (2008).

The evidence before the Court establishes a fiduciary relationship between

Charanjeev and Maharaja.  Charanjeev testified that he was the agent for Maharaja

in its purchase of Pinetree Plaza with Pinetree LLC.  Vini executed a corporate

resolution dated June 22, 2019 giving Charanjeev the authority to carry out the

purchase of Pinetree Plaza on behalf of Maharaja. Charanjeev was not a member of

Maharaja. When he executed the quitclaim deed transferring Maharaja's interest in

Pinetree Shopping Center to Crown Assets it was for the benefit of himself, Karan,

and Crown Assets. Crown Assets did not pay any money for the transfer of the

$700,000 asset, which means Crown Assets obtained an instant $700,000 increase

in wealth.  According to Charanjeev and Karan's testimony, they shared all assets

equally which means that Charanjeev also made an instant profit of $700,000 for

no consideration arising out of his fiduciary relationship with Maharaja.

Based on the evidence before the Court, it finds that Charanjeev had a fiduciary duty to Maharaja and made a profit for himself and his brother that resulted in an injury to Maharaja thereby breaching his fiduciary duty.

### J.    Pinetree LLC's Breach of Fiduciary Duty To Maharaja

Under Georgia law, fiduciary duties are based on a special relationship existing between two or more parties. *Munford, Inc. v. Munford*, 188 B.R. 860 (Bankr. N.D. Ga. 1994).  When Pinetree LLC and Maharaja purchased Pinetree Plaza together, they became tenants in common under Georgia law. O.C.G.A. § 44-6-120. Tenants in common are entitled to simultaneous possession of the property.

"A tenant in common shall be liable to account to his cotenant if he receives any rent or other profit from the joint property or deprives his cotenant of the use of his fair proportion of the joint property." O.C.G.A. § 44-6-121(b)(1), (3). Each tenant in common is entitled to his share of the use, rent and profits from the jointly owned property. *Dozier v. Wallace*, 169 Ga. App. 126 (1983). When one tenant in common receives more than his share, his is liable to account for the surplus. *Smith v. Smith*, 141 Ga. 629 (1914).

On July 15, 2017, Pinetree LLC and Maharaja became tenants in common which created a fiduciary relationship between them. When Vini and Sahib spoke with Shaneel Lalani about Charanjeev's transfer of Pinetree Plaza to Crown

Assets, he replied that he was not getting involved. He could not recall when he

learned of the transfer or what he knew of the transfer. If he knew the conveyance

was unauthorized, he had a duty to share this information with Maharaja.

The Court finds that Shaneel Lalani's inconsistent recall for pertinent facts

diminishes his credibility as a witness. He willingly signed an affidavit to support

Respondents' positions which further lessens his credibility.  As a result, the Court

finds that Pinetree LLC had a fiduciary duty to inform Maharaja that its interest in

Pinetree Plaza was transferred but breached that duty.

### K.    Constructive Trust Claim

Petitioners ask the Court to place a constructive trust on Pinetree Plaza to

prevent Respondents from further conveying or disposing of the property before

the Court's order and judgment is given full effect. "A constructive trust is a trust

implied whenever the circumstances are such that the person holding legal title to

property, either from fraud or otherwise, cannot enjoy the beneficial interest in the

property without violating some established principle of equity." O.C.G.A. § 53-

12-132.

Maharaja's 50% interest in Pinetree Plaza was never properly conveyed to

Crown Assets and therefore Crown Assets could not properly convey Pinetree

Plaza to Pinetree LLC. These two transfers are null and void as the Court discussed

infra. Thus, the Court finds that the circumstances warrant the imposition of a

constructive trust on 2551 E. Pinetree Plaza and all rental income generated by the property until the Court's order and judgment is entered and performed.

