

**IT IS ORDERED as set forth below:**

**Date: April 22, 2022**

_____
**James R. Sacca**
**U.S. Bankruptcy Court Judge**

_____

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CROWN ASSETS, LLC, | ) | Case No. 20-21451 |
| | ) | |
| Debtor. | ) | Chapter 11 |
| _____ | ) | |
| | ) | |
| SAHIB ARORA; VINEET SINGH; | ) | Removed Case: |
| KING GROUP MGMT, LLC; | ) | |
| MAHARAJA INVESTMENTS, LLC; and | ) | Fulton County, Superior Court, |
| ZILLIONAIRE ASSETS, LLC, | ) | Case Number 2020CV339119 |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No.: |
| | ) | |
| CHARANJEEV SINGH; KARAN S. AHUJA; | ) | 20-02041-JRS |
| JARNAIL SINGH; JONIKA ARORA; | ) | |
| CROWN ASSETS, LLC; 2551 E PINETREE | ) | |
| BLVD MGMT LLC; 2551 EAST PINETREE | ) | |
| BLVD LLC; 4319 COVINGTON HWY LLC; | ) | |

1

140 W DYKES STREET LLC; 1604 E      )
OGLETHORPE BLVD LLC; KING ASSETS,    )
LLC; and 2505 S MAIN STREET, LLC,     )
                                              )
     Respondents.                       )
_____ )

## **ORDER ON COMPLAINT AND COUNTERCLAIMS AFTER TRIAL**

This adversary proceeding involves a family feud pitting the sons of two brothers and their respective families against each other. The allegations primarily revolve around the families' jointly owned real estate business in the United States and whether agreements dividing up millions of dollars' worth of properties were allegedly coerced through extortion and duress related to threats to ruin the upcoming wedding of the Petitioners' sister in India. The parties' stories were so radically different that the opening statement for one of the Respondents' attorneys was one of the shortest the Court has ever heard, simply that "[t]he evidence in this case is going to show completely the opposite of what is presented in opening statements today…In fact, it's going to show that this entire story, made up over a year after these transactions occurred is simply that, a made-up story."

## **PROCEDURAL HISTORY**

This adversary proceeding was originally filed by Petitioners in Fulton County Superior Court as Case Number 2020-cv-339119 on August 7, 2020 (the "Original Complaint"), and lis pendens were filed by the Petitioners on numerous properties owned by the Respondents, including most if not all of the properties owned by Crown Assets, LLC ("Crown Assets"). On account of the lis pendens, Crown Assets filed for Chapter 11 bankruptcy protection and removed this action

to this Court on October 25, 2020.[1]  No motion to remand was filed.  Petitioners filed a Second

Amended and Restated Complaint on November 18, 2020 (collectively, with the Original

Complaint, the "Complaint.")  Respondents and Petitioners consented to a final order and

judgment being entered by this Court.[2]  The trial consisted of six days of evidence and the parties

agreed to submit proposed findings of fact and conclusions of law in lieu of closing argument.[3]

## FINDINGS OF FACT

Petitioner Sahib Arora ("Sahib"), Petitioner Vineet Singh ("Vineet"), and non-party

witness Harsimran Arora ("Harsimran") are siblings, and the children of non-party witness

Meharban Arora ("Meharban") (collectively the "Meharban Family").  Petitioner Zillionaire

Assets, LLC ("Zillionaire") was formed in December 2018 to hold the property located at 5754

Attucks Blvd, Morrow, GA.  The initial member of Zillionaire was Petitioner King Group MGMT,

LLC, which will be discussed in more detail below.

Respondent Charanjeev Singh ("Charanjeev") and Respondent Karan Ahuja ("Karan") are

siblings and the children of Respondent Jarnail Singh ("Jarnail") and Respondent Jonika Arora

---

[1] Petitioners removed another state court proceeding, *TC Federal Bank v. 2551 East Pinetree Blvd LLC et. al.* (the "TC Federal Case") from Thomas County Superior Court on December 16, 2020.  TC Federal Bank filed a motion to abstain or remand which was granted on February 3, 2021, and the case was returned to state court.

[2] Petitioners consented to a final order and judgment being entered by the Bankruptcy Court in several ways.  First, they did not file a motion to remand or object to the removal in any way.  Second, they did not raise any issues or object to the authority of this Court to enter a final judgment in either the Joint Report of Rule 26(f) Conference [Adv. Doc. 72] or the Amended Pre-trial Order [Adv. Doc. 153], although both documents specifically state that failure to do so is an acknowledgement of this Court's authority to enter a final judgment.  Finally, Petitioners admitted that this adversary was a core proceeding in their answer to Respondents' counterclaims [Adv. Doc 27].

[3] Approximately 4 weeks before the first scheduled trial in this case Petitioners replaced their attorney, Michael Dominy, with new counsel.  The trial was also continued once because some of the attorneys in the case tested positive for Covid-19.

("Jonika") (collectively the "Jarnail Family"). Meharban and Jarnail are brothers who began doing business together in India approximately 40 years ago. Sahib, Vineet, Harsimran, Charanjeev, and Karan are cousins. Charanjeev, Karan, Jarnail, Jonika, Crown Assets, 2551 E Pinetree Blvd Mgmt LLC, 4319 Covington Hwy LLC, 140 W Dykes Street LLC; 1604 E Oglethorpe Blvd LLC, King Assets, LLC; and 2505 S Main Street, LLC are all represented by the same counsel and will be referred to hereafter collectively as the "Crown Parties." Respondent 2551 East Pinetree Blvd LLC, which is represented by different counsel than the Crown Parties, will be referred to hereafter as "Pinetree LLC" or "Pinetree."[4]

Over the course of the 40 years Meharban and Jarnail have been in business together, these two families lived together in the same home in Amritsar, India and some of the family also lived together in the same house in United States.[5] The home in India has 24-hour security seven days a week with a gate surrounding the property. Both families essentially raised each other's children.

Meharban and Jarnail jointly own and operate a hospitality venue in India known as Maharaja Farms. They also jointly own a hotel, a farm and 8 to 10 other small businesses. Their business relationship in India is a fifty-fifty partnership. Verbal agreements between the parties were commonplace during the 40 years the families have been in business together. All income from their businesses was deposited into a joint bank account in India that covered the expenses of the two families. For example, the education, including medical school education, of all five children was funded from the joint account.

---

[4] Pinetree LLC is the current owner of the Pinetree Plaza located at 2551 E Pinetree Blvd Thomasville, GA 31792.

[5] The common aunts, Reeta Rani and Neena Tuckar, are Meharban and Jarnail's sisters, and they also reside in the Atlanta, Georgia area.

Prior to 2019, Jarnail and Meharban had a good family and business relationship. That changed during the summer of 2019. What caused that change and led to the filing of this action and bankruptcy case follows.

**History of King Group**

After Sahib graduated from medical school in India, he moved to the United States in 2013 to start a real estate business and then formed King Group MGMT, LLC ("King Group") in 2014.[6]

At its formation, the parties intended that King Group would be a family business. Its business at all relevant times was to buy commercial and residential property at a discount and either lease or sell it for a profit. Funds for King Group's first purchase of real property in 2014 for approximately $175,000 were from the Meharban Family and the Jarnail Family.

In 2015, there were nine members of King Group, including Charanjeev, Karan, Jarnail, Jonika, Sahib, Vineet, Meharban, and Harsimran, as well as Meharban's wife, Neeta. Each of the members put money into King Group in 2014 or 2015 in exchange for their membership interests. Each member held an 11% interest in King Group, except Sahib who held a 12% interest.[7] From its inception, Sahib has been the Manager of King Group according to its operating agreement.

From King Group's formation until Charanjeev arrived in the United States in March 2018, Sahib handled the day-to-day operations of the business although the decisions on which deals to

---

[6]Gobind Madan, a CPA, filed the articles of organization in 2014. He also has prepared King Group's tax returns and the individual family members' tax returns.

[7] The Complaint contains averments that the 11% interests were gifted by Sahib to the other members, and Sahib verified these pleadings. Even Vineet disagreed with the averments that the membership interests in King Group were given to the family members as a gift. In addition, when cross-examined about it, Sahib conceded that the interests were not a gift (i.e. that his previously sworn statements about this were not true).

do were made by the entire family. Before Charanjeev came to the United States in March 2018 to work with King Group, he worked with Karan to manage the family businesses located in India.

From 2016 through January 2019, Sahib, Jonika, Jarnail, Karan, Charanjeev, Vineet, and Meharban provided funding to King Group through credit card cash advances. The cash advances involved a card holder accepting an interest free loan from the card with a certain date by which the advance must be paid in full to avoid paying interest. The families agreed that before the "no interest" advance period expired, King Group would pay the credit card balance in full either from rental income, proceeds from the sale of real estate, or by transferring balances from another family member's card. Charanjeev managed the credit card cash advances and balance transfers for King Group.

King Group did not have any formal accounting records, such as QuickBooks, but rather simply provided its bank statements to its accountant every year. Sahib acknowledged that King Group's bank account was frequently used to pay the personal expenses of family members, including the personal expenses of family members who did not have a membership interest in King Group. Nor did King Group make annual cash distributions to its members based on the percentage of their interests. For the years 2016 through 2019, it paid the federal and state income tax of its members, as well as some of the health insurance and medical expenses for Meharban and Jarnail.

**King Group Membership Interests**

In August 2017, the two families agreed to consolidate the membership interests of King Group into one representative from the Meharban Family and one from the Jarnail Family. The families chose Sahib and Karan for two primary reasons. Both were American citizens and Sahib lived in Atlanta. This consolidation resulted in an operating agreement backdated to January 6,

2017 (the "January 6 Operating Agreement"), which provided that Sahib owned 51% of King Group and Karan owned the other 49%. This agreement was prepared by Joel Haber, an Atlanta area attorney. Because this was a family business regardless of the formal ownership percentages, the other family members were not paid anything for the membership interests that were essentially transferred to Sahib and Karan.

The operating agreement was changed in the Spring of 2018, but the parties disagree as to why it was purportedly changed and if the change was authorized. Sahib testified that during the discussions in August 2017 he raised concerns about the membership split because he was managing King Group and allegedly contributing more capital and cash advances into the business than any other family member. He testified that the family addressed his concerns by agreeing that going forward other family members would put more effort into King Group's business, but when this did not happen, the family allegedly agreed to change the membership interests in the Spring of 2018 to 89% for Sahib and 11% for Karan. This was allegedly documented through an amended operating agreement back dated to January 9, 2017 (the "January 9 Operating Agreement"). It is clear that Karan did not sign the January 9 Operating Agreement, but rather the signature page from the January 6 Operating Agreement with his signature on it was simply attached to the January 9 Operating Agreement. In addition, neither Karan nor any other member of the Jarnail Family was given anything in return for this alleged transfer of 38% of the membership interest in King Group. Moreover, Mr. Haber, the lawyer for King Group, testified that the only operating agreement for King Group in his computer system was the one with the percentages close together (i.e. the January 6 Operating Agreement with a 49/51 split).

The Jarnail Family has a much different account of what transpired regarding the January 9 Operating Agreement. The parties agreed that Charanjeev moved to the United States in March

2018, about the same time the agreement was allegedly amended, and he became very involved in King Group. He came to the United States specifically to work in the business rather than pursue medicine in India despite graduating from medical school there, just like his brother and cousins, including Sahib. Jarnail Family members testified they became aware of the January 9 Operating Agreement when Karan came to the United States in June 2019 to also help with King Group. When Karan was working on Sahib's laptop, he discovered documentation showing King Group ownership being 89/11, which caused concern. Sahib explained to Charanjeev and Karan that it was changed to facilitate the refinancing of the family home at 660 Belgrave Lane, Tucker, GA 30084. Sahib needed to show more income on his personal tax return for 2017 to qualify for that refinancing so he had to increase his ownership percentage to increase his purported income. The Belgrave Lane home was in fact refinanced in May 2018, a couple of months after the January 9 Operating Agreement was created. Sahib allegedly told Karan and Charanjeev that he would amend the 2017 tax return and that the 2018 return was already set to have Karan with 49%.

Charanjeev testified that in early July of 2019 he learned that the 2018 taxes had actually been filed 89/11 instead of 51/49, so he raised the issue[8] and was told by Sahib, Vineet, and Meharban that it was because the lender for the Milledgeville shopping center purchase needed to see this in underwriting and that it was going to be fixed in a few days. Karan also testified that Sahib reassured him that the 89/11 split for the 2018 tax returns was related to the Milledgeville loan.

---

[8] The King Group 2015 and 2016 federal tax return Schedule K-1s state that Sahib owned a 12% interest and Meharban, Neeta, Vineet, Harsimran, Jarnail, Jonika, Charanjeev, and Karan each owned an 11% interest. The King Group 2017 federal tax return Schedule K-1s state that Sahib owned an 89% interest at the end of the year and Karan owned an 11% interest at the end of the year. The beginning of the year numbers on the K-1s reflect the 2015 and 2016 membership interests. The King Group 2018 federal tax return Schedule K-1s state that Sahib owned an 89% interest and Charanjeev owned an 11% interest in King Group.

While all of this was going on in the United States, Harsimran got engaged in India. Her marriage was arranged by Meharban, her father. She did not know her future husband before meeting him in December 2018. The meeting was scheduled by a third party based on the families' reputations. She became engaged on January 17, 2019, at a ceremony in India. All the family was in India for the ceremony except for Charanjeev, who remained in the U.S. to conduct King Group business, and Jarnail, who was not happy with the engagement. He told Meharban to break the engagement because the fiancé's family was not affluent enough.

The parties have wildly different stories of what transpired in July and August 2019 with respect to the discussions about the family interests in King Group. The Jarnail Family story is that Meharban and Vineet told Jarnail that Sahib had gone rogue and wanted to break from the family business because he thought King Group should be his, so the Jarnail Family asked that their interests be split to be 50/50. Sahib's response to that request was set forth in a July 12, 2019, email to Joel Haber. In that email, he provided an outline of a series of transactions, which included him receiving a payment of $950,000 and King Group transferring partial interests in nine properties to the Jarnail Family. However, after further negotiations, the follow-up instructions from Sahib to Mr. Haber are in an August 13, 2019, email which did not include the payment of $950,000, and included five properties, instead of nine. These emails were titled "liquidation agreement." In addition, the July 12, 2019, email discussed dividing the Pinetree Plaza property at a time before either family even had an ownership interest in that property. In Sahib's emails to Mr. Haber, he included that Vineet would also be receiving 25% of the profits even though Vineet was not a member of King Group at that time. Sahib testified that the Crown Parties had not demanded that Vineet receive anything, and yet Vineet was included.

There is no dispute that Mr. Haber prepared the transaction documents according to Sahib's instructions for execution on August 14, 2019.  Mr. Haber advised Sahib to do a comprehensive agreement, but Sahib did not follow Mr. Haber's advice.  Additionally, there were assets owned by King Group which were not included in the proposed transaction.  There is also no dispute that on August 14, 2019, Sahib, Charanjeev, and Karan met at Mr. Haber's office to consummate the transaction. During the meeting, Charanjeev – as opposed to Sahib – sent photos of all the documents to Vineet who was in India.  Vineet, through messages, asked Charanjeev – as opposed to Sahib – about the structure of the transaction.

The Jarnail Family created Crown Assets for the purpose of receiving their portion of the family settlement and thereafter continued to operate a real estate business through it.  Four quitclaim deeds were signed by Sahib on behalf of King Group conveying to Crown Assets 50% of each of the four King Group properties: 106 Commerce Street; 2723 Roosevelt Highway; 3811 Flat Shoals Parkway; 5341 Snapfinger Park Drive (the "August 14 Deeds").  On August 14, 2019, these were the only unencumbered properties owned by King Group.  King Group also owned all or an interest in three other properties that were encumbered with loans: 2485 N. Columbia Street (the Milledgeville Shopping Center); 2318 Old Cornelia Highway; and 5754 Attucks Blvd.

At the meeting, Charanjeev and Karan wanted to ensure they would receive 50% of the profits from any future sale of 2318 Old Cornelia Highway and 5754 Attucks Blvd which resulted in the execution of an agreement between Zillionaire, King Group, and Crown Assets (the "Tri-Party Agreement.")  Under the Tri-Party Agreement, Zillionaire conveyed an undivided 50% interest in Attucks Blvd. and King Group conveyed 50% of its interest in Old Cornelia Highway which was an undivided 28% interest in that real property to Crown Assets.  In return, Crown

Assets was liable for 50% of the debt on Attucks Blvd. and 25% of the debt on Old Cornelia Highway.

On August 14, 2019, all the documents were executed by those present, but Vineet needed to return his signature page for the Maharaja Amended and Restated Operating Agreement.[9]  Mr. Haber was to hold the documents in escrow until he received Vineet's signature page which he said he received the next day by email, although he was never able to produce a copy of that email by the time of trial. Mr. Haber then recorded the August 14 deeds on August 16, 2019 and released the Tri-Party Agreement and the Maharaja Amended and Restated Operating Agreement, although the parties dispute whether Vineet's signature was on the Maharaja Agreement.

There were sticky notes with numbers that were prepared during an August 15, 2019, meeting between Charanjeev and Sahib at Mr. Haber's office.  According to Charanjeev the sticky notes contained calculations for the settlement of the debt owed by King Group to the Jarnail Family to accomplish a 50/50 split, which resulted in a calculation of $374,963 owed to the Jarnail Family.  Charanjeev also testified that the other numbers on the sticky notes were the balances owed on the credit cards which were to be paid by King Group after they became due.  Sahib, on the other hand, testified that the families agreed that each family would be responsible for the amounts owed on their own cards.  Charanjeev testified that Sahib requested that a photo be taken of these notes which was introduced at trial.  The documents signed on August 14, 2019, and the agreement reached on August 15, 2019, at Mr. Haber's office and the transactions reflected therein are referred to hereafter as the "August 2019 Agreements" or "August 2019 Transactions."

---

[9] A further discussion of Maharaja and the various Maharaja documents is below starting at pg. 15.

Now for the other side of the story.  According to the Meharban Family, the August 2019 Agreements were not the result of a negotiated settlement of a family business dispute, but rather the result of duress and extortion on the part of the Jarnail Family – specifically the threat of ruining Harsimran's marriage – to obtain the properties and business interests described therein.

 Harsimran alleges she received a threatening message from Jarnail in January 2019.  He was screaming: "Your father is dead. Pick up the phone. I'll destroy everything."[10]  In late June 2019, when Meharban and Vineet returned to India, Jonika allegedly asked Meharban to give 50% of King Group to Charanjeev and Karan based on their familial relationship, which message Vineet conveyed this to Sahib.  Jarnail allegedly called Meharban very frequently asking to have Sahib give 50% of King Group to Charanjeev and Karan because they had second thoughts about their decision to give up their interest in King Group now that Sahib had made it so successful.[11]

Jarnail allegedly threatened Vineet directly by leaving messages on his phone.  He said Jarnail called to say, "has your father died, is he deceased" and "either give the 50 percent of the property or I will make the liv- -- your father's life miserable and I'll make sure that he is thoroughly and fully defamed in the society."[12]

In July 2019, Sahib said he learned from Meharban and Vineet that Jarnail, Jonika, Charanjeev, and Karan were asking that their 50% of King Group be restored.  The requests were

---

[10] The actual voice message recording was not produced at trial.

[11] Jarnail allegedly told Meharban that if Sahib did not transfer 50% of King Group to Charanjeev and Karan, he would shoot Sahib and that he would wreck Sahib.  The actual voice message recording was not produced at trial.  Meharban said he deleted all the messages related to threats so that no one could hear them.  He said he did not realize he would "end up in court" when he deleted the messages.

[12] The actual voice message recording was not produced at trial.  Vineet testified he deleted Jarnail's WhatsApp voice mails and messages from 2019.

not made directly to Sahib even though they were living with him in Atlanta.  One request for 50% of King Group was made directly to Sahib the first week of July 2019 but Sahib counteroffered with the July 12, 2019, proposal discussed above.

Petitioners do not allege that Charanjeev, Karan, Jarnail, and Jonika communicated any death threats or threats to ruin Harsimran's wedding directly to Sahib.  When Meharban allegedly conveyed the death threat to Sahib, Sahib's response was to "ask Meharban to convey [that] they should start looking for a house for themselves."

Vineet testified that he had one saved voice message from Jarnail on his phone from August 1, 2019.  He testified it exemplified all the messages Jarnail left for Vineet and Meharban between June and August 2019.  In an excited voice Jarnail, speaking in his native Punjabi, said "…total destruction…You will see that.  That's what will make me happy.  When I hear your screams, your screams, the time for that has come, it is close by.  You say that I eat your sons, no, I don't, I eat [some Punjabi name].  Destruction, total destruction; time will tell.  [Unspecified profanities], you, the sister [indiscernible], you, the devil.  You do not know what the price is for a daughter's marriage.  You have destroyed two years of my life.  Time will tell you.  The time is coming when the drums will be beaten, and your cries won't be heard."[13]

---

[13] This was the translation provided by the interpreter in Court during the trial when the message was played. The parties stipulated to the admission of many documents at the end of the trial, including what purport to be transcriptions of audio recordings with certificates showing they were transcribed in August 2021, but these purported transcripts were not identified at trial nor do they identify who was speaking or the recipient, so the Court cannot tell who was allegedly speaking or who was the recipient, nor are the dates of the alleged messages revealed.  Based on all that, those alleged transcriptions of messages were of no evidentiary value to the Court in making its decision.

In his testimony, Jarnail explained that the intent of this voicemail – which he said was to Meharban instead of Vineet[14] - was to say, "when you're going to hurt me, then I will hurt you." When Jarnail's counsel asked him: "Have you ever told him that you were going to break up his daughter Harsimran's wedding?", Jarnail's response was that he loved her like his own daughter and helped Harsimran with medical school even when her own father would not.

Petitioners allege Jarnail threatened to defame Harsimran and the family in society. He allegedly said, "your sister is not of a good character, that I'm going to spread this loud and clear in the society and all of you will be defamed." Petitioners allege that Jonika became more threatening through August 2019. She allegedly threatened to tell others that Harsimran does not have good character. Meharban and Vineet allegedly could not force Jonika out of the family house because she would have "spoiled the marriage right away, right then." Vineet was not fearful for his life but was fearful that Jonika would break Harsimran's marriage.

The Meharban Family story is that on August 14, 2019, in India at the family home, Jonika was angry when Meharban told her that Sahib owned the majority of King Group. Jonika allegedly left the house at 3:00 a.m. telling Meharban and Vineet "face to face" that she was "going to gather a hundred people -- hundred of our relatives and would go to Harsimran's fiancée's house and would break up the marriage…" Vineet and Meharban testified that they believed these threats because Jonika left the house right away.

Harsimran testified that she was present in the home during this incident. She heard loud voices and said Jonika took the car and left the house. Harsimran asked Vineet what happened.

---

[14] It makes more sense that this would have been a message to Meharban instead of Vineet based on the content of the message.

He allegedly told her that Jonika said she would take 100 people to her in-law's house and create a scene if they don't transfer the property to Karan and Charanjeev's names.

Vineet had a WhatsApp message chain with Jarnail. On August 15, 2019, at 7:16:48 AM Jarnail messaged Vineet saying, "your father commit me. He stops Sahib." Vineet responds, "no, he did not." Vineet found Jarnail to be very angry over the thought that Meharban would prevent Sahib from transferring 50% of the King Group properties to Charanjeev and Karan. Vineet assured Jarnail that Meharban did not stop Sahib from conveying the properties. In that same chain at 7:26:29 AM, Vineet told Jarnail that Sahib was going to the CPA that day.