### L.    Cancellation of Deeds

When a party fails to perform a promised act coupled with the present intention not to perform, fraud, in the legal sense, is present." *Hinson v. Hinson*, 221 Ga 291, 292 (1965). When the evidence shows that the "promise of the grantee was the consideration inducing the execution of the deed, and that it was made with the present intention on the part of the grantee not to comply with it," a cause of action is present for cancellation of the deed. *Id.*

Charanjeev and Karan agreed to the terms of the August 14 agreement. They both testified that the purpose of the transactions that day was to separate the business relationship with the Arora Family. The consideration they gave was the promise to not interfere with Harsimran's wedding or to defame her and to wait on the payment of the unliquidated debt that remained owed to them until King Group's next closing.

Based upon the timing of events, they did not intend to wait on the payment as four days later Charanjeev conveyed Pinetree Plaza to Crown Assets. Charanjeev and Karan induced Sahib into conveying approximately $1,700,000 in real estate to them based on their promise to produced receipts before being paid a sum of cash at the next closing, which promise it appears they never intended to

keep.  As Karan testified, they discussed the situation between them on August 16 and decided to take Pinetree Plaza.

The Court finds that the facts support a finding of fraud in the execution of the four deeds at the August 14 meeting. With this finding the Court orders the annulment of these conveyances pursuant to O.C.G.A. § 23-2-60. The Court orders Crown Assets to file cancellations of the deeds in the counties in which they are recorded.

### M.    Punitive Damages

The Court finds that Charanjeev, Karan, Jarnail, and Jonika committed by theft by extortion and exercised duress over Sahib and Vini with the threats to harm Harsimran's reputation and to ruin her marriage. While the Arora Family averted that outcome, Harsimran's wedding was substantially different than the wedding she planned. Charanjeev and Karan commited fraud against Maharaja in transferring its interest in Pinetree Plaza to Crown Assets, Karan's entity. The two did not stop at that point. They used the promise to return Pinetree Plaza to Maharaja to receive about $900,000 in sales proceeds from Zillionaire and King Group.

Punitive damages are awarded "solely to punish, penalize, or deter a defendant."  O.C.G.A. § 51-12-5.1(c). Punitive damages are awarded only when a defendant's actions show willful misconduct, fraud, wantonness, oppression, or

"that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b).

The Court finds that a punitive damages award in this instance is necessary and appropriate and would further deter the Singh Family's future misconduct toward the Arora Family. Given Charanjeev and Karan's continued efforts to obtain additional assets from King Group after the parties had come to terms on August 14, this award should deter any future attempts to demand and threaten the Arora Family for addition assets.

## N.    Attorney's Fees

O.C.G.A. § 13-6-11 allows for the recovery of attorney's fees when the opposing party has acted in bad faith, been stubbornly litigious, and has caused the other party unnecessary trouble and expense.  Petitioners seek their attorney's fees in the amount of $ which are subject to the Court's review for reasonableness if Respondents object to the fees.

If Petitioners prevail on their RICO claims, RICO mandates an award of reasonable attorney's fees. Petitioners will not seek their fees under § 13-6-11 if the Court awards fees under RICO.

## RESPONDENTS' COUNTERCLAIMS

The Court now turns to Respondents' Counterclaims.

## Count I    Sahib's Breach of the King Group Amended and Restated Operating Agreement.

95

The Court has found, supra, that the evidence supports finding that the January 9 Operating Agreement is the controlling operating agreement for King Group. As a result, from January 2017 through August 14, 2019, Karan was the 11% member of King Group and Sahib was the 89% member of King Group.

At the August 14, 2019 meeting, Ahuja affirmed that his interest was 11% when he signed the Bill of Sale conveying this interest to Sahib. Ahuja had the opportunity to assert an additional 38% interest in King Group at that meeting, but he remained silent. Other than Ahuja's statement that he retained this interest, no evidence was presented at trial to support this claim.

The Court finds that Ahuja was not a member of King Group when Sahib added Vini as a member and Ahuja did not retain a 38% interest in King Group for any purpose.  The Court will enter judgment against Respondents on this claim.

### Count II    Sahib's Breach of Fiduciary Duties

The Court need not reach the issue of Sahib's fiduciary duty because Respondents did not prove any damages at trial. The Court will enter judgment against Respondents on this claim.