Petitioners allege Meharban called Jarnail and explained Jonika's actions and begged Jarnail to forgive him and let Harsimran get married. He said he also called Sahib and pressured him to do what was being asked of him to enable Harsimran to get married.

## Maharaja Investments

Petitioner Maharaja Investments, LLC ("Maharaja") was formed in June of 2019 to own an interest in the Pinetree Plaza shopping center in Thomasville, Georgia. Maharaja's first operating agreement was dated June 9, 2019.

King Group won an auction to purchase Pinetree Plaza and assigned 50% of the interest in the purchase and sale agreement to Maharaja and 50% to Billionaires Funding Group, LLC, which is a company controlled by Shaneel Lalani ("Shaneel"), a real estate developer from Atlanta. Billionaires Funding Group, LLC assigned its interest in the purchase and sale agreement to another company controlled by Shaneel, Respondent Pinetree LLC.

Maharaja and Pinetree each contributed half of the total purchase price of $1,470,000.00. King Group provided the funds to Maharaja to purchase Pinetree Plaza. King Group obtained the

15

funds from the refinance of 5754 Attucks Boulevard on June 26, 2019, from which it received $950,000.[15]  King Group wired $625,168.01 for the purchase and Shaneel Lalani sent $110,000 on behalf of King Group since he owed King Group funds from another property.

On July 15, 2019, Maharaja and Pinetree LLC purchased Pinetree Plaza and received title via a limited warranty deed as tenants in common. The closing that took place was a remote closing via email and did not require the purchasers' presence.  Charanjeev was the real estate agent for Maharaja for the purchase of Pinetree Plaza and received a commission when the sale closed. Because the closing was scheduled for July and Vineet was leaving for India on June 23, 2019, he signed a Certified Resolution and Incumbency Certificate of Maharaja Investments, LLC dated June 22, 2019, giving Charanjeev authority to execute any and all documents necessary to purchase Pinetree Plaza (the "Maharaja Purchase Resolution").  Vineet testified this resolution was the only resolution he signed for Maharaja in his own writing.

The Amended Estimated Closing Statement for the Pinetree Plaza purchase has Vineet's name signed for Maharaja.  Vineet did not attend the closing and did not sign the closing statement because he was in India.  Charanjeev was the authorized agent for Maharaja to consummate the purchase of Pinetree Plaza.  He testified that he could not remember if he attended the closing or if he signed the closing statement, but according to Vineet, Charanjeev signed Vineet's name to

---

[15] The complaint filed by the Petitioners claimed that the money used to purchase the Pinetree Plaza was "the product of years of hard work and represented practically all of Dr. Arora and Vineet's savings." Vineet acknowledged that, although he verified the complaint, the aforementioned money was not from his savings. Sahib acknowledged that, although he verified the complaint, the aforementioned money was not from his savings or Vineet's personal savings.  Sahib also agreed that his previously verified statement that the $700,000 came out of his and Vineet's pockets was not true.

the closing statement, but Vineet never told Charanjeev that he had a problem with Charanjeev signing his name.[16]

King Group did not receive anything in exchange for providing the funds for Maharaja to purchase its interest in the Pinetree Plaza, although Maharaja did list on its tax return a debt to King Group in the amount of $730,522.   The bottom line is that Maharaja was an investment of King Group and, therefore, an investment of both the Meharban and Jarnail Families, [17] regardless of whatever interests were specified in any operating agreements.[18]

On August 14, 2019, an amended and restated operating agreement for Maharaja, prepared by Joel Haber, was executed by Sahib, Karan, and Charanjeev in Mr. Haber's office, providing each – including Vineet - a 25% membership interest in Maharaja.  The parties disagree as to when Vineet – who was in India at the time - signed this amended and restated operating agreement.[19]

---

[16] Similarly, Vineet testified that he would be fine with signing a check on behalf of Sahib if Sahib told him to do so, and he has done so before.

[17] According to an Affidavit of Shaneel admitted at trial, it was Jarnail who approached him about this opportunity to buy this property with the families.

[18] There is an operating agreement with Vineet designated as its sole member, but there was also an operating agreement for Maharaja showing Karan as a 50% member and Vineet as a 50% member of the company, although Vineet denied that he ever signed that agreement wherein Karan was listed as a 50% membership owner.  The parties did not always observe the corporate form with respect to this or any of their transactions, so who had what percentage in an operating agreement did not necessarily seem to be important as long as everyone knew it was a family asset.  For example, in August of 2019, Sahib obtained a loan for Maharaja through Westmoore, and in doing so, Sahib transmitted the operating agreement to Westmoore showing that Maharaja was owned 50% by Vineet and 50% by Karan.  Sahib picked up the physical copy of this document, scanned it, and submitted it.  The document was relied on in obtaining the loan.  The loan was funded by Westmoore but was quickly repaid.  In connection with this loan transaction, on August 2 or 3 of 2019, Sahib signed the loan documents as the manager of Maharaja, but the operating agreement of Maharaja at that time did not provide that Sahib was the manager.

[19] Vineet testified that he signed it on August 14, 2019 and sent it to Sahib and no one else.  However, Vineet's further testimony shows that he is unsure as to whether he sent it to Sahib in August or September.  There is no dispute that Vineet did not send the signature page to the Respondents.  Charanjeev also testified that he had never seen a signature page for this agreement prior to the litigation, and that he had seen two emails from Mr. Haber, one dated August 16, 2019, and the other August 19, 2019, and neither of those documents had a signature page with Vineet's signature.  Karan testified that Vineet told him he did not

The stories diverge at this point.  The Jarnail Family alleges that on August 16, 2019, the

day after the meeting at Mr. Haber's office, Charanjeev talked to Meharban and Vineet to discuss

the repayment of the $374,963 owed to the Jarnail Family by King Group that was shown on the

sticky notes admitted into evidence at trial.  Charanjeev said they discussed that the Attucks

Boulevard and Commerce Street properties were under contract and how the debt could be paid

from the sale proceeds, but because those sales would be 1031 exchanges, there would be no

proceeds with which to pay the debt.  Vineet allegedly said he would figure it out, then shortly got

back to Charanjeev and discussed transferring his family's interest in Pinetree Plaza as repayment

of the debt, which Charanjeev and Karan accepted because Maharaja's interest in the property was

owned 50/50 by the families and the debt was roughly half of the $700,000 purchase price paid by

King Group to Maharaja.  Vineet allegedly told Charanjeev to use the corporate resolution he had.

Vineet also allegedly told Karan that the Pinetree Plaza could be transferred to Crown Assets to

pay the debt, and Charanjeev could use the resolution to do the transfer.  Jarnail also testified that

Meharban and Vineet told him that they could transfer the Pinetree Plaza using the "power of

---

execute the August 14, 2019, Maharaja amended operating agreement.  Karan went to Mr. Haber's office
on August 16, 2019, for copies of the documents, and the agreement was not signed.  Joel Haber testified
that he received Vineet's signature page on or around August 15 or16 via email, but that email was not
produced.  Karan testified that on August 19, 2019, Mr. Haber emailed Karan the documents, and the
Maharaja amended operating agreement was not signed, but that email was not produced at trial, either.
The first time Karan said he saw a copy of the signature page with Vineet's signature was during discovery
in this case.  The copy of the August 14, 2019 amended operating agreement for Maharaja attached to the
original petition in this case filed by the Petitioners as Exhibit C also does not contain Vineet's signature,
and the verified petition states that the exhibit is a true and correct copy of the document.  Vineet also
testified that as of trial, he was the 100% owner of Maharaja and that he owned 100% of Maharaja at the
time of the quitclaim deed from Maharaja to Crown Assets.  This testimony conflicts with the Petitioners'
allegation that Vineet had signed the operating agreement providing Vineet, Sahib, Charanjeev, and Karan
each 25% of the membership interests of Maharaja on or about August 14, 2019.  In addition, Maharaja's
2019 tax return also lists Vineet as the 100% member of Maharaja.  This tax return is dated June 19, 2020.

attorney" Vineet previously provided, and that transfer was a part of the separating out of the assets.[20]

On August 19, 2019, Charanjeev visited attorney Michael Brochstein to have him prepare a Quitclaim Deed conveying Maharaja's interest in Pinetree Plaza to Crown Assets.[21]   Mr. Brochstein asked for evidence of Charanjeev's authority to make the transfer.  Charanjeev emailed to him a Certified Resolution and Incumbency Certificate of Maharaja Investments, LLC dated June 22, 2019 purportedly signed by Vineet that stated Charanjeev had the authority on behalf of Maharaja to sell Pinetree Plaza (the "Maharaja Sale Resolution"). Charanjeev testified that he took the original resolution to Michael Brochstein's office. Mr. Brochstein prepared the Quitclaim Deed transferring Maharaja's interest in Pinetree Plaza to Crown Assets, then Charanjeev signed it and Brochstein had it recorded (the "Maharaja Transfer").

Karan testified that it was his belief that under either the original operating agreement of Maharaja with Vineet as the 100% member or the August 14, 2019 amended operating agreement with Sahib, Vineet, Charanjeev, and Karan each owning 25%, there was sufficient authority to transfer the interest in Pinetree Plaza with Vineet's consent, because it would combine with his consent and Charanjeev's consent to be a majority.  The Jarnail Family did not trust Sahib at this time and believed him to be a loose cannon, unstable and erratic, so they communicated through

---

[20] There is another version of this resolution, Respondents' Ex. 26, which shows Vineet as a 50% member of Maharaja.  The testimony is that Sahib found this and sent a photo of it to Vineet, but there was no testimony that anyone used this resolution and there is no evidence as to how it came into existence.

[21] Charanjeev told Mr. Brochstein that there was no consideration conveyed to Maharaja from Crown Assets so they would not have to pay transfer tax.  The Meharban Family contends transfer tax must be paid if financial consideration is present, even if the transfer is from one corporation to another.  The Court has seen many insider transactions where no consideration was disclosed to the County to avoid paying transfer tax before, and although the Court by no means condones this practice if transfer tax is actually due, that is an issue between transferee and the County.  The evidence in this case shows that between the families there was consideration and consent or ratification of the transfer.

Vineet or Meharban and assumed they spoke for Sahib.  Mr. Haber also testified that if three of

the members approved the transaction, then, in his opinion, it would have been a valid transaction.

On the date that the interest in Pinetree Plaza was transferred from Maharaja to Crown Assets,

Charanjeev testified that he was called by Vineet twice to confirm that the transaction took place.

The Meharban Family version of the facts related to Maharaja is much different.  Basically,

the Meharban Family asserts that Charanjeev and Karan chose to take – or more accurately, steal

– Pinetree Plaza from Maharaja as payment for an unliquidated debt they believed King Group

still owed them after the transactions consummated in Mr. Haber's office on August 14 and 15.

The Meharban Family contends that Charanjeev fabricated the resolution he presented to

Mr. Brochstein showing he had authority to transfer Maharaja's interest in Pinetree Plaza to Crown

Assets by doctoring the purchase resolution to provide for a sale and attaching Vineet's signature

page from the prior purchase resolution to it.  At trial, Mr. Brochstein testified that he did not

receive the original version of the resolution, but only a copy.  That testimony did conflict with

Mr. Brochstein's signed declaration.  When asked further about it, he stated that "I just do not have

any recollection of being handed an – handed an original resolution." [22]

Petitioners allege that neither Charanjeev nor Karan told Meharban, Vineet, or Sahib that

the transfer occurred.  Vineet testified he learned of the unauthorized conveyance on either

---

[22] The Jarnail Family asserts that this trial testimony is not definitive either way as to whether Mr. Brochstein received an original or a copy of the resolution. Moreover, Mr. Brochstein recalled being emailed both a copy of the resolution and Charanjeev providing him a hard copy. The Jarnail Family asserts this calls into question whether the resolution provided to Mr. Brochstein was the original or a copy because there would have been no need for Charanjeev to bring a mere physical copy to his office if a previously emailed copy was sufficient.  Ultimately, whether Mr. Brochstein was provided an original or a copy is not determinative of any issue in this case because the Maharaja Transfer was either consented to or ratified. Mr. Brochstein also testified that he sent the transaction documents to 660 Belgrave Lane after recording so Charanjeev never received the original deed or the original resolution, or whatever was provided to Mr. Brochstein, back after the transaction because he had moved from 660 Belgrave Lane by that time.

September 9, 2019, or September 14, 2019,[23] when Jarnail flew to India allegedly for the sole purpose of telling the Meharban Family "face to face" that he took Pinetree Plaza and it was no longer theirs. They allege that Jarnail went to India from the U.S. and arrived at the family home at 3:00 a.m. Jonika, Harsimran, Meharban, and Vineet were in the family home at that time. The security guards had opened the door for Jarnail. Meharban was sleeping and Jarnail woke him up. Meharban went to the living room at Jarnail's request and Jarnail told him he had "snatched" Pinetree Plaza from Meharban and he came to India to fight about it.

Petitioners allege that Vineet told Harsimran that Jarnail came to tell them that he had transferred the shopping center to his name and threatened that he would ruin the wedding if they tried to do anything about it. Petitioners allege Jarnail stayed for only one day. They allege in their proposed Findings of Fact that Jarnail's passport stamps show his arrival in India on September 13, 2019, and his arrival in Atlanta on September 14, 2019.[24] Vineet allegedly contacted Sahib as soon as Jarnail told them about the transfer. Vineet and Meharban returned to the United States on or about September 18, 2019, allegedly to determine what happened with Pinetree Plaza.

Petitioners allege that Sahib wanted to pursue litigation against Charanjeev and Karan and met with an attorney. A demand letter was allegedly prepared, but it was allegedly not sent because Harsimran's wedding had not yet occurred.[25]

---

[23] In the affidavit he filed in the TC Federal Case Vineet alleged that Jarnail's trip to India to reveal he stole the property occurred on September 9, but his testimony at trial was September 14. Meharban initially testified it was September 1, then stated he did not know when it was in September. Harsimran believed it occurred in the "middle of September." Petitioner's proposed Findings of Fact stated that Jarnail arrived at the family home in Amritsar in the early morning hours of September 13.

[24] It appears to the Court after viewing a photocopy of Jarnail's passport that he arrived in India on September 14 and left on September 16, which is discussed further below.

[25] A copy of the alleged demand letter was not produced at trial.

The parties do not dispute that Sahib emailed Charanjeev demanding a return of Maharaja's interest. Sahib also emailed Charanjeev's real estate broker to inform him of the transfer because Charanjeev was the real estate agent for Maharaja during the July purchase. In response, Karan emailed Sahib on September 20, 2019, that they would sell back Maharaja's interest in Pinetree Plaza to Vineet or an entity he chooses for $385,000.

## Was the Maharaja Transfer Authorized or Ratified?

The Court will start with its analysis of whether the transfer of Maharaja's interest in Pinetree Plaza to Crown Assets was either authorized or ratified.

The witness who had the most credibility in this trial was Shaneel Lalani. Shaneel continues to have business dealings with Sahib and Vineet as well as Karan and Charanjeev and he had business dealings with King Group prior to the Maharaja Transfer. He is a successful real estate developer in the Southeastern United States and the dealings with these parties are not a substantial percentage of his business. No testimony was elicited, nor evidence produced that called his credibility into question, and the Court finds that he had no improper incentive to support either side in this dispute because he continues to do business with both sides.

Shaneel was called as a witness during Petitioners' case. He testified that Charanjeev told him that the Pinetree Plaza transfer from Maharaja to Crown Assets was part of the family splitting up and dividing of the family properties. At the time of the Maharaja Transfer, King Group was partners with Shaneel on the Milledgeville shopping center on which there was a $3,000,000 loan. He testified that Sahib and Vineet came to his office in Norcross in early October 2019 and told him that they gave up their interest in the Pinetree Plaza to Karan and Charanjeev.[26] Based on

---

[26] Sahib and Vineet testified they told Shaneel at this meeting that Charanjeev stole the property.

that, they told him they did not want to use the funds from Milledgeville for Pinetree Plaza because Milledgeville was cash flow positive and the Pinetree Plaza was cash flow negative.  Because of this conversation with Sahib and Vineet, Shaneel believed that going forward he would be dealing with Charanjeev and Karan relating to Pinetree Plaza.  In fact, even after discussing the Maharaja Transfer with Shaneel, Sahib and Vineet purchased another property with Shaneel on December 21, 2019.

Shaneel also testified that sometime in late February or March of 2020, Sahib, Vineet, and Meharban visited him in person at his office and asked him whether it would be beneficial for them to attempt to obtain their interest back in the Pinetree Plaza.  Shaneel testified that he refused to discuss this with them because they no longer had any interest in the Pinetree Plaza.  This was a second conversation Shaneel had with Sahib and Vineet confirming that they had previously given up their interest in Pinetree Plaza.

Several months after Sahib and Vineet told Shaneel that they had given up their interest in the Pinetree Plaza, Pinetree borrowed $1.5 million from TC Federal Bank (the "TC Federal Loan") and Shaneel personally guaranteed the loan.  It would make no sense – and would indeed be quite risky – for Shaneel to agree to guaranty a $1.5 million loan along with Karan on Pinetree Plaza if he had been told by Sahib and Vineet that Charanjeev and Karan had stolen their interest in the property from them.  Shaneel had no incentive to misrepresent facts to this Court and his testimony established that the Petitioners confirmed with him that they had given up their interest in the Pinetree Plaza as part of a family settlement.

Respondents story that Vineet approved the transaction and had knowledge of it all along is also supported by the August 21, 2019, email from the U.S. Department of Agriculture, a tenant in the Pinetree Plaza Shopping Center, that was sent to Vineet and Shaneel Lalani only two days

after the Maharaja Transfer. The email clearly states that certain forms needed to be completed on account of the change in ownership of the property. Vineet acknowledged in his testimony that he received the email and merely forwarded it to Charanjeev, indicating he was aware of and did not take issue with the transfer of Pinetree Plaza.  That email, which plainly referenced a transfer of ownership of the property, should have been a huge red flag for Vineet if he had not authorized the transfer.[27]  In addition, it is hard to believe Vineet would forward such an important document to Charanjeev to handle if he had allegedly been extorted by him less than a week before.

The Petitioners' story that Jarnail flew all the way over to India more than three weeks after the transfer of Pinetree Plaza just to wake Meharban up in the middle of the night to tell him he stole Pinetree Plaza and wanted to fight about it is simply not believable.   First, they alleged at trial that Jarnail arrived in India on September 13, 2019, woke Meharban up at 3 a.m. on September 14 and left on September 14 or 15, 2019. Jarnail's passport shows that he actually arrived in India on September 14, 2019, and left on September 16, 2019.[28] Second, in Vineet's affidavit filed in the TC Federal Case regarding the Maharaja Transfer, Vineet declared under oath that Jarnail

---

[27] The mere transfer of 50% of the equity interests in Maharaja Investments to Charanjeev and Karan would not have triggered a change in ownership of the property on the real estate records because Maharaja would have still been a joint owner of the property along with Pinetree LLC, and, therefore, still the landlord, as opposed to Crown Assets replacing Maharaja as a title owner of the property with Pinetree LLC and, therefore, becoming a new landlord.

[28] Jarnail's trip to India in September was on a one-way ticket, and he did not intend to stay in India for only one day. According to Jarnail's testimony, Meharban was fighting with Harsimran about getting married when Jarnail arrived at the home because Harsimran thought her fiancé's family was greedy for asking for gold. Meharban and Vineet then allegedly came to Jarnail and told him they were going to America to get their share from Sahib and that Jarnail had to make Harsimran understand that she had to get married. Jarnail testified he did not want to be involved in convincing Harsimran to get married, so he arranged to return to America, stayed in the house until he left for his flight two or three days later and did not threaten Meharban or Vineet. Jarnail said he did not travel to India to tell them he stole their property, and that he did not tell them he stole their property while he was there.

arrived in India on September 9, 2019, a noticeable discrepancy for an event in the recent past that was so unusual, and which should have been very memorable if it actually happened.

There are two additional facts that do not reconcile with the allegation that Jarnail traveled to India to tell Meharban that he stole the Pinetree Plaza. First, on September 17, 2019, Meharban and Vineet asked Jonika to book airline tickets so they could travel to the United States, and she did so. It does not make sense to ask Jonika to book their airline travel right after her husband came to India and told them he stole their property. In addition, the day after Jarnail returned to the United States, Meharban and Vineet arrived, and they asked Jarnail to get a car for them to use. In response, Jarnail dropped off a Toyota Camry at Neena Tuckar's house. Meharban also gave money to Jarnail at Neena Tuckar's house to pay for life insurance. If a few days before, Jarnail had traveled to India for the purpose of telling Meharban that he stole his property, it does not make sense that Meharban and Vineet would be contacting Jarnail for a car upon their arrival into the United States and to pay Meharban's life insurance.

Likewise, the story that Petitioners were led to believe that the property would be transferred back to them after Jarnail returned to the United States in March 2020 is not believable either. The transfer of the property did not require Jarnail's presence in the United States, so the story makes no sense, other than to try to manufacture an explanation for why they did not take any legal action on the property sooner. No reasonable person would wait almost a year to take legal action if a $1.5 million piece of property was really stolen from them. Yes, there were periodic discussions for its retransfer, but Charanjeev and Karan were consistently adamant in those discussions that any return would have to be for repayment of the debt that was the

25

consideration for the transfer in the first place.[29]  There was no evidence that the Jarnail Family was ever going to transfer the property back for nothing and was merely waiting for Jarnail to come to the United States in March 2020 to do so for some unexplained – and unexplainable – reason.

The Court also finds that the parties agreed that King Group owed the Jarnail Family about $375,000 as a part of the August 2019 Transactions.  If the parties had agreed that King Group would not be responsible for the amounts it otherwise owed to each of the family members, it would not have been necessary to write the amounts down on post its and take a picture of it.  The agreement to transfer Maharaja's interest in Pinetree Plaza to Crown Assets to repay that debt King Group owed to the Jarnail Family was a reasonable solution that also made economic sense.

Therefore, whether the Amended and Restated Maharaja Operating Agreement was signed by Vineet, or whether Charanjeev gave an original or a copy of the Maharaja Resolution to Mr. Brochstein, are perhaps interesting questions, but they are not particularly material to the ultimate issue of whether the Maharaja Transfer was either authorized or ratified.  Both parties seemed to argue a lot about what the Original or Amended Agreements and the disputed Resolutions provided with respect to who was authorized to do what, but there was plenty of evidence that these parties historically worked off oral agreements and did not follow corporate form because this was a family business.  Perhaps Sahib was not consulted on the Maharaja Transfer and did not initially agree with it, but the Court finds that Vineet was consulted and agreed with Charanjeev and Karan to transfer the interest in the property in consideration of the repayment of a debt owed to the

---

[29] In addition to Karan's September 20, 2019, email requiring payment for the re-transfer of the interest in Pinetree Plaza, on April 4, 2020, Charanjeev, Jarnail, Vineet, Meharban, Reeta Rani, and Harsimran held a meeting to discuss the return of Pinetree Plaza to Maharaja.  Charanjeev testified that "we figured out amount, you know, signed it off," but Karan was not present at the meeting and did not sign the note and the proposal was never thereafter finalized.

Jarnail Family by King Group.  Because Vineet, Charanjeev, and Karan agreed to the transfer, this would have meant that the majority of the interests in Maharaja consented, which was sufficient given the parties' ordinary course of doing business, particularly given the tensions with Sahib at the time.  Furthermore, to the extent formal corporate consent was not provided at the time of the transfer, it is clear based on Shaneel's testimony that Sahib and Vineet ratified the transfer no later than early October 2019.