### Count III    Vini's Tortious Procurement of Breach of Fiduciary Duties

Respondents failed to prove at trial that Vini tortiously procured any breach of fiduciary duties. The Court finds that the evidence presented at trial does not

support this claim. The Court will enter judgment against Respondents on this claim.

### Count IV    Conversion

Ahuja testified that the family operated its businesses as one and that the family shared in "one pot of money" generated by those businesses. He also testified that each side of the family designated a representative to be the member of King Group. According to his testimony and apparent belief, he held his King Group membership interest in name only as the representative for his family.

Further, Charanjeev, Ahuja's brother, had full access to the King Group bank account and regularly transferred cash advance funds to and from the account. The Court also notes that the bank statements show that from 2017 through July 2019, King Group distributed cash payments to Jarnail in the amount of $76,000.

The Court finds that Charanjeev had the opportunity from at least March 2018 through August 2019 to raise this issue if it existed. Charanjeev's failure to do so results in a waiver of this claim. The Court also finds that Sahib and Vini did not commit the act of conversion. The Court will enter judgment against Respondents on this claim.

### Count V    Fraud

To state a claim for fraudulent misrepresentation, a plaintiff must establish that: (i) the defendant made false representations; (ii) the defendant knew the representations were false at the time they were made; (iii) the defendant intended to deceive the plaintiff at the time; (iv) the plaintiff justifiably relied upon such representation; and (v) the plaintiff sustained damages as the proximate result therefore. *Clemons v. Delta Airlines, Inc.,* 338 Ga. App. 844, 847 (2016).

The Court finds that Ahuja has not proven that Sahib and Vini committed fraud, fraudulent inducement, and deception with regard to Ahuja's membership interest in King Group or any King Group funds. The record shows that Ahuja voluntarily executed a Bill of Sale on August 14, 2019, giving his 11% interest in King Group to Sahib in exchange for receiving 50% of four King Group properties and execution of the Zillionaire Internal Agreement. The record does not show that Ahuja at any time stated he believed he continued to hold a 38% interest in King Group.

The Court finds that Sahib and Vini have not committed fraud against Ahuja. The Court will enter judgment against Respondents on this claim.

### Count VI    Conspiracy

The evidence presented at trial does not support a claim for conspiracy against Petitioners. Respondents did not prove any damages for this claim. The Court will enter judgment against Respondents on this claim.

98

### Count VII  Indemnification

Ahuja misunderstands the indemnification provision found in Article 11.02 of the King Group January 6, 2017 and January 9, 2017 Operating Agreement. This provision contemplates the company committing a wrongful act that results in the members becoming involved in the defense of that wrongful act. The claims asserted by Petitioners are for the wrongdoing of Ahuja, not King Group. Thus, the Court finds that Respondents do not prevail on this claim. The Court will enter judgment against Respondents on this claim.

### Count VIII Declaratory Judgment

The Court determined this count when it rescinded the documents executed as part of the August 14 agreement which places the parties in their respective positions as if the August 14 agreement did not occur. As a result, Ahuja is now the 11% member of King Group and Sahib is the 89% member of King Group and the January 9 Operating Agreement is the controlling document. This rescission also removes Vini as a member of King Group. The Court will enter judgment on this claim to reflect these findings.

[In the event the Court does not rescind the August 14 Agreement, Petitioners propose this conclusion.  Based on the facts and the credible testimony of Joel Haber, the Court finds that the January 9 Operating Agreement controls and Ahuja conveyed his entire interest to Sahib as part of the August 14, 2019

agreement. Thus, Ahuja had no basis upon which to participate in the decision for Vini to become a member of King Group.]

### Count IX    King Group's Breach of the Zillionaire Operating Agreement

The Court need not reach this issue of fiduciary duty because Respondents did not prove any damages at trial. The Court will enter judgment against Respondents on this claim.