**Whether the August 2019 Transactions Were Coerced Through Duress or Extortion**

With respect to what happened that led to the August 2019 Transactions, other than a little snippet from a recorded voice message from Jarnail in early August 2019 that "you don't know the value of a daughter's marriage"[30] – a marriage that he vocally disapproved of as early as January 2019, well before the internal family business issues flared up in the summer of 2019 – the Petitioners' story that they only agreed to the August 2019 Transactions to save Harsimran's wedding because they were under duress and were being extorted has too many holes and inconsistencies and is otherwise simply not credible in light of what went on before and after the August 2019 Transactions were agreed upon and the documents signed.

Sahib's story that the families jointly agreed to the January 9 Operating Agreement in the Spring of 2018 makes no sense.  Supposedly, this was agreed upon because the Jarnail Family recognized that they were not putting enough time or money into King Group.  But at the same time Sahib says they agreed to that change and amended the Operating Agreement, Charanjeev came over from India to live in Atlanta and work for King Group and then a year later Karan did

---

[30] Nowhere in this message is the division of the King Group or any property even mentioned, let alone is it tied to Harsimran's marriage, nor does he threaten to ruin the marriage, but rather only criticizes Meharban for not valuing his daughter's marriage, which could be consistent with his belief that her future in-law's family was not wealthy enough.

the same thing.  Obviously, Charanjeev and Karan were not doing that for the principal benefit of Sahib, but for the benefit of both families because King Group was and always had been a family business.  Furthermore, if the Jarnail Family had agreed to substantially reduce its interest in the business to a mere 11% in the Spring of 2018, then why would Jonika extend King Group a $53,000 interest free loan from a cash advance on her credit card on January 15, 2019?  It makes no sense for a non-member to do that, or for anyone in the Jarnail Family to do, if their interest had been consensually reduced so drastically.[31]  It also makes no sense why the January 9 Operating Agreement was backdated if the purpose was to merely reflect the new understanding and agreement of the families, but it does make sense to backdate it if the purpose was to show Sahib had increased income in 2017 to facilitate a refinancing.

The January 9 Operating Agreement clearly used the same signature page as the January 6 Operating Agreement that had the family interests at 51/49.  It is apparent that Sahib changed the operating agreement to favor him and then took the signature page from the previous agreement and attached it to the January 9 Operating Agreement.  There are only three realistic reasons he did that: (1) to facilitate the refinancing of the Belgrave Lane property in May 2018, which lines up perfectly with the timing of both the January 9 Operating Agreement and the filing of the 2017

---

[31] The Court has considered the argument that the Jarnail Family consented to this reduction in interest as allegedly evidenced by Charanjeev allegedly sending out documents like the January 9 Operating Agreement to third parties but the Court notes that Charanjeev denied doing that and he testified that Sahib oversaw sending those documents out at that time and that Sahib allegedly also sent conflicting documents out to third parties.  Because the families in 2018 and early 2019 trusted one another it would have been easy to grab documents without considering this type of detail in its contents.  Why would a family member check the ownership percentage in such a document if they were unaware of it being changed or had no suspicions that it would have been changed?  The Court certainly must wonder whether the selection of January 9, 2017, to replace a document dated January 6, 2017, and that it was not called a Second Amended Agreement, but still simply called an Amended Agreement, was intentional to make it appear as though it was actually the same document.  The fact that the January 6 Operating Agreement was prepared by a lawyer, but the January 9 Operating Agreement was not, and that a new signature was not obtained for the agreement, is further evidence that the January 9 Operating Agreement was concocted to make it difficult to realize that a change had been made.

tax return to show him as having more income to make the refinance easier, (2) he was taking a larger share in King Group without the consent of the family members because he thought he was entitled to it or (3) both.

It is understandable why the Jarnail Family would be upset about this change when they found out about it – particularly given the testimony about the family regarding about Sahib's conduct in general – and pushed to get their family interest reaffirmed according to the January 6 Operating Agreement and it is understandable that this could create a difficult family situation with very tense moments with plenty of emotion.  Looked at in a vacuum, the Court can understand why Sahib thought he should have been entitled to a larger share of King Group because he got it started and devoted more time to it in its early years than other family members did.  But we are not in a vacuum and that is simply not how these families historically operated.  If this was a reason to change the percentages in the operating agreement, the Jarnail Family arguably could have been entitled to a larger share of the businesses in India because Charanjeev and Karan were working on those, and Sahib was not.  That is not how these families historically divided the income from the businesses.  King Group was eventually worth millions of dollars and Charanjeev and Karan did work for it.  The two of them certainly did not do this to have their family's interest in King Group diluted from 49% to 11%.  The Jarnail Family testified and presented evidence that Sahib's behavior in general was a cause for concern, but particularly with respect to King Group.  It is clear Sahib's conduct caused tension between the families and the Meharban Family offered little if any rebuttal to that.

From the testimony and documentation, it is clear that negotiations took place to resolve the Jarnail Family interests in King Group, which is also inconsistent with the Petitioners' claims that they were under duress and being extorted.  Vineet referred to the August 2019 Transactions

as a settlement.  Mr. Haber said Sahib contacted him to prepare documents to resolve an "internal dispute," which Mr. Haber characterized as a break-up.  If someone was being extorted to turn over assets, it does not seem plausible that they would refer to those transactions as a settlement or a break-up or an internal dispute.  Sahib also testified that he did not discuss or mention the alleged extortion and duress with Mr. Haber because he did not think there was anything he or Mr. Haber could have done about it.[32]  How would he know that without asking?  It seems to the Court that it is more probable that Sahib did not tell Mr. Haber about the alleged extortion or duress because he could not tell him about something that did not happen.  This was, as Mr. Haber described it, the settlement of an internal dispute regarding ownership of the business.

Also very telling are the parties' interactions with one another both before and after the August 2019 Agreements and the conflicts in the Petitioners' story itself.  The Court will first focus on the interactions the Jarnail Family had with Harsimran, whose wedding is the subject of Petitioners' allegations.

Harsimran testified that she loved Jonika like a mother, Jarnail like a father, and Charanjeev and Karan like brothers, and yet she never confronted any of them regarding the alleged threats.  Jonika testified that she was happy for Harsimran when she got engaged, and Jonika was very

---

[32] Joel Haber represented Sahib and King Group before, during, and after the time of the August 2019 Transactions.  As a part of his engagement with Sahib, Mr. Haber also agreed to represent affiliated parties, which he considered Maharaja to be.  Regarding the transactions that took place on August 14, 2019, Mr. Haber advised Sahib that the proper way to accomplish the transactions would be to put together a comprehensive agreement.  Mr. Haber told Sahib on multiple occasions that it would be best to do such an agreement, but Sahib did not want to do that.  Whether Sahib took Mr. Haber's advice or not, Mr. Haber provided Sahib with legal advice.  As such, Sahib and Vineet, sophisticated businessmen, had access to and received advice from Mr. Haber relating to the transactions.  There is also an email indicating that Mr. Haber had an outstanding invoice from a tax attorney who provided consultation for the August 14 meeting, and Mr. Haber testified that he may have called a tax attorney to discuss any tax issues created by the transactions.  Mr. Haber testified that if he had a discussion with the tax attorney at the August 14 meeting that he likely discussed it with Sahib.  As such, in addition to access to and the advice of Mr. Haber, Sahib and Vineet had access to and received advice from a tax lawyer relating to the transactions.

involved in helping with Harsimran's wedding planning. Because of the tension – or threats according to Harsimran – between the families over the divestiture of the interest of the Jarnail Family from King Group, Harsimran's wedding was moved without the knowledge of the Jarnail Family who were no longer invited.

The same day she got married, Harsimran informed Jonika by text that she had just gotten married.  Jonika was very happy for her but cried because she wanted to be at the wedding.  The text chain between the two of them on her wedding day, Respondents' Ex. 67, is very revealing. Harsimran initiated the interaction by texting with Jonika on her wedding day that she got married, that she missed her and expressed happiness that she, as a married woman, was now free from her father's restrictions and could communicate with Jonika.  Harsimran expressed that she could now speak to Jonika every day, and no one could stop her.  Harsimran expressed to Jonika that her wedding functions were changed, and Jonika expressed concerns because she heard that the functions were changed "because we ripped off all the cash, seized the accounts and moreover I was coming from America to ruin the functions…" Harsimran responded **"That's all a lie"** and the functions were "such a waste of money." (emphasis added).

Harsimran testified that she texted Jonika the way she did because Jonika was manipulating her and that she was only telling Jonika what she wanted to hear, but that is not credible because it was Harsimran who initiated the texts.  In a powerful moment on cross-examination, counsel for the Jarnail Family asked Harsimran "when you typed 'it's all a lie,' was that or was that not a true statement from you?"  There was a *very* long pause -- so long that the Court underlined "long pause" three times in its notes.  Harsimran eventually answered that she was not telling the truth when she texted "That's all a lie." But based on the Court's assessment of the credibility and

demeanor of the witness, it was crystal clear to the Court that Harsimran knew her text to Jonika was the truth and that now she was being pressured to lie about it at trial.[33]

The text exchange between Jonika and Harsimran continued with Jonika expressing frustration to Harsimran about Harsimran's mother hitting her and talking bad about her. Harsimran's response was to ask Jonika to "leave it."  Harsimran asked Jonika to move on and forget everything.  Jonika responded that she could not just leave it, that these things bothered her a lot, and she cannot forgive.  Harsimran told Jonika to settle for less money and have a peaceful life.  Jonika said, "these dirty blame things need to end," to which Harsimran responded "I know."

---

[33] Harsimran is the owner of a Georgia limited liability company known as Rising Star Constructions, LLC, which owns a piece of real estate at 2526 Panola Road.  At her deposition, she referred to 2526 Panola Road as her brother's place.  Her company took title to this property in December of 2020 and paid only $50,000 for the property, but she had previously listed this property as the real estate agent for $300,000.  Sahib testified at trial that since the filing of the lawsuit, King Group did transfer real estate to a business controlled by a family member, but he was impeached with his deposition testimony on this subject, which testimony was that no such transaction had occurred.  Just 63 days before his deposition, Sahib caused King Group to transfer 2526 Panola Road to Rising Star Constructions, the company owned by Harsimran.  King Group had purchased this property for $174,9000 in September of 2019 and sold it to Sahib's sister, a witness for the Petitioners, on December 30, 2020, for $50,000, substantially less than the amount King Group previously paid to purchase the property.  Sahib also acknowledged that he testified during his deposition that if he made sales, he did so at fair market value, and yet this property was listed for sale for $300,000 before the transfer to Harsimran's company.  Sahib was very evasive and difficult in his testimony on cross examination about this transfer and its value, which further hurt his credibility.

There was also a text on March 2, 2020, from Charanjeev to Harsimran – before the suit was filed - discussing that "Sahib dragged my dad across the floor because he saved you from Sahib smashing you in glass."  Harsimran's response was that **"in order to make things right we would have to ignore a lot of things."**(emphasis added)  She did not challenge Charanjeev about any of the statements he made, including the incident involving Sahib holding her head over glass and threatening her.

Similarly suspicious was the testimony of another witness Petitioners presented as a fact witness in this case, Ms. Neena Tuckar, Meharban's sister.  The day before her testimony at trial (i.e. while trial was ongoing), an entity owned by Ms. Tuckar and an entity owned by Sahib jointly purchased a piece of real estate.  Ms. Tuckar also refused to answer a legitimate question about her criminal past, even after repeated requests and direction from the Court to do so.  Because of Ms. Tuckar's refusal to cooperate, Petitioners' counsel stipulated that she had pled guilty to fraud.  Ms. Tuckar also acknowledged that during the trial she confronted Karan and Jonika, separately, outside of the courtroom.  Ms. Tuckar had no probative testimony to offer; however, she displayed her unwillingness to cooperate with questioning regarding her criminal past, she had a new business relationship with Sahib, and she had confronted several of the Respondents in the courthouse outside of the courtroom.

Harsimran's confirmation that the "dirty blame things need to end" is consistent with her prior text statement that the allegations were all lies. Harsimran never challenged Jonika about what she said in her messages, but instead started texting Jonika about going to a spa. These messages are significant. They are not consistent with how you would expect someone to communicate with someone else who had allegedly threatened to ruin your wedding.

Harsimran also texted with Charanjeev about her wedding. Charanjeev expressed wishes for a happy and blessed life and expressed that it was upsetting that he could not witness Harsimran's wedding. Harsimran responded "I know brother." Harsimran and Charanjeev's exchange is inconsistent with how you would relate to someone allegedly involved in threats to ruin your wedding.

In January of 2020, Harsimran visited Jonika, Charanjeev, and Karan at their home in St. Marlo. Harsimran's husband was with her during this visit. When Charanjeev first saw Harsimran, they hugged and teared up about what had gone on between the families over the last few months. During that meeting, Meharban, along with his wife and other sisters arrived in the afternoon. They expressed interest in Meharban and Vineet getting back into business with Charanjeev, and Meharban and Vineet allegedly acknowledged that what Sahib had done was wrong. The fact that Harsimran and Meharban would visit the family home at this time is inconsistent with the threat allegations. According to Meharban, Jarnail and Jonika threatened to kill his son, Sahib, and ruin Harsimran's wedding and stole Pinetree Plaza. It is irreconcilable that he would then come to their house so soon thereafter and have a pleasant visit. Harsimran and her husband visited again in February of 2020. It is irreconcilable that Harsimran and her husband would visit with people who allegedly threatened to ruin her wedding and allegedly stole family property. The fact that Sahib did not attend any of these family get togethers or the family meeting on April 4, 2020 discussed

in footnote 29 supports Respondents' contention that Sahib and his conduct were the primary source of the conflict between the families.

Respondents introduced at trial a text chain between Jonika and Vineet spanning from August 21, 2019, through September 20, 2019. (Resp. Ex. 66). On August 21 and August 23, 2019, Vineet was sending Jonika photos of wedding dresses for Harsimran. Vineet explained at trial that he had to continue to communicate with her about this at this point in time because it was too late to find another dressmaker since wedding dresses take four to six months to make. However, it was not the Court's understanding that Jonika was making the wedding dress, although a friend of hers may have been, and it was less than two and a half months until the wedding, so that excuse did not seem credible. On August 27, 2019, Jonika sent Vineet a YouTube link and he responded "ha-ha." On August 31, 2019, Vineet texted Jonika pictures of wedding cards for Harsimran's wedding. On September 5, 2019, Vineet sent Jonika a picture of Harsimran's wedding invitation. On September 17, 2019, Vineet asked Jonika to book him a flight to the United States. It is of note that this request is around the time Petitioners alleged that Jarnail came to India for one day to allegedly tell them he stole Pinetree Plaza. These types of communications are inconsistent with the allegations that Jonika and her family were threatening Vineet and his family.

Respondents introduced at trial a text chain between Jarnail and Vineet spanning from June 26, 2019, through November 22, 2019. On August 19, 2019, Vineet was apologizing to Jarnail. It is of note that this message was deleted from Vineet's phone and that this message was sent on the same day the interest in Pinetree Plaza was transferred from Maharaja to Crown Assets.

Respondents introduced at trial a text chain between Charanjeev and Vineet. Vineet claims that the Jarnail Family began making threats in January of 2019, and yet Vineet requested Charanjeev to schedule a real estate showing in June of 2019 and authorized Charanjeev to handle

the Maharaja closing in his absence in July 2019.  From July 30, 2019, through August 2, 2019, Vineet had a cordial text conversation with Charanjeev, occasionally referring to him as "baby." On August 14, 2019, Vineet was texting with Charanjeev asking Charanjeev, as opposed to Sahib (who was in the same room as Charanjeev), to tell him what was going on at Joel Haber's office. Vineet asked Charanjeev – as opposed to Sahib – to send him copies of the documents from Haber's office.  On September 13, 2019, Vineet sent Charanjeev a text regarding a car saying, "if you want we will get this for $43,000 fully loaded."   On September 19, 2019, Vineet asked Charanjeev for usernames and passwords for Vineet and Meharban's accounts, which Charanjeev provided.  On September 23, 2019, Vineet asked for Harsimran's username and password for her Credit Karma account.  Vineet testified he asked for this information so he could change the usernames and passwords on all of the Meharban Family bank and credit card accounts.  However, if that was true, then why on November 30, 2019, did Vineet ask Charanjeev to make a credit card payment for Harsimran?   On December 25, 2019, Vineet asked Charanjeev for his Netflix password.  On March 9, 2020, Vineet asked Charanjeev for his opinion on a belt that Vineet was planning to purchase.

The text chains discussed above are not consistent with communications with people who are allegedly threatening you and your family, placing you under duress, or extorting you.  Not only are they not consistent with the allegation that the August 2019 Transactions were coerced, but the lack of any text or WhatsApp messages supporting their allegations of duress or extortion is also significant.  There were so many text and WhatsApp communications between the parties, yet not one that supported the allegations.  This hurts the credibility of the Petitioners.  Their story that they had some messages but deleted the ones that would have helped them, but did not delete others, does not help their case but rather hurts the credibility of their story.

On September 1, 2019, Jonika attended a dinner with Vineet, Harsimran, Meharban, and Harsimran's future in law's side of the family.  At the dinner, Jonika texted with Vineet about Vineet picking up and paying the bill before Harsimran's future in law's side of the family picked it up.  The dinner was in connection with the upcoming wedding.  On September 17, 2019, Jonika provided Vineet the telephone number of the wedding banquet facility, as she had been working to plan the banquet. Allowing Jonika to be involved in these activities during these dates is inconsistent with the allegations that Jonika and her family were threatening Meharban and his family.

It is also of note that the Petitioners' testimony regarding the Jarnail Family's move out of the Belgrave Lane house is also conflicting.  Sahib testified that the day before the August 14, 2019, meeting in Mr. Haber's office, he told Charanjeev they needed to move out of the Belgrave Lane property.  Meharban and Vineet also asked them to move out.  Sahib testified that after he learned of the threats to kill him, he asked Meharban to ask Charanjeev, Karan, and Jarnail to move out of the Belgrave Lane property.  However, Sahib also testified that he was surprised when Charanjeev, Karan, and Jarnail moved out.  In one part of his testimony, Sahib is asking that they move out and in another part of his testimony he is claiming the move out was a surprise.  Those inconsistencies cannot be reconciled.

There are also conflicts in the Petitioners' testimony about when Jonika allegedly threatened to get a 100 people to break up the wedding.  Vineet and Meharban testified at trial that on August 14, 2019, Jonika left the residence in India at 3 a.m. saying that she was going to get 100 people to go to Harsimran's future in-laws to break up her marriage.  Vineet testified at trial that the first time this threat was made was on August 14, 2019.  Vineet testified that because of this, the transactions on August 14, 2019, took place.  Jonika was the only member of her side of

the family living in the residence in India during this time, and she was living with Vineet, Meharban, Vineet's mother, and Harsimran. However, contrary to his trial testimony that this alleged incident took place on August 14, 2019, Vineet previously signed an affidavit (Resp. Ex. 93) indicating that the threat of 100 people to wreck the wedding did not take place until after Jarnail came to India in September. As such, Vineet has two conflicting sworn statements as to when the alleged threats regarding 100 people took place. In addition, in responding to the Court's questioning, Harsimran testified at trial that Jarnail's alleged one-day trip to India in September took place before the alleged threat of 100 people to wreck the wedding, which also conflicts with the timeline offered by Vineet at trial.

Even if the story of Jonika making her alleged threat at 3 a.m. on August 14, 2019 (5:30 p.m. on August 13, 2019 in Atlanta) was true, the timeline renders it impossible that it had any impact on Sahib agreeing to the August 2019 Transactions on August 14 because he had already emailed Mr. Haber earlier in the day on August 13 with the terms of the documents he wanted Mr. Haber to prepare for him and the others to sign on August 14, so it is obvious the deal had already been agreed upon. Furthermore, Harsimran testified that her future in-laws were from Ludhiana, India, a completely different city than Amritsar, India, so even if the threat did take place, it is hard to believe anyone would give up millions of dollars of assets in response to a threat that someone was going out at 3 a.m. to gather 100 people to drive to another city to break up a wedding.

Meharban's testimony was generally not credible, either. He testified that he was concerned the future in-laws would reject the marriage offer after the Jarnail Family stole Meharban's half of the joint family business account as part of the effort to ruin Harsimran's marriage. He alleged that Jarnail and Jonika withdrew 3 crore rupees from the joint bank account in India, approximately $399,000, which Meharban said he had intended to use to pay for

Harsimran's wedding.  He allegedly visited Harsimran's future in-laws at the end of September or beginning of October to explain the financial situation.  Meharban testified that his mother-in-law paid for Harsimran's wedding.

The Maharaja Farms bank statement was admitted into evidence but there was little or no testimony about it.  It was cited by Petitioners in their Proposed Findings of Fact in support of Meharban's contentions.  A review of the bank statement for the joint account certainly does not support Meharban's testimony and appears to not only contradict his story that Jonika and Jarnail looted the account, but shows that he, Neeta (his wife), and Harsimran withdrew dramatically more from the account than Jonika and Jarnail at this time.  From July 15 to October 31, 2019, it appears that Jonika and Jarnail withdrew about 2,400,000 rupees (less than $40,000), but none *after* September 18, 2019.  Meharban, however, withdrew about 3,300,000 rupees and Neeta about 1,700,000 during that same time period, almost all of which was *after* September 7, 2019, and Harsimran withdrew about 1,250,000 rupees, almost all of which was on September 23 and 24, 2019.  Therefore, between September 18 and 24, 2019, Meharban, Neeta, and Harsimran withdrew about 5,200,000 rupees alone.  So Meharban, Neeta, and Harsimran appear to have withdrawn about 6,250,000 rupees (about $100,000) at the time they allege they had to go the future in-laws to claim they could not afford the big wedding.[34]  Yet they complain about Jonika and Jarnail withdrawing less than half that amount.

---

[34] The original wedding date was November 10, 2021. The wedding was allegedly planned as a grand affair with 700-800 people attending over two days on November 9 and 10.  Mehaban testified he was afraid that Jarnail would disrupt Harsimran's marriage. He went to the future in-law's home and asked them to move up the wedding date. The wedding date was changed to October 25, 2019, and Jarnail and Jonika were not told about the change.

Meharban also testified that Jonika took about 10 kilograms of gold the family had in the bank in India.[35] This claim is suspicious for a couple of reasons. First, no document was produced that supported this allegation and the Court would think a bank would have a record of someone walking out of a branch with more than 20 lbs. of gold worth perhaps as much as $500,000.[36] Second, Meharban is not a party to this case and is not asserting claims against any of the Respondents, and he has also elected to not pursue any such alleged claims in India. If he felt he was personally wronged – including allegations of theft and extortion – he could have easily been a plaintiff in this case where the defendants had submitted themselves to the jurisdiction of the Court.[37]

During cross-examination, Meharban confirmed that he had testified on direct examination about all the alleged threats allegedly received from any of the Respondents. However, cross-examination exposed that Meharban had previously testified in his deposition that Jonika and

[35] When cross examined, he acknowledged that the property he was testifying about was company property for a company jointly owned (50%/50%) with Jarnail.

[36] Jonika testified that she did not go to the bank and remove gold, and further explained that she could not have physically removed 10 kilograms of gold because of her rheumatoid arthritis. She also testified that everyone in the family was authorized to withdraw money from the joint bank accounts of the business, but she could not withdraw cash, only write checks. Jonika further testified that she never withdrew cash from the business accounts.