### Count X    Sahib and Vini's Tortious Procurement of Breach of Fiduciary Duties

The Court finds that Crown Assets failed to meet its burden at trial by not proving that Vini owed a fiduciary duty to Crown Assets since he was not a member of Zillionaire or a member of King Group at the time of the alleged actions. Further, Respondents did not prove any damages at trial for Crown Assets' assertion that Sahib breached a fiduciary duty owed to Crown Assets.

The Court will enter judgment against Respondents on this claim.

### Count XI    Sahib, Vini, and Other Parties Conspiracy

The Court finds that no evidence was presented at trial to show that Sahib, Vini, and any other person acted in concert and in furtherance of a common plan or scheme with the goal of obtaining possession and control of Crown Assets' property and funds through unlawful means breaching fiduciary duties owed to Crown Assets under the Zillionaire Amended and Restated Operating Agreement.

The evidence presented at trial supports the opposite result - a Singh Family conspiracy against the Arora Family. Testimony from all the parties details the Arora Family's efforts to obtain the return of Maharaja's 50% in Pinetree Plaza which the Court has determined was conveyed to Crown Assets through fraudulent means.

The Court will enter judgment against Respondents on this claim.

## Count XII   Indemnification by Zillionaire

Crown Assets misunderstands the indemnification provision found in Article 11.02 of the Zillionaire Amended and Restated Operating Agreement. This provision contemplates the company committing a wrongful act that results in the members becoming involved in the defense of that wrongful act. The claims asserted by Petitioners are for the wrongdoing of Crown Assets, not Zillionaire.

Thus, the Court finds that Respondents do not prevail on this claim. The Court will enter judgment against Respondents on this claim.

## Count XIII Declaratory Judgment

The Court finds credible Sahib's testimony that he agreed to give Crown Assets a 50% interest in Zillionaire based upon promises that 50% of Pinetree Plaza would be conveyed back to Maharaja when Jarnail returned to the United States. Crown Assets did not give any financial consideration to Zillionaire for this

50% membership interest. The consideration given was the promise to return Pinetree Plaza, which Crown Assets did not do.

The Court finds that Crown Assets procured the 50% membership in Zillionaire based on fraudulent inducement which makes the Operating Agreement void. Crown Assets will relinquish its 50% interest in Zillionaire.

The Court will enter judgment against Respondents on this claim.

### Count XIV  Sahib's Tortious Depravation of Membership Interest in King Package, LLC

The Zillionaire Internal Agreement is the operative agreement regarding the liquor store business of King Package, LLC. The Agreement expressly conveys a 28% interest in the real property located at 2318 Old Cornelia Highway where the King Package liquor store sits. Charanjeev and Ahuja testified that the Zillionaire Internal Agreement only conveys an interest in the real property to Crown Assets.

The testimony was uncontroverted that Sahib is and was the intended member of King Package, LLC, not King Group. King Package, the owner of the liquor store, is not a party to the Zillionaire Internal Agreement. The Court finds that King Group could not convey any interest in the liquor store business to Crown Assets.

The testimony was contradictory regarding whether Crown Assets received a "distribution" in February 2020 from King Package. The other member of King

Package was not present to testify as to the purpose of that payment. Sahib

demanded that the other member reimburse him for that payment as he did not

authorize it or consider it appropriate.

   As for the Singh Family's assertion that Jonika made cash advances in the

amount of $75,000 to King Group to fund the inventory of King Package,

Respondents did not present any documentary evidence of that payment. All cash

advances made to King Group were repaid.

   Charanjeev and Sahib both testified that King Package took out a loan with

Fidelity Bank and repaid King Group for the loan King Group made to King

Package.  The evidence also shows that Sahib was the co-borrower on the Fidelity

Bank loan. Based on the evidence presented at trial, the Court determines that

Sahib did not tortiously deprive Jonika, Jarnail, Charanjeev, Ahuja, or Crown

Assets of a membership interest in King Package.

   The Court will enter judgment against Respondents on this claim.

**Count XV   Sahib Fraud**

   The Court denies this claim based on its findings in Count XIV. The Court

will enter judgment against Respondents on this claim.