[37] The Petitioners' litigation strategy of not having Meharban and Harsimran as named plaintiffs when they appeared to be asserting claims against the Respondents is strange indeed and adversely effects the credibility of their respective stories and the Petitioners' story as a whole. If Charanjeev really stole money through the unauthorized use of Harsimran's credit cards, then she could have sued him here just like her brothers did. If Meharban really thought Jarnail and Jonika stole from him, or extorted him, then he could have sued them here just like his sons did. The only way that litigation strategy seems to make sense is that (a) they were not comfortable being plaintiffs in a case in which they did not wholeheartedly believe in, possibly because they knew there could be counterclaims and possible sanctions awarding attorney's fees when the claims were dismissed and/or (b) Petitioners' former counsel tried to protect the Petitioners from the out-of-court statements these so-called "non-party" witnesses made to the Respondents on the grounds they were hearsay and therefore not admissible, but the Court did not permit the rules of evidence to be manipulated that way. Both Meharban and Harsimran were also represented by Petitioners' former counsel in their respective depositions.

Jarnail had threatened to kill Sahib if the properties were not transferred, but he did not testify about this on direct.  This is a substantial omission of the most serious of the alleged threats. Meharban testified during his deposition that Jonika, Jarnail, and Charanjeev threatened to have Sahib shot, but he "forgot" about that serious threat at trial and testified at trial that Charanjeev never communicated a threat to him.  Notwithstanding the alleged threats to kill his son and destroy his daughter's marriage, Meharban testified that he still trusted the Respondents.  In addition, notwithstanding the alleged threats to kill his son and ruin his daughter's wedding, Meharban had a pleasant visit at the St. Marlo residence of Jarnail, Jonika, Charanjeev, and Karan in February of 2020, where family photos were taken.

Sahib testified about the alleged threats, as well.  Sahib also sat through Meharban's testimony, including the cross-examination regarding death threats, and yet Sahib made no reference in his direct examination to any death threat against him.  Sahib was living in the same house with Jarnail, Charanjeev, and Karan at the time of the alleged threats.  Sahib's testimony was that his response to the death threat was that Jarnail, Charanjeev, and Karan needed to look for another place to live.  Also of substantial importance, the alleged death threat was not mentioned in the Complaint filed in this action.  In addition, Sahib's affidavit discussing the threats makes no mention of an alleged death threat.  The Court does not find it credible that the Jarnail Family would have made threats to kill Sahib, but neither Meharban nor Sahib would have testified in their direct examinations about the death threats and that the death threats would not be included in the pleadings in this case.  Additionally, the credibility of the alleged death threats is further eroded by the fact that Sahib continued to live with Jarnail, Charanjeev, and Karan after the alleged death threats were made to Meharban.

Meharban's testimony contained further conflicts. He testified that prior to 2019, he had a very good relationship with Jarnail. However, he also testified that Jarnail would regularly get drunk and hold a pistol to his head. In addition, after having received the alleged threats, Meharban requested that the Jarnail Family pay his life insurance premiums for him, sending money to them in the United States to do so. At this time, Meharban's own son, Sahib, was living in the United States, and yet he asked members of the Jarnail Family – who were allegedly threatening and extorting his family – to do this.

During the time of the alleged threats, Charanjeev, Karan, and Jarnail were all living with Sahib, and yet it was Sahib's testimony that threats were communicated to his family in India and not to him.[38] Charanjeev, Karan, and Jarnail were living under the same roof as Sahib, and yet he did not have conversations with them about the alleged threats after he was informed about them by his family.

Immediately after the August 2019 Transactions, Vineet made efforts to do business with Charanjeev, Karan, and Jarnail by offering to contribute 25% to a new business with them. Petitioners acknowledge that after Vineet found out about Charanjeev's transfer of Maharaja's interest in Pinetree Plaza, he nevertheless continued to communicate with Charanjeev through May 2020. He allegedly did so because he said he believed Charanjeev and Karan would return Pinetree Plaza when Jarnail returned from India in March 2020. As previously discussed by the Court, the story that the interest in Pinetree Plaza would be returned after Jarnail returned to the United States in March 2020 is not credible.

---

[38] Sahib testified at trial that he did not receive direct threats from Jarnail, Jonika, Charanjeev, or Karan. However, in the verified complaint, Sahib represented that "Defendants represented to Dr. Arora and Vineet that if they agreed to the transactions on August 14, 2019, Defendants would not take any action to harm their sister as they had threatened." Sahib testified that the statement contained in the verified complaint was not accurate with respect to representations made to him.

Vineet testified that he told Harsimran's fiancé in September 2019 about the family issues because he realized he could not solve the situation. This seems to conflict with the whole notion that the Meharban Family had to shield these things from the fiancé's family so they would not break off the marriage.[39] Even without that testimony, it is unreasonable to believe the Meharban Family would transfer millions of dollars' worth of property based on the threat of *lying* about a family member's character to stop a marriage. Vineet's testimony that he told the fiancé's family about the threats anyway seems to indicate that keeping the alleged threats quiet was not the reason the properties were transferred.

In February of 2020, Vineet acknowledged to Charlie Gonzalez, a real estate broker, that there were no issues between Vineet and Charanjeev to get Charlie Gonzalez to assist with real estate transactions. Charlie Gonzalez testified that in February of 2020 he received email and text confirmation from Charanjeev and Vineet that there were no issues between them. Based on this, Vineet was communicating to a third party and affirming that there were no issues between the families. That is inconsistent with Vineet's allegations in this case.

Sahib's testimony shows that, contrary to the assertion that Respondents were using duress and extortion, there was a negotiation taking place regarding the "liquidation" of King Group. Sahib even stated that they were "putting pressure back and forth."

---

[39] Sahib testified that he wanted to act against Charanjeev from the middle of September of 2019, but that he could not because Harsimran's wedding had not taken place. Vineet testified that he communicated the alleged threats to Harsimran's fiancé's family in September of 2019, and yet the wedding went forward in October of 2019, and they are still married. As such, Sahib's statement of concern about Harsimran's wedding does not make sense. In addition, if this were the reason Sahib did not act, he could have taken action as soon as Vineet told Harsimran's in-laws or no later than after the October wedding of Harsimran, but he did not do so until the middle of the following year.

In November 2019, Mr. Haber was approached by Sahib and Karan about a 1031 exchange involving proceeds to be split between King Group and Crown Assets from the sale of a property at 5754 Attucks Boulevard.  The parties and Mr. Haber devised a way to complete the 1031 exchange for tax purposes by amending the operating agreement of Zillionaire on November 20, 2019 to formalize Crown Assets' 50% interest in Zillionaire (the "Zillionaire Amended and Restated Operating Agreement") and entering into an internal agreement for Zillionaire dated December 21, 2019 regarding certain rights and obligations of the parties with respect to each other's use of their respective portions of the sale proceeds to effectuate 1031 exchanges (the "Zillionaire 1031 Agreement" together with the Zillionaire Amended and Restated Operating Agreement, the "Zillionaire Agreements").  The Zillionaire 1031 Agreement was framed by Mr. Haber as a "cooperation agreement" where the parties would agree to facilitate each other's purchases, but that King Group would not be responsible for Crown Assets' debt and vice versa.

Petitioners allege that prior to November 20, 2019, Zillionaire had one member – King Group – and that on November 20, Charanjeev demanded that Sahib add Crown Assets as a 50% member for three reasons: (a) Attucks Boulevard was under contract and Charanjeev, the real estate agent on the deal, threatened to interfere with the closing; (b) Charanjeev was collecting the rent and not remitting it to King Group which left King Group without a revenue source to pay the mortgage; and (c) Charanjeev promised that Pinetree Plaza would be returned to Maharaja when Jarnail returned from India in March 2020.

Sahib testified that he provided Crown Assets with an interest in the Attucks Boulevard and Snapfinger Park Drive properties because he believed that in doing so the Respondents would transfer Pinetree Plaza back to Maharaja, and he still trusted Charanjeev, even after the alleged threats and the transfer of the Pinetree Plaza.  One month after the Attucks Boulevard transaction,

the sale of Snapfinger Park Drive took place. Aside from the unbelievable story that Sahib would have still trusted Charanjeev after all of the alleged threats, this story does not make financial sense. Sahib testified that Crown Assets received $341,000 in proceeds from the sale of Attucks Boulevard and an additional $541,756 in proceeds from the sale of Snapfinger Park Drive. As such, Sahib's testimony is that he provided Crown Assets $882,756 because he believed doing so would result in Crown Assets returning an asset to Maharaja for which Maharaja paid $700,000. Sahib testified "It's better to get something for the investment rather than zero dollars," and yet he provided Crown Assets $882,756 in the hope that Crown Assets would reconvey Pinetree Plaza to Maharaja, for which Maharaja had paid $700,000. Following Sahib's logic, he authorized a loss of $882,756 to obtain an asset for which Maharaja had only paid $700,000 and in which he and Vineet only had a 50% interest in based on the Maharaja Amended Operating Agreement. That logic does not make sense, and therefore lacks credibility for that reason alone.

Sahib also testified that he had no choice but to agree to the sale of Attucks Boulevard in December 2019 because King Group could no longer afford to pay the mortgage. That testimony is not credible based on the King Group bank statements for that period which show that King Group consistently had sufficient funds to continue to service the loan if it needed to find a deal without Charanjeev's involvement.

An additional reason Sahib's story does not make sense is because the Tri-Party Agreement signed on August 14, 2019, already had obligated King Group to give Crown Assets a 50% interest in Attucks Boulevard. Without making Crown a 50% shareholder of Zillionaire, King Group would have been taxed on the entire equity from the sale. The Zillionaire Amended and Restated Operating Agreement fixed that so the tax liability could be shared equally between King Group and Crown Assets.

## King Package

King Package, Inc. is an entity owned by Sahib Arora (50%) and Harinder Bajaj (50%).  It operates a liquor store in a building and property owned by King Group and another entity.  King Group funded the initial acquisition and operations of the liquor store, and King Package pays the mortgage on the property owned by King Group as its rent.  The parties dispute who exactly funded the money to King Group that was earmarked for starting King Package, and the Jarnail Family (specifically Charanjeev) claims Karan was to receive an ownership interest in King Package which never materialized.  They point to a $5000 payment in early 2020 as evidence that they were receiving distributions from the liquor store profits.  There was no evidence introduced at trial regarding any written agreements or other writings about the ownership of King Package, and Karan himself did not testify that he was to receive a 50% or other stake in the LLC.

## Lis Pendens

In connection with this lawsuit, Sahib caused the following lis pendens to be recorded against properties owned by the Crown Parties:

| Property Address | Owner(s) on Title | Ownership | Loan Obligor(s) or Guarantor(s) |
|---|---|---|---|
| 7530 St. Marlo Country Club Parkway, Duluth, GA 30097 | Charanjeev Singh | Individual | Charanjeev Singh |
| 90 Hunters Chase, McDonough, GA 30253 | Debtor and Zillionaire Assets LLC | Tenants in Common | Debtor; Karan Ahuja; and Zillionaire Assets LLC |
| 325 Crooked Stick Drive, Milton, GA 30004 | Debtor | LLC | Debtor and Karan Ahuja |
| 1604 E Oglethorpe Boulevard, Albany, GA | Debtor and 1604 E Oglethorpe Blvd LLC | Tenants in Common | Debtor; Shaneel Lalani; Karan Ahuja; 1604 E Oglethorpe LLC; Billionaires Funding Group, LLC; 2505 S Main Street LLC; and 4319 Covington Hwy LLC |

| 140 W Dykes Street, Cochran, GA | 140 W Dykes LLC | LLC | Debtor; Shaneel Lalani; Karan Ahuja; 1604 E Oglethorpe LLC; Billionaires Funding Group, LLC; 2505 S Main Street LLC; and 4319 Covington Hwy LLC |
| 2505 S Main Street, Moultrie, GA | 2505 S Main Street LLC | LLC | Debtor; Shaneel Lalani; Karan Ahuja; 1604 E Oglethorpe LLC; Billionaires Funding Group, LLC; 2505 S Main Street LLC; and 4319 Covington Hwy LLC |
| 4319 Covington Highway, Decatur, GA | Debtor and 4319 Covington Hwy LLC | Tenants in Common | Debtor; Billionaires Funding Group, LLC; 4319 Covington Hwy LLC; Karan Ahuja; Shaneel Lalani |

The last four of these lis pendens were filed under the contention that the properties were purchased with the proceeds from the TC Federal Loan obtained in connection with the Pinetree Plaza. Notwithstanding recording lis pendens that clouded the title to the Crown Parties' properties, Sahib testified that he was not aware of any proof showing that the proceeds of the TC Federal Loan were used to purchase any of the properties on which a lis pendens was filed. Instead, Sahib made his contention connecting the purchases to the proceeds of the TC Federal Loan based solely on timing.

Karan also testified that none of the TC Federal Loan proceeds were used to buy other properties. Moreover, Shaneel testified that he did not believe any of the TC Federal Loan proceeds or any other proceeds from the Pinetree Plaza were used to purchase 140 West Dykes Street, 2505 South Main St, 1604 East Oglethorpe, or 4319 Covington Hwy. Accordingly, there is no evidence to show that any of the proceeds from the TC Federal Loan or any other funds derived from the Pinetree Plaza were used to purchase any of the properties against which a lis pendens has been filed in connection with this lawsuit.

The filing of the lis pendens caused the Crown Parties a number of issues related to their properties and finances, which they allege include, but are not limited to, increased interest and other fees in connection with the loan with Westmoore Lending, the inability to repair a roof on their property in Albany, Georgia, having to leverage their credit cards and therefore incur additional debt of $400,000 to pay for day to day operations and items, and being unable to sell a property in Cochran, Georgia.  Crown Assets is in the business of buying and selling real estate and to refinance properties as necessary.  The purpose of filing a lis pendens is, at a minimum, to prevent the other party from selling or financing the properties.  The natural consequence of filing lis pendens on most or all of the properties owned by a company that is in the business of buying and selling real estate would result in damage to its business in the ways described by the Crown Parties.  In the case of Crown Assets, these lis pendens were also a principal cause of its filing bankruptcy and the damages that flowed from that.

**Communications to Third Parties**

Sahib contacted various third parties to make allegations about the Crown Parties.  The first e-mail is dated September 25, 2019, from Sahib to Mike Ray at Keller Williams, who was Charanjeev's broker (the "Keller Williams E-mail").  The second e-mail is dated April 21, 2020 from Sahib to Greg Elford and Kevin Vick with TC Federal Bank, "aaron@silvis-ambrose.com" who is affiliated with the law firm that handled the closing for the TC Federal Bank Loan, and Toby Knifer with the City of Thomasville, Georgia Police Department (the "TC Federal E-mail").  The third e-mail is dated May 29, 2020, from Sahib to Jack Miller – with Gelt Financial LLC – and Joel Haber (the "Gelt Financial E-mail").

Also, in the months of May and June 2020, Sahib did the following: filed the affidavit in the real estate records in Thomas County regarding title to Pinetree Plaza and contacted Bank of

America to report a series of banking transactions as being unauthorized even though they were consistent with King Group's banking history.  The impact of these various communications will be discussed below.

### Gelt Financial communications

Under the Zillionaire Amended and Restated Operating Agreement, Crown Assets and King Group would share equally from the profits of the sale of Attucks Boulevard. Sahib and Karan intended to treat that sale as a 1031 exchange with each using their share of the proceeds to buy a property under the name of their respective entity.  Therefore, Crown Assets, King Group, and Zillionaire entered into the Zillionaire 1031 Agreement, in which the parties set out the terms for the use of the Attucks Boulevard sales proceeds in separate 1031 exchanges. This agreement provided that if Zillionaire would be a co-owner of the properties purchased by Crown Assets and King Group with the sale proceeds, neither Crown Assets nor King Group would be obligated to assume any financial obligation of a loan secured by the other's respective 1031 replacement properties and each signed for the other a Zillionaire resolution authorizing the other to execute all documents necessary to effectuate a loan for their respective 1031 exchange properties.  Crown Assets purchased 90 Hunter's Chase. King Group purchased 3180 Atlanta Hwy.  The Certified Resolution and Incumbency Certificate for Zillionaire Assets, LLC dated January 2020 was signed by Sahib in his capacity as manager of Zillionaire and expressly "authorized and directed" Karan "to execute and deliver, on behalf of the Company [Zillionaire], such agreements, instruments or documents which he, in his sole and absolute discretion, deem necessary or desirable to facilitate or carry of the Purchase of the Property [defined as 90 Hunter's Chase] and that the Company and the Members of the Company shall be bound by all such acts;" (the "Zillionaire Resolution").

Crown Assets obtained an interest only loan in the principal amount of $485,000 from Gelt Financial to purchase 90 Hunter's Chase. Gelt Financial required a guaranty from Zillionaire and a confession of judgment from Crown Assets, Karan, and Zillionaire before it would fund the loan, all of which were within the scope of the documents provided for under the Zillionaire 1031 Agreement and the Zillionaire Resolution signed by Sahib.

Nevertheless, Sahib emailed Jack Miller at Gelt Financial on May 29, 2020, and stated that he was a member of Zillionaire and that the loan for 90 Hunters Chase, the property purchased with Crown Assets' portion of the Attucks Boulevard proceeds, was not properly approved by Zillionaire. He did this even though the Zillionaire 1031 Agreement and Zillionaire Resolution he signed clearly provided that he would approve of such a loan and it did not provide him the discretion to disapprove of such a loan. In addition, Sahib acknowledged at trial that the Zillionaire 1031 Agreement and Zillionaire Resolution also provided that Karan could execute the documents on behalf of Zillionaire that he, in his sole and absolute discretion, deemed necessary to facilitate or carry out the purchase and that Zillionaire would be bound by those acts. Despite this, Sahib never contacted Gelt Financial to tell it his statements in the Gelt Financial Email were wrong. In fact, he doubled down and caused Petitioners to oppose the payment of Gelt Financial from the cash collateral generated by 90 Hunters Chase in Crown's bankruptcy case, which opposition caused a delay in payments resulting in a payment default in addition to the lis pendens creating a cloud on the title to Gelt Financial's collateral.

As a result of Sahib's communication with Gelt Financial, and the filing of this lawsuit and the placing of a lis pendens on Gelt Financial's collateral, 90 Hunter's Chase, Gelt Financial accelerated the loan, started charging interest at the higher default rate of 24%, triggered contractual attorney's fees and late charges, including a 10% late charge on the principal balance

due on the loan upon acceleration or maturity, and it filed a lawsuit against Zillionaire and Karan (a suit against Crown Assets was stayed because of the bankruptcy). Gelt Financial specifically referenced in the Complaint the contact from Sahib and the lis pendens and it appears to have started charging default interest and assessed other fees on the loan on August 12, 2020, on or shortly after the date of the filing of the lis pendens. Gelt Financial proceeded to get a confession of judgment against Zillionaire and Karan for more than $659,000 in December 2019 and Gelt Financial has filed a proof of claim for a similar amount against Crown Assets in its bankruptcy case.

The breakdown of the total judgment obtained by Gelt is as follows: Principal $485,000, Interest through December 10, 2020 at the default rate of $42,922.45, with interest accruing at the default rate of $323.23 per day, Late Fees of $57,546.62 including a 10% late fee on the entire principal balance upon maturity or acceleration of $48,500, Bank Fee of $125.00, Monthly service Fees for 6 months $1,200.00, Payoff Processing Fee $1,000.00, Exit Fee $9,700.00, Impound – Refund ($24,289.85), and Attorney's Commission $85,980.63. Karan has filed a motion to reopen the judgment in the Pennsylvania state court and the matter is pending. The Debtor has also filed an objection to Gelt Financial's proof of claim.

### TC Federal Bank Loan

On January 16, 2020, Pinetree LLC obtained a construction loan from TC Federal in the principal amount of $1,537,94.00 to redevelop Pinetree Plaza, and TC Federal recorded a security deed and other loan documents related to the loan. TC Federal required Pinetree Plaza be held by a single entity as a prerequisite to close the Loan; therefore, Crown Assets conveyed its interest in Pinetree Plaza to Pinetree LLC immediately prior to the loan closing, and Karan became a 50% member of Pinetree LLC simultaneously with the loan closing. Prior to January 16, 2020, Pinetree

LLC had only two members: Shaneel and Sameer Lalani, but since January 16, 2020, Pinetree

LLC's members are Karan (50%), Shaneel (25%), and Sameer Lalani (25%).

When Shaneel took action to close the loan on behalf of Pinetree LLC, Sahib and Vineet

had already told him they were no longer involved in Pinetree Plaza and that they had given up

their interest in the property.  TC Federal disbursed the loan proceeds to Pinetree LLC as

construction progressed, and from January 2020 to October 2020, Pinetree LLC incurred at least

$1,600,000 in construction costs to renovate, repair, and finish constructing Pinetree Plaza,

exceeding the amount of the loan.

Despite his statements to Shaneel regarding the surrender of his family's interest in Pinetree

Plaza, Sahib recorded an Affidavit Pertaining to Title in the real estate records of Thomas County,

Georgia, on June 3, 2020, challenging Pinetree LLC's 100% title to Pinetree Plaza by disputing

the validity of Maharaja's transfer to Crown Assets and Crown Assets' subsequent transfer to

Pinetree LLC.  During construction, Sahib contacted TC Federal disputing Pinetree LLC's title to

Pinetree Plaza.  Because Pinetree LLC fronted construction costs and drew drown the TC Federal

Loan as costs accrued, Charanjeev and Karan testified that Sahib's actions delayed construction

and disrupted Pinetree LLC's access to loan funds for construction cost reimbursements.

As a result of actions taken by Sahib, Karan testified Pinetree LLC incurred expenses from

construction delays to Pinetree Plaza, including $60,000 in contractual lease delays Pinetree LLC

paid to its tenant, Ollie's Bargain Outlet (the "Ollie's Lease Damages").

**<u>Bank of America Transactions</u>**

In June of 2020, Sahib reported several transactions within the King Group bank account

as fraudulent.  Jarnail had made interest-free loans to King Group using his credit card.  Without

any accounting records at all to confirm whether the bank transactions were appropriate or not,

Sahib reported transactions involving the Jarnail Family as fraudulent. Sahib acknowledged at trial that it is possible that some of the reported transactions were repayment of loans. When testifying about a specific transaction from July 2019, a $22,092 transaction with Jarnail's name attached to it, Sahib testified that he did not know what the transaction was for, but that he did not authorize it. In July or August 2019, he apparently did not realize the transaction was unauthorized, but he testified he was somehow able to state to the Bank that it was unauthorized almost a year later in June of 2020. Sahib tried to distinguish between King Group and non-King Group expenses as an explanation; however, he previously acknowledged that the King Group account was used to pay personal expenses of members and non-members. When Sahib received the bank statement after the close of July 2019, he did not report the transaction as fraudulent. King Group did not keep a loan balance registry to keep track of the loans and repayments. When questioned about other charges on the bank statement, Sahib could not identify what the charges were for.

The first transaction reported as fraudulent was dated March 1, 2019. Sahib's parents' credit cards were paid out of this account on the same day Jarnail's was also paid, but only the payment to Jarnail's credit card was reported as fraudulent.[40] There was a long history of payments like the ones that were reported by Sahib as fraudulent; however, a year after these transactions took place, he determined that certain transactions were unauthorized, which was at the time he was preparing this lawsuit in June of 2020. Without the benefit of any accounting records, only after Sahib made the decision to litigate with the Respondents, did he go back and report transactions as unauthorized.

---

[40] Also in contrast, the credit card charges Harsimran complained about were not reported as unauthorized but were instead paid.

These transactions appeared to be made in the ordinary course of King Group's business. It appears to the Court that Sahib had them reversed for no reason other than to hurt or penalize Jarnail in the amount of $36,021.00.

**Criminal Allegations**

Sahib acknowledged that to the best of his knowledge, none of the Respondents have been charged with or convicted of any crimes, yet in some of his communications with third parties he accused Charanjeev and Karan of committing crimes and stated that they were being investigated by local police and that the matter had been referred to the FBI. There was no evidence presented that any of these statements were true.