**Count XVI King Group, Sahib, Vini Injunctive Relief**

   Respondents did not address this claim at trial. Therefore, the Court denies

this claim. The Court will enter judgment against Respondents on this claim.

## Count XVII Injunctive Relief for Violations of the Georgia Uniform Deceptive Trade Practices Act ("UDTPA")

A successful claim under subsection (a)(8) the UDTPA requires misrepresentation of fact, rather than statement of opinion. *Int'l Brominated Solvents Ass'n v. American Conference of Governmental Indus. Hygienists, Inc.,* 625 F. Supp. 2d 1310, 1319 (M.D. Ga. 2008). At trial, the testimony regarding statements made by Sahib and Vini regarding Respondents were based on their opinions of the legality of the actions taken by Respondents regarding King Group and Maharaja properties. The Court finds that their statements were not misrepresentations of facts, but Sahib and Vini's opinion of these facts and do not violate UDTPA. As for any violation under O.C.G.A. § 10-1-372(a)(11), the Court finds this section is not applicable in this case.

The Court will enter judgment against Respondents on this claim.

## Count XVIII Sahib and Vini Tortious Interference with Business or Contractual Relations

"Statements made with a good faith intent on the part of the speaker to protect his interest in a matter in which he is concerned are privileged." O.C.G.A. § 51-5-7(3). This privilege can be a defense to a claim for tortious interference with contractual relations. *Kitchen Hardware Ltd. V. Kuehne & Nagel, Inc.,* 205 Ga. App. 94, 97 (1992). To complete this defense, the speaker must show good faith, an interest to be upheld, a statement limited in scope, a proper occasion, and

publication to proper persons. *Sherwood v. Boshears,* 157 Ga. App. 542, 543 (1981). To overcome this privilege, Respondents must show "actual malice in making the statement." *Culpepper v. Thompson,* 254 Ga. App. 569 (2002).

Based upon the evidence presented, the Court finds that Respondents failed to meet their burden of showing that Sahib and Vini spoke or wrote with "actual malice." Thus, this claim cannot stand against Sahib and Vini.

The Court will enter judgment against Respondents on this claim.

**Count XIX Sahib and Vini Defamation**

O.C.G.A. § 51-5-8 extends an absolute privilege to "[a]ll charges, allegations, and averments contained in regular pleadings filed in a court of competent jurisdiction, which are pertinent and material to the relief sought, whether legally sufficient to obtain it or not .... However false and malicious such charges, allegations, and averments may be, they shall not be deemed libelous." Respondents presented minimal evidence for this claim.

Sahib forwarding the Complaint to third parties is protected by this absolute privilege. Georgia courts have extended this privilege to affidavits and requests to investigate. *See RCO Legal, P.S., Inc. v. Johnson,* 347 Ga. App. 661 (2018). These extensions are similar to filing a police report and recording an affidavit that occurred in this case.

Based upon the evidence in the record, the Court finds that the oral and written statements made by Sahib and Vini fall under this privilege and are not defamation.  The Court will enter judgment against Respondents on this claim.

### Count XX   Sahib and Vini Defamation Per Se

The Court need not reach this issue of defamation per se because Respondents did not prove any damages for this claim at trial. The Court will enter judgment against Respondents on this claim.

### Count XXI  Sahib and Vini Fraud Regarding Credit Card Balance Transfer Transactions

To state a claim for fraudulent misrepresentation, a plaintiff must establish that: (i) the defendant made false representations; (ii) the defendant knew the representations were false at the time they were made; (iii) the defendant intended to deceive the plaintiff at the time; (iv) the plaintiff justifiably relied upon such representation; and (v) the plaintiff sustained damages as the proximate result therefore. *Clemons v. Delta Airlines, Inc.,* 338 Ga. App. 844, 847 (2016). Moreover, Georgia law requires fraud claims to be pled and proven with particularity. O.C.G.A. § 9-11-9(b).