**The Destruction of Evidence**

Meharban acknowledged that he destroyed messages relating to the alleged threats. Meharban is not a party, so the Court will not weigh his destruction of evidence when considering the request for sanctions, but his failure to have any messages of recordings to support his version of the facts does hurt his credibility.

Vineet previously testified in his deposition that the materials from his old phone had been deleted,[41] but at trial he was able to play one voice message from Jarnail from his old phone. Vineet also acknowledged that he deleted copies of his texts. In discovery, Petitioners produced a text chain, admitted as Respondents' Exhibit 82, which shows that messages were deleted, including the apology message to Jarnail on the day of the transfer of Pinetree Plaza. Vineet is a party, and the testimony at trial shows that he did destroy evidence, which hurts his credibility and will also be considered when deciding the motion for sanctions in a separate order.

---

[41] At the hearing on the Respondents' Motion for Sanctions for the destruction of evidence, Vineet was able to find or retrieve some additional messages from his phone that were then produced to Respondents.

But what is relevant to the Court with respect to the trial of this matter is that out of all of the many texts and WhatsApp exchanges between the parties over a period of many months before and after August 14, 2019, there is only one exchange dealing with the allegations of the Complaint and that is Harsimran telling Jonika that the allegations are a lie.  Given the volume of written communications between the parties during this time, it is simply not credible that the Petitioners' allegations could be true and yet not have any written communications over this period of time that support their story of duress or extortion.

**Karan's Alleged Conversion of the Bayview Check**

In November 2019, Zillionaire, as the borrower, expected to receive a check from Bayview Loan Servicing, LLC in the amount of $25,169.53.  Sahib testified that he informed Bayview that the check had not been received.  He testified that Bayview in response informed him that the check dated November 12, 2019, was sent to 660 Belgrave Lane and had been cashed.  It sent a copy of the endorsed and cashed check to Sahib.  This copy shows that Karan endorsed the check to Crown Assets – "Pay to the order of Crown Assets LLC" with his signature below.

The Zillionaire Amended and Restated Operating Agreement named Sahib as the manager of Zillionaire.  Karan was not a member of Zillionaire, but Crown Assets was.  Sahib testified that because he was the manager of Zillionaire, only he had access to Zillionaire's bank account and authority to endorse checks on behalf of Zillionaire.

Karan admitted signing the check and thinks it was sent to his St. Marlo house, doesn't recall how it got there, but acknowledged it was addressed to 660 Belgrave Lane.  No issue about the deposit of this check for more than $25,000 was raised by Petitioners in the Complaint or the Amended Pre-trial Order.  In addition to it being strange that an issue about a $25,000 check was not raised in the Complaint or the Amended Pre-trial Order, Sahib's story that Karan was not

authorized to negotiate this check does not make sense for several reasons: (a) signature authority on bank accounts is not based on the LLC operating agreement, but on the deposit agreement with the bank, the latter of which was not entered into evidence, but we know the bank did accept the check with Karan's signature, (b) if Karan was not an authorized signatory on the account, Sahib could have easily raised the issue with the bank and been reimbursed for the bank's mistake in negotiating the check and we know Sahib certainly challenged other transactions on the grounds they were unauthorized and (c) the only realistic way the check could have gotten to Karan for him to sign is if someone living at 660 Belgrave Lane – which at this time was only people from the Meharban Family – sent it to him.  Therefore, the court concludes that Sahib, purportedly acting on behalf of Zillionaire, of which Crown Assets was a half owner, did not carry his burden of proof that the endorsement of this check by Karan was unauthorized, even assuming it was allowed to assert a claim not in the Complaint or Amended Pre-Trial Order.

**Alleged Forgery and Theft of Maharaja and Vineet Checks**

Charanjeev had access to Vineet's credit cards, but Vineet allegedly had never given Charanjeev access to his bank account.  Nor had Vineet allegedly given Charanjeev or any member of the Jarnail Family authority to sign any checks drawn on his bank account.  On August 12, 2019, check number 1010 from Vineet's personal bank account was made payable to Karan in the amount of $5300.  Vineet testified that he did not sign the check, nor did he authorize anyone else to issue this check to Karan.  We do know, however, that Vineet was in India at the time which was why he did not personally attend the signing of the August 2019 Agreements at Mr. Haber's office.

Vineet testified he was and is the only authorized signer on the Maharaja bank account.  On July 30, 2019, a check made payable to King Property Advisors, LLC in the amount of $15,000

was drawn on Maharaja's bank account.  The signature on the check is not Vineet's.  King Property Advisors is solely owned by Charanjeev.  Vineet alleged he did not write the check or sign the check or authorize anyone to sign the check.

Because of the passage of time between the writing and cashing of these checks and when the matters were finally raised by Vineet, it is not credible that they were not authorized by him. The checks were for significant amounts and Vineet should have seen them no later than when the respective July and August bank statements were issued the following month, assuming he would not have seen them sooner through online banking, so if the checks were not authorized then it likely would have been raised earlier because Vineet was still communicating with the Jarnail Family at that time and even into 2020.

## **CONCLUSIONS OF LAW**

### **Overarching Issues of Duress and Extortion**

An overarching issue and the basis for many claims in this case is whether or not the transactions the Petitioners seek to rescind or seek damages for were entered into on account of the alleged fraud, duress, or extortion on the part of some or all of the Respondents.  This issue effects most of the claims and counterclaims in the case.  The Court heard six days of testimony, during which it was able to evaluate the demeanor and the stories of the witnesses and assess their credibility, considered all the documentary evidence, the proposed findings of fact and conclusions of law each party submitted in lieu of their closing argument, and all other matters of record.  Based on that and the Court's Findings of Fact, above, the Court concludes that (a) the Petitioners have not met their burden to establish that they acted under duress on account of Respondents' actions or that Respondents otherwise committed fraud or extortion so most of the Petitioners' claims must

be denied for this reason alone and (b) the Respondents carried their burden of proof on some of their counterclaims because they affirmatively showed that the Petitioners' allegations of fraud, duress and extortion were untrue.[42]

**Petitioners' Claims against the Respondents**

Count I – Claims Under the Georgia RICO Act

Petitioners' claim under the Georgia RICO Act is predicated on the alleged threats and the alleged duress or extortion.  Because the Court has concluded that the Petitioners have not met their burden regarding fraud, duress, extortion, or other illegal activity, Petitioners cannot meet their burden regarding their Georgia RICO claim.

The Court will nevertheless apply the facts of this case and the law to Petitioners' claim under the Georgia RICO statute.  Georgia's RICO statute states "it shall be unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or

---

[42] Respondents have also argued that, as to the alleged duress, there is a legal barrier the Petitioners cannot overcome.  They argue that it is "well-established" that "when the signer of an agreement is sophisticated in business matters and has access to and in fact obtains advice of counsel, the defense of duress is not available to void the contract." *Compris Technologies v. Techwerks, inc.,* 274 Ga.App. 673, 682 (2005) (quoting *Cooperative Resource Center v. Southeast Rural Assistance Project,* 256 Ga.App. 719, 720-721 (2002); See also, *In re Chatham Parkway Self Storage, LLC*, 507 B.R. 13, 22 (Bankr. S.D. Ga. 2014)).  There is no question that Sahib and Vineet are both sophisticated in business matters.  In addition, Sahib and Vineet did have access to Joel Haber, an attorney, on August 14, 2019, and Mr. Haber did offer advice (i.e. to do a comprehensive agreement); however, Sahib elected to not act on that advice.  Nonetheless, Mr. Haber did prepare the agreements for which he was retained and advice was provided.  In addition, advice was sought and obtained from a tax attorney.

Respondents previously filed a Motion to Dismiss certain counts of the Complaint based on this alleged legal barrier.  The Court set the matter for a hearing and even though counsel for Petitioners at that time failed to appear for the hearing, the Court denied the Motion at that stage of the case, preferring to have all of the facts before it to make such a determination.  Although Respondents' interpretation of these cases could be the law, the Court does not have to reach this issue because the Court has found that factually the duress and extortion did not occur.  But even if that is not a conclusion that can be reached as a matter of law based on the cases cited by Respondents, the fact that the Petitioners failed to mention any alleged duress or extortion to their general outside business lawyer – who was offering advice on the very deal in which the alleged duress is involved – is a relevant fact and one indicator among many that the alleged duress or extortion simply did not happen.

maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." O.C.G.A. § 16-14-4(a). Under this statute, "enterprise" "means any person, sole proprietorship, partnership, corporation, business trust, union chartered under the laws of this state, or other legal entity; or any unchartered union, association, or group of individuals associated in fact although not a legal entity; and it includes illicit as well as licit enterprises and governmental as well as other entities." O.C.G.A. § 16-14-3(3).

A "pattern of racketeering activity" means "engaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such acts occurred after July 1, 1980, and that the last of such acts occurred within four years, excluding any periods of imprisonment, after the commission of a prior act of racketeering activity." O.C.G.A. § 16-14-3(4)(A). The requisite predicate acts that demonstrate a "pattern of racketeering activity" for an actionable claim under the Georgia RICO statute include, but are not limited to, theft by deception under O.C.G.A. § 16-8-3 and theft by conversion under O.C.G.A. 16-8-4.

Petitioners have alleged the following racketeering activity: theft by extortion, theft by deception, theft by conversion, forgery in the first degree, forgery in the third degree, false swearing, illegal use of financial cards, and identity fraud. As stated in more detail below and in the Findings of Fact above, the Court concludes that the Petitioners have not met their burden to show any of the alleged racketeering activities.

A person commits the offense of theft by extortion "when he unlawfully obtains property of or from another person by threatening to:

(1) Inflict bodily injury on anyone or commit any other criminal offense;
(2) Accuse anyone of a criminal offense;
(3) Disseminate any information tending to subject any person to hatred, contempt, or ridicule or to impair his credit or business repute;
(4) Take or withhold action as a public official or cause an official to take or withhold action;
(5) Bring about or continue a strike, boycott, or other collective unofficial action if the property is not demanded or received for the benefit of the group in whose interest the actor purports to act; or
(6) Testify or provide information or withhold testimony or information with respect to another's legal claim or defense.

O.C.G.A. § 16-8-16.

Petitioners allege that theft by extortion in this case is predicated on the alleged threats to harm Harsimran by defaming her, but the Court has concluded that the Petitioners have not met their burden to show any acts of theft by extortion.

A person commits the offense of theft by deception "when he obtains property by any deceitful means or artful practice with the intention of depriving the owner of the property." O.C.G.A. § 16-8-3(a).  A person deceives "if he intentionally: (1) creates or confirms another's impression of an existing fact or past event which is false and which the accused knows or believes to be false; [or] (2) fails to correct a false impression of an existing fact or past event which he has previously created or confirmed . . ." *Avery v. Chrysler Motors Corp.*, 214 Ga. App. 602, 603, 448 S.E.2d 737, 738 (1994) (citing O.C.G.A. § 16-8-3(b)).  "The intent necessary for the crime of theft by deception . . . must be specific to the creation of a known false impression." *Avery v. Chrysler Motors Corp.,* 214 Ga. App. 602, 607, 448 S.E.2d 737, 741 (1994).

"The gravamen of theft by deception lies in obtaining the property of another by intentionally creating a false impression as to an existing fact or past event." *Z-Space, Inc. v. Dantanna's CNN Ctr., LLC*, 349 Ga. App. 248, 253, 825 S.E.2d 628, 635 (2019).  The Petitioners

claim that theft by deception was committed by the conveyance of Maharaja's interest in Pinetree Plaza to Crown Assets, Crown Asset's conveyance to Pinetree LLC, and Pinetree LLC's conveyance of a security deed to TC Federal.  The Court has found that Maharaja either consented to or ratified the transfer of Pinetree Plaza to Crown Assets so there cannot be any theft.  Therefore, the Court concludes that the Petitioners have not met their burden to show any acts of theft by deception.

A person commits the offense of theft by conversion "when, having lawfully obtained funds or other property of another including, but not limited to, leased or rented personal property, under an agreement or other known legal obligation to make a specified application of such funds or a specified disposition of such property, he knowingly converts the funds or property to his own use in violation of the agreement or legal obligation." O.C.G.A. § 16-8-4(a).  As to the alleged offenses of theft by deception and theft by conversion, "the act of obtaining, taking, converting, or appropriating the *property of another* is a common element. *Z-Space, Inc. v. Dantanna's CNN Ctr., LLC*, 349 Ga. App. 248, 253, 825 S.E.2d 628, 635 (2019) (emphasis in original).

The Petitioners allege that theft by conversion was accomplished by taking the rental income from the Pinetree Plaza.  Because the Court has concluded that the Maharaja Transfer was authorized or ratified, and Maharaja ceased to have an interest in the rental income of Pinetree Plaza, there can be no conversion of its rental income.

A person commits the offense of forgery in the first degree "when with the intent to defraud he or she knowingly makes, alters, or possesses any writing, other than a check, in a fictitious name or in such manner that the writing as made or altered purports to have been made by another person, at another time, with different provisions, or by authority of one who did not give such authority and utters or delivers such writing." O.C.G.A. § 16-9-1(b).

Petitioners claim that Charanjeev's use of the Maharaja Sale Resolution to transfer Maharaja's interest in Pinetree Plaza supports this claim. Because the Court has concluded that the transfer of Maharaja's interest in Pinetree Plaza was authorized or ratified, the use of the Maharaja Sale Resolution was either authorized or ratified and, therefore, the Petitioners have not met their burden to show any acts of forgery in the first degree.

A person commits the offense of forgery in the third degree "when with the intent to defraud he or she knowingly: (1) Makes, alters, possesses, utters, or delivers any check written in the amount of $1,500.00 or more in a fictitious name or in such manner that the check as made or altered purports to have been made by another person, at another time, with different provisions, or by authority of one who did not give such authority." O.C.G.A. § 16-9-1.

Petitioners allege forgery in the third degree based on the alleged forgery of Vineet's name on checks. The evidence showed that these parties routinely signed documents for one another, including checks. Because of this and the passage of time between the cashing of the checks and the raising of issues about their validity it is not credible that they were not authorized. Therefore, the Court concludes that the Petitioners have not met their burden to show any acts of forgery in the third degree.

Petitioners allege that false swearing was committed by Karan in the execution of an affidavit of possession. "A person to whom a lawful oath or affirmation has been administered or who executes a document knowing that it purports to be an acknowledgment of a lawful oath or affirmation commits the offense of false swearing when, in any matter or thing other than a judicial proceeding, he knowingly and willfully makes a false statement." O.C.G.A. § 16-10-71. Because the Court has concluded that the affidavit in question is truthful, the Court concludes that the Petitioners have not met their burden to show any acts of false swearing.

Petitioners claim under four separate statutes that some of the Respondents have engaged in the illegal use of financial cards: O.C.G.A. §§ 16-9-31 *et seq.* The allegation regarding these statutes is that Harsimran's credit cards were improperly used. Petitioners' allegations as to illegal use of financial cards are not related to any of the Petitioners. Harsimran is not a party to this action. Petitioners do not have standing to assert claims against the Respondents based on acts alleged against a non-party.[43] In addition, the Court concludes that the Petitioners have not met their burden to show any acts of illegal use of financial cards.

As to identity fraud:

> (a) A person commits the offense of identity fraud when he or she willfully and fraudulently:
>
> (1) Without authorization or consent, uses or possesses with intent to fraudulently use identifying information concerning a person;
> (2) Uses identifying information of an individual under 18 years old over whom he or she exercises custodial authority;
> (3) Uses or possesses with intent to fraudulently use identifying information concerning a deceased individual;
> (4) Creates, uses, or possesses with intent to fraudulently use any counterfeit or fictitious identifying information concerning a fictitious person with intent to use such counterfeit or fictitious identification information for the purpose of committing or facilitating the commission of a crime or fraud on another person; or
> (5) Without authorization or consent, creates, uses, or possesses with intent to fraudulently use any counterfeit or fictitious identifying information concerning a real person with intent to use such counterfeit or fictitious identification information for the purpose of committing or facilitating the commission of a crime or fraud on another person.
>
> (b) A person commits the offense of identity fraud by receipt of fraudulent identification information when he or she willingly

---

[43] O.C.G.A. § 44-12-24 provides: Except for those situations governed by Code Sections 11-2-210 and 11-9-406, a right of action is assignable if it involves, directly or indirectly, a right of property. A right of action for personal torts, for legal malpractice, or for injuries arising from fraud to the assignor may not be assigned.
The exceptions provided in O.C.G.A. § 11-2-210 and 11-9-406 are inapplicable to the facts of this case.

accepts for identification purposes identifying information which he or she knows to be fraudulent, stolen, counterfeit, or fictitious. In any prosecution under this subsection it shall not be necessary to show a conviction of the principal thief, counterfeiter, or fraudulent user.

O.C.G.A. § 16-9-121.

Petitioners' claim of identify fraud is also based on allegations relating to Harsimran. As was the case with the claim for illegal use of financial cards, Petitioners do not have standing to assert claims against the Respondents based on acts alleged against a non-party. In addition, the Court concludes that the Petitioners have not met their burden to show any acts of identity fraud.

With respect to Pinetree LLC, Petitioners allege Pinetree LLC violated Georgia's RICO statute by obtaining Maharaja's interest in Pinetree Plaza through theft by deception and/or theft by conversion based on the argument the transfer from Maharaja to Crown Assets was improper, which the Court has found to not be the case. The evidence, however, also showed that when Maharaja transferred its interest in Pinetree Plaza to Crown Assets, the only members of Pinetree LLC were Shaneel and Sameer Lalani. In addition, Petitioners presented no evidence or testimony at trial of any intentional act by either Shaneel or Sameer Lalani that deprived Maharaja of its interest in Pinetree Plaza, or of any action by Shaneel or Sameer Lalani related to Maharaja's transfer to Crown Assets.

Further, Shaneel's testimony regarding his conversation with Sahib and Vineet after the transfer of Maharaja's interest in Pinetree Plaza to Crown Assets shows that this transfer was with the consent of or was ratified by Sahib and Vineet. Shaneel's actions with respect to the TC Federal Loan also occurred after Sahib and Vineet confirmed they had relinquished their interest in Pinetree Plaza. Simply put, the evidence showed that Pinetree LLC did not improperly take any

property of Petitioners or create any false impression of fact with Petitioners related to Pinetree Plaza.

Accordingly, the Court finds that Petitioners failed to carry their burden of proving Pinetree LLC committed theft by deception or theft by conversion, and therefore they failed to prove Pinetree LLC committed any necessary predicate act to sustain their claim.

Because the Court finds that Petitioners failed to meet their burden of proof on any of the necessary predicate acts to sustain their claim, Petitioners' Georgia RICO claim in Count I is denied as to all Respondents.

<u>Count II – Quiet Title</u>

Petitioners seek to quiet title to the Pinetree Plaza property to unwind transactions and put title to the property back in Maharaja.

"A quia timet, or quiet title action, is intended to remove a cloud on the plaintiff's title to land." *Cunningham v. Gage*, 301 Ga. App. 306, 308, 686 S.E.2d 800, 802 (2009) (citing O.C.G.A. § 23-3-40). To bring a quia timet action, "the [claimant] 'must assert that [it] holds some current record title or current prescriptive title. … Otherwise, [it] possesses no title at all, but only an expectancy." *Id*. (quoting *In re Rivermist Homeowners Ass'n*, 244 Ga. 515, 518, 260 S.E.2d 897 (1979)).

The preponderance of evidence and testimony at trial established that Maharaja conveyed its interest in Pinetree Plaza to Crown Assets for valid consideration to settle a family debt.  As set forth in the Findings of Fact, Petitioners have not met their burden to show that the Maharaja Sale Resolution was not properly used or that the transfer from Maharaja to Crown Assets was not otherwise authorized or subsequently ratified.  Moreover, Shaneel testified that Sahib and Vineet

acknowledged to him that they had given up their interest in Pinetree Plaza and later came back to him to inquire whether they should attempt to regain title.

Accordingly, the Court finds that Petitioners failed to meet their burden to sustain their claim, so Petitioners' Quiet Title claim in Count II is denied.

Count III – Injunctive Relief

Petitioners withdrew their claim for injunctive relief in the Amended Pre-Trial Order filed in this case, so this Court has been dismissed.

Count IV – Recission on the Grounds of Duress

As stated above, Petitioners have not met their burden to show that the threats were made and that the transactions at issue in this case were undertaken on account of the threats or duress. In this matter, the Petitioners claimed they were under duress and extorted. However, they negotiated the terms of the transaction, continued to do business with the Respondents after the transaction, took further actions relying on the transaction, and did not promptly take action to rescind. For the reasons stated in the Findings of Fact above, Petitioners' assertion that they waited as long as they did to take legal action because they believed the Pinetree Plaza would be reconveyed to them is simply not believable. As such, recission is unavailable.

Accordingly, the Court finds that Petitioners failed to meet their burden to sustain their claim, so Petitioners' claim of Recission on the Grounds of Duress in Count IV is denied.

Count V – Recission on the Ground of Fraudulent Inducement

Fraudulent inducement has five essential elements:

> (1) a false representation or concealment of a material fact, (2) that the defendant knew the representations or concealment were false, (3) an intent to induce the allegedly defrauded party to act or refrain from acting, (4) justifiable reliance by the plaintiff, and (5) damages as a result of the false representations or concealment. When

evidence as to any one of these elements is lacking, the fraud claim
fails.

*Pacheco v. Charles Crews Custom Homes, Inc.*, 289 Ga. App. 773, 774–75, 658 S.E.2d 396, 398

(2008).

Petitioners assert that they were fraudulently induced into the transactions at issue because

the Respondents allegedly said they would not take any action against Harsimran if the Petitioners

cooperated.  As stated above, the Petitioners have not met their burden regarding proving the

existence of this alleged threat or that it was the reason they entered into the transactions at issue.

Petitioners also assert that they were fraudulently induced into the Zillionaire transactions

that occurred in November and December of 2019 with the promise that Pinetree Plaza would be

reconveyed to Maharaja.  As addressed above, the logic of this claim does not make sense and the

Court found that this promise did not occur.

In addition, fraudulent inducement requires justifiable reliance.  Even assuming the other

elements, which the Court concludes have not been proven, the Petitioners have not presented any

credible evidence as to justifiable reliance.  If those transactions were a result of nefarious conduct

by the Respondents, as Petitioners have alleged, there is no way Petitioners could have justifiably

relied on additional statements from the Respondents.  It is not possible to justifiably rely on your

extortioner.

The Court finds that Petitioners failed to meet their burden to sustain this claim.  Therefore,

Petitioners' claim of Recission on the Grounds of Fraudulent Inducement in Count V is denied.

<u>Count VI – Recission on Ground of Illegality</u>

'If a contract be illegal as against public policy, its invalidity will
be a defense while it remains unexecuted. If the illegal contract be
in part performed, and money has been paid in pursuance of it, no
action will lie to recover the money'.

*Hanley v. Savannah Bank & Tr. Co.*, 208 Ga. 585, 587, 68 S.E.2d 581, 582 (1952).

The evidence shows that these transactions occurred as a part of a family settlement to separate the family business. There has been no showing of illegality as consideration for the transactions. The content of the documents themselves are not for an illegal or immoral purpose.

Petitioners even acknowledge receipt of consideration which at a minimum included the transfer of Karan's interest in King Group. As such, even Petitioners acknowledge something of value was exchanged. In addition, each of the documents sought to be rescinded specifically call out consideration.

As set forth above, Petitioners did not promptly rescind but rather negotiated the terms of the transaction, continued to do business with the Respondents after the transaction, and took further actions relying on the transactions. As such, recission is unavailable.

Because the Court finds that Petitioners failed to meet their burden to sustain this claim, Petitioners' claim for Recission on the Grounds of Illegality in Count VI is denied.