Respondents' assert this claim against the incorrect parties. Jarnail made the cash advance loans to King Group, not to Sahib and Vini. Also, the testimony shows that Jarnail's son, Charanjeev, was the person managing the cash advances

and credit card balance transfers for King Group in 2018. Charanjeev made the decision to use Jarnail's credit cards to effectuate balance transfers and cash advances, not Sahib or Vini.

Further, at trial, neither Jarnail nor any of the Respondents proved that either Sahib or Vini intended for King Group to not repay the cash advances at the time the cash advances were made in 2019. By their own testimony, Sahib, not Vini, requested the reversals one year later in August 2020. This fact indicates to the Court that Sahib did not make false representations at the time of the transfers and did not intend at the time of the transfers to deceive Jarnail. Again, Charanjeev requested the cash advances on behalf of King Group, not Sahib. The record does not show that Vini participated in the decision to report the transactions as fraudulent. The Court finds for Petitioners on this Count.

The Court will enter judgment against Respondents on this claim.

**Count XXII Sahib, Vini and King Group Fraud Regarding Credit Card Transactions**

This fraud claim suffers the same fate as the fraud claim above. The same analysis applies to Jonika's fraud claim.  Neither Jonika nor any of the Respondents proved that either Sahib or Vini intended for King Group to not repay Jonika's cash advances at the time the cash advances were made in 2019. The

testimony at trial did not show that Sahib, Vini or King Group intended to deceive Jonika at the time she made any transfers to King Group.

While the Court recognizes that Jonika contributed credit card advances to King Group, she did not prove the amounts of those advances at trial. No documentary evidence was presented that proved she made credit card advances in the amount of $175,000 or any other amount.

The Court finds for Sahib, Vini, and King Group on Respondents' claim for fraud regarding Jonika's credit card transactions. The Court will enter judgment against Respondents on this claim.

### Count XXIII        Sahib, Vini, and King Unjust Enrichment

The theory of unjust enrichment applies when a contract does not exist between parties and a benefit is conferred upon another and equity requires compensation for that benefit. The evidence presented at trial proves that Jonika contributed credit card advances to King Group, not to Sahib or Vini. The benefit conferred was upon King Group as the recipient of her credit card advances. While Sahib as a member of King Group benefited from the credit card advances, so did Ahuja, Jonika's son, who also was a member of King Group in 2019.

Jonika did not present specific evidence for the amount of any advances in 2019. She did not testify that she advanced any sum certain and was not repaid.

Charanjeev testified as to general amounts without specificity. Without evidence of an amount certain, the Court cannot fill in the blank for Jonika's claim.

Thus, the Court finds in favor of Sahib, Vini, and King Group on Respondents' claim for unjust enrichment. The Court will enter judgment against Respondents on this claim.

## CONCLUSION

Based upon these findings of fact and conclusions of law, it is hereby

**ORDERED** that the four Quitclaim Deeds dated August 14, 2019 from King Group MGMT, LLC to Crown Assets, LLC are cancelled and Crown Assets is **ORDERED** to record cancellations in the appropriate Superior Court records within ten days from the date of this Order;

**ORDERED** that the August 14, 2019 Agreement between Zillionaire Assets, LLC, Crown Assets, LLC, and King Group MGMT, LLC is rescinded as of August 14, 2019 as to 2318 Old Cornelia Highway;

**ORDERED** that Crown Assets shall pay to Zillionaire the amount of $437,760 which represents the 38% of the proceeds from the sale of 5754 Attucks Boulevard to which it was not entitled;

**ORDERED** that the Quitclaim Deed dated August 19, 2019 conveying Maharaja Investment, LLC's 50% interest in Pinetree Plaza Shopping Center to

Crown Assets, LLC is void as a matter of law and Maharaja Investments, LLC is the legal owner of 50% of the Pinetree Plaza Shopping Center;

**ORDERED** that the Maharaja Operating Agreement dated June 9, 2019 signed by Vineet Singh and naming Vineet Singh as the 100% member of Maharaja Investments, LLC is the controlling and binding operating agreement of Maharaja Investments, LLC;