<u>Count VII – Declaratory Judgment</u>

"The State Declaratory Judgment Act gives superior courts the power to declare rights and other legal relations of any interested party in 'cases of actual controversy' under O.C.G.A. § 9-4-2 (a) and 'in any civil case in which it appears to the court that the ends of justice require that the declaration should be made.'" *Walker v. Owens*, 298 Ga. 516, 518, 783 S.E.2d 114, 116 (2016). "The object of the declaratory judgment is to permit determination of a controversy before obligations are repudiated or rights are violated." *Walker v. Owens*, 298 Ga. 516, 518, 783 S.E.2d 114, 116 (2016). "Where the party seeking declaratory judgment does not show it is in a position of uncertainty as to an alleged right, dismissal of the declaratory judgment action is proper." *Walker v. Owens*, 298 Ga. 516, 519, 783 S.E.2d 114, 117 (2016).

The Petitioners seek a declaratory judgement to invalidate to the August 2019 Agreements, the Zillionaire Agreements, the Tri-Party Agreement, and the Maharaja Transfer.  As set forth in the Findings of Fact, the preponderance of the evidence does not support invalidating the agreements and unwinding the transactions as requested by Petitioners, including but not limited to Maharaja's transfer of its interest in Pinetree Plaza to Crown Assets.  Because the Court finds that Petitioners failed to meet their burden to sustain this claim, Petitioners' claim for Declaratory Judgment in Count VII is denied, including but not limited to the claim that Maharaja has any record title to Pinetree Plaza, or other interest in Pinetree Plaza or its rental income.

Count VIII – Conversion of Pinetree Plaza Income

As discussed above, "conversion consists of an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation." *Trey Inman & Assocs., P.C.*, 306 Ga. App. at 457, 702 S.E.2d at 716.  In order to establish a claim for conversion, "the complaining party must show (1) title to the property or the right of possession, (2) actual possession in the other party, (3) demand for return of the property, and (4) refusal by the other party to return the property." *Id.*

The Court finds that Petitioners failed to meet their burden to sustain this claim because Maharaja – through Vineet, as well as Sahib – authorized or ratified the transfer of its interest in Pinetree Plaza and acknowledged – through Vineet and Sahib – to Shaneel Lalani that it gave up its interest, and therefore, it cannot have a claim to the rental income of Pinetree Plaza which could be converted.  Furthermore, the evidence showed that Pinetree LLC played no role in the transfer of Maharaja's interest in Pinetree Plaza to Crown Assets.  Also, when Pinetree LLC became the owner of Pinetree Plaza it was the rightful owner of the rents generated by the property.  Therefore,

Pinetree LLC never withheld any rents from Maharaja, and it could not possibly convert what it owns. Accordingly, Petitioners' claim of Conversion of Pinetree Plaza Income in Count VIII is denied.

Count IX – Conversion of Bank Funds

Petitioners claim that certain checks were forged. However, the testimony at trial showed that it was the parties' common practice to use credit cards and checks not titled in their own names and to sign those checks. The testimony showed that this was done routinely and with consent.

Petitioners rely on O.C.G.A. § 16-9-1 as a basis of their claim; however, in order for a forgery to exist under any of the subparts of the referenced statute, there must be a showing that the act was done with the intent to defraud. Given the parties' history of allowing the other parties to use their credit cards and checking accounts, and the substantial period of time that passed between the writing of the check and any issue being raised about them, Petitioners have not carried their burden of establishing the intent to defraud.

Therefore, the Court finds that Petitioners failed to meet their burden to sustain this claim, so Petitioners' claim for Conversion of Bank Funds in Count IX is denied.

Count X – Conversion through Identity and Financial Transaction Card Fraud

This claim is predicated on claims relating to Harsimran. As addressed elsewhere, O.C.G.A. § 44-12-24 prohibits the Petitioners from presenting to this Court a claim for an alleged fraud committed against Harsimran. Petitioners do not have standing to bring claims on behalf of Harsimran. In addition, even if conversion were an available claim, the Court finds that Petitioners failed to meet their burden to sustain their claim, so Petitioners' claim of Conversion through Identity and Financial Transaction Card Fraud in Count X is denied.

Count XI – Breach of Fiduciary Duty

In this claim, Petitioners contend Pinetree LLC breached an alleged fiduciary duty to Maharaja with respect to their joint ownership in Pinetree Plaza.  A member or manager's duties and responsibilities in managing the affairs of a limited liability company are governed by O.C.G.A. § 14-11-305.  "A limited liability company owes no fiduciary duty to its members, either directly or vicariously, for actions taken by its manager." *ULQ, LLC v. Meder*, 293 Ga. App. 176, 181, 666 S.E.2d 713, 718 (2008).  "A fiduciary or confidential relationship arises where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith. such as the relationship between partners, principal and agents, etc. O.C.G.A. § 23-2-58 . . . The mere fact that one reposes trust and confidence in another does not create a confidential relationship. In most business dealings, opposite parties have trust and confidence in each other's integrity, but there is no confidential relationship by this alone." *First Union Nat'l Bank v. Gurley*, 208 Ga. App. 647, 648-49, 431 S.E.2d 379, 381 (1993) (citations omitted).

The Court heard testimony that Maharaja and Pinetree LLC were business partners in their joint ownership of Pinetree Plaza, but neither Maharaja, nor Vineet, nor Sahib were ever members of Pinetree LLC.  The Court finds that because Maharaja and Pinetree LLC were not members of the same limited liability company they did not owe fiduciary duties to one another according to the statute, and therefore Maharaja cannot impose the obligations created by O.C.G.A. §§ 14-11-305 and 14-11-307 on Pinetree LLC.

Petitioners also failed to present evidence of any special relationship between Maharaja and Pinetree LLC that would impose a fiduciary duty upon Pinetree LLC with respect to their joint

ownership of Pinetree Plaza.  Most importantly, the evidence shows Maharaja either authorized or ratified the transfer of its interest in Pinetree Plaza to Crown Assets in August 2019.

Because the Court finds that Maharaja either authorized or ratified the transfer of its interest in Pinetree Plaza and Petitioners failed to establish a fiduciary relationship between Maharaja and Pinetree LLC, the Court denies Petitioners' claim for breach of fiduciary duty in Count XI of the Complaint.

<u>Count XII – Fraud</u>

Petitioners claim fraud with respect to the August 2019 Agreement and the subsequent transfer of Pinetree Plaza.  Fraud requires the proof of five essential elements:

> (1) a false representation or concealment of a material fact, (2) that the defendant knew the representations or concealment were false, (3) an intent to induce the allegedly defrauded party to act or refrain from acting, (4) justifiable reliance by the plaintiff, and (5) damages as a result of the false representations or concealment. When evidence as to any one of these elements is lacking, the fraud claim fails.

*Pacheco v. Charles Crews Custom Homes, Inc.*, 289 Ga. App. 773, 774–75, 658 S.E.2d 396, 398 (2008).  The absence of any of the aforementioned elements causes the fraud claim to fail.  Here, none of the five essential elements to a fraud claim have been satisfied.

As to the August 2019 Transactions, the Court has found they were the result of the two families negotiating a settlement of a business dispute caused by Sahib's unauthorized attempt to increase his ownership interest in King Group and, therefore, those transactions were not fraudulent.  The Petitioners claim they were under duress or being extorted, which is not supported by the evidence.  However, assuming the alleged duress or extortion for the sake of Petitioners' argument, then there could not have been any misrepresentation or concealment, and it also would have been impossible for the Petitioners to justifiably rely on the Respondents.

As to the Maharaja Transfer, the transfer of the interest in the property was either authorized or ratified so it necessarily cannot be fraudulent.  In addition, the Petitioners have not shown (i) any false representation to the Petitioners or concealment of material fact from the Petitioners, (ii) any intent to induce the Petitioners to act or refraining from action, or (iii) any justifiable reliance by the Petitioners.  Although contrary to the evidence, Petitioners testified they were unaware of the Maharaja Transfer until after it had occurred and that they were informed of it by Jarnail.  As such, the elements of fraud are unable to be established.  Moreover, the testimony of Shaneel showed that Sahib and Vineet acknowledged to him that they had given up their interest in Pinetree Plaza, and later came back to him to inquire whether they should attempt to regain title.  Shaneel's testimony shows that the Maharaja Transfer was not a nefarious act but was a part of the parties' efforts to separate their business interests.  Sahib and Vineet were aware of it, consented to it, and acted after the fact as though it was authorized.  Subsequently, Sahib and Vineet consulted Shaneel about changing their mind to attempt to regain the property.

Accordingly, the Court finds that Petitioners failed to meet their burden to sustain this claim, so Petitioners' Fraud claim in Count XII is denied.

<u>Count XIII – Imposition of an Equitable Lien; Count XIV – Imposition of a Constructive Trust; Count XVI – Request for Equitable Accounting</u>

Petitioners request three forms of equitable relief regarding four properties Petitioners assert were purchased with a portion of the proceeds from the TC Federal loan relating to the Pinetree Plaza: (i) the imposition of an equitable lien on the four properties, (ii) the imposition of a constructive trust as to those four properties, and (iii) an equitable accounting relating to those four properties.

As discussed elsewhere herein, the Court has found that the Maharaja Transfer was not a nefarious act but was an agreed upon part of the parties' efforts to separate their business interests

and repay family debt.  Sahib and Vineet were aware of it, consented to or ratified it, and acted after the fact as though it was authorized.  Subsequently, Sahib and Vineet even consulted Shaneel about changing their mind to attempt to regain the property, which is what Sahib and Vineet have now requested of this Court.  Based on the forgoing, there is no basis to impose an equitable lien, a constructive trust, or equitable accounting against any of the Respondents or their properties.

Even if the Maharaja Transfer was a nefarious act, as alleged by the Petitioners, there is no evidence showing that any of the loan proceeds were used to purchase those properties.  To the contrary, the evidence regarding the use of the loan proceeds was conclusively that none of them were used to purchase the properties.  As such, for this additional reason, there is no basis to impose an equitable lien against any of the Respondents or their properties.

Accordingly, the Court finds that Petitioners failed to meet their burden to sustain these claims.  As such, Petitioners' Equitable Lien claim in Count XIII, Constructive Trust claim in Count XIV, and Equitable Accounting claim in Count XVI are all denied.

<u>Count XV – Disgorgement</u>

As indicated in the Amended Pretrial Order, this claim has been withdrawn by the Petitioners.  Therefore, this claim has been dismissed.

<u>Count XVII – Conspiracy</u>

Petitioners' pleadings included a claim for conspiracy.  However, that claim is not included in Petitioners' claims portion of the Amened Pretrial Order, but Petitioners do reference the Conspiracy claim in their damages section of the Amended Pretrial Order.

The Court need not reach the issue as to whether the Conspiracy claim is or is not a part of the case because of its omission from the Plaintiff's claims section of the Amended Pretrial Order

because there is no factual basis for the claim.  Petitioners have not established any tortious acts

by the Respondents.

As such, even if the Conspiracy claim was a part of the case following its omission from

the Amended Pretrial Order, the Court finds that Petitioners failed to meet their burden to sustain

this claim. Therefore, Petitioners' Conspiracy claim in Count XVII is denied.

Count XVIII – Punitive Damages

A request for punitive damages is a derivative request relating to a successful tort claim:

> Punitive damages may be awarded only in such tort actions in which
> it is proven by clear and convincing evidence that the defendant's
> actions showed willful misconduct, malice, fraud, wantonness,
> oppression, or that entire want of care which would raise the
> presumption of conscious indifference to consequences.

O.C.G.A.§ 51-12-5.1.

Because the Petitioners have not set forth any successful tort claims, a claim for punitive

damages is inappropriate.  As such, the Court finds that Petitioners failed to meet their burden to

sustain this claim.  Accordingly, Petitioners' request for punitive damages in Count XVIII is

denied.

Count XIX – Attorney's Fees

Petitioners have alleged claims for attorney's fees pursuant to the RICO claim, as well as

pursuant to O.C.G.A. § 13-6-11.

Because the Court has already determined that the RICO claim has failed on the merits and

has been dismissed, a claim for attorney's fees pursuant to that claim also fails.

A claim for attorney's fees under O.C.G.A. § 13-6-11 is an ancillary request that the

attorney's fees requested be allowed as damages relating to a successful primary claim. Petitioners'

claim for attorney's fees pursuant to O.C.G.A. § 13-6-11 asserts that Respondents acted in bad

faith and were stubbornly litigious.  Because the Court has not found in favor of the Petitioners on any of their claims, the ancillary claim for attorney's fees must also fail.  In addition, the evidence at trial did not show that the Respondents acted in bad faith or were stubbornly litigious.

As such, the Court finds that Petitioners failed to meet their burden to sustain their claim. Accordingly, Petitioners' request for attorney's fees in Count XIX is denied.

<u>Count XX – Breach of Fiduciary Duty</u>

Petitioners cite the Brokerage Relationships in Real Estate Transactions Act (specifically, O.C.G.A. §§ 10-6A-5(a)(2)(c), 10-6A-5(b), and 10-6A-5(a)(2)), Rule 520-1-10(b) of the Georgia Real Estate Commission, and *Graham v. Lynch*, 206 Ga. 301, 301, 57 S.E.2d 86, 86 (1950) as a basis for their claim against Charanjeev for breach of fiduciary duty.

Petitioners' claims against Charanjeev for the alleged breach of fiduciary duties relate to his actions in the Maharaja Transfer.  There is no evidence that Charanjeev was acting as a real estate agent on behalf of Maharaja in that transaction.  As such, during that transaction, Charanjeev would not have owed fiduciary duties pursuant to the cited authorities.

In addition, as discussed in more detail in the Findings of Fact, the evidence showed that the Maharaja Transfer was with the consent of or was ratified by Sahib and Vineet and confirms that Charanjeev was acting with authority when he facilitated the transfer of Maharaja's interest in Pinetree Plaza to Crown Assets.  As such, even if the cited authorities would have ascribed fiduciary duties to Charanjeev associated with the transaction, the facts show that he was acting with authority.

Therefore, the Court finds that Petitioners failed to meet their burden to sustain this claim.

Accordingly, Petitioners' claim for Breach of Fiduciary Duty in Count XX is denied.

Count XXI – Breach of Fiduciary Duty

The Petitioners argue that if the Maharaja Amended and Restated Operating Agreement, dated August 14, 2019, is enforceable, then Charanjeev and Karan owed fiduciary duties to Maharaja and its members.  As discussed in more detail in the Findings of Fact, the evidence showed that the Maharaja Transfer was with the consent of or was ratified by Sahib and Vineet. As such, even if the cited authorities would have ascribed fiduciary duties to Charanjeev and Karan associated with the transaction, the facts show that the transaction was authorized so no fiduciary duties could have been violated if that operating agreement was enforceable.

As such, the Court finds that Petitioners failed to meet their burden to sustain their claim. Accordingly, Petitioners' claim for Breach of Fiduciary Duty in Count XXI is denied.

Count XXII – Claims Under the Brokerage Relationships in Real Estate Transactions Act

Petitioners have elected to not pursue this claim.  As such, the Court denies Count XXII, Claims Under the Brokerage Relationship in Real Estate Transactions Act.

Count XXIII – Misappropriation of Prospective Business Opportunities

Petitioners' pleading regarding this claim relates to the properties allegedly purchased by the Respondents with proceeds from the TC Federal Loan associated with the Pinetree Plaza.

As addressed elsewhere herein, no evidence was introduced showing that any of the proceeds from the TC Federal Loan were used to purchase the properties relating to this claim.  In addition, the claim presupposes that the Maharaja Transfer was improper.  As addressed herein, the evidence does not support that conclusion either.

As such, the Court finds that Petitioners failed to meet their burden to sustain this claim. Accordingly, Petitioners' claim for Misappropriation of Prospective Business Opportunities in Count XXIII is denied.

<u>Count XXIV – Cancellation of Deeds</u>

Petitioners have requested this Court exercise equity under O.C.G.A. § 23-2-60 and cancel the deeds executed on August 14, 2019, claiming they are the result of extortion and fraud.

As addressed elsewhere herein, the Court concludes the deeds at issue were not procured by fraud, duress or extortion.  They were provided as part of a negotiated settlement between the parties.

As such, the Court finds that Petitioners failed to meet their burden to sustain this claim. Accordingly, Petitioners' claim for Cancellation of Deeds in Count XXIV is denied.

**<u>Crown Respondents' and Pinetree's Counterclaims</u>**

<u>Crown Declaratory Judgments (Counts VIII, XIII)</u>

<u>Declaratory Judgment for King Group Operating Agreement (Count VIII)</u>

Throughout the course of trial in this matter, there were multiple operating agreements discussed and presented into evidence regarding King Group.  In the Counterclaims, Karan alleges that Sahib forged his signature on an operating agreement for King Group dated January 9, 2017. As set forth in the Findings of Fact, the Court agrees with the Crown Parties on this point.

However, the Court disagrees with the Crown Parties that there is an immediate and real need to warrant the issuance of a declaratory judgment.  It is clear from the evidence in this case that the parties settled their interests in King Group as part of the transactions that took place between August 14, 2019, and December 31, 2019.  Although the Court agrees that the January 6 Operating Agreement was the operative and effective agreement for King Group up until August 14, 2019, to the extent the Crown Parties are trying to argue that Karan still has a 38% interest in King Group after the August 2019 Agreements, that argument flies in the face of the reality of

what the parties intended to accomplish in those agreements.  To the extent the Crown Parties are making this argument, the Court also concludes that Karan's execution of the Bill of Sale for his interest in King Group to Sahib as part of the August 2019 Agreements was a bargained for release or waiver of any interest he had in King Group, or to the extent necessary, a ratification of the January 9 Operating Agreement, which waiver, release, or ratification was given in consideration for the August 2019 Transactions, which even the Crown Parties referred to as a settlement. Therefore, there is no longer an ongoing conflict with respect to whether any of the Crown Parties own an interest in King Group that requires this Court to issue a declaratory judgment.

<u>Declaratory Judgment for Zillionaire Agreements (Count XIII)</u>

In the Second Amended Complaint, the Petitioners allege that the Zillionaire Amended and Restated Operating Agreement and the Zillionaire 1031 Agreement were coerced and seek rescission and a declaratory judgment to that effect.

Crown Assets, which is a party to the Zillionaire Amended and Restated Operating Agreement, alleges that it holds a fifty percent (50%) membership interest in Zillionaire by way of the Zillionaire Amended and Restated Operating Agreement and seeks a declaratory judgment that this document is the operative document for Zillionaire and that the Zillionaire 1031 Agreement is also still in full force and effect.

These dueling allegations are sufficient to establish a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.  In addition, the conflict is ongoing and actual.

The Petitioners claim the Zillionaire Amended and Restated Operating Agreement should be rescinded so that Crown Assets no longer holds a fifty percent (50%) membership interest in Zillionaire.  On the other hand, Crown Assets claims that the Zillionaire Amended and Restated

Operating Agreement must be enforced because Zillionaire still holds an interest in two properties – one at 90 Hunters Chase and another at 3180 Atlanta Highway – the former belonging to Crown Assets and the latter belonging to the King Group – per the terms of the Zillionaire 1031 Agreement reached between the parties.

As discussed above, the Court has found that the Petitioners did not meet their burden to show that the August 2019 Agreements and Zillionaire Agreements were the result of duress or extortion on the part of the Crown Parties and, to the contrary, found that the Crown Parties have carried their burden to show that those agreements were part of a settlement of a family business dispute and should be enforced.

In November 2019, Mr. Haber was approached by Sahib and Karan about a 1031 exchange involving proceeds to be split between King Group and Crown Assets from the sale of a property at 5754 Attucks Boulevard.  The parties and Mr. Haber devised a way to complete the 1031 exchange for tax purposes by amending the operating agreement of Zillionaire and entering into the Zillionaire 1031 Agreement.  The Zillionaire 1031 Agreement was framed by Mr. Haber as a "cooperation agreement" where the parties would agree they would not be liable for the debts of the other party with respect to property acquired as part of a 1031 exchange but that they would cooperate with each other to facilitate each other's respective purchases.  The Zillionaire Amended and Restated Operating Agreement and the Zillionaire 1031 Agreement were entered into voluntarily by King Group and Crown Assets and are valid, binding, and enforceable documents.

Therefore, under the Declaratory Judgment Act, the Court grants the relief sought by Crown Assets in Count XIII of its Counterclaims, and decrees that the Zillionaire Amended and Restated Operating Agreement, the Zillionaire 1031 Agreement and the Zillionaire Resolution are

valid, binding, and enforceable documents; and that the Zillionaire Amended and Restated Operating Agreement is the operative operating agreement for Zillionaire.

<u>Declaratory Judgment (Pinetree Plaza Count III)</u>

Pinetree LLC seeks a decree from this Court that Charanjeev acted within the authority granted to him by Maharaja in executing a quitclaim deed to Crown Assets for Maharaja's interest in Pinetree Plaza, or, alternatively, that his actions were subsequently ratified by Petitioners.

This Court has "jurisdiction to grant declaratory judgments under the Declaratory Judgment Act, which states "[i]n a case of actual controversy within its jurisdiction … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration …." *King v. Skolness (In re King),* 624 B.R. 259, 272-273 (2020) (quoting 28 U.S.C. § 2201).

As discussed in detail herein, the evidence at trial showed both sides of the family agreed to the Maharaja Transfer to settle a family debt. The evidence further showed Charanjeev used a corporate resolution purportedly signed by Vineet in his alleged capacity as Maharaja's sole member that granted Charanjeev authority to execute a quitclaim deed on Maharaja's behalf transferring its interest in Pinetree Plaza to Crown Assets. The resolution was recorded with the deed.

At trial, Shaneel provided credible testimony that Charanjeev acted with authority when he facilitated the Maharaja Transfer. Shaneel testified that Charanjeev told him the Maharaja Transfer was part of the family splitting and dividing multiple properties they jointly owned. Shaneel further testified that Sahib and Vineet came to Shaneel's office in Norcross in October 2019 and told him personally that they had given up their interest in the Pinetree Plaza. From these conversations, Shaneel believed and testified that going forward he would be dealing with

Charanjeev and Karan's side of the family in all matters related to Pinetree Plaza. Shaneel continues to do business with both sides of the family, and Petitioners failed to discredit him, strengthening the credibility of his testimony.

The preponderance of evidence and testimony at trial establishes Charanjeev acted with authority when he facilitated Maharaja's interest in Pinetree Plaza to Crown Assets, and that Vineet and Sahib, and by extension Maharaja, ratified Charanjeev' conduct through their subsequent admissions to Shaneel in October 2019.

Thus, under the Declaratory Judgment Act, the Court grants Pinetree LLC's request for relief under Count III of the Counterclaim and decrees that the resolution recorded with Maharaja's quitclaim deed to Crown Assets is a valid, binding, and enforceable document, that Charanajeev acted with proper authority when he executed the deed, and that title to Pinetree Plaza is 100% vested in Pinetree LLC.

<u>Crown Parties' Claims for Breach of Operating Agreements (Counts I and IX)</u>

<u>Count I: Breach of the King Group Operating Agreement by Sahib</u>

The Court has concluded that the King Group Amended and Restated Operating Agreement dated January 6, 2017, was the valid and binding document between the parties until Karan gave up his interest in King Group on August 14, 2019 as part of the August 2019 Agreements. This resolved any claims or damages Karan had arising from Sahib's breach of the King Group Amended and Restated Operating Agreement dated January 6, 2017 because the breaches of duty damaged King Group and Karan no longer has any interest in the company. Therefore, the Crown Parties are not entitled to relief for any breach of the January 6 Operating Agreement by Sahib, and so Count I is denied.