**ORDERED** that Vineet Singh did not authorize the transfer of Maharaja Investment, LLC's 50% interest in Pinetree Plaza to Crown Assets or any other party;

**ORDERED** that the Quitclaim Deed conveying Maharaja's interest in Pinetree Plaza to Crown Assets is void;

**ORDERED** that within seven days from the date of this Order 2551 E. Pinetree Plaza, LLC and Karan Ahuja shall execute and record the appropriate deeds conveying a 50% interest in Pinetree Plaza Shopping Center to Maharaja Investments, LLC;

**ORDERED** that the Bill of Sale by which Karan Ahuja transferred his 11% interest in King Group MGMT, LLC is rescinded and Karan Ahuja holds an 11% member interest in the company as of August 14, 2019;

**ORDERED** that the Zillionaire Assets, LLC Amended and Restated

Operating Agreement dated November 19, 2019 is rescinded as of the date of this

Order;

**ORDERED** that the conveyances transacted under Zillionaire Assets, LLC

Amended and Restated Operating Agreement dated November 19, 2019 remain

valid and binding;

**ORDERED** that Charanjeev, Karan, Jonika, and Jarnail are jointly and

severally liable for damages in the amount of $553,060 under RICO;

**ORDERED** that under RICO 2551 E. Pinetree Blvd LLC is divested of 50%

of its interest in Pinetree Plaza and this 50% shall be vested in Maharaja as of the

date of this order;

**ORDERED** that Karan Ahuja shall convey his 50% interest in 2551 E.

Pinetree Blvd LLC to Maharaja within 7 days from the date of entry of this order;

**ORDERED** that Charanjeev, Karan, Jarnail, and Jonika are jointly and

severally liable for treble damages in the amount of $1,359,180 under RICO;

**ORDERED** that King Group is awarded damages in the amount of

$122,000 under RICO against Charanjeev;

**ORDERED** that Charanjeev, Karan, Jarnail, and Jonika are jointly and

severally liable for Petitioners' attorney's fees in the amount of $156,851.84 under

RICO;

**ORDERED** that 2551 E. Pinetree Blvd LLC is liable for damages as to Maharaja in the amount of $330,000;

[IN THE ALTERNATIVE, SHOULD THE COURT NOT RESCIND, PETITIONERS SEEK THE FOLLOWING MONETARY DAMAGES.]

**ORDERED** that judgment shall be entered in favor of Petitioner King Group and against Respondents, jointly and severally, in the amount of $437,760;

**ORDERED** that judgment shall be entered in favor of Petitioner Maharaja against Respondents Crown Assets, LLC, Karan Ahuja, Charanjeev Singh, and 2551 E. Pinetree Blvd, LLC, jointly and severally, in the amount of $1,075,000;

**ORDERED** that judgment shall be entered in favor of Petitioner Vini against Karan Ahuja, Charanjeev Singh, 2551 E. Pinetree Blvd LLC, and Crown Assets, LLC, jointly and severally, in the amount of $1,075,000;

**ORDERED** that judgment shall be entered in favor of Petitioner Zillionaire against Karan Ahuja and Crown Assets, jointly and severally, in the amount of $437,760;

**ORDERED** that judgment shall be entered in favor of Petitioners for all reasonable attorneys' fees and costs in the amount of $156,851.84;

**ORDERED** that any other relief sought in the Complaint is denied; and

**ORDERED** that Respondents' Counterclaims are denied.

**ORDERED AND ADJUDGED** this 3rd day of December 2021.

_____
The Honorable James R. Sacca
United States Bankruptcy Court Judge

Prepared and Submitted by:

Wiggam & Geer, LLC

/s/ Will Geer_____
Will Geer
Georgia Bar No.
Ceci Christy
Georgia Bar No. 370092
50 Hurt Plaza, SE, Suite 1150
Atlanta, GA 30303
T: (678) 587-8740 wgeer@wiggamgeer.com
cchristy@wiggamgeer.com