Count IX: Breach of the Zillionaire Operating Agreement and Zillionaire 1031 Agreement by King Group

The Zillionaire Amended and Restated Operating Agreement and the Zillionaire 1031 Agreement are valid and binding documents on King Group and Crown Assets because they are the members of the company.  The operating agreement of Zillionaire is similar to that of the King Group Amended and Restated Operating Agreement dated January 6, 2017. (*Compare* Resp. Ex. 2 *with* Resp. Ex. 31.)

The Zillionaire 1031 Agreement is a cooperation agreement entered into to facilitate a 1031 exchange, which will eventually allow the parties to remove 90 Hunters Chase and 3180 Atlanta Highway from Zillionaire.  King Group, through Sahib's actions, has caused injury to Crown Assets, namely by contacting the lender on 90 Hunters Chase – Gelt Financial, LLC – and alleging false claims against Crown Assets and other Crown Parties and filing an improper lis pendens on Gelt Financial's collateral.  There is no question that the breach of the Zillionaire 1031 Agreement by King Group through Sahib's actions was a primary cause for Gelt Financial calling the loan in default and penalizing Crown Assets and Karan with default interest, fees and charges.

The total amount of the damages caused by King Group acting through Sahib with respect to the loan from Gelt Financial, LLC on account of the default caused by King Group's breach of the Zillionaire Agreements is $163,420.14 (the "Gelt Financial Damages").[44]  This amount is based

---

[44] This amount is arrived at as follows.  The 10% late fee charged upon acceleration on the full principal balance of $485,000 equals $48,500.  Although the Confession of Judgment provided for attorney's fees of $85,000, Gelt Financial acknowledged at the hearing on the objection to its proof of claim that it would only seek $40,000 in attorney's fees and provided invoices to substantiate that claim, so the Court will apply the lesser figure here.  Finally, the difference between the highest rate of non-default interest of 15% ($202 per day) and default interest on the note of 24% ($323.23 per day) is $121.23 per day.  There have been 618 days from the default caused by King Group and Sahib's wrongful actions and the entry of this Order, so the total amount of damage on account of default interest is $74,920.14.  These total $163,420.14.

on the complaint filed by Gelt Financial, LLC for which it obtained a confession of judgment against Karan discussed previously and in footnote 46.[45]

As discussed herein, Crown Assets has suffered damages as a result of King Group's actions.  Therefore, because King Group has breached the Zillionaire Agreements, Crown Assets is entitled an award of damages against King Group under this Count in the amount of $163,420.14.

<u>Crown Parties' Claims for Breach of Fiduciary Duties (Count II)</u>[46]

In order to prevail on a breach of fiduciary duty claim, the claimant must establish (i) the existence of a fiduciary duty, (ii) the breach of that duty, and (iii) damage proximately caused by the breach. *Wells Fargo Bank v. Cook,* 332 Ga. App. 834, 842 (1)(b) (2015).  A managing member of a limited liability company owes a fiduciary duty to both the company and any other member, which is independent from his contractual duties. *Niloy & Rohan, LLC v. Sechler,* 335 Ga. App. 507, 511 (2016) (citations omitted).  A breach of that duty may give rise to liability separate and apart from that stemming from a contractual breach. *Id*. at 512 (citations omitted).

Karan alleges that he has a claim against Sahib because Sahib was and is the managing member of King Group and, therefore, he owed a fiduciary duty separate and distinct from the duties he owed under the terms of the January 6  Operating Agreement and that Sahib breached

---

Crown Assets did not sufficiently prove that the other amounts charged by Gelt Financial were on account of the default caused by King Group and Sahib.

[45] To the extent this Court or the Pennsylvania state court concludes that Gelt Financial is not entitled to some or all of the interest and charges awarded above, or if either Court concludes that Gelt Financial is owed more on account of accruing attorney's fees and default interest, the Court will entertain a Motion under Fed. R. Bankr. P. 9024 to adjust the amounts awarded to the Crown Parties as part of the Gelt Financial Damages.

[46] The Crown Parties elected not to pursue Counts IV or V because they were duplicative of Counts II and III.

his duty to the other member of King Group – Karan, by engaging in various breaches of the operating agreement and Prohibited Transactions as defined in the January 6 Operating Agreement.  Basically, Karan alleges that Sahib diverted funds, which can be found to constitute a breach of a fiduciary duty. *See Sechler,* 335 Ga. App. at 510-512.

While the Court finds that Sahib owed Karan a fiduciary duty, the Court finds that Karan did not carry his burden of proof that Sahib diverted funds to the detriment of King Group in a way that damaged Karan while he was a member.  In addition, Karan gave up his interest in King Group as part of the consideration for the August 2019 Transactions, so he would not otherwise be entitled to any damages Sahib may have caused to King Group.

<u>Crown Parties' Claims for Tortious Procurement of Breach of Fiduciary Duties (Counts III and X)</u>

Georgia authorizes a claimant to recover damages upon proof of the following elements: (i) through improper action or wrongful conduct and without privilege, the defendant acted to procure a breach of the primary wrongdoer's fiduciary duty to the claimant, (ii) with knowledge that the primary wrongdoer owed the plaintiff a fiduciary duty, the defendant acted purposely and with malice and the intent to injure, and (iii) the defendant's wrongful conduct procured a breach of the primary wrongdoer's fiduciary duty, and (iv) the defendant's tortious conduct proximately caused damage to the plaintiff. *Insight Tech., Inc. v. FreightCheck, LLC,* 280 Ga. App. 19, 25-26 (2006) (citations omitted).

<u>Tortious Procurement of Breach of Fiduciary Duties by Vineet Concerning King Group (Count III)</u>

As discussed *supra*, Sahib owed a fiduciary duty to Karan under the January 6 Operating Agreement and as the managing member of King Group.  The Crown Parties argue that Vineet worked alongside Sahib in attempting to injure Karan and that Vineet knew that Sahib owed Karan

a fiduciary duty, even though Vineet was <u>not</u> a member of King Group after 2017, but was still a signatory on the bank accounts and intimately involved with the day-to-day activities of the company,  that Vineet and his father Meharban wanted to procure Vineet's "share" back in King Group and therefore decided to work alongside Sahib with the actions that Sahib took against Karan and in violation of his fiduciary duty, that such actions amount to malicious behavior and Vineet had an intent to injure Karan, that Vineet's actions in helping Sahib caused Sahib to breach his fiduciary duty owed to Karan and for the same reasons discussed *supra*, Vineet's actions proximately resulted and caused Karan to suffer damages.

The Court finds that the Crown Parties did not carry their burden of proof that Vineet tortiously procured Sahib's breach of his fiduciary duty owed to Karan in connection with King Group, including that the Crown Parties' testimony was that Vineet told them that Sahib had gone rogue, which implies that Sahib was acting on his own.

<u>Tortious Procurement of Breach of Fiduciary Duties by Sahib and Vineet Concerning Zillionaire (Count X)</u>

The Crown Parties argue that Sahib and Vineet were instrumental in causing Gelt Financial, LLC to declare the loan on 90 Hunters Chase in McDonough, Georgia in default which resulted in Gelt Financial, LLC tacking on default interest and other charges to the loan, as well as filing a confession of judgment action in Pennsylvania.

King Group, as a signatory on the Zillionaire Amended and Restated Operating Agreement, and the managing member of Zillionaire, did owe Crown Assets a fiduciary duty.  Crown Assets argues that King Group, through the actions of Sahib aided by Vineet, breached that fiduciary duty, that their actions amount to malicious behavior, and they had an intent to injure Crown Assets, that these actions caused King Group to breach its fiduciary duty owed to Crown Assets and that Crown Assets has suffered damages as a proximate result of Sahib and Vineet's actions.

The Court finds that Crown Assets has met its burden of proof that Sahib, but not Vineet, tortiously procured King Group's breach of its fiduciary duty owed to Crown Assets in connection with Zillionaire and that Crown Assets is entitled to damages against Sahib for $163,420.14, the same amounts awarded to Crown Assets for King Group's Breach of the Zillionaire Agreements in Count IX and not in addition thereto.

<u>Crown Parties' Claims for Indemnification (Counts VII and XII)</u>

Georgia recognizes "two broad categories of indemnity: as created by contract, as between a surety and a debtor; and under the common law of vicarious liability, as between principals and agents." *Dist. Owners Ass'n v. AMEC Envtl. & Infrastructure, Inc.,* 322 Ga.App. 713, 716 (2013). "[T]he words of a contract of indemnification must be construed strictly against the indemnitee, and every presumption is against an intention to indemnify." *Firmani v. Dar-Court Builders, LLC,* 339 Ga. App. 413, 425 (4) (2016). Interpretation of a contract is normally a question of law to be resolved by the court and if there is no ambiguity then the contract is simply enforced according to its terms. *Viad Corp. v. United States Steel Corp.,* 343 Ga. App. 609, 614 (2017) (citations omitted). Terms such as "arising out of" are construed relatively broadly under Georgia indemnity law. *See id.* at 615.

<u>King Group Indemnification of Karan (Count VII)</u>

Because Karan gave up any interest he had in King Group as part of the consideration for the August 2019 Transactions, he is not entitled to indemnification under the King Group Operating Agreement. Accordingly, the claim under Counterclaim Count VII is denied.

<u>Zillionaire Indemnification of Debtor (Count XII)</u>

The Crown Parties contend the Petitioners' claims, as well as the claims of Gelt Financial, LLC, are "arising in connection" with Zillionaire and, therefore, fall under the indemnification clause of the Zillionaire Amended and Restated Operating Agreement.

Although the Court agrees that some of the claims of Petitioners and Gelt are arising in connection with or related to Zillionaire, those claims are not within the scope covered by the Zillionaire Amended and Restated Operating Agreement with respect to the indemnification of its members.  The claim of Gelt Financial is with respect to Zillionaire in its capacity as a guarantor rather than as a member of Zillionaire.  The claims of Petitioners are not against Crown Assets in its capacity as a member of Zillionaire.  Accordingly, the claim under Counterclaim Count XII is denied.

<u>Crown Parties' Claims for Tortious Interference, Defamation, and Defamation Per Se (Counts XVIII, XIX, and XX)</u>

The Crown Parties allege that Sahib and Vineet defamed them. To succeed on their claims for defamation, the Crown Parties must prove: (i) a false and defamatory statement concerning them, (ii) an unprivileged communication to a third party, (iii) fault by Sahib and/or Vineet amounting to at least negligence, and (iv) special harm or the "actionability of the statement irrespective of special harm." *Mathis v. Cannon,* 276 Ga. 16, 20-21 (2002) (citing Restatement (Second) of Torts (1977)).  Special damages or harm is not required if there has been an imputation of a crime or defamation concerning one's trade, profession, or business. O.C.G.A. § 51-5-4; *see also Jones v. Poole,* 62 Ga.App. 309 (1940) (imputation of a crime); *Strange v. Henderson,* 223 Ga.App. 218 (1996) (trade, profession, or business).  If a private figure is defamed, then a negligence standard for the element of fault applies. *Mathis,* 276 Ga. at 21.

The elements for tortious interference are similar to those of defamation and are addressed *infra.*

Regarding the element of a false and defamatory statement, the Crown Parties point to at least three (3) e-mails – the Keller Williams E-mail, the TC Federal E-mail, and the Gelt Financial E-mail – that Sahib sent to third parties and also an affidavit that Sahib filed and one which the Crown Parties allege Vineet filed in the real estate records in Thomas County, Georgia.

The Court finds that the statements made in the above referenced e-mails and the affidavit filed by Sahib in Thomas County, Georgia, were false and they were certainly defamatory as Sahib claimed that Crown Assets, Karan and Charanjeev were committing fraud, had violated certain laws, and were under investigation by the FBI.  There is no indication or evidence that these were somehow privileged communications; rather they were made out of court and prior to any litigation being brought against the Crown Parties.  They were made to third parties, those being persons associated with Keller Williams, TC Federal Bank, and Gelt Financial, LLC.

The Court has found the evidence showed that Sahib acted with requisite intent and willfulness to cause a default under the loans at issue and to trouble Karan and Charanjeev in their business dealings – there is no other reason to contact the lenders and Charanjeev's employer and no other likely consequence of his actions.  Because Karan and Charanjeev are private individuals, this conduct exceeds the mere negligence standard of fault applicable to this situation.  Finally, special damages or harm is not required in this situation as the defamatory statements imputed criminal activity against Crown Assets, Karan, and Charanjeev.  The actions also defamed their trade, profession, or business – the buying and selling and financing of real estate – so they are entitled to general damages that naturally flow from Sahib's tortious actions without any proof of a specific amount. O.C.G.A. § 51-12.2(a).

88

And the defamatory statements were not sent to random third parties, but they were specifically directed to Charanjeev's broker and two current lenders in an attempt to cause problems with Charanjeev's job and to default Crown Assets and Karan under the loans they were obligated on with TC Federal Bank and Gelt Financial, LLC.

In fact, as discussed herein, Gelt Financial, LLC did declare a default on the loan with 90 Hunters Chase in McDonough, Georgia and sued Karan in Pennsylvania for his guarantee on the loan, in which the communication from Sahib was specifically mentioned.  TC Federal Bank delayed some of the loan draws and also filed a lawsuit naming Karan and Charanjeev as defendants in the Superior Court of Thomas County.  From the complaint filed by Gelt Financial, LLC, it appears it began accruing default interest on or shortly after the lis pendens was filed against its collateral, so the connection between Sahib's actions and Gelt Financial, LLC's response – and resulting harm to the Crown Parties – cannot be ignored.

So even though special damages or harm is not required, it is clear from the evidence at trial that Crown Assets, Karan, and Charanjeev have suffered damages as a result of Sahib's defamatory statements.  Therefore, Sahib is liable to Crown Assets, Karan, and Charanjeev for tortious interference, defamation, and defamation per se.  These damages consist of $163,420.14 in favor of Crown Assets for the Gelt Financial Damages referred to above, and the aggregate of $20,000 to Karan and Charanjeev for general damages.

The Court finds that the Crown Parties did not carry their burden on this claim against Vineet because they did not introduce into evidence the title affidavit he allegedly signed and filed in Thomas County.  Vineet did testify that he filed one "similar" to what Sahib filed, but "similar" is not sufficient in the eyes of this Court because it is too vague and indefinite, particularly when

the document was readily available on the public record and, therefore, should have been easy to produce.

<u>Pinetree Plaza Tortious Interference with Contractual Relations (Count II)</u>

Pinetree LLC contends that Sahib's recording of his title affidavit and his unsolicited, intentional contacts with TC Federal tortiously interfered with Pinetree LLC's contractual relationships with both the bank and its tenants at Pinetree Plaza.

The elements for tortious interference with contractual relations are: "(1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff." *Disaster Servs. v. Erc P'ship*, 228 Ga. App. 739, 740, 492 S.E.2d 526, 528 (1997).

The evidence at trial shows Sahib acted intentionally and with malice to disrupt Pinetree LLC's relationship with TC Federal, and by extension, Pinetree LLC's tenants, when he filed the title affidavit and contacted the bank. As previously discussed, Shaneel testified that in October 2019, Sahib and Vineet admitted to him they had given up all their interest in Pinetree Plaza. Nine months later, and after Pinetree had borrowed $1.5 million, Sahib recorded a contrary affidavit improperly contesting Maharaja's transfer of its interest in Pinetree Plaza to Crown Assets, and Pinetree LLC's complete ownership of the property.

The evidence further showed that Sahib was neither a member of Pinetree LLC nor a borrower with respect to the Pinetree Plaza when he recorded his title affidavit and contacted the bank, disrupting Pinetree LLC's access to its loan. Karan and Charanjeev further testified at trial that Sahib's actions caused the bank to delay disbursing loan funds for Pinetree LLC to maintain

its construction schedule, harming Pinetree LLC's relationship with both the bank and its contractors. Delayed construction and access to loan funds proximately caused Pinetree LLC to miss its contractual construction delivery deadline with its tenant, Ollie's Bargain Outlet, resulting in damages of $60,000 that had to be paid to Ollie's. To the extent Pinetree LLC sought additional damages, it failed to provide sufficient evidence for the Court to award any additional amounts.

The Court finds Sahib's tortiously interfered with Pinetree LLC's contractual relationships with TC Federal and Ollie's Bargain Outlet, and as a result proximately caused Pinetree LLC to incur damages of $60,000.00. Thus, this Court grants Count II of the Counterclaim.

### Crown Parties' Claim for Uniform Deceptive Trade Practices Claim (Count XVII)

O.C.G.A. § 10-1-373(a) provides the Court with authority to enjoin actions that violate the Uniform Deceptive Trade Practices Act. Based on the evidence before the Court, the Court concludes that Petitioners' conduct was not within the scope of the UDTPA so Count XVII must be denied.

### King Package Claims

### Tortious Depravation of Membership Interest in King Package, Inc. (Count XIV) and Fraud by Sahib (Count XV)

Sahib is a 50% shareholder in King Package. The Crown Parties allege that Charanjeev and Jonika used their personal credit cards to place approximately $93,120.44 in King Group, as was customary with the family members, that was then used to fund King Package and, in return, both Sahib and Karan were supposed to obtain an interest in King Package, along the 50/50 split the family members had generally adhered to. Instead, they allege Sahib retained the full interest for himself and never provided Karan an interest in King Package even though Karan and other Crown Parties participated in the business for a period of time. In 2020 Crown Assets received a $5,000 payment, alleged to be a distribution, from King Package.

The Crown Parties have not satisfied their burden of proof on these claims. King Package was formed well before August 2019, so the Crown Parties had sufficient time to obtain an interest in King Package if they were supposed to have one. Also, the Crown Parties could have obtained an interest in King Package as part of the August 2019 Transactions – an easy bill of sale or other agreement for the transfer of an interest in a company from one member to another – but they did not do that then like they did with Maharaja. Furthermore, Charanjeev and Jonika did not meet their burden of proving that the money they loaned to King Group was intended specifically for obtaining an interest in King Package as opposed to merely being a loan to King Group for which they may have a claim against King Group for repayment. Therefore, the Court denies Counts XIV and XV of the counterclaims.

<u>Fraud Concerning Karan's Membership Interest in King Group (Count V)</u>

The Crown Parties allege that the evidence at trial established that Sahib and Vineet participated in a scheme regarding Karan's membership interest in King Group. While the Court does agree the evidence showed that Sahib – as opposed to Vineet – participated in such a scheme as shown by the January 9 Operating Agreement, the Crown Parties did not meet their burden to show that Vineet participated in such a scheme. The evidence also showed that Karan gave up his interest in King Group as part of the consideration for the August 2019 Transactions when he signed his interest over to Sahib, thereby rendering moot any damages Karan could claim as part of any scheme.

Therefore, neither Sahib nor Vineet is liable to Karan for fraud under this Count, so Count V is denied.

Fraud Regarding and Unjust Enrichment Regarding Credit Card Balance Transactions (Counts XXI, XXII, XXIII)

As was the normal course of business between the parties, the parties' credit cards were used to fund King Group through balance transfers and cash advances. King Group would then pay back those amounts before interest started to accrue.

Jonika claimed her credit card was used to fund King Group for at least $172,247, which credit card balance was discussed by Charanjeev and Sahib and written on sticky notes at the August 15, 2019 meeting in Mr. Haber's office regarding the August 2019 Transactions. She alleges that these amounts have not been paid back to date, even though promised by King Group and Sahib and that at least $91,664.11 in interest has accrued on her credit cards.

First, Jonika did not carry her burden of proof at trial that this amount was not included in the $374,000 of family debt that was paid in the Maharaja Transfer. The fact that it may have been identified on a sticky note does not necessarily mean the parties agreed King Group would pay it except to the extent it was included in the consideration for the Maharaja Transfer. Furthermore, there were no other efforts made to collect it – including by text or email – after the Maharaja Transfer, even though the parties other than Sahib were still communicating amicably - which leads the Court to conclude that it was included in the consideration for that transfer.

With respect to Jarnail, his credit card was used to fund King Group for at least $36,021. King Group then paid those amounts back to Jarnail's credit card in 2019. However, in June 2020, Sahib reported these transfers totaling $36,021 as fraudulent, which resulted in that amount being placed back on Jarnail's credit cards. As discussed herein, Sahib had no basis for reporting the transfers as fraudulent, and they in fact had benefitted King Group. Jarnail asserts that $9,365 in interest has accrued on his credit cards.

The evidence at trial established that Sahib and King Group participated in a scheme regarding Jarnail's credit card balances with the specific intent to harm Jarnail for which Jarnail suffered damages as a direct and proximate result of such actions. There was simply no basis for Sahib's actions in charging back Jarnail's credit cards other than to seek to hurt Jarnail as some form of leverage or retribution.

Also, there was no evidence produced at trial that any interest had accrued on either Jonika's or Jarnail's credit card other than their testimony. For example, no monthly statements were admitted into evidence showing the interest that had accrued and monthly statements would have been the easiest and most credible way to prove the interest accrual.

Therefore, the Court finds Sahib and King Group are not liable to Jonika for her credit card balances, but the Court does finds that Sahib and King Group are liable jointly and severally to Jarnail for the principal amount of his credit card balances in the amount of $36,021.00.

<u>Slander of Title</u>

<u>Crown Parties</u>

The Crown Parties claim that the Petitioners slandered title to their properties by placing wrongful *Notices of Lis Pendens* in connection with this lawsuit. This claim was included by the Crown Parties in the Joint Pretrial Order entered by the Court [Adv. Doc. 153 at p. 25] although it was not in the counterclaims raised in the pleadings.

Federal Rule of Civil Procedure 15(b)(2), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 15, permits issues to be tried by consent where they have not previously been raised in the pleadings. Specifically, the Rule states "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." In addition, a "failure to amend does not affect the result of

the trial of that issue."  The Petitioners did not object[47] and evidence was presented at trial to substantiate this claim.  Therefore, the Court will consider the claim to have been tried through the consent of the parties because it was in the agreed upon Amended Pre-Trial Order, even though it is not expressly set forth in the Counterclaims.

In order to prevail on a slander of title claim, the claimant must establish that (i) it is the owner of the property, (ii) the uttering and publishing of slanderous words, (iii) that the words were false, (iv) that they were malicious, and (v) that the claimant sustained special damages. *Giles v. Swimmer,* 290 Ga. 650, 652 (2012) (citing and quoting *Latson v. Boaz,* 278 Ga. 113, 114 (2004). The special damages must be specific. *Latson,* 278 Ga. at 114-115; *see also S. River Farms v. Bearden,* 210 Ga. App. 156, 158 (1993) (plaintiffs lost a contract for sale and were required to obtain a cancellation of the lis pendens in order to sell other property); *Compris Tech., Inc. v. Techwerks, Inc.,* 274 Ga. App. 673, 680-681 (2005) (evidence of damages that claimant lost an equity investment with IBM and spent in excess of $500,000 in defending and settling certain lawsuits to remove any cloud from its title to software).

A wrongful lis pendens may serve as the basis for a slander of title claim. *McChesney v. IH Riverdale, LLC,* 307 Ga. App. 77, 81 (2010).  While lis pendens are generally subject to an absolute privilege under O.C.G.A. § 51-5-8 as a pleading filed in court, O.C.G.A. § 51-5-9 provides the following:

> In every case of privileged communications, if the privilege is used merely as a cloak for venting private malice and not bona fide in promotion of the object for which the privilege is granted, the party defamed shall have a right of action.

*See also Morton v. Gardner,* 155 Ga. App. 600 (1980).

---

[47] Had Petitioners objected, the Crown Parties could have filed a motion to amend the counterclaims to add the claim but did not have to do so because of the Amended Pre-Trial Order.

The evidence at trial and in the record showed that the Petitioners filed their initial complaint in the Superior Court of Fulton County and asserted equitable liens and constructive trusts against several parcels of real property owned by the Crown Parties. The alleged factual basis for some of these claims was that money was used from the TC Federal Bank Loan to purchase the properties. The lis pendens filed against the 90 Hunter's Chase Property was allegedly based on the loan from Gelt Financial being unauthorized. Another property on which a lis pendens was placed was the Jarnail Family residence at 7530 St. Marlo County Club Parkway, but the Court is not aware of any reason that one was filed.

These properties and owners are as follows:

| Property Address | Owner(s) on Title | Ownership | Loan Obligor(s) or Guarantor(s) |
|---|---|---|---|
| 7530 St. Marlo Country Club Parkway, Duluth, GA 30097 | Charanjeev Singh | Individual | Charanjeev Singh |
| 90 Hunters Chase, McDonough, GA 30253 | Debtor and Zillionaire Assets LLC | Tenants in Common | Debtor; Karan Ahuja; and Zillionaire Assets LLC |
| 325 Crooked Stick Drive, Milton, GA 30004 | Debtor | LLC | Debtor and Karan Ahuja |
| 1604 E Oglethorpe Boulevard, Albany, GA | Debtor and 1604 E Oglethorpe Blvd LLC | Tenants in Common | Debtor; Shaneel Lalani; Karan Ahuja; 1604 E Oglethorpe LLC; Billionaires Funding Group, LLC; 2505 S Main Street LLC; and 4319 Covington Hwy LLC |
| 140 W Dykes Street, Cochran, GA | 140 W Dykes LLC | LLC | Debtor; Shaneel Lalani; Karan Ahuja; 1604 E Oglethorpe LLC; Billionaires Funding Group, LLC; 2505 S Main Street LLC; and 4319 Covington Hwy LLC |
| 2505 S Main Street, Moultrie, GA | 2505 S Main Street LLC | LLC | Debtor; Shaneel Lalani; Karan Ahuja; 1604 E Oglethorpe LLC; Billionaires Funding Group, |

| | | | LLC; 2505 S Main Street LLC; and 4319 Covington Hwy LLC |
|---|---|---|---|
| 4319 Covington Highway, Decatur, GA | Debtor and 4319 Covington Hwy LLC | Tenants in Common | Debtor; Billionaires Funding Group, LLC; 4319 Covington Hwy LLC; Karan Ahuja; Shaneel Lalani |

Around the time the Petitioners filed their initial complaint, they recorded lis pendens against these properties. These lis pendens have remained on these properties since then and according to the Crown Parties, forced Crown Assets to file for bankruptcy protection, which is credible because Crown Assets is in the business of buying, selling, and refinancing real estate and lis pendens make doing that impossible.

At trial, when specifically asked about the factual basis for the equitable lien and constructive trust claims brought against the Crown Parties, Sahib admitted they had no such basis. There was also no documentary evidence presented that would support the factual allegations for the equitable lien and constructive claims asserted by the Petitioners, and Sahib knew or should have known the Gelt Financial loan was authorized based on the Zillionaire Agreements and the Zillionaire Resolution he signed.

The Court finds that there is no other explanation for the filing of the lis pendens except that the Petitioners intended to use them merely as a cloak to vent private malice and as a sword for leverage in this litigation. This constitutes a malicious use. *See Jordan v. Hancock,* 91 Ga. App. 467 (1955) (when the communication is made maliciously with conscious knowledge that the communication is false, there is an abuse of the privilege). This does not constitute a bona fide promotion, so the absolute privilege under O.C.G.A. § 51-5-8 would not apply.

Simply put, the lis pendens were wrongful and are not protected by the privilege. Finding that the lis pendens were wrongful and not protected by the privilege, the evidence established that

these properties were owned by the respective claimants as discussed *supra* and that the words were malicious and false.

The Crown Parties allege that they could not sell or refinance these properties because of the lis pendens.  This is a typical purpose and consequence of the filing of a lis pendens and Sahib knew or should have known that.  This allegedly resulted in the Crown Parties having to pay higher interest rates to Westmoore Lending totaling $184,062, having to make a payment of $88,000 to reduce monthly payments on these properties, and having to make a payment of $25,000 to Westmoore Lending to extend the maturity date on the loan for these properties.  The Crown Parties also showed that Crown Assets had to file this bankruptcy in order to continue operating and alleged that they have been unable to make repairs to properties and have incurred additional credit card debt totaling $400,000.  In addition, they had to defend the claims brought by Petitioners in this adversary proceeding and incurred hundreds of thousands of dollars in attorney's fees and costs doing so.  Although the types of damages alleged by the Crown Parties are the type one would expect to incur on account of a lis pendens being filed, no evidence was presented at trial regarding the Westmoore Lending costs alleged by the Crown Parties, nor were any credit card statements for any of the individuals or Crown Assets admitted that showed the alleged $400,000 in extra costs.  While the Court is confident that the wrongful placing of lis pendens on the properties had severe adverse effects on the Crown Parties and has found that the filing of the lis pendens caused the bankruptcy filing of Crown Assets, the Crown Parties did not meet their burden of proving the amount of damages in regard to Westmoore Lending or the credit card charges, but the Petitioners are liable to the above-referenced Crown Party property owners for slander of title with respect to the Gelt Financial Damages and also for the cost of defending the various actions that have resulted from the lis pendens and litigating to have them removed.

Accordingly, the Crown Parties are entitled to damages in the aggregate amount of $163,420.14 for the Gelt Financial Damages and $346,000.00[48] against the Petitioners, jointly and severally, for the attorney's fees they have incurred regarding the defense of their title in response to the slander of title, for a total of $509,420.14.

Pinetree LLC Count I

Pinetree LLC asserts a claim for slander of title under Count I of its Counterclaim for Sahib's recording of an affidavit in the public records of Thomas County, Georgia falsely impugning Pinetree LLC's 100% ownership in and title to Pinetree Plaza.

The Court heard testimony and evidence at trial that Pinetree LLC acquired 100% of the interest in Pinetree Plaza on January 16, 2020, to obtain the TC Federal Loan, and that as consideration for Crown Asset's transfer of interest, Karan, Crown Asset's sole member, became a 50% member in Pinetree LLC concurrent with the loan.

Shaneel testified that in October 2019, Sahib and Vineet admitted they had given up all their interest in Pinetree Plaza; however, in June 2020, Sahib recorded an affidavit in the real estate records of Thomas County, Georgia contesting Maharaja's transfer of its interest in Pinetree Plaza to Crown Assets, and Pinetree LLC's complete ownership of the property.

Sahib's title affidavit and his contact with TC Federal caused Pinetree LLC to experience construction delays and incur difficulty in obtaining its loan funds to cover construction costs and also incur attorney's fees to remove the cloud on its title. These construction and funding delays directly caused Pinetree LLC to pay its tenant $60,000 that it otherwise would not have been required to pay but for the delays caused by Sahib's false statements. In addition, Pinetree LLC

---

[48] After reviewing the attorney's fees statements, the Court found that about 80% of the fees incurred by the Crown Parties were related to the slander of title and the defense of their title, although the amount could arguably be higher because it is difficult to separate out much of the work because it is so interrelated.

incurred attorney's fees and costs in defending this action and prosecuting its counterclaim of $100,581.07.

The Court further finds Sahib's title affidavit and conduct with regard to contacting TC Federal were malicious because the evidence shows he took these actions months after admitting he had surrendered any interest he or his side of the family claimed in Pinetree Plaza.

The Court finds that Pinetree LLC presented sufficient testimony and evidence that it incurred special damages totaling $60,000 as well as attorney's fees of $100,581.07 and grants its claim for slander of title against Sahib under Count I of its Counterclaim. The $60,000 awarded here is duplicative of the amounts awarded in Count II of Pinetree's Counterclaims and not in addition hereto. The attorney's fees awarded are also duplicative and not in addition to those awarded elsewhere to Pinetree LLC.

Conspiracy (Counts VI, XI)

The Crown Parties seek to hold Sahib and Vineet jointly liable for the damages awarded by the Court under Counts I through V.  As the Court has denied these counterclaims it does not need to reach the conspiracy issue regarding them. They also seek to hold Sahib and Vineet jointly liable for the damages awarded by the Court under Counts IX and X. The Court has found that King Group, through the actions of Sahib but not Vineet, is liable to the Crown Parties for breach of the Zillionaire Amended and Restated Operating Agreement.  Similarly, Count X was granted as to Sahib but not Vineet.  Therefore, the Court does not need to reach the conspiracy issue as to these Counts, so they are denied.

Respondents' Claims for Damages and Attorney's Fees

Before specifically considering the Respondents' requests for punitive damages and attorneys' fees, the Court will briefly summarize its findings of this case that relate to these claims.

Petitioners had the burden of proof on their claims that the Crown Parties extorted millions of dollars of properties from them on the threat that the Crown Parties would spread a lie about the moral character of the Petitioners' sister – the niece of Jarnail and Jonika and cousin of Charanjeev and Karan, who they all grew up with – to ruin her wedding and this threat was sufficient to give them no choice but to give into the Crown Parties' demands.  They filed this lawsuit (a) knowing they had no written evidence and only a snippet of one voice recording that they could try to argue supported the existence of the alleged threats, (b) knowing it was likely the Respondents would have substantial text or other messages between them and evidence of a course of business and personal dealings between them that would contradict their story, (c) knowing they made false allegations in their Verified Complaint, (d) knowing that sometime either shortly before or after filing the case, they destroyed or otherwise failed to preserve evidence of communications between the parties which should have been preserved, and (e) knowingly placed lis pendens on properties for which they knew they had no evidentiary basis at the time of filing and, in the case of 90 Hunters Chase, knew or should have known they actually signed agreements and a corporate resolution that authorized Crown Assets to obtain such a loan on that very property.  Nevertheless, they pursued a litigation strategy that placed lis pendens or filed title affidavits on Respondents' properties which they knew would harm the Respondents.  As the case progressed, they heard or saw the testimony of Shaneel Lanali – one of their very own business partners – destroy their story with respect to the Maharaja Transfer, first in an affidavit and then reaffirmed in a deposition, but they pressed on with no credible evidence to counter the credibility of his testimony at trial.  That is a foolish and risky litigation strategy that makes it appear the claims were brought primarily to harass the Respondents and force or pressure them to pay something to resolve the matter.  But the Respondents did not give in to that pressure and instead filed counterclaims to, among other things,

clear the title to their properties and seek to recover damages for the harm the Petitioners caused them.  The Petitioners are now faced with the consequences of their foolish and risky litigation strategy.

<u>Crown Parties' Attorney's Fees and Costs of Litigation Under O.C.G.A. § 13-6-11</u>

The Crown Parties seek recovery of attorney's fees and expenses of litigation against the Petitioners under O.C.G.A. § 13-6-11.  That statute reads as follows: "[t]he expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them." O.C.G.A. § 13-6-11.  If the trial court sits as a trier of fact, it may grant attorney's fees or litigation expenses under O.C.G.A. § 13-6-11. *Covington Square Assoc. v. Ingles Mkts.,* 287 Ga. 445, 446 (2010).

The Court has found that the Petitioners filed their claims in the Second Amended Complaint and previous iterations of the complaint, including filing lis pendens against certain properties owned by the Crown Parties, without probable cause and with a specific intent to harass and harm the Crown Parties, which caused the Crown Parties to file some or all of their counterclaims.  Such actions amount to bad faith under O.C.G.A. § 13-6-11.  Some of the claims brought by the Petitioners also did not amount to a bona fide controversy and the Petitioners were stubbornly litigious or caused the Crown Parties unnecessary trouble and expense. *See WMI Urban Servs., Inc. v. Erwin,* 215 Ga. App. 357 (1994).

The Crown Parties' counsel presented evidence of their law firm's billing statements, the work that members of the law firms completed on this case, and why such work was necessary in this adversary proceeding.  The Court has thoroughly reviewed those billing statements and finds that the

102

amount of work completed, and the rates of counsel and the law firm attorneys and staff are reasonable for litigation in adversary proceedings pending before this Court. The Court further finds that the amount of work and attorney's fees and costs incurred by the Crown Parties and awarded by the Court were necessary in this adversary proceeding.

Thus, the Crown Parties, are entitled to a judgment in the aggregate amount of $367,000 of the $431,947.80 they requested against the Petitioners, jointly and severally, for the reasonable and necessary attorney's fees and costs they incurred in this adversary proceeding pursuant to O.C.G.A. § 13-6-11.[49] These fees and costs include the same fees and costs awarded to the Crown Parties based on their slander of title claim, so those amounts awarded for that slander of title claim are not in addition to the ones awarded hereto pursuant to O.C.G.A. § 13-6-11.

Pinetree Plaza Attorneys' Fees (Count V)

Pinetree LLC also asserted a claim for attorney's fees and costs incurred in this adversary proceeding under O.C.G.A. § 13-6-11.

As discussed herein, the evidence at trial showed that Sahib and Vineet admitted to Shaneel in October 2019 that they had given up all their interest in Pinetree Plaza and that Vineet received

---

[49] The general rule is that an award of attorney's fees "must be apportioned to those … fees attributable to claims on which the plaintiff prevailed." *Fowler's Holdings, LLLP v. CLF Family Investments, L.P.,* 318 Ga. App. 73, 75 (2) (2012). However, the claims in this lawsuit "are so similar that it would be too difficult to separate the hours spent on each" and therefore the Crown Parties are not required to allocate their counsel's hours between successful and unsuccessful claims. *Krayev v. Johnson,* 327 Ga. App. 213, 223 (citing *Campbell v. Beak,* 256 Ga. App. 493, 498(5) (2002)). The Court will nevertheless make a downward adjustment of 15% of the amounts sought by the Crown Parties to account for some of the work that was more likely attributed to the unsuccessful counterclaims such as Counts I-VIII, XI, XII, XIV-XVII, and XXII of the Counterclaims and some of Petitioners' claim that were unrelated to the counterclaims, but the vast majority of the work was clearly related to the successful counterclaims which were really at the heart of this case, those being for slander of title, defamation, tortious interference, Jarnail's credit card, the breach of duty related to Zillionaire and the declaratory judgment related to Zillionaire in Counts such as IX, X, XIII, XVIII, XIX, XX, XXI and XXIII. The Court therefore finds that the Crown Parties are entitled to damages for the attorney's fees incurred by them from Rountree Leitman and Klein LLC in the amount of $280,000 of the requested $329,416.79 and from Matt Thiry Law LLC in the amount of $87,000 of the requested $102,531.01.

an email from the USDA on August 21, 2019, specifically about the transfer of ownership of the property, that he merely forwarded to Charanjeev to handle.  Yet, in June 2020, Sahib recorded a contrary affidavit in the real estate records of Thomas County, Georgia contesting the Maharaja Transfer, Crown Assets' transfer to Pinetree LLC, and Pinetree LLC's complete ownership of the property.

The evidence showed that Sahib also contacted TC Federal which caused Pinetree LLC to experience construction delays and incur difficulty in obtaining its loan funds to maintain its construction efforts at Pinetree Plaza.  These tortious intrusions damaged Pinetree LLC's relationships with its lender, contractors, and tenant, and warrant an award of punitive damages against Sahib to deter any future improper conduct set forth below.  Petitioners continued to pursue their baseless claims against Pinetree and defend against Pinetree's counterclaims even after the repeated testimony from Shaneel Lalani, a business partner of theirs, contradicted their story on multiple occasions.

The Court finds Petitioners filed their claims in the Complaint against Pinetree LLC without probable cause and with a specific intent to harass and harm Pinetree LLC, particularly given their prior admissions that they surrendered any interest in Pinetree Plaza, which claims resulted in Pinetree LLC filing its counterclaims.  Such actions amount to bad faith under O.C.G.A. § 13-6-11.

Pinetree LLC's counsel presented evidence of his law firm's billing statements, the work that he and members of his law firm completed on this case, and why such work was necessary in this adversary proceeding.  The Court has thoroughly reviewed those billing statements and finds that the amount of work completed, and the rates of counsel and his law firm attorneys and staff are reasonable for litigation in adversary proceedings pending before this Court.  The Court further finds that the

amount of work and attorney's fees and costs incurred by Pinetree LLC were necessary in this adversary proceeding in the prosecution of its claims.  Thus, Pinetree LLC, is entitled to a judgment in the amount of $100,581.07 against Petitioners, jointly and severally, for the reasonable and necessary attorney's fees and costs it incurred in this adversary proceeding.

<u>Punitive Damages for Crown Parties and Pinetree LLC (Count IV)</u>

The Crown Parties and Pinetree LLC seek recovery of punitive damages against the Petitioners. To authorize the imposition of punitive damages, there must be evidence of willful misconduct, malice, fraud, wantonness, or oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences. *Speir Ins. Agency, Inc. v. Lee,* 158 Ga. App. 512 (1981); O.C.G.A. § 51-12-5.1.

"A conscious indifference to consequences relates to an intentional disregard of the rights of another." *Tyler v. Lincoln,* 272 Ga. 118, 120(1) (2000).  The burden of proof on a request for punitive damages is heightened to the "clear and convincing evidence" standard. *Zieve v. Hairston,* 266 Ga. App. 753 (2004).

The evidence presented at trial clearly and convincingly established that Sahib and Vineet intentionally disregarded the rights of the Respondents and willfully and maliciously brought frivolous claims against the Crown Parties and Pinetree LLC, willfully and maliciously filed baseless notices of lis pendens against most if not all of the properties owned by Respondents, and willfully and maliciously made false and defamatory statements against some of the Crown Parties with the specific intent of harming the Respondents.  The willful and malicious committing of multiple torts by Sahib and Vineet against the Crown Parties and Pinetree LLC entitles the Respondents to an award of punitive damages against Sahib and Vineet in order to punish and deter Sahib and Vineet from repeating their actions in the future.

105

Therefore, the Court awards the Crown Parties punitive damages in the aggregate amount of $75,000 against Sahib and King Group, jointly and severally, and in the aggregate amount of $7,500 against Vineet[50] and in the amount of $10,000 in favor of the Pinetree LLC and against Sahib and Vineet, jointly and severally.

Accordingly, it is hereby ORDERED as follows:

1.  All of Petitioners' Claims set forth in Counts I through XXIII or in the Amended Pre-Trial Order, if any, are DISMISSED;

2.  The following Counts in the Counterclaims of the Crown Parties are DISMISSED: I, II, III, IV, V, VI, VII, VIII, XI, XII, XIV, XV, XVI, XVII, and XXII.

3.  The following Counts and Claims in the Counterclaims of the Crown Parties are GRANTED, in whole or in part, and damages awarded as follows:

    (a) With respect to Count IX and Count X of the Crown Parties' Counterclaims, Count IX is GRANTED with respect to King Group and Count X is GRANTED as to Sahib, and is DENIED as to Vineet, and Crown Assets is awarded a judgment of $163,420.14 against King Group and Sahib, jointly and severally;

---

[50] Because the Court awarded the attorney's fees discussed above, it awarded a lower amount of punitive damages than it otherwise would have had it not been able to do so. Had the Court not awarded, or been able to award, as much or any of the attorney's fees it would have increased the punitive damages by the amount of attorney's fees it did not or could not have awarded.

(b) With respect to Counts XIII, XIX, and XX of the Crown Parties' Counterclaims, Crown Assets is entitled to a declaratory judgment that the Zillionaire Operating Agreement and the Zillionaire Internal Agreement were and continue to be valid, binding and enforceable agreements;

(c) With respect to Count XVIII of the Crown Parties' Counterclaims, it is GRANTED with respect to Sahib but DENIED with respect to Vineet, and Crown Assets is awarded a judgment of $163,420.14 against Sahib which is the same damages awarded for Counts IX and X and not in addition thereto; and Charanjeev and Karan are awarded a judgment against Sahib, but not Vineet, in the aggregate amount of $20,000, which amount is in addition to any other amounts awarded herein;

(d) With respect to Count XXI and XXII of the Crown Parties' Counterclaims, these are GRANTED with respect to King Group and Sahib but DENIED with respect to Vineet, and Jarnail is awarded a judgment of $36,021.00 against King Group and Sahib, jointly and severally, and these Counts are DENIED with respect to Jonika's claims;

(e) With respect to the claim for Slander of Title by the Crown Parties, this claim is GRANTED with respect to Sahib but DENIED with respect to Vineet, and the Crown Parties are awarded a judgment in the aggregate amount of $509,420.14 against Sahib which consists of attorney's fees (also awarded as part of the attorney's fee claim under O.C.G.A §13-6-11) and the Gelt Financial Damages awarded in Counts IX and X and is not in addition thereto;

(f) With respect to the claim for Attorney's Fees by the Crown Parties pursuant to O.C.G.A. § 13-6-11, this claim is GRANTED against all of the Petitioners, and the

Crown Parties are awarded a judgment in the aggregate amount of $367,000 against all the Petitioners, jointly and severally, all but $21,000 of which amount is a part of and not in addition to the amount of attorneys's fees awarded for the slander of title; and

(g) With respect to the claim for Punitive Damages by the Crown Parties, this claim is GRANTED with respect to Sahib, Vineet and King Group, and the Crown Parties are awarded a judgment in the aggregate amount of $75,000 against Sahib and King Group, jointly and severally, and in the aggregate amount of $7,500 against Vineet;

4. The following Counts and Claims in the Counterclaims of Pinetree LLC are GRANTED, in whole or in part, and damages awarded as follows:

(a) With respect to Count I of the Pinetree Counterclaims, the claim is GRANTED against Sahib and Pinetree LLC is awarded a judgment in the amount of $160,581.07 against Sahib which includes the Ollie's Lease Damages and attorney's fees;

(b) With respect to Count II of the Pinetree Counterclaims, the claim is GRANTED against Sahib and Pinetree LLC is awarded a judgment in the amount of $60,000 against Sahib which represents the Ollie's Lease Damages, so it is not in addition to the amounts awarded in Count I;

(c) With respect to Count III of Pinetree, LLC's Counterclaims, Pinetree, LLC is entitled to a declaratory judgment that the deed transferring Maharaja's interest in the property located at 2551 East Pinetree Boulevard, Thomasville, Georgia to Crown Assets was and is a valid, binding and enforceable deed, that the deed

transferring Crown Assets' interest in that property to Pinetree, LLC was and is a valid, binding and enforceable deed, that Pinetree, LLC is the sole and exclusive owner of the property located at 2551 East Pinetree Boulevard, Thomasville, Georgia and that none of the Petitioners have any rights, claims or interests in or to that property or its income or the membership interests in Pinetree, LLC;

(d) With respect to the claim for Attorney's Fees by Pinetree, LLC set forth in Count V of its Counterclaims, this claim is GRANTED, and Pinetree, LLC is awarded a judgment in the aggregate amount of $100,581.07 against all the Petitioners, jointly and severally, which amounts were also included in the judgment against Sahib in Count I and are not in addition thereto; and

(e) With respect to the claim for Punitive Damages by Pinetree, LLC set forth in Count IV of its Counterclaims, this claim is GRANTED with respect to Sahib and Vineet, and Pinetree, LLC is awarded a judgment in the amount of $10,000 against Sahib and Vineet, jointly and severally;

5. Further, the notices of lis pendens recorded in the real estate records by Petitioners in connection with this litigation and any title affidavits they filed are cancelled of record. The Crown Parties and Pinetree may file a copy of this Order or the Judgment entered concurrently herewith in the real estate records of each county where Petitioners recorded notices of lis pendens or a title affidavit, with marginal references for each notice of lis pendens directed to each Clerk of Superior Court or, at their request, they may submit supplemental judgments specifically limited to the lis pendens or title affidavit on each

property at issue in this case if that would make it easier for recording and title purposes; and

6. All Respondents shall have a judgment in their favor against all of Petitioners, jointly and severally, for all costs of this action. Interest shall accrue on all monetary judgments at the federal legal rate.

[END OF ORDER